1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6     JOEL THOMAS TOLER,

7          Plaintiff,

8     Vs.                              CASE NO. CIV. S-06-0735 LKK

9     DAVID PAULSON, COUNTY
      OF SOLANO, AL GARZA,
10    BROOK BYERLEY, and DOES
      1 THROUGH 10, inclusive,

11

12         Defendants.

13    _____/

14

15

16                      ---o0o---

17              REPORTER'S TRANSCRIPT

18         EXCERPT FROM TRIAL PROCEEDINGS

19           TRIAL TESTIMONY OF AL GARZA

20    FRIDAY, AUGUST 14TH, 2009 - TUESDAY, AUGUST 18TH, 2009 -

21            WEDNESDAY, AUGUST 19TH, 2009

22                      ---o0o---

23

24

25    Reported by:                CATHERINE E.F. BODENE,
                                  CSR. No. 6926

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

```
 1                         APPEARANCES

 2                          ---o0o---

 3

 4   For the Plaintiff:

 5           GONZALEZ & LEIGH, LLP
             Two Shaw Alley, 3rd Floor
 6           San Francisco, California  94105

 7           BY:  MATT GONZALEZ, Attorney At Law
             BY:  MATT SPRINGMAN, Attorney At Law
 8

 9

10

11   For the Defendants:

12            PORTER SCOTT
              350 University Avenue, Suite 200
13            Sacramento, California  95825

14            BY:  TERENCE J. CASSIDY, Attorney At Law

15

16

17

18

19

20

21

22

23

24

25                          ---o0o---
```

```
1                      EXAMINATION INDEX

2                         ---o0o---

3

4    FOR THE PLAINTIFF:

5        EXAMINATION:                                    PAGE

6

7      AL GARZA (ADVERSE WITNESS)

8      (Friday, August 14th, 2009)

9         Cross-Examination by Mr. Gonzalez              1

10

11

12     (Tuesday, August 18th, 2009)

13        Continued Cross-Examination by Mr. Gonzalez    35

14

15     (Wednesday, August 19th, 2009)

16        Direct Examination by Mr. Cassidy              77
          Recross-Examination by Mr. Gonzalez            124
17        Redirect Examination by Mr. Cassidy            157
          Further Recross-Examination by Mr. Gonzalez    161
18

19

20

21

22

23                        ---o0o---

24

25
```

1

1     SACRAMENTO, CALIFORNIA

2          FRIDAY, AUGUST 14TH, 2009 - AFTERNOON SESSION

3                    ---o0o---

4          (Excerpt from trial proceedings.)

5          THE COURT:  Call your next witness, sir.

6          MR. GONZALEZ:  Al Garza.

7                         AL GARZA,

8     was thereupon called as a witness herein by the Plaintiff,

9     and having been sworn to tell the truth, the whole truth and

10    nothing but the truth, was thereupon examined and testified

11    as follows:

12         THE CLERK:  Please, take a seat.

13         State your name, spell your last name and speak

14    directly into the microphone.

15         THE WITNESS:  Yes.  My name is Al Garza.  Last name

16    is spelled G-a-r-z-a.

17              CROSS-EXAMINATION (ADVERSE WITNESS)

18    BY MR. GONZALEZ:

19    Q.     Good afternoon, Mr. Garza.

20    A.     Good afternoon, Mr. Gonzalez.

21    Q.     I want to direct your attention to Plaintiff's

22    Exhibit 14.  First, you're an investigator in the Solano

23    County District Attorney's Office?

24    A.     Yes, sir, I am.

25    Q.     And you've been doing that for how long?

2

1    A.      I've been at the District Attorney's Office in Solano
2    County since 1990.
3    Q.      Okay.  I want to direct your attention to People's
4    14.  Do you have -- The binders are there.  The black one
5    apparently.
6    A.      I'm sorry?
7    Q.      Is that the wrong one?
8    A.      Exhibit 19?
9    Q.      14?
10   A.      14.
11   Q.      I believe it is the Declaration of Al Garza in
12   Support of Application for Injunctive Relief Against
13   Workplace Violence.
14           Do you see that?
15   A.      Yes, I do.
16   Q.      You're familiar with that?
17   A.      Yes, sir, I am.
18   Q.      This was something that you signed on June 14th?
19   A.      Yes, it is, sir.
20   Q.      And it related to an incident that you had with Tom
21   Toler on June 13th?
22   A.      Yes.
23   Q.      I want to ask you just to get this out of the way.
24   Was your first interaction with Tom Toler on June 13th?
25   A.      I remember a phone call I had prior to that with him.

3

1    Q.      Prior to 2005?

2    A.      Yes.  Prior to June 13th, 2005, yes.

3    Q.      Did it involve the matters that have been the subject

4    of this lawsuit?

5    A.      No, sir.

6    Q.      All right.

7            Was there anything about that interaction with Tom

8    Toler that would have given rise to criticism of you?

9    A.      No.

10   Q.      So when Mr. Godwin testified to the derogatory

11   remarks Tom Toler had made to him about you, you understood

12   that they were based on your interaction with him in this

13   matter?

14           MR. CASSIDY:  Objection.  Calls for speculation.

15           THE COURT:  He's asking his understanding, but I'm

16   not sure his understanding is relevant, sir.

17           MR. GONZALEZ:  I'll ask it differently.

18   BY MR. GONZALEZ:

19   Q.      In this matter the first time you interacted with Tom

20   Toler was June 13th; is that correct?

21   A.      Yes, sir.

22   Q.      And at some point you directed William Godwin to

23   prepare memos and reports to start memorializing Tom Toler's

24   visits to the DA's Office, correct?

25   A.      I believe that I asked him -- I assigned him to

4

1    investigate the report that he was coming to complain about

2    in our office.  So he was assigned to investigate that.

3    Q.      All right.

4    A.      In a report form.

5    Q.      Just follow me here.

6    A.      Okay.

7    Q.      Now, Mr. Godwin wrote the first one April 12th, 2005;

8    is that correct?

9    A.      Yes, sir.

10   Q.      And do you have any memory that in that report that

11   Mr. Godwin prepared that he indicated that Tom Toler had been

12   disparaging of you in any way?

13   A.      Not that I can remember, sir.

14   Q.      All right.

15           The other reports that Mr. Godwin wrote were all

16   written after you sought a TRO; isn't that correct?

17           THE COURT:  You saw a TRO?

18           MR. GONZALEZ:  Sought the TRO.

19           MR. CASSIDY:  Objection.  Misstates the evidence.

20           THE COURT:  Well, he's asking whether it is correct.

21   If it is not correct, I'm sure Mr. Garza will be able to say

22   so.

23   BY MR. GONZALEZ:

24   Q.      Mr. Garza, I'm not trying to mislead you in any way

25   so let's go through them.

5

1          Do you have People's 6.

2          THE COURT:  There are no People's here.

3    BY MR. GONZALEZ:

4    Q.     Plaintiff's 6.  Excuse me.

5    A.     May I answer one -- Well -- No.

6    Q.     Do you see that's a memo prepared by William Godwin

7    on April 12th.  That's the day the ad was taken out in the

8    Daily Republic?

9    A.     Yes, sir.

10         MR. CASSIDY:  That's the same problem.  It is 7.

11         MR. GONZALEZ:  It is dated --

12         THE COURT:  Gentlemen, Mr. Cassidy, I'm going to

13   invite you to do what I invited Mr. Gonzalez.  If you want to

14   go out and chat, go out in the hall.  If you would like to

15   express a legal objection, you direct them to the Court.

16         MR. CASSIDY:  Objection, Your Honor.  The witness's

17   attention, I think, is directed to Exhibit 7, not 6.

18         I apologize.

19   BY MR. GONZALEZ:

20   Q.     Is that the investigative report by William Godwin of

21   April 12th?

22   A.     Yes, sir.  I have Plaintiff's Exhibit 6 marked here

23   April the 12th, 2005.

24         MR. CASSIDY:  Good.  Sorry.

25         MR. GONZALEZ:  I accept your apology.

6

1    BY MR. GONZALEZ:

2    Q.      Now, take a look at that.  There is nothing in that

3    that relates to any disparaging remark about you in that; is

4    that correct?

5    A.      No, sir, not that I see.

6    Q.      Now, my records show that the other memos prepared by

7    Mr. Godwin are dated June 14th, June 16th, June 20th, all of

8    them after you sought the TRO.

9            Is that your memory or shall we go through each one?

10   A.      I don't remember seeing the reports to tell you the

11   truth.  It would have been my supervisor, which was Brook

12   Byerley, who was supposed to be reviewing and approving those

13   reports -- the written reports.

14   Q.      Let me ask you the question that I'm really

15   interested in which is you heard Mr. Godwin talking about the

16   disparaging things Tom Toler said about you?  You heard that

17   today?

18   A.      Yes, sir.

19   Q.      And he said that he would update you and Mr. Byerley,

20   who he was calling Bryerley (sic.), but Mr. Byerley, he would

21   keep you updated, including the various insults being hurled

22   at you, right?

23   A.      Yes, sir.

24   Q.      And I'm asking you, did he ever tell you that Tom

25   Toler had insulted you prior to the submission of your

1  declaration in support of the TRO?

2  A.     During the course of his investigation he told me

3  about the disparaging remarks on -- during the investigation

4  because I expected at least for him to brief me on what he

5  was doing.

6          THE COURT:  The question, sir, is timing.

7          THE WITNESS:  The timing?

8          THE COURT:  The question is was it before or after

9  the TRO had been sought, if you can remember?

10         THE WITNESS:  It had to be before that, before June

11  13th.

12  BY MR. GONZALEZ:

13  Q.     Wouldn't it have to be afterwards, Mr. Garza, because

14  you -- your first substantial interaction with him was the

15  day before you prepared the declaration?

16  A.     No, sir.  He briefed me on through the investigation

17  and would tell me about those things.

18  Q.     No.  I know that he was briefing you and was telling

19  you about disparaging remarks, but disparaging remarks that

20  involved you only occurred after you had filed a declaration

21  in this matter seeking the TRO?

22         MR. CASSIDY:  Objection.  That misstates the

23  evidence.

24         THE COURT:  Well, it wasn't a question.  It was

25  testimony.  You haven't been sworn, sir.

8

 1          MR. GONZALEZ:  No.  No.  Come on.  Your Honor, that's

 2     not fair.

 3          THE COURT:  I'm sorry that you feel that way,

 4     Mr. Gonzalez.

 5          Sir, the written reports are all -- with the

 6     exception of the first one, are all after you sought --

 7     strike that -- after the TRO was sought, correct?

 8          THE WITNESS:  Correct.  Yes, sir.

 9          THE COURT:  All right.

10          And your meeting with Mr. Toler was the day before

11     the TRO was sought, correct?

12          THE WITNESS:  Yes, sir.

13          THE COURT:  Would there have been any occasion that

14     you had any communication with Mr. Toler before that first

15     meeting?

16          THE WITNESS:  No, sir.

17          THE COURT:  So any disparaging remarks had to be

18     after the first meeting; right or wrong?

19          THE WITNESS:  Disparaging remarks from Mr. Toler?

20          THE COURT:  About you personally.  Not about

21     Mr. Byerley, about you.

22          THE WITNESS:  No, sir.  That's not correct.

23          THE COURT:  All right.

24     BY MR. GONZALEZ:

25     Q.    All right.

9

1        Tell me the first time Mr. Godwin related to you that

2   Tom Toler had made a disparaging remark about you?

3   A.      As he testified today, he would brief me when he

4   talked and met with Mr. Toler.  During those times after he

5   had finished talking, interviewing and assisting Mr. Toler in

6   this investigation, he would let me know and advise me that

7   "Mr. Toler really hates you, Al."

8   Q.      All right.

9        Mr. Garza, let me just ask you.  The way it looks is

10  we've got four reports from William Godwin.  The first one is

11  dated April 12th identified as Plaintiff's 6.  The second one

12  is dated June 14th.  It's Plaintiff's 8, I believe.  The next

13  one is June 16th, which is Defendant's G.  I'm sorry.  Yeah.

14  Defendant's G.  And then the fourth one is June 20th, which

15  is Defendant's H.

16       Now, the first one came out after and is, in fact,

17  labeled "Response to Daily Republic Article."  The next three

18  all came out after your interaction with Tom Toler and

19  seeking of the TRO; is that correct?

20       MR. CASSIDY:  Objection.  It is argumentative.

21       THE COURT:  No.  You may answer, sir.

22       THE WITNESS:  I'll have to look at them again.

23  BY MR. GONZALEZ:

24  Q.      Let me ask you a different question.

25       You're the chief investigator in the office?

1    A.      Yes, sir.

2    Q.      So isn't it odd that William Godwin is looking into

3    the threats case by Tom Toler, but only prepares memos after

4    there's been something written in the paper?

5    A.      It is odd because as a law enforcement officer he

6    should prepare a report immediately after he has finished,

7    after the incident, after the interview, at the time those

8    things take place.

9    Q.      So --

10   A.      Those are supposed to be prepared at that time.

11   That's the proper way to do it, yes.

12   Q.      So even though Mr. Godwin has generated four

13   different memos in this matter, can you tell me with any

14   degree of certainty for instance what day Mr. Godwin met with

15   Richard Oawster?

16   A.      No, I can't, sir.  I can't tell you.

17   Q.      Even though these four reports were generated, none

18   of them say that on this particular date I went to meet with

19   Mr. Oawster and this is what I learned?

20   A.      No, I can't.  I cannot give you an honest answer to

21   that.  I don't know.

22   Q.      But you'll concede that if this investigation were

23   being done properly, this kind of information would be noted

24   when it took place so that people's memories are good and

25   we're not speculating as much as to what people said?  I mean

11

1    we have a better memory of it, right?

2    A.      Most definitely, sir.  That's the way it is supposed

3    to be done.

4    Q.      Now, I want to direct your attention back to People's

5    14 -- I'm sorry -- Plaintiff's 14.

6            First off, Tom Toler did not go to the District

7    Attorney's Office to the reception window and ask to speak to

8    you, Mr. Garza; is that correct?

9            MR. CASSIDY:  Objection.  Calls for speculation.

10           THE COURT:  It does.  I mean he wasn't there when he

11   first approached.

12           MR. GONZALEZ:  All right.

13   BY MR. GONZALEZ:

14   Q.      In the declaration in the second paragraph, line 26,

15   you indicated that "Tom Toler was in the lobby asking to see

16   me"; is that correct?

17   A.      Yes, sir.  That is correct.

18   Q.      And at a deposition, when you were deposed January

19   19th, 2006, what's been labeled Plaintiff's 18 --

20           THE COURT:  Depositions are not received into

21   evidence, but go ahead.  It doesn't matter.

22           MR. GONZALEZ:  Marked.  Excuse me.

23           MR. CASSIDY:  What was the page?  I'm sorry.

24           MR. GONZALEZ:  I am looking at it now.  It is page

25   16, line 22.  You said that --

12

1          THE COURT:  Through?

2          MR. GONZALEZ:  Well, 22, 23.  The question is a

3     little bit before that, from 19 to 23.

4     BY MR. GONZALEZ:

5     Q.     So it says -- part of the question is:

6            (READING):

7            Is it your recollection that your staff asked you to

8            go talk to this gentleman or that Mr. Toler mentioned

9            your name and said "I want to see Al Garza?"

10           And you answered:  No.  It is my recollection that

11           the staff asked me to go see him.

12           (READING CONCLUDED.)

13           So is that correct?

14    A.     That's what I said at the deposition, yes, sir.

15    Q.     So I don't want you to speculate, but I want to go

16    back.  There was an objection when I asked you you wrote in

17    your declaration, just for starters, that Tom Toler went to

18    the lobby asking to see you.

19           Is that correct?

20    A.     On the declaration, yes, I wrote that.

21    Q.     But that wasn't exactly the truth, was it?

22    A.     Well, staff told me that Mr. Toler is out there

23    asking for Al Garza.

24    Q.     Say again?

25    A.     Staff was telling me that Tom Toler is asking for Al

13

1   Garza.

2   Q.      Let me go backwards then and maybe set this up

3   differently.

4           You understand that the declaration you were

5   submitting was going to be reviewed by a court and considered

6   for whether or not it was going to place restrictions on what

7   Mr. Toler could and could not do; is that correct?

8   A.      Yes, sir.

9   Q.      So you took the declaration seriously when you

10  prepared it; isn't that right?

11  A.      Most definitely.

12  Q.      And you wanted it to be a complete representation of

13  your office's interaction with Tom Toler?

14  A.      As much as possible, yes, sir.

15  Q.      And you wanted to be sure that the things contained

16  within the declaration were accurate?

17  A.      Correct.

18  Q.      All right.

19          So just for starters, I know it is not -- you know,

20  it is not the biggest point that I'm going to make in this

21  declaration, but just for starters you start out telling the

22  judge that Tom Toler came to the office seeking to speak to

23  you, but that was not true, was it?

24          MR. CASSIDY:  Objection.  Misstates his testimony.

25          THE COURT:  Well, it conflicts with the testimony in

14

1    your deposition.  Which is correct, the deposition or the

2    declaration?

3             THE WITNESS:  I would say the deposition is.

4    BY MR. GONZALEZ:

5    Q.      All right.

6             So you also stated that you recognized Tom Toler from

7    previous contacts with him, but you have indicated today that

8    the previous contact you had with him was by telephone; is

9    that correct?

10   A.      Physical contact, yes.  I mean, yes, you're correct.

11   Q.      And you started the interaction by asking Tom whether

12   or not you could help him; is that right?

13   A.      That's correct.

14   Q.      So when you -- when you said that Mr. Toler

15   immediately stated to me that he wanted to set up an

16   appointment to talk with the District Attorney, that's what

17   you mean.  You said, "What I can do for you?"  He immediately

18   said, "Look, I would like to set up a meeting with the DA,"

19   right?

20   A.      Yes, sir.  That's what he asked me.

21   Q.      All right.

22            And you said:  No problem.  Give me a phone number

23   where I can reach you and after I've talked to Mr. Paulson

24   that you would arrange the meeting.

25            Is that correct?

15

1    A.       Yes, sir.

2    Q.       Now, did your office already have Tom Toler's phone

3    number?

4    A.       They probably did.  Yes, sir.

5    Q.       And you were aware Tom had been to the office

6    numerous times trying to obtain this meeting with Dave

7    Paulson?

8    A.       Yes, sir.

9    Q.       And you understood that he had a number of complaints

10   about the way Dave Paulson's office dealt with constituents

11   and victims?

12   A.       I'm sorry.  The office had a number of complaints?

13   Q.       I'll ask it again.

14            You were aware that Tom Toler was dissatisfied with

15   the customer service that he was getting from the District

16   Attorney's Office?

17   A.       Yes, sir.

18   Q.       And so you knew exactly why he wanted to talk to Dave

19   Paulson, didn't you?

20   A.       No, I didn't.

21   Q.       Well, you knew that he probably wanted to express his

22   dissatisfaction with the way he had been treated?

23   A.       I had an idea, but I really didn't know exactly, sir.

24   I wouldn't know what he was thinking at that point.  That's

25   why I asked him.

16

1        I said:  You know, what's this -- let me know what

2    this is about, Tom, so I can tell Mr. Paulson.

3        As I said in my deposition, this was my thought of

4    thinking.  When I have a meeting, not just any meeting, it is

5    nice to have information beforehand so that we can have an

6    effective -- have all the materials.  And if I need to have

7    other people there, we can do it quickly and efficiently.

8        That was my thought.  I'm sorry.

9    Q.      With all due respect, Mr. Garza, you knew.  I mean,

10   this wasn't the first time that Tom Toler had been to your

11   office in the last couple of months, right?

12   A.      This wasn't the first?

13   Q.      The first time he had been there?

14   A.      No, sir.  It wasn't.

15   Q.      Were you aware he was leaving messages to try to get

16   a phone call back about a meeting with Dave Paulson?

17   A.      I believe somebody told me that, yes.

18   Q.      I mean, you were being briefed about Tom Toler's

19   interaction in the office?

20   A.      Yes.

21   Q.      And can you explain to me why Tom Toler never got a

22   call back about a meeting with Dave Paulson?

23   A.      No, sir.  I wouldn't know that.

24   Q.      And Tom, he responded to you by asking you whether or

25   not you had seen the newspaper article that had just been

17

1   published, didn't he?

2   A.     Yes.

3   Q.     In fact, you had seen the newspaper article, hadn't

4   you?

5   A.     Yes, I had.  Yes, sir.

6   Q.     And, in fact, you're quoted in the article, aren't

7   you?

8   A.     Yes, sir.

9   Q.     And you're quoted in the article saying that Tom has

10  been pretty adamant about wanting to meet Paulson; is that

11  right?

12  A.     Yes, sir.

13  Q.     And so when Tom asked you, "Well, haven't you seen

14  the article," in response to your question "What do you want

15  to meet Dave Paulson about," you told him, "I don't know what

16  you are talking about."

17       Right?

18  A.     Yes, I did.  Yes, sir.

19  Q.     All right.

20       You'll concede, won't you, that when you said that,

21  and you were asked this at your deposition, that was not

22  truthful, was it, when you told him "I don't know what you

23  are talking about?"

24  A.     No, it was truthful.  Yes, sir.

25  Q.     So when he said, "Haven't you seen the article," you

18

1    think it was a truthful response to say "I don't know what

2    you're talking about?"

3    A.     I didn't know which article he was talking about, if

4    it was another more recent article.  And my memory, if I

5    remember, I don't know when –– I don't know if I saw that

6    article that you talked about that I said I did read prior to

7    his contact.

8    Q.     Well, you were quoted in the article, right?

9    A.     Yes, sir.

10   Q.     And you told me that.  And then I asked you whether

11   or not in the article you mention that you were quoted saying

12   that Tom was adamant about meeting your boss and you conceded

13   that was true.

14   A.     That is true, sir.  Yes, sir.

15   Q.     Now you're saying that you're not sure you had read

16   that article or that was the article Tom was referring to?

17   A.     No.  I said I read the article.  I didn't say I read

18   it before Mr. Toler showed up at the lobby.

19   Q.     Do you get quoted in the newspapers a lot?

20   A.     I try not to, sir.

21   Q.     Okay.

22          Now, at your deposition, sir, looking at page 21 of

23   the deposition, beginning line 16.

24          THE COURT:  15 or 16?

25          MR. GONZALEZ:  16.  This is for impeachment.

19

1          THE COURT:  To?

2          MR. GONZALEZ:  To the bottom.

3          THE COURT:  Last?

4          MR. GONZALEZ:  25.

5          THE COURT:  Hang on.

6          MR. GONZALEZ:  (READING):

7          QUESTION:  --

8          THE COURT:  Hang on.

9          MR. CASSIDY:  I don't believe it is proper for

10    impeachment.

11         THE COURT:  Just a minute.

12              (Brief pause.)

13         You haven't asked that question.  There is no reason

14    to think it is impeaching yet.

15         Ask the question.

16         MR. GONZALEZ:  Well, the witness, I think, said he

17    wasn't sure if he had read the article so I'm asking him -- I

18    think that this --

19         THE COURT:  Had you discussed the article with

20    Mr. Paulson prior to the meeting with Mr. Toler?

21         THE WITNESS:  The article that I was quoted in, Your

22    Honor, sir?

23         THE COURT:  That's the only article we've been

24    talking about.

25         THE WITNESS:  I may have talked to Mr. Paulson about

20

1    it briefly, yes.

2          MR. GONZALEZ:  Well, you're stating that in less than

3    certain terms.  I'd like to impeach with this.

4          THE COURT:  You may.

5          MR. GONZALEZ:  All right.  Starting at line 16.

6          (READING):

7          QUESTION:  Prior to the time you met Mr. Toler on the

8          13th of June, you knew that Mr. Toler had caused

9          something to be published in the local newspaper

10         regarding Mr. Paulson?

11         ANSWER:  Yes.

12         QUESTION:  Okay.  Prior to meeting with Mr. Toler on

13         the 13th of June, had you discussed whatever that was

14         Mr. Toler had published in the newspaper, had you

15         discussed that with Mr. Paulson?

16         ANSWER:  We talked about it.

17         (READING CONCLUDED.)

18   By MR. GONZALEZ:

19   Q.    I want to ask you, were you talking with Mr. Paulson

20   about the article that came out June 13th or the

21   advertisement that came out April 12th?

22   A.    Really, I can't remember what -- I believe we were

23   talking about the other two articles.  I can't remember

24   whether we were talking about that June 12th article.

25   Q.    So how long did you talk to Mr. Paulson about those

21

1  other articles?

2  A.      Frankly, I noted that they were there.  There was no

3  in-depth conversation about them.

4  Q.      Three, four, five minutes?

5  A.      No.  It was like maybe five, 10 seconds.  I walked

6  into his office as I normally do in the morning, mentioned

7  that there was some articles.  As a matter of fact, I didn't

8  even know they were the articles.  I don't read the paper.  I

9  don't get the paper.

10          My staff brought some of those articles to me.

11  They're the ones that brought them to my attention.

12  Q.      Let me stop you there, sir.

13  A.      Okay.

14  Q.      You've served on Mr. Paulson's re-election campaign

15  staff, haven't you?

16  A.      I've assisted in his campaign, yes, sir.

17  Q.      You were treasurer of his campaign?

18  A.      Yes, sir.

19  Q.      So how many campaigns have you worked with

20  Mr. Paulson on?

21  A.      I want to say two.

22  Q.      All right.

23          And have you found that elected officials generally

24  care what's written about them?

25  A.      Yes, they do.

22

1    Q.       And particularly any time you're anywhere near an

2    election you're quite interested in what's being written

3    about you?

4    A.       Yes.

5    Q.       And --

6    A.       Probably.

7    Q.       And if you're his Chief Investigator and somebody who

8    has worked on his campaign on top of that, don't you think

9    that if you saw something in the paper that was brought to

10   your attention you would have brought it to his attention?

11   A.       Yes, I would have.

12   Q.       Don't you think that an interaction about an article

13   like that, where somebody is lodging a complaint against the

14   office, is precisely the kind of thing an elected official

15   might want to know about and give concern to?

16   A.       Yes.

17   Q.       And don't you think your conversation with him would

18   be more than five seconds long?

19   A.       We weren't running a campaign.

20   Q.       But you're running an office where you're trying to

21   make sure people are satisfied with services, right?

22   A.       Most definitely.  Yes, sir.

23   Q.       So somebody who is lodging a complaint -- Let me ask

24   it differently.

25            You thought it was important enough to mention to

23

1   him, right?

2   A.      Yes.

3   Q.      How come?

4   A.      Because it was mentioned to me.

5   Q.      But you don't mention everything to Dave Paulson that

6   gets mentioned to you, do you?

7   A.      That's true.  No, sir, I don't.

8   Q.      So it must have had some greater importance than the

9   mere fact it was mentioned to you for you to want to bring it

10  up with Mr. Paulson?

11  A.      To let him know that we saw the article, I've got an

12  investigator on it, it looks like a complaint so we're going

13  to start moving on it.

14  Q.      Okay.  And how long was that conversation with

15  Mr. Paulson?

16  A.      It was -- I usually go in his office in the morning,

17  and I'll check with him on a number of things.  So the entire

18  conversation sometimes runs anywhere from five minutes to

19  depending if we've got some filing -- homicide filing cases

20  or other cases that he needs to be involved in, then it turns

21  into a longer meeting in the morning.

22  Q.      Now, the part of the transcript that we read -- that

23  I read asked you specifically if prior to the 13th you had

24  discussed with Mr. Paulson something Toler had published in

25  the local paper; is that correct?

24

 1    A.      Yes, sir.

 2    Q.      And you indicated in that that you had, in fact,

 3    talked to Mr. Paulson; isn't that right?

 4    A.      Yes, sir.

 5    Q.      And here in court you said you remember talking to

 6    him about a couple of articles that had come out before June

 7    13th; is that correct?

 8    A.      That's correct.  When the two articles were

 9    published, staff brought them to me.  When I had my meeting

10    with him in the morning to touch bases with him, we just Hey,

11    the articles were there, and he said, Yeah, I know the

12    articles are there.  That was about the extent of it.

13    Q.      Okay.  So --

14    A.      We knew they were there.

15    Q.      Okay.  So did Mr. Paulson tell you that he had read

16    them?

17    A.      No.

18    Q.      Did you ask him if he had read them?

19    A.      No.

20    Q.      Did he ask if there was any truth to what this fellow

21    was saying in the article?

22    A.      No, he didn't.

23    Q.      Did that seem unusual to you?

24    A.      No.

25    Q.      Is he generally -- Well, strike that.

25

1          So give me your best estimate as to that meeting with

2     Dave Paulson because there are two meetings before June 13th

3     at least wherein you discuss articles that have been

4     published related to Tom Toler.

5          How long were each of those meetings?

6     A.     I wouldn't be able to tell you.  I can't recall that

7     long ago.

8     Q.     Did you memorialize either one?

9     A.     No, sir.  I don't memorialize any of those meetings.

10    Q.     And is there any way that we can know?

11         Was there anybody else in those meetings that might

12    have heard the conversation and could tell us what they

13    remember about what you said to Mr. Paulson and what he said

14    to you about the articles Tom Toler published prior to June

15    13th?

16    A.     I can't recall.  There may have been somebody there,

17    there may not.  Normally the door's closed.  I go in there

18    and knock in the morning just to let him know I'm there.

19         And if there's -- Like I said, if there's anything

20    that we need to talk about for the day or whatever happened

21    the previous day, we just kind of brief ourselves.

22    Q.     When you told him, "Don't worry, we're talking care

23    of it," did he respond by saying, "What are you talking

24    about?"

25    A.     No.  I told him -- No, he didn't.

26

1    Q.      Did you tell him that there's a complaint in this
2    article or this publication, and I'm assigning someone to
3    deal with the complaint?
4    A.      Yes.  I told him we were looking into it.  Yes, sir.
5    Q.      But did you say what you were looking into?
6    A.      We told him we were looking into this complaint that
7    looked like from the newspaper that Mr. Toler was complaining
8    about his dissatisfied service, that we were going to look
9    into it.
10   Q.      So did you tell Dave Paulson, did you use the name
11   Tom Toler when you told him this person's lodged a complaint
12   and we're going to investigate it?
13   A.      I can't remember if I told him Mr. Toler's name.
14   Q.      But you mentioned to him -- you told him that it
15   related to a complaint of some kind?
16   A.      Yes, sir.
17   Q.      Did he tell you, "Well, what kind of complaint is
18   being made?"
19   A.      No, sir.
20   Q.      Did he give you any indication that he had not read
21   either an article or an advertisement in the paper relating
22   to Tom Toler?
23   A.      He didn't say very much about it.
24   Q.      Okay.
25           When Mr. Toler insulted you, there is a disagreement

27

1    about this Uzi comment.  But if I understand correctly, you

2    believed that Mr. Toler's statement to you was a credible

3    threat; is that correct?

4    A.      Yes, sir.

5    Q.      And did you consider arresting him right on the spot?

6    A.      A lot of things went through my mind at that time.  I

7    wasn't armed so -- I thought he was on his way out.  I was

8    not going to stop him.

9    Q.      Let me ask you this:  Was Tom Toler ever armed when

10   he came into your office?

11   A.      I don't know.  But based on the fact that -- Well, I

12   don't know.

13   Q.      Anybody ever tell you differently, that he was armed

14   when he came into the District Attorney's Office?

15   A.      No.

16   Q.      So you're telling me that -- Well, did you respond

17   when he made this comment?  Did you respond by saying to Tom,

18   "Tom, are you threatening me?"

19   A.      I believe I said:  Why do you have to make these

20   threats against this office?  Why do you have to make these

21   threats here?

22   Q.      All right.

23           And did this seem to you to be a discretionary call

24   on your part, that you could make an arrest and charge him

25   with credible threats -- credible and immediate threats, or

28

1   you could give him a warning or something like that?

2   A.      Yes.  It was discretionary.

3   Q.      And you heard, for instance, Mr. Godwin indicate that

4   when Mr. Oawster lied to him about making a phone call, he

5   immediately just said, "Look, buddy, I know you're lying, and

6   if you do this again I'll be back here and we're going to

7   charge you with a crime."

8           You heard Godwin say something to that effect, right?

9   A.      Correct.  Yes, sir.

10  Q.      Did it occur that you could say to Tom Toler, "Hey,

11  buddy, that's a borderline threat you're making there.  You

12  do that again, and I will arrest you on the spot."

13          Did you consider saying it to him like that?

14  A.      No, I wasn't going to threaten him.

15  Q.      Threaten him with arrest if he continued that

16  conduct?

17  A.      No.

18  Q.      But you yourself are conceding that this was a

19  judgment call about whether or not you should proceed, right?

20  A.      Correct.

21  Q.      And is that because the statement that he made to you

22  was conditional?

23  A.      I perceived it as real given the background, the

24  briefings that I received from Godwin and Mr. Byerley.  Bill

25  Godwin.

29

1 Q. But sir, you have conceded that there was a judgment

2 call that had to be made here about how to proceed, correct?

3 A. Most definitely.

4 Q. And you, after your interaction with Tom Toler, you

5 went and you talked to Dave Paulson about what just happened,

6 didn't you?

7 A. I reported the threat.

8 Q. Right.  But you went to Dave Paulson to tell him what

9 had happened and to try to figure out how to proceed; isn't

10 that right?

11 A. Yes.  I reported the threat.  Yes, sir, I did.  I

12 reported it.

13 Q. Did Dave Paulson say to you, "Al, why didn't you

14 arrest him on the spot?"  "This is a credible immediate

15 threat he's making."

16 A. No, sir, he didn't.

17 Q. You guys discussed how to proceed, didn't you?

18 A. Most definitely.  Yes, we did.

19 Q. Was one consideration that you would have Mr. Toler

20 arrested and have a criminal charge brought against him?

21 A. I wrote a report.  We didn't discuss that.  I wrote a

22 report.  Yes, I did.

23 Q. All right.

24 A. That was --

25 Q. The decision was to obtain a TRO that would not allow

30

1   Tom Toler to enter your office any more; is that correct?

2   A.      Correct.  Mr. Paulson seeked the advice of County

3   Counsel, yes, he did, for assistance.

4   Q.      But you neither arrested Tom Toler or wrote a report

5   about what Tom Toler had said to you until you spoke to Dave

6   Paulson; is that correct?

7   A.      Yes, that's correct.  Yes, sir.

8   Q.      Now, when you said to Mr. Toler, "Why do you have to

9   make these threats" or "You're threatening me" or something

10  to that effect, he said to you, "Fuck it.  You know, Al, you

11  can blow me.  I'm just going back to the newspaper and take

12  out another ad."

13          Is that correct?

14  A.      Yes, sir.

15  Q.      And wouldn't you agree that in a situation where

16  you're trying to decide whether or not something is a threat

17  or not, someone's subsequent statement to you might shed

18  light on whether or not that's a threat?

19  A.      I'm not sure.

20  Q.      Well, you asked him, "Are you making a threat?"

21  A.      Yes, I did.  Yes.

22  Q.      And he didn't say, "You better believe I'm making a

23  threat.  I'll be back here tomorrow to take care of it."  He

24  didn't say that, did he?

25  A.      I really wasn't expecting an answer back from him

31

1    when I asked him if he was making a threat.

2    Q.      But you did get an answer back from him?

3    A.      Yes, I did.

4    Q.      And I asked you first whether or not he said that

5    he's coming back the next day to carry out the threat.

6            He didn't say that, did he?

7    A.      No, sir, he did not.

8    Q.      He made a disparaging remark about you, "You can blow

9    me."  And then he said, "I'm going to go back to a newspaper

10   and take out another ad."

11           That's what he said to you, right?

12   A.      That's correct.  Yes, sir.

13   Q.      And you understood that this was a man that was

14   willing to spend money to take out ads in the paper to let

15   people know how he was feeling about the District Attorney's

16   Office; isn't that right?

17   A.      I don't know if I had that thought right then.

18   Q.      When you went and talked to Dave Paulson, did you say

19   to Dave, "The guy's upset.  I don't think it is a real

20   threat, but he shouldn't have made that statement?"

21   A.      No, I didn't say that.

22   Q.      Did you say to Mr. Paulson, "You know, when I asked

23   him if he was making a threat, he told me, you know, whatever

24   and said he was going to go take out another ad in the

25   newspaper?"

32

1    A.      I did explain to -- I did tell Mr. Paulson exactly

2    what Mr. Toler said to me in the -- in that lobby area by the

3    elevator, yes.

4    Q.      Now, other than the statements that were made in your

5    interaction with Tom Toler on June 13th, you quote Mr. Toler

6    as wanting to shake Dave Paulson's hand as the reason for why

7    he's gone to the DA's Office.

8            Is that correct?

9    A.      I'm sorry.  I said that?

10   Q.      Well, no.  I'm asking you.  I'll look at my notes.  I

11   believe it is paragraph five of your declaration.

12   A.      Okay.

13   Q.      It was reported that Mr. Toler's supposed reason to

14   meet Mr. Paulson was to shake his hand.  That was reported in

15   the newspaper article, and you put that in your declaration.

16           Do you see that?

17   A.      Yes, sir, I do.

18   Q.      Now, you understand that Mr. Toler had been wanting

19   to talk to Mr. Paulson because he was dissatisfied with the

20   way the office had handled his problem; isn't that right?

21   A.      Initially, yes, sir.

22   Q.      So you didn't actually tell the judge -- in your

23   declaration you did not tell the judge that Mr. Toler had

24   ever come to your office as a victim of a threat made against

25   his children, did you?

33

1   A.      No, sir, that's not in the declaration.

2   Q.      And you never told the judge that Mr. Toler had

3   repeatedly tried to get a meeting with the District Attorney

4   to discuss the way his complaint was handled?

5   A.      No, sir, that's not in the declaration.

6   Q.      You elected to take one sentence, one phrase out of

7   an article and portray Mr. Toler as apparently wanting to

8   come to the office to shake Dave Paulson's hand.

9           Is that correct?

10  A.      I'm sorry.  Could you say that one more time, please.

11  Q.      Sir, let me ask you this:  Did you believe that Tom

12  Toler wanted to meet with Dave Paulson to discuss how matters

13  had transpired in the case that he had brought to the

14  District Attorney?

15  A.      I know Mr. Toler wanted to meet Mr. Paulson, yes.  I

16  can't answer as to why.  I can't answer why.

17          THE COURT:  He's asking what you understood at the

18  time you wrote or what you believed at the time you wrote the

19  declaration.

20          Did you believe that the purpose that Mr. Toler

21  wanted to meet Mr. Paulson was to complain about the service

22  he had received from the office?

23          THE WITNESS:  I don't know.

24          THE COURT:  Let me interrupt you.  We agreed we'd

25  stop at four o'clock.

34

1          MR. GONZALEZ:  I'm sorry.

2          THE COURT:  That's all right.  It is four o'clock.

3          Ladies and Gentlemen, we'll reconvene Tuesday at?

4          THE CLERK:  10:30.

5          THE COURT:  10:30.

6          Please, remember the admonition the Court has

7     heretofore given to you.

8          (Off the record at 03:56 PM.)

9                         ---o0o---

10    ///

11    ///

12    ///

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

35

1                       SACRAMENTO, CALIFORNIA

2           TUESDAY, AUGUST 18TH, 2009 - AFTERNOON SESSION

3                            ---o0o---

4           (Excerpt from trial proceedings.)

5           MR. GONZALEZ:  Your Honor, I think we're going to

6    recall Mr. Garza unless there is any other out-of-order

7    requests.

8                THE COURT:  Mr. Garza, resume the stand.

9                We'll take fifteen minutes of it before we take our

10   break.

11               CONTINUED CROSS-EXAMINATION (ADVERSE WITNESS)

12   BY MR. GONZALEZ:

13   Q.      Good afternoon, Mr. Garza.

14   A.      How are you doing there, Mr. Gonzalez?

15   Q.      Good.

16           I asked you on Friday as the chief investigating

17   officer whether you had occasion to review reports that were

18   put together by William Godwin in this matter?

19   A.      Yes, sir, you did.

20   Q.      And first off, I believe I asked you -- we went

21   through what the dates of those reports were.

22           Do you remember that?

23   A.      Correct.

24   Q.      I asked you whether or not you recalled that

25   Mr. Godwin first put together a report on April 12th of 2005,

36

1    and then whether or not he prepared reports on June 14th,

2    16th and 20th.

3            Do you remember that?

4    A.      Yes, sir.

5    Q.      All right.

6            And we -- I asked you, for instance, whether or not

7    Mr. Godwin indicated anywhere in any of the memos that he

8    prepared as to what date he actually met with Richard

9    Oawster.  And you conceded that there is no reference to the

10   date of that meeting.

11           Do you remember that?

12           If not, I'll ask it to you.

13   A.      I can't remember if you asked.

14           I don't remember when -- I can't recall or I don't

15   remember reading anything like that.

16   Q.      All right.

17           Let me ask it to you like this:  Would you agree --

18   You're the chief investigating officer in the Solano County

19   District Attorney's Office.  Would you agree that the best

20   way to preserve facts in a case when you're interviewing

21   witnesses is to try to record that conversation in a writing

22   at or about the time it takes place?

23   A.      I would prefer that they tape record the

24   conversations at the time, but also record it as soon as

25   possible.  Yes, I agree with you.

37

1    Q.     All right.

2    A.     But normal business is the way law enforcement

3    officers are supposed to do that.

4    Q.     So we know that -- do we know -- do you know, sir,

5    having reviewed Mr. Godwin's reports in this case, on what

6    date he met with Mr. Oawster?

7    A.     No, I don't.  I can't recall.

8    Q.     You can't recall what date Mr. Godwin wrote down or

9    are you saying that you --

10          THE COURT:  Do the reports contain a report of the

11   day, as far as you can recall, that Mr. Godwin met with

12   Mr. Oawster?

13          THE WITNESS:  Yes, sir, they do, based on his

14   narrative report.

15   BY MR. GONZALEZ:

16   Q.     All right.

17          Could you -- could you indicate for me which report

18   has a date that he met with Mr. Oawster?

19          And just for your information we're talking about

20   Plaintiff's -- or actually they are all in the defense

21   binder, Defense F, Defense G and Defense H -- or Defendant's,

22   I should say.  These are reports by Godwin, June 14th, June

23   16th, June 20th.  So that's F, G and H, and the April 12th

24   date is Plaintiff's 6.

25   A.     That would be these.

38

1   Q.      Take a minute and look.

2   A.      F and G you said?

3   Q.      F I believe should be the June 14th date?

4   A.      Yes, sir, it is.

5           (Witness reviews exhibit.)

6           Okay.  I read this first defense marked as F.  The

7   report is dated at the top June 14th, 2005.

8   Q.      Mr. Garza --

9   A.      Yes, sir.

10  Q.      I'll just direct you with some questions.  Contained

11  within that memo by Mr. Godwin is the fact that he met with

12  Mr. Oawster; is that correct?

13  A.      Yes, it is, sir.

14  Q.      He doesn't indicate on what date he took -- that

15  meeting took place?

16  A.      I can only -- By reading this report literally, I'm

17  making the assumption that's in the beginning of the summer.

18  He starts off his narrative report on April the 7th.

19          THE COURT:  Sir, the question is really very

20  straightforward.

21          Does he in that report state when he took the -- when

22  he had the meeting with Mr. Oawster?  "Yes" or "no?"

23          THE WITNESS:  No, sir.

24  BY MR. GONZALEZ:

25  Q.      Can you tell me whether or not -- from the totality

39

1    of that writing whether or not the meeting took place in

2    June, May or April?

3    A.      The meeting with Mr. Oawster?

4    Q.      Yes.

5    A.      I couldn't tell you when he met with him based on

6    this report.

7    Q.      Okay.  I want to ask you this:  You heard the

8    testimony of former Investigator Godwin here in court?

9            Do you remember that?

10   A.      Yes, sir.

11   Q.      He testified to a conversation he had with John

12   Colfer and somebody identifying themselves as Mr. Colfer's

13   father.

14           Do you recall that?

15   A.      Yes, sir.

16   Q.      Can you take a look at Defense F, G and H and see --

17   and tell me when Mr. Godwin had such a meeting?

18   A.      (Witness reviews exhibits.)

19           No, sir.  There is no indication here that talks

20   about that.

21   Q.      All right.

22           In fact, there is not an indication of when the

23   meeting took place, but there's also not an indication that

24   the meeting ever took place.

25           Is that correct?

40

1    A.      I don't see that narrative here.  Yes, you're right.

2    Q.      Just so we're clear, do you know of any narratives

3    other than the ones that we've discussed here in court that

4    Mr. Godwin wrote, the June 14th, the June 16th or June 20th

5    reports, and then the April 12th report?

6    A.      No, sir.

7    Q.      And if you want to look at the April 12th report

8    that's Plaintiff's 6.

9    A.      (Witness reviews exhibit.)

10          This is a report by Mr. Byerley, correct?

11   Q.      I'm sorry.  Plaintiff's 6 should be an investigative

12   report by Godwin dated April 12th.

13   A.      This Plaintiff's 6 indicates it's Mr. Byerley's

14   report.

15          MR. GONZALEZ:  If I can approach the witness?

16          (Counsel confers with witness.)

17   BY MR. GONZALEZ:

18   Q.      So you've got it as Plaintiff's 7?

19   A.      Yes, sir.

20   Q.      Does that say Plaintiff's 5 or 7?

21   A.      Plaintiff's Exhibit 7.

22   Q.      My apologies for the confusion.

23          Why don't you take a look at that and see if that has

24   any reference to what we're talking about?

25   A.      (Witness reviews exhibit.)

41

1          I've read it, Mr. Gonzalez.  What was the question?

2          THE COURT:  The question is does he report in that

3  report anything about a meeting with Mr. Oawster?

4          THE WITNESS:  No, sir.

5  BY MR. GONZALEZ:

6  Q.     So Plaintiff's Exhibit 7, you directed -- Strike

7  that.

8          You directed Mr. Godwin to prepare Plaintiff's

9  Exhibit Number 7 which is the investigative report of April

10  12th, 2005?

11  A.     When you say "directed," my conduit is my Supervisor

12  Brook Byerley.  And there are times, correct, I may tell an

13  individual investigator to -- ask them to do something, but

14  the majority of the times those investigators must deal with

15  the supervisor at their level.

16          And I -- we expect these kinds of things to be done,

17  yes.  So I don't -- I can't tell you honestly if I directed

18  him when you say "directed."  I didn't -- I guess it's --

19          THE COURT:  Well, do you recall speaking to

20  Mr. Godwin about writing the report?

21          THE WITNESS:  No, I don't.

22          THE COURT:  Do you recall speaking to Mr. Byerley

23  about writing the report?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  So you asked Mr. Byerley to ask

42

1   Mr. Godwin to write an investigative report?

2          THE WITNESS:  Correct.

3   BY MR. GONZALEZ:

4   Q.      And did you -- were you aware Mr. Godwin did not

5   believe anything had occurred on April 7th that necessitated

6   the writing of a report?

7   A.      No, I wasn't.

8   Q.      And do your investigators have the authority to write

9   a memo or an investigative report if they see an incident in

10  your office that they believe merits that?

11  A.      Do they have --

12  Q.      Do they have the authority to do it?

13  A.      They have the responsibility to conduct an

14  investigation and utilize proper police procedures in writing

15  a police -- narrative police report.

16  Q.      Can you -- do you know -- Strike that.

17          Did you direct Mr. Byerley to have William Godwin

18  respond to the Daily Republic article?

19  A.      No.

20  Q.      You saw the subject line of Mr. Godwin's April 12th

21  memo or investigative report and it says "Response to Daily

22  Republic?"

23  A.      Yes, I did.

24  Q.      Can you think of any reason why an in investigator

25  working underneath you would have been responding to a

43

1    newspaper article?

2    A.      No.  And the only thing I can say is that if I would

3    have reviewed the report, I would have done some editing to

4    that report.  In the first place, we're not working on the

5    Daily Republic news articles.  We're working on his issue and

6    his crime and complaint for the reason Mr. Toler showed up

7    here.

8            And I would have expected these reports to be written

9    immediately after or as soon as possible after the interviews

10   and statements were taken.

11   Q.   Can you think of any reason why Mr. Godwin's reports

12   don't keep a running log of what he's doing on individual

13   days, who he's speaking to or what information he learns?

14           THE COURT:  Folks, I don't want to interrupt, but I'm

15   going to.  We're going to take our recess now.

16           Fifteen minutes, Ladies and Gentlemen.  Please,

17   remember the admonition the Court has heretofore given to

18   you.

19           Sorry to interrupt.

20           MR. GONZALEZ:  Thank you.

21           (Off the record at 02:29 PM.)

22           (Jury seated at 02:50 PM.)

23           THE CLERK:  Please, remain seated.

24           Court is now in session.

25           THE COURT:  Please, be seated everyone.

44

1           Again, I apologize, Mr. Gonzalez.

2           Please continue.

3    BY MR. GONZALEZ:

4    Q.      Mr. Garza, I want to direct you back to Plaintiff's

5    14 which is the declaration that you submitted in support of

6    the application for the injunctive relief against workplace

7    violence?

8    A.      Yes, sir.  I have it in front of me now.

9    Q.      You indicated in that declaration that -- Let me ask

10   you a few questions about it.

11          First off I asked you on Friday whether or not it

12   was -- you understood the importance of giving the judge who

13   would be making the decision of whether or not a TRO should

14   issue a complete picture of what transpired with Mr. Toler?

15   A.      Yes, sir, you did.

16   Q.      And let me ask you this:  You did not in your

17   declaration tell the judge that to your knowledge Tom Toler

18   had no criminal record; is that correct?

19   A.      It is not in the declaration.  Yes, sir.

20   Q.      You did not tell the judge that Mr. Toler was a bail

21   bondsman with a good reputation, did you?

22   A.      No, sir.  That's not in the declaration.

23   Q.      You did not tell the judge anything about the purpose

24   of Mr. Toler's visits to the District Attorney's Office,

25   meaning threats by Mr. Oawster to Mr. Toler's children; is

45

1  that correct?

2  A.      No, sir.  That is not in the declaration.

3  Q.      You did not tell the court that Mr. Toler was a

4  former reserve police officer in a number of different

5  jurisdictions, did you?

6  A.      No, sir.  No.  It is not in the declaration.  Yes,

7  sir.

8  Q.      And as to that matter a number of law enforcement

9  acquaintances had told you that Mr. Toler was a former police

10  officer; is that correct?

11  A.      Yes, sir.

12  Q.      And you had heard nothing negative about his police

13  history; is that correct?

14  A.      That's correct.

15  Q.      You indicated in your declaration that -- I'm looking

16  at number 6 which is on the third page.  I guess it is

17  numerical 6 of your paragraphs.

18          You indicated in your declaration that "Mr. Toler's

19  contacts with the District Attorney's Office have grown

20  increasingly disturbing and volatile."

21          Do you see that?

22  A.      Yes, sir.

23  Q.      Yet you did not in this declaration tell the court

24  anything about Mr. Toler's interactions with Mr. Godwin, is

25  that correct, in terms of what appeared to be a good rapport

46

1   with Mr. Godwin?

2   A.      The way you ask the question, no, sir, there's not

3   that in the declaration.  Correct.

4   Q.      Is there any reference to Mr. Godwin in the

5   declaration?

6   A.      No, there isn't.  No, sir.

7   Q.      In fact, you indicated the increasing disturbing and

8   volatile behavior, you enumerated it indicating that he had

9   acted in a threatening manner on several occasions; is that

10  correct?

11  A.      Correct.

12  Q.      I mean a threatening manner on several occasions

13  culminating in the Uzi incident; is that correct?

14  A.      Correct.  Yes, sir.

15  Q.      So for instance, you tell the court "including on or

16  about March 28th or 29th and April 7th" as dates on which

17  that behavior has taken place by Mr. Toler in the DA's

18  Office?

19  A.      Yes, sir.  That's in the declaration.

20  Q.      All right.

21          As to Mr. Toler's interaction on March 28th and 29th,

22  though, you don't enumerate what behavior Mr. Toler was

23  involved in that was disturbing or volatile; is that correct?

24  A.      Not in the declaration.  You are correct, sir.

25  Q.      And you don't indicate in the declaration what

1    threatening manner he posed or exhibited on March 28th or

2    29th?

3    A.      Well, the declaration does say that he raised his

4    voice in a threatening manner, yes, that's to the extent.

5    Yes, sir.

6    Q.      And so is it -- are you -- Would you concede, sir,

7    that your characterization of his first visit to the office

8    then was simply to tell the court that he had raised his

9    voice and acted in a threatening manner?

10   A.      I'm sorry.  Say that again.

11   Q.      Right.

12           When you use the dates March 28th or 29th, you're

13   talking about Mr. Toler's first visit to your office

14   concerning Mr. Oawster's threat against his children?

15   A.      Yes, sir.

16   Q.      Mr. Garza, let me ask it to you like this:  March

17   28th or 29th, what is the entirety of what you told the court

18   in your declaration as related to Mr. Toler's visit to the

19   District Attorney's Office?

20   A.      This declaration is what the court got with the

21   assistance of County Counsel.  I told the County Counsel

22   everything up to June 13th.

23   Q.      What I'm --

24   A.      With her assistance we prepared this.

25   Q.      What I'm asking you is you make reference to March

48

1    28th or 29th, which I believe I can represent to you here in

2    court that that appears to be Mr. Toler's first visit to the

3    DA's Office.

4           Is that correct?

5    A.     On this issue?

6    Q.     Yes.

7    A.     Yes, sir.

8    Q.     And so I'm asking you, in your declaration, the

9    information that you provided to the court about that first

10   visit, what did you tell the court about that first visit?

11   A.     The court only has my declaration, sir.  So that's

12   what I told the court, the declaration that's in front of

13   him.

14   Q.     Right.  And the only thing in your declaration

15   related to that first visit is the conclusory statement that

16   Mr. Toler had acted in a threatening manner on that date?

17          MR. CASSIDY:  Objection, Your Honor.  Misstates the

18   evidence and is argumentative.

19          THE COURT:  It is not argumentative.

20          You may read whatever you said -- whatever the

21   declaration says about the visit on March the 28th or 29th.

22          Just go ahead and read it.

23          THE WITNESS:  Okay, sir.

24          (READING):

25          Item number 6.  Mr. Toler's contacts with the

49

1          District Attorney's Office have grown increasingly

2          disturbing and volatile, culminating in his recent

3          threat to bring an Uzi to the office.  On information

4          and belief Mr. Toler has raised his voice and acted

5          in a threatening manner to the District Attorney's

6          staff on several occasions, including on or about

7          March 28th or 29th, April 7th, 2005.

8          (READING CONCLUDED.)

9          THE COURT:  The question dealt with March 28th or

10   29th.

11          THE WITNESS:  Okay.

12          THE COURT:  The jury has more than the question, but

13   as least you got the answer.

14   BY MR. GONZALEZ:

15   Q.     Mr. Garza, my point to you is that what you told the

16   court about Mr. Toler's first visit to the office was not

17   that he was there investigating a report of threats made

18   against his children, right?

19   A.     No.  That's not in the declaration.

20   Q.     Nothing about threats to his children are in the

21   report, right?  In your declaration, right?

22   A.     No, you're right.  Correct.  There isn't anything.

23   Q.     So what you told the court was that you got

24   increasing disturbing and volatile behavior starting with

25   loud and threatening behavior on his first visit on April 7th

50

1    and now the Uzi incident, correct?

2    A.        Correct.  Yes, sir.

3    Q.        You indicated that Mr. Toler had refused to calm down

4    on April 7th.  Do you believe that to be correct?

5    A.        That's what was told to me, yes, sir.

6    Q.        You're aware that Mr. Godwin met with Mr. Toler to

7    discuss why he was in the District Attorney's Office and

8    unhappy?

9    A.        Yes, sir, I am.

10   Q.        He did so in a calm manner?

11   A.        Afterwards.  Yes, sir.  There was two separate kind

12   of incidents there, the first contact with reception and I

13   believe it is the staff up in the lobby and then with

14   Mr. Godwin.  So he refused, then, yeah, Mr. Godwin calmed him

15   down and he cooperated.

16   Q.        So is it your testimony that you felt you could leave

17   out some of Mr. Toler's visits to your office if they didn't

18   support the narrative that he was growing increasingly

19   disturbing and volatile?

20   A.        I wouldn't want to leave out anything important in a

21   declaration, but I'm not sure what you're asking.

22             If it is that I intentionally left it out, no, I

23   didn't.

24   Q.        Do you think it would have been important to tell the

25   court that Mr. Toler was upset that after eleven days nobody

51

1   in the District Attorney's Office had read a police report

2   that he had filed related to threats against his children?

3   A.      I wouldn't know.  I wouldn't know if it would be

4   important or not.

5   Q.      Well, you would concede that would give a more

6   complete picture of what transpired with Mr. Toler and your

7   office?

8   A.      It would be a more complete picture, yes, sir.

9   Q.      You indicate that staff has expressed concern for

10  their safety at the end of that paragraph.

11          Could you tell me which staff members expressed

12  concern for their safety to you?

13  A.      I had Marsha Johnson.  Warren Butler said something.

14  I can't recall what.  He was concerned.  Marsha Johnson.

15  Brook Byerley also told me they had concerns about the safety

16  for staff.

17  Q.      Let me ask you this:  Can you tell me why Marsha

18  Johnson and Warren Butler were not included, listed their

19  names as victims for the purpose of seeking this TRO?

20  A.      No, sir.  You would have to ask County Counsel on

21  that.

22  Q.      Can you tell me why they weren't listed by name in

23  your declaration?

24  A.      No, sir, I can't tell.

25  Q.      For instance, when you said "staff has expressed

52

1    concern for their safety," you don't indicate which staff

2    you're referring to, correct?

3    A.        No, sir.

4    Q.        You did not tell the judge that Mr. Toler had

5    published an ad critical of the District Attorney's Office on

6    April 7th of 2005 -- I'm sorry -- April 12th of 2005; is that

7    correct?

8    A.        I'm sorry.  I did not tell the court?

9    Q.        In your declaration you don't reference the fact that

10   Mr. Toler took out a full-page ad in the Daily Republic and

11   other newspapers on April 12th; is that correct?

12   A.        You're correct.  That's not in the declaration.

13   Q.        You don't tell the court that he had -- Well, were

14   you aware that he had written a letter to the District

15   Attorney's Office -- that Mr. Toler had written a letter to

16   the District Attorney's Office?

17   A.        Written a letter?

18             No, I wasn't aware he had written a letter.

19             Is it the letter you were referring to that came up

20   sometime in the previous week here?

21             THE COURT:  The point is you knew nothing about him

22   writing a letter to the DA's Office?

23             THE WITNESS:  No, sir.

24   BY MR. GONZALEZ:

25   Q.        And do you believe that you could have attached a

53

1  copy of that advertisement to the declaration in seeking the

2  TRO?

3  A.      No, I was not aware, but could have.

4  Q.      I'm sorry, Your Honor.  My notes are --

5          Mr. Garza, I want to ask you about paragraph 7.  You

6  told the court that you have -- that you're a trained law

7  enforcement peace officer and have qualified as an expert in

8  the Solano County Superior Court on numerous occasions.

9          That is not in fact true; isn't that right?

10 A.      It's not true in the sense that I can't remember when

11 and if that has ever happened.

12 Q.      Let me ask it to you like this:  For instance, you

13 understand that sometimes certain witnesses come to court and

14 they pass a certain threshold for being experts; is that

15 correct?

16 A.      Correct.  Yes, sir.

17 Q.      And sometimes they might be a police officer that's a

18 ballistics expert; is that right?

19 A.      Correct.

20 Q.      And they'll have to give their qualifications for

21 being an expert in ballistics, and the other side gets a

22 chance to cross-examine them, then the judge makes a decision

23 about whether or not they're an expert, correct?

24 A.      Correct.

25 Q.      You've never actually testified as an expert witness

54

1    before, have you?

2    A.      Can't remember going through that process.

3    Q.      All right.

4            But in your deposition, sir, you admitted that you

5    have never qualified as an expert; is that correct?

6    A.      Correct.

7    Q.      And so when you wrote in your declaration that you

8    have qualified as an expert in the Solano County Superior

9    Court on numerous occasions, that's not true; is that right?

10   A.      When I say that where?  In my declaration?

11   Q.      Yes.  Sir, on the third page, paragraph 7, you told

12   the court that you had qualified as an expert on several

13   occasions -- I'm sorry -- on numerous occasions.

14           That's not true?

15   A.      As a law enforcement officer I have.

16   Q.      Not as an expert opinion -- as an expert witness you

17   haven't; is that correct?

18   A.      No, sir.

19   Q.      All right.

20           THE COURT:  "No, that's correct" or "No, that's not

21   correct?"

22           THE WITNESS:  No, I have never qualified as an expert

23   witness.

24   BY MR. GONZALEZ:

25   Q.      All right.

55

1            Now, you also told the court that based on your

2    training and observations and your expertise in threat

3    assessment evaluation and knowledge of Mr. Toler's escalating

4    behavior, that in your expert opinion Mr. Toler presents a

5    credible threat of violence to the District Attorney's

6    Office?

7    A.      That's true.

8    Q.      All right.

9            MR. GONZALEZ:   May I approach the witness for an

10   exhibit?

11   BY MR. GONZALEZ:

12   Q.      Mr. Garza, do you see Defense Exhibit E, which is the

13   ad that -- the advertisement that Mr. Toler published?

14   A.      Yes, sir.   I do.   I have it.

15   Q.      Do you see the third paragraph from the bottom?

16   A.      Correct.   Begins with "My experience."

17   Q.      Mr. Toler writes about his favorable experience with

18   Mr. Godwin?

19   A.      I have to read it.

20   Q.      All right.  Go ahead.   Do that for a moment.

21   A.      (Witness reviews exhibit.)

22           Correct.   I read it.

23   Q.      It's a paragraph that deals with Mr. Toler saying

24   despite his negative visit to the DA's Office he did feel

25   that Mr. Godwin was genuine in trying to assist him?

56

1  A.      Yes.  Correct, it does.

2  Q.      If you look at the very last paragraph on that

3  advertisement, do you see the portion where Mr. Toler

4  indicates that you can make political change through

5  elections, we don't have to put up with the way things are?

6  A.      The last paragraph?

7  Q.      I believe so.

8  A.      (Witness reviews exhibit.)

9          Yes.  Correct.  I see that.

10 Q.      And I just want to reiterate:  Do you think either of

11 those paragraphs might have helped the judge decide whether

12 or not Mr. Toler was engaging in increasingly escalating

13 violent behavior?

14         MR. CASSIDY:  Objection, Your Honor.  Calls for

15 speculation.

16         THE COURT:  Overruled.  It's asking for his frame of

17 mind as to what he put into the affidavit and didn't.

18         Do you think if you had put that in the affidavit it

19 would have been helpful to the judge deciding whether the TRO

20 was appropriate?

21         THE WITNESS:  I wouldn't be able to answer that, sir.

22 I wouldn't know what the judge would actually order.

23 BY MR. GONZALEZ:

24 Q.      Mr. Garza, your previous deposition was on January

25 19th, 2006?

57

1    A.       Yes, sir.

2    Q.       And the First Amendment retaliation law suit for

3    which we're here today was filed in December 2006?

4    A.       Yes.  I guess if you say so.  I don't know.  I don't

5    know when it was filed.

6    Q.       All right.  But it was after your deposition was

7    taken?

8    A.       Yes, I presume.

9    Q.       And before I forget to ask you this, sir, did I

10   previously ask you, I believe I did, that you had worked on

11   Mr. Paulson's campaign?

12   A.       Yes, you did ask me.

13   Q.       And the next campaign after 2005, was it in June of

14   2006?

15   A.       I have to go backwards.  I would assume.  I believe

16   he ran unopposed I think anyway.

17   Q.       Not what I asked you.

18   A.       Okay.

19   Q.       In 2005 -- in June of 2005 you certainly didn't know

20   whether or not Mr. Paulson was going to be running unopposed,

21   correct?

22   A.       No.  I wouldn't know that, no.

23   Q.       And I asked you, the next election after the events

24   that we've been discussing, primarily the April and June

25   events of 2005, was June of 2006; is that correct?

58

1   A.        That would be correct.  Yes.

2   Q.        I want to ask you about, I believe, what's noted as

3   Plaintiff's Exhibit 3, which is the e-mail from Marsha

4   Johnson and the subject line is "Today's Newspaper."  It is

5   dated April 14th, 2005.

6   A.        Yes.  I have that in front of me.

7   Q.        Sir, do you recall receiving that e-mail?

8   A.        I probably did get it, yes.

9        THE COURT:  The question is do you recall getting it?

10       THE WITNESS:  Yes, I do.

11  BY MR. GONZALEZ:

12  Q.        And you see that Miss Johnson in the very first line

13  is saying:  "Al, I didn't know Dave had already responded to

14  this."

15            Do you see that?

16  A.        Yes, I do.

17  Q.        And by what did you understand that to mean?

18  A.        Frankly, I don't know because I'm more concerned with

19  making sure that Byerley and Godwin are helping Mr. Toler and

20  trying to solve his issue with regards to the crime report he

21  dealt with in Fairfield.  That was my concern.  And she

22  included all of this because of -- she included all of this

23  narrative regarding her contact with Mr. Toler.

24            No, in answer to your question.  I'm sorry.  I really

25  don't know what she was talking about when she said that Dave

59

1   responded to this.

2   Q.      Let me ask you some follow-up questions.  You're

3   saying your primary concern was to see how Mr. Godwin and

4   Mr. Byerley were helping Mr. Toler; is that correct?

5   A.      Correct.

6   Q.      So were you checking up throughout April and May to

7   see what progress was being had on Mr. Toler's complaint?

8   A.      They were coming in and telling me every once in a

9   while as to what events were occurring, yes.

10  Q.      But Mr. Garza, nobody was writing any reports about

11  any of this until you filed a declaration on June 14th?

12          MR. CASSIDY:  Objection.  Asked and answered.

13          THE COURT:  Sir?

14          MR. CASSIDY:  Asked and answered.

15          THE COURT:  Overruled.

16          THE WITNESS:  You're right.

17  BY MR. GONZALEZ:

18  Q.      So would you -- would you agree that your actions

19  don't appear to have taken Mr. Toler's concern as related to

20  Mr. --

21          THE COURT:  I'm waiting for the objection.

22          MR. GONZALEZ:  I'll restate it.  You're holding your

23  hand up.

24          THE COURT:  I was holding it to get him stopped.

25          Go ahead.

60

1   BY MR. GONZALEZ:

2   Q.      Sir, you were asked a question whether or not you

3   remembered receiving this e-mail.  After you hesitated a

4   while you said yes.  Is that correct?

5   A.      Yes, sir.

6   Q.      And the first line is directed to you.  It says:

7   "Al, I didn't know Dave had already responded to this."

8           Do you see that?

9   A.      Yes, sir.

10  Q.      And I asked you what did you think this was in

11  regards to.  You say you don't remember?

12  A.      I don't remember.  No, sir.

13  Q.      And you don't remember in part because you're so

14  focused on making sure everybody takes care of Tom Toler

15  properly; is that correct?  His complaint against Mr. Oawster

16  is properly investigated, et cetera?

17  A.      That was my first priority, yes, sir.

18  Q.      I'm not asking you what your first priority was on

19  April 14th or April 12th.  I'm asking you today, as you look

20  at this document, I guess what's Plaintiff's 3, are you

21  saying to me that you have no idea what it's referring to?

22          MR. CASSIDY:  Objection.  It's overbroad.

23          THE COURT:  The first line -- what that line refers

24  to, is that what you're saying, sir?  Is that your testimony?

25          THE WITNESS:  Yes, sir.  Normally there's some

61

1    attachments to this maybe, but -- that referred to what that

2    is about, but there was nothing but that.

3         I'm not saying that I later found out or anything,

4    but I don't even remember what that was about.  I didn't even

5    know about this Board of Supervisor thing or something.  I

6    didn't even know about that.

7    BY MR. GONZALEZ:

8    Q.      When did you first learn about that?

9    A.      Today.  Or -- Yeah.  Today.

10   Q.      Mr. Garza, weren't you here when I gave opening

11   statements in court indicating that we believed this was an

12   e-mail related to the Board of Supervisors' inquiry?

13   A.      Excuse me.  I found out about that when you brought

14   it up in these court proceedings.  Yes, that's when I found

15   out.

16   Q.      Nobody asked you prior to court beginning here as to

17   what this might have referred to?

18        MR. CASSIDY:  Objection to the extent it calls for

19   attorney-client privilege.

20        MR. GONZALEZ:  I'll withdraw it, Your Honor.

21   BY MR. GONZALEZ:

22   Q.      Sir, do you see the subject line, "RE:  Today's

23   Newspaper?"

24   A.      Yes, sir.

25   Q.      Does that refresh your memory as to what that first

62

1    line might be about?

2    A.      The first -- No, sir.  Not the first line.

3    Q.      Did you -- Did Mr. Godwin or anyone working in your

4    office ever relate to you that Mr. Toler was seeking the

5    advice of other law enforcement officials as he investigated

6    Mr. Oawster?

7    A.      Other than the Fairfield PD, no.

8    Q.      Were you aware he was talking to a lieutenant in

9    Vacaville for instance?

10   A.      No, sir.

11   Q.      That he had spoken to the FBI?

12   A.      No, sir.

13   Q.      Or an investigator in the Sacramento Police

14   Department?

15   A.      No, sir.

16   Q.      Had you known those facts, would any of those have

17   been relevant to the declaration that you submitted to the

18   court in support of your TRO request?

19   A.      I don't believe so, sir.

20   Q.      Mr. Garza, was it unusual for there to be a full-page

21   ad in the paper criticizing the District Attorney's Office?

22   A.      I don't think I have ever seen a full-page ad, but as

23   far as maybe -- I remember seeing a half-page ad from

24   somebody else so it is not unusual.

25   Q.      Is this, though, the sort of thing that triggers a

63

1  lot of conversation around the courthouse about this ad?

2  Putting out an ad in the paper, does that generate a lot of

3  talk?

4  A.      Human nature, probably, yeah, people would talk about

5  it.  Yes, sir.

6  Q.      I'm asking you if you remember on April 12th when you

7  were walking around that day.  Everybody knows you work in

8  the DA's Office as the Chief Investigator?

9  A.      Yes, sir.

10  Q.      So were people asking you about this ad?

11  A.      I can't recall that a lot of people asked me about

12  it.

13  Q.      Do you have a memory one way or the other?

14  A.      There may have been some people that asked, but I

15  can't remember specifically who and when and how often it was

16  asked.

17  Q.      Mr. Garza, you saw the video of Mr. Toler going to

18  the elevators on the April 7th visit to the District

19  Attorney's Office here in court?

20  A.      Yes, sir.  I did.

21  Q.      And you've -- you heard the testimony of Mr. Byerley

22  in regards to that video and the events that transpired on

23  April 7th?

24  A.      Yes, sir.

25  Q.      And presumably you're his supervisor; is that

64

1    correct?

2    A.      Correct.

3    Q.      And did you see anything on the video that supported

4    the testimony that Mr. Toler stood at the elevators and was

5    looking intently -- staring intently at the reception desk or

6    reception counter area on April 7th?

7    A.      I'm trying to recall the video and the portions where

8    Mr. Toler was seen.  The only thing I can recall in that

9    video is at some point he was facing that way, towards the

10   lobby windows.

11   Q.      Sir, you wouldn't condone any kind of

12   misrepresentation made by any of the investigators working

13   underneath you, would you?

14   A.      No, I wouldn't.

15   Q.      Do you believe that the way Mr. Byerley characterized

16   that videotape was a misrepresentation of what appears to

17   have taken place?

18   A.      I don't know what he saw.  And I would believe he saw

19   more than what's on the videotape.

20   Q.      Have you conducted any kind of inquiry into

21   Mr. Byerley's recollection of those events and the videotape

22   that was played here in court?

23   A.      Conducted an investigation?

24   Q.      Yes.  In other words, you're telling me that you've

25   made -- you've reached a conclusion that Mr. Byerley must

65

1   have made other observations or any discrepancies between the

2   videotape and Mr. Byerley you're going to lean toward

3   Mr. Byerley.

4           Is that what you are saying?

5   A.      No.

6           MR. CASSIDY:  Objection, Your Honor.  It's

7   argumentative.  Misstates the evidence.

8   BY MR. GONZALEZ:

9   Q.      As a question, Mr. Garza, have you concluded, after

10  seeing the videotape and hearing Mr. Byerley's testimony,

11  that there is anything that you should be concerned about in

12  Mr. Byerley's testimony?

13  A.      No.

14  Q.      And you have reached that conclusion without

15  conducting any kind of investigation of the matter?

16  A.      Yes.

17  Q.      Any formal investigation?

18  A.      Yes.

19  Q.      And would you agree that if the -- if you had

20  evidence that was clear and an investigator of yours was

21  testifying under oath to facts different than to what could

22  be proven, in other words testifying untruthfully about

23  something, that would be something of concern to you?

24  A.      Most definitely it would be of concern to me.

25  Q.      What kind of action would you take in the event

66

1   something like that happened?

2         MR. CASSIDY:  Objection, Your Honor.  Calls for

3   speculation.  Lacks foundation.

4         THE COURT:  No.  He can answer that question.  It's

5   not speculative.  You may answer, sir.

6         THE WITNESS:  Normal procedures for those things that

7   happen in any law enforcement is you start an investigation,

8   and you refer it to an internal administrating

9   investigation.

10  BY MR. GONZALEZ:

11  Q.      Are you familiar with Mr. Byerley's law enforcement

12  background?

13  A.      Yes.  To some extent, yes.

14  Q.      What do you mean by to "some extent?"

15  A.      I know he was there before I was.

16  Q.      And do you know what law enforcement agencies he

17  worked for before he worked for the Solano County District

18  Attorney's Office?

19  A.      I know he worked for the Suisun Police Department.

20  Q.      He testified to that I believe.

21  A.      Right.

22  Q.      Did he work for any other law enforcement agency?

23  A.      I'm trying to remember.  And I know he was like with

24  the DA's Office, Family Support.

25  Q.      Mr. Garza, are you aware that Mr. Byerley worked for

67

1   the Fairfield Police Department prior to working for Suisun?

2   A.      I think he may have, yes.  I'm not positive.

3   Q.      Are you -- You're his current supervisor?

4   A.      Yes, sir.

5   Q.      You have access to his personnel records?

6   A.      Correct.

7   Q.      And you're saying he's never brought that up to you

8   or had any discussion with you about prior law enforcement

9   service other than with Suisun?

10  A.      Correct.  Talks a lot about Suisun.

11          MR. GONZALEZ:  Okay.  Your Honor, can we approach for

12  a minute?

13          THE COURT:  Come to sidebar.

14              (Whereupon, the following discussion was held at

15              sidebar.)

16          THE COURT:  Yes.

17          MR. GONZALEZ:  Your Honor, the evidence that we have

18  is that Mr. Byerley was let go from the Fairfield Police

19  Department during his probationary period for falsifying

20  police reports.  He apparently had fallen behind in filling

21  them out and was accused of fabricating just to get them off

22  his desk.

23          MR. CASSIDY:  Your Honor, this is the first I've

24  heard of anything like this.  I have not had an opportunity

25  to speak to my client, nor do I know where the source of this

68

1   information is from.

2           THE COURT:  What is the source of the information?

3           MR. GONZALEZ:  We first heard about it from several

4   Fairfield Police officers who came forward with this

5   information.  We subpoenaed someone yesterday who was a

6   supervisor to Mr. Byerley at the police department.  He's now

7   on the city council in Fairfield.

8           He said he's got no interest in testifying, but if he

9   were called and you told him to answer the question, he would

10  answer to that effect.

11          MR. CASSIDY:  Your Honor, we haven't had a chance to

12  conduct any discovery on this or look into it, and it is

13  unduly prejudicial obviously.

14          THE COURT:  It is highly prejudicial.

15          MR. CASSIDY:  Your Honor, I purposely did not put in

16  the record what we have on Mr. Toler, why he left the

17  Fairfield Police Department because of the same reason.

18          MR. GONZALEZ:  What are you talking about?

19          MR. CASSIDY:  Apparently Fairfield PD --

20          MR. GONZALEZ:  What are you talking about?

21          THE COURT:  Just a minute.  I'm going to get the jury

22  out of here.

23              (Whereupon, the sidebar was concluded.)

24          THE COURT:  Ladies and Gentlemen, I'm going to ask

25  you to vacate the courtroom.  This is an intricate problem,

69

1    and I want to be able to talk to the lawyers without having

2    to  hang over the microphone.

3              (Jury exits at 03:27 PM.)

4              THE COURT:  Counsel, approach the podium.  Both

5    counsel.

6              Go ahead and talk to him.

7              Go ahead.  Relax.  You can get off.  We'll call you

8    back.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  Record will reflect we're in open court,

11   counsel are present, the jury is not.

12             I am informed, Mr. Cassidy, that Mr. Gonzalez has

13   active evidence concerning – and I don't know whether it is

14   true or not, but that's neither here nor there – concerning

15   Mr. Byerley's providing false reports.

16             And if that is true, then what is your response to

17   whether or not that's proper?

18             I mean, I don't think it is proper to ask Mr. Garza.

19   He doesn't know.  He knows nothing about it.  Whether you can

20   put it on in rebuttal seems to me to be fairly, I think,

21   straightforward.  But certainly we'll hear from you,

22   Mr. Cassidy, before I make a judgment.

23             MR. CASSIDY:  Well, Your Honor, as I understand it,

24   and I've only just learned this information so there hasn't

25   been a chance to do any discovery on this or to take any

70

1    evidence of testimony, and I'm told that now there will be

2    some witness called, but I am told by Investigator Byerley

3    that he resigned from the Fairfield Police Department and

4    that there was not an issue of a falsification of a report.

5          We're going to be trying a collateral issue, and this

6    is extremely prejudicial to Investigator Byerley.

7          THE COURT:  I don't disagree that it is prejudicial.

8    The question is whether it is inappropriately prejudicial.

9    And the question is whether or not -- I mean to the extent --

10   I think the evidence code actually deals with this question.

11   Just a minute.

12          (Brief pause.)

13          MR. GONZALEZ:  Your Honor, I have a proposal.

14          THE COURT:  Yes.

15          MR. GONZALEZ:  I'm fully aware of the prejudicial

16   nature, and I certainly didn't want to ask the witness

17   anything.  However, the reason I brought it to the Court's

18   attention at this time is because Mr. Byerley did not mention

19   working for this law enforcement agency in his direct exam,

20   and Mr. Garza either isn't aware of it or seemed only vaguely

21   aware of it.

22          I contend that this is a purposeful sort of evasion

23   to this particular history.  If the Court would allow us to,

24   when we get to the rebuttal portion of this case, which I

25   believe we'll be at tomorrow --

71

```
 1              THE COURT:  If ever.

 2              MR. GONZALEZ:  -- we could put the witness on the

 3    stand and do a --

 4              THE COURT:  Before we do that, I assure you -- I'm

 5    sorry.

 6              Before we do that, I assure you I'm going to have to

 7    have some legal discussion with you folks.  And this is a

 8    good opportunity I think over the evening for everybody to go

 9    look at the law and see what we can find.

10              You know, I am now talking off the top of my head,

11    which I should not do, but the rule in general is that you

12    can't introduce evidence of prior bad acts as proof that he

13    committed a bad act in the matter-in-chief.

14              I think that's the rule.

15              There are some exceptions to that rule, and we would

16    have to go through it and try and see what it is about.

17              Mr. Cassidy, I am of the view that if the evidence

18    code permits such testimony -- and I'm not at all satisfied

19    that it does, this is something we'll have to research

20    tonight -- but if it's just evidence of bad character, I

21    don't think it comes in.

22              MR. CASSIDY:  It is impeachment on a collateral

23    issue.

24              THE COURT:  It's not at all.  It deals with the

25    reliability of the witness' testimony and this witness'
```

72

1    testimony is terrifically significant in the case.  So I

2    don't agree with that argument.

3         I think there's a real problem in whether it is

4    admissible at all for other reasons, and we'll all have to

5    research it tonight.

6         MR. GONZALEZ:  Your Honor, the one reason I brought

7    it up with Mr. Garza was because he filed the declaration

8    obviously, and if he had knowledge of this at all --

9         THE COURT:  He's indicated he couldn't even remember

10   whether Mr. Byerley worked for Fairfield so he wouldn't have

11   any -- I'll ask him directly.

12        Do you know anything about this allegation,

13   Mr. Garza?

14        THE WITNESS:  No, sir, I don't.

15        THE COURT:  Of course.  Sit down.

16        You know, give me a break, guys.  You don't have to

17   be -- Never mind.  I know all judges as soon as they take the

18   black robe become stupid.  Sometimes it is just obviously not

19   the case.

20        MR. GONZALEZ:  I'm sorry, Your Honor.  Did you think

21   I was --

22        THE COURT:  Never mind.  Relax.

23        I'm going to direct that there be no further

24   examination concerning this matter, and we'll take it up

25   tomorrow.

73

1          What is the pleasure of the parties?

2          I'm at your disposal.

3          Do you want to take it up before we commence court

4     tomorrow, or do you want to take it up when you get to the

5     point where you're going to put on the witness?

6          What's your pleasure?

7          MR. GONZALEZ:  Mr. Cassidy?

8          I would say 9:15 tomorrow.

9          MR. CASSIDY:  That's fine.

10          THE COURT:  All right.

11          MR. CASSIDY:  I do have a concern that I don't have

12     available to me any of the records that might somehow shed

13     light on this.  And for a witness to come in and take a

14     position --

15          THE COURT:  If he can come in and say:  Look, I was

16     the sergeant or supervisor or whatever he was, and we let him

17     go or we asked him to resign because he wasn't getting his

18     reports in or he was fabricating reports in order to get them

19     in on time or whatever -- I don't know what he is going to

20     say.

21          Is that what he is going to say?

22          MR. GONZALEZ:  Yes.

23          MR. CASSIDY:  There is big --

24          THE COURT:  Let the record reflect plaintiff's

25     counsel nodded his head "yes."

74

1          MR. CASSIDY:  There is big difference between

2     fabrication or not keeping up with --

3          THE COURT:  That's cross-examination.  If he's going

4     to say "fabrication," you can then try and hammer home what

5     it was really about.

6          That's another thing that I think we have to do is

7     probably I need a formal offer of proof as to what the guy's

8     going to say.  I want that tomorrow morning or when we get

9     ready at 9:15.

10         MR. GONZALEZ:  That's fine.

11         THE COURT:  All right.

12         I dislike the idea that the jury is out.  They

13    obviously -- I mean, any sensible person would know what

14    we're talking about, but I'm just not going to permit you to

15    go forward with that line of questioning until we know

16    something about it all.

17         MR. GONZALEZ:  My exam is over then for now.

18         THE COURT:  Okay.  Madam Clerk, bring the jury back

19    in.

20         MR. CASSIDY:  Your Honor, at this point should we --

21    should we break and start our issues?

22         THE COURT:  I'm prepared to do that because I think

23    you've got some work you've got to do, you know.

24         First you got to spend some time with me, then I

25    suspect you probably want to talk to somebody about what this

75

1    is supposedly about.

2           MR. CASSIDY:  Right.

3           THE COURT:  All right.  Let's bring the jury in, and

4    we're going to send the jury home.

5           Wait before you do that.

6           Mr. Gonzalez thinks he's done with rebuttal tomorrow,

7    God willing and river don't rise?

8           MR. GONZALEZ:  Your Honor, I think we've got a couple

9    of witnesses to call, and we'll be ready to go first thing in

10   the morning.

11          THE COURT:  Your best judgment?

12          You don't know.  This case is taking so much longer

13   than anybody would have believed anyhow.

14          Bring the jury in.

15          (Jury seated at 03:38 PM.)

16          THE COURT:  Ladies and Gentlemen, as you probably

17   have guessed we've got an evidentiary question.  And I know

18   this will shock you, but I don't know the answer to it so I'm

19   going to have to spend a little time doing some research

20   tonight.

21          I'm not going to keep you here while I go floundering

22   around so we'll see you -- We're going to meet first at 9:15.

23   Why don't you folks come in at 9:30.

24          Too short a period of time?

25          Quarter to 10:00.  Wait in there.  I think we'll get

76

1    to you very shortly thereafter, but you may have to wait a

2    little while.

3           I want you to know the lawyers agree we're very close

4    to the end of the case.  We'll actually get it to you

5    tomorrow or the next day.

6           Thank you, Ladies and Gentlemen.  We'll see you

7    tomorrow.

8           I'll see counsel in chambers after.

9           Stand in recess.

10          (Off the record at 03:39 PM.)

11          (Further proceedings held in chambers and not

12           transcribed.)

13                           ---o0o---

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

77

```
 1                    SACRAMENTO, CALIFORNIA
 2          WEDNESDAY, AUGUST 19TH, 2009 - AFTERNOON SESSION
 3                           ---o0o---
 4          (Excerpt from trial proceedings.)
 5          THE COURT:  Mr. Cassidy?
 6          MR. CASSIDY:  Yes, Your Honor.  I believe at this
 7   time in order of witnesses we would return to the
 8   cross-examination, if you will.
 9          THE COURT:  Direct examination.  He was called as an
10   adverse witness obviously.
11          Come around and be sworn, sir.
12          You've been sworn.  I'm sorry.
13          Resume the stand.
14          (Whereupon, Mr. Garza resumes the witness stand.)
15                      DIRECT EXAMINATION
16   BY MR. CASSIDY:
17   Q.      Good afternoon.
18   A.      Good afternoon, Mr. Cassidy.
19   Q.      Mr. Garza -- Chief Garza, how old are you?
20   A.      55.
21   Q.      And could you please give us a brief description of
22   your educational background?
23   A.      I've got an AS and an AA from Solano Community
24   College in Criminal Justice and Corrections.  I've graduated
25   high school.  That's my formal education.
```

78

1    Q.       Did you at some point attend any police academies?

2    A.       Yes.  In 1980 -- in the end of 1979, I believe, I

3    attended a POST law enforcement course.  It was in Santa Rosa

4    for a basic POST certificate.

5    Q.       Did you obtain that successfully?

6    A.       Yes, sir, I did.

7             THE COURT:  Sir, let Mr. Cassidy finish his question

8    before you answer.  Okay?

9             THE WITNESS:  Yes, sir.

10   BY MR. CASSIDY:

11   Q.       After that time did you receive any additional POST

12   certificates?

13   A.       Yes, I did.

14   Q.       And could you just briefly describe those?

15   A.       Yes.  Since 1980, attending the POST academy, I have

16   attended numerous advanced officer courses, some POST

17   certified training, received intermediate and advanced in

18   management/supervisory POST certificates.

19   Q.       Can I stop you there for a minute?

20   A.       Yes.

21   Q.       Could you generally describe those POST certificates

22   that you just identified?

23   A.       The POST certificate is received after successfully

24   attending and graduating a basic POST academy, which is a

25   requirement, and then you must serve -- be employed full-time

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

79

1  for one year by a law enforcement agency as a peace officer

2  under 830.1.  Once you've completed that, then you get your

3  basic POST certificate.

4        The other certificates are accumulated with the

5  number of credits that you attain of attending advanced

6  officer courses.

7        I believe POST also has a time limit on it.  So it's

8  depending on how long you've been in as a peace officer along

9  with the courses that you take.

10 Q.    So you said that you had the basic intermediate and

11 advanced certificates?

12 A.    Correct, sir.

13 Q.    What POST certificates in addition to those do you

14 have?

15 A.    Supervisory POST certificate.

16 Q.    What's generally the supervisory POST certificate

17 about?  Can you describe that?

18 A.    You must attend a POST certified supervisory class.

19 I believe it is like two weeks or something.

20 Q.    Just what's the general nature of that?

21 A.    Basically, it introduces you and exposes you to the

22 responsibilities that you're going to have as a supervisor,

23 as a manager, outlining a number of areas which are not just

24 related to law enforcement, but as to working with people,

25 managing people, certain liability issues that you may come

80

1    across.  And just general stuff like that.

2    Q.      After you attended the police academy in Santa Rosa,

3    did you obtain any law enforcement employment?

4    A.      Yes.  As a matter of fact, the Sheriff's

5    Department -- the Solano County Sheriff's Department was

6    already -- had already employed me.  They're the ones that

7    sent me to the basic, to the academy.

8    Q.      So from when-to-when did you work for the Solano

9    County Sheriff's Department?

10   A.      I worked at the Solano County Sheriff's Office from

11   1980 to the end of '90, I believe it was.  I worked there

12   eleven years.

13   Q.      Okay.

14   A.      About eleven years.

15   Q.      Could you please describe the various positions that

16   you held while employed by the Solano County Sheriff's

17   Department?

18   A.      I started at the jail, then moved into patrol --

19   general patrol responsibilities.  And then from patrol I went

20   into -- I was assigned for four-and-a-half years as a

21   Detective for Crimes Against Persons.

22           And then I think I went back to patrol, and I did

23   serve as a bailiff for a couple -- a year-and-a-half or

24   something around there.

25   Q.      When you say you were a detective in terms of Crimes

81

1    Against Persons, what does that mean?

2    A.      Any crime that's indicated by the Penal Code that is

3    against a person.  Not a property crime.  Assaults.  Sexual

4    assaults.  Batteries against people.  Homicides.  Rapes.

5    Those kinds of crimes.

6    Q.      Now, at some point you became employed by the Solano

7    County District Attorney's Office?

8    A.      Yes, sir.

9    Q.      And what year was that?

10   A.      1990.

11   Q.      What was your title or position at that time?

12   A.      DA Investigator.

13   Q.      And generally, could you describe the duties and

14   responsibilities you had as an investigator for the District

15   Attorney's Office?

16   A.      Our main purpose as a DA Investigator is to assist

17   the Deputy DA's, the prosecutors, in the successful

18   prosecution of a case that they already have, that they're

19   working on.

20   Q.      At some point did you continue on and receive a

21   promotion above investigator?

22   A.      Yes.  When I first came to the DA's Office, they

23   didn't have supervisors or chiefs so I'm the second chief.

24   There was a chief before me.  And I was promoted to

25   supervisor -- I can't recall exactly the exact date.  But I

82

1   did that for three years, and then in 2002 or 2003 I became

2   chief -- I was promoted to chief.

3   Q.      And you were asked some questions about participating

4   in campaign activities in relation to District Attorney

5   Paulson.

6           Is your job as Chief Investigator a political

7   appointment job that depends on who's the DA, or are you

8   fixed in place as Chief Investigator regardless of who the DA

9   is?

10  A.      I've been trying to figure that one out.  I'm an

11  at-will-employee.  I don't know that if the DA that appointed

12  me or promoted me leaves that I would just be thrown out.

13          People keep telling me I fall under the Federal Civil

14  Service Rules.  I don't know that they could actually for no

15  cause get rid of me.  I don't know to tell you the truth.

16  Q.      Could you please generally describe your duties and

17  responsibilities as Chief Investigator?

18  A.      Currently my duties and responsibilities are first

19  and foremost to the elected DA in the sense that I'm in

20  charge of running the Bureau of Investigations so that we can

21  meet his missions and goals.  And that's in successfully

22  prosecuting cases and assisting the Deputy DA's.

23          We offer all kinds -- we have and provide services in

24  the Bureau of Investigations that are a lot of services.  So

25  I mean I could name them for you if you want.

83

1   Q.      Do you just -- can you just do that very briefly?

2   A.      Yes.  We have our general criminalist, which we have

3   our investigators who we have eight.  Ten investigators, two

4   supervisors.

5           We have our real estate unit -- real estate fraud

6   unit, insurance fraud unit, auto insurance fraud, worker's

7   comp. fraud unit.

8           We have a bad check program.  We have -- Trying to

9   remember all of them.  We have a cold case unit.  We also

10  have a child abduction unit.

11          We have -- I'm trying to remember all of them.  We

12  have the subpoena service unit.  Then we have our general

13  discovery unit.  Trying to remember all of them.

14  Q.      I think that's probably covered at least a few.

15          Could you describe your role then in supervising

16  those activities?

17  A.      It's my job to manage those units, to make sure I

18  communicate and interface with the two supervisors that have

19  the responsible for those units, to make sure that we're

20  running, we're doing what we're supposed to do and assisting

21  through investigative work requests that we receive from the

22  Deputy DA's to get the job done, to get assignments done.

23  Q.      Do you have any other duties or responsibilities in

24  relation to your position as Chief Investigator?

25  A.      Yes.  We're on the -- One of the duties that we -- an

84

1    issue that comes up all the time is the statewide 58 counties

2    and the District Attorneys Offices.  And I communicate with

3    all of those District Attorneys Offices.

4         We're supposed to provide protection for the District

5    Attorney, provide protection for the staff and assist them in

6    that area.  But in our office we do just about -- kind of the

7    buck kind of stops in our office.  We get everybody that

8    comes into our office.

9         We handle internal administrative investigations for

10   the smaller departments in our county.  We -- People come

11   into our lobby a lot, and we have to assist them.  It could

12   be anything from a report.  It would be anything from trying

13   to assist them in identity theft.  All kinds of things.

14   People come in to our lobby because they don't know where

15   else to go sometimes.

16   Q.      Do you have -- In addition to providing protection,

17   if you will, to the District Attorney, do you as Chief

18   Investigator for the District Attorney's Office provide any

19   other guidance to any other departments for security and

20   protection?

21   A.      I've been called upon to assist the courts in working

22   with the Sheriff's Office providing assistance to them and

23   actually providing investigators for the purposes of some

24   manning to protect some judges over there.

25         Also in providing them with some analysis or some

85

1    assistance in helping them out with maybe people that they're

2    concerned with that may be some sort of threat to them.

3          MR. CASSIDY:  Your Honor, may I approach?

4    BY MR. CASSIDY:

5    Q.      Drawing your attention to Defendant's Exhibit I,

6    could you just take a brief look at that and identify the

7    nature of those documents?

8    A.      This is a printout that comes out from POST, the

9    Commission on Peace Officer Standards and Training Office,

10   which details the courses that I've been through and

11   attended, the instruction I've had.

12   Q.      All right.

13          Then attached to that, about page 2 or 3, what is

14   that?

15          I believe it is page 3.

16   A.      This is -- I believe this is something that's done

17   within the County, I believe.  Another sort of EXCEL printout

18   that indicates the courses I've taken with the County.

19   Q.      Okay.  Now, you gave us a general description of

20   various types of advanced officer training that you received.

21          Generally, are those types of trainings included in

22   the first two pages of Defendant's Exhibit I?

23   A.      I'm sorry.  Say that again.

24   Q.      Go to the first two pages, please, of Exhibit I?

25   A.      Okay.

86

1    Q.      You mentioned that over the course of time that

2    you've worked in the Solano County District Attorney's Office

3    you've received what you refer to as advanced officer

4    training?

5    A.      Correct.  I received that while I was at the

6    Sheriff's Office, and it is a requirement that we attend.  We

7    have to do 24-hours a year for POST --

8    Q.      Okay.

9    A.      -- certification.

10   Q.      Generally speaking, rather than have you list all of

11   those out here, do those two pages of Defendant's Exhibit I

12   generally list the advanced officer training that you've

13   received over the years?

14   A.      Yes, sir.

15   Q.      Okay.  Now, have you received any specific training

16   in security and protection?

17   A.      I've attended a dignitary protection course in

18   San Diego.  Yes, sir.

19   Q.      And could you please describe -- Well, when was that?

20   A.      I'd have to look at it here on my -- Can I look here?

21           (Witness reviews exhibit.)

22           Yes, sir.  It was hosted and provided by the

23   Department of Justice.  Looks here like January the 10th,

24   2003.

25   Q.      And could you please give us a brief description of

87

1    the nature of the training you received in that class?

2    A.      The dignitary protection course that was given here

3    is actually a hands-on practical work and exercise doing

4    exercises.

5           And they instruct you on things like going to --

6    protecting an individual -- for the purposes of protecting an

7    individual and taking him from place to place and doing some

8    preplanning, doing some intelligence, looking to make sure

9    that wherever you're going to take him is secure.

10          And then if something goes haywire, how you're

11   supposed to get him in the car -- into the car, who's around,

12   communicating with those people you are working with and

13   protecting that individual and getting them to safety.

14   Q.      Were there any specific procedures that they used if

15   you're, for instance, going to be on the lookout for somebody

16   in your office, that type of thing?

17          THE COURT:  I have no idea what the question means.

18   Mr. Garza was equally hesitating, sir.

19          MR. CASSIDY:  I will withdraw.

20   BY MR. CASSIDY:

21   Q.      Did you successfully complete that dignitary training

22   course?

23   A.      Yes, sir, I did.

24   Q.      Have you received any other specific training in

25   security and protection?

88

1   A.      I've received some in-house from Solano County.

2   Q.      And is that reflected in terms of the time period

3   when you received that in those documents -- in Defendant's

4   Exhibit I?

5   A.      (Witness reviews exhibit.)

6          Yes, sir, I do see that.

7   Q.      And does it indicate when it was you had received the

8   last training from Solano County prior to the spring of 2005?

9   A.      Well, there's some dates here I can give you.  March

10   18th, 2003.  January 23rd, 2003.  2001.  '97.  '99.  2006.

11   Q.      Those dates are under the category of what?

12   A.      It says Workplace Protection.  Workplace Protection.

13   Q.      Could you please describe the nature of the in-house

14   training that you received from Solano County in relation to

15   security and protection?

16   A.      That instruction is basically to the employees of

17   Solano County.  First and foremost they wanted to let them

18   know that Solano County does have a Workplace Protection

19   Policy, expose it to everybody, just like sexual harassment

20   policies and so forth.

21          There are some guidelines in there to make employees

22   aware of what kind of things to look for, how to report and

23   who to report to and when to report.

24          And then there's some additional aid for the employee

25   in attempting to see how they could handle those kinds of

89

1    situations for themselves or they can't handle them and how

2    they need to handle them.

3          And then also being aware of their own awareness as

4    they are walking around or into the office and conducting

5    business with -- with the public and who approaches them and

6    how to handle that to some extent.

7          And then like I say, it does tell you what, when and

8    whom you need to report to.

9    Q.    On those occasions that you received that workplace

10   protection or security training, did you successfully

11   complete that in attending those courses?

12   A.    Yes, sir.

13   Q.    Have you attended any other courses or training

14   specifically in the area of security and protection?

15   A.    I attended a class in Reno which was on threat

16   management assessment.  It was provided by the US Marshals,

17   Secret Service, the Department of Treasury.

18         That course had a lot to do with basically their

19   guidelines and how they assess threats -- those agencies

20   assess threats, the federal agencies, and were instructing

21   local law enforcement and state law enforcement as to how

22   they do it and giving us training in that area.

23   Q.    Do you recall generally when that course took place?

24   A.    I want to say '98.  1998.  Somewhere around there.

25   Q.    In the course of that training, did you receive any

90

1   specific trainings?  For instance, of perhaps what type of

2   profiles of people are to be considered in relation to

3   security and protection or threat management?

4   A.      Right.  It's a complex field.  And, you know, one of

5   the things they do is they offer you case studies.  And

6   that's how they provided a lot of the learning process that

7   the federal agencies even went through.

8           There's no real legitimate profile as to who and how

9   you look at a person or you investigate a person.  That just

10  doesn't mean, you know, that that person is potentially going

11  to be a valid threat to you.  They don't know.

12          There's no perfect profile.  I mean, like, I guess,

13  one of the examples is they said that nobody had a white

14  female Squeaky Fromme in their profile that was going to

15  attempt to do the President.  Nobody even paid attention to

16  her.

17          So they learned from those case studies and those

18  kinds of things too that now they're going to add her into

19  the list of people to think to look at.

20          So from those kinds of case studies they -- they try

21  and put together some sort of categories, characteristics,

22  indicators that will at least assist somebody in attempting

23  to make some sort of a reasonable analysis of a threat

24  towards an individual which would be a public official.

25          In the case of the federal agencies, their primary

91

1    goal is to protect the judges, and even in the public,

2    artists, entertainers, so forth.

3    Q.      In the course of this threat management training,

4    were you provided with any factors to be considered in making

5    an assessment of a threat assessment?

6    A.      Yes.  They provided a general guideline of some

7    factors to consider to think about such as considering any

8    motives or intents, what is going on with the person's life.

9    If, in fact, they're going through a divorce or going

10   through -- what is the relationship with what they called

11   "the target," which is, you know, the person that's

12   looking -- being looked at to, like I said in this case,

13   assassination or whatever.

14         But they also looked at history.  You know, what's

15   been going on with this individual.  They invite you to see

16   what kind of -- is the individual free, is he walking around,

17   that kind of thing to look at versus is the person who made

18   the threat in jail.

19         Well, you know, you make that assessment.  You know,

20   is it a valid or not valid threat if the guy's in jail or

21   prison if he makes a threat.  You know, it lowers your

22   assessment of whether it's a valid threat.

23   Q.      In the context of a person's conduct, is there any

24   factors that are considered in the threat assessment that you

25   learned in this training?

92

1   A.      Yes.   If there's an emotional tie or there is an

2   obsession.   If there's a reason for -- You attempt to find

3   out if this person is targeting this person because of --

4   their example is there a case in court that a judge made a

5   decision on.   Is there a report, you know, that they're

6   having a problem with.

7        And then the behavior of the individual, which means

8   that, you know, is this person, you know, agitated, is he

9   physically raising his voice, and can you attribute that

10  emotion to whatever is his issue.

11  Q.      When you talk about looking into the background of an

12  individual, what did this training provide you in terms of

13  what to look for in a person's background when making a

14  threat assessment?

15  A.      Well, is this personal always in court.   Is this

16  person -- is he employed or not employed.   Again, like I said

17  before, is he having some problems at home.   Did somebody

18  really, you know -- how would I say -- threaten this

19  individual.

20       I'm trying to remember the rest of them.

21       Do they have access to weapons.   Are they weapon

22  fanatics.   Those kinds of things.

23       Do they have a criminal history -- a prior criminal

24  history.   Is there a propensity for this individual to have

25  prior violence.   Those are the kinds of things you look for.

93

1    Q.      Now, prior to the spring of 2005, had you had any

2    experience in making threat assessments?

3    A.      Yes.  The Sheriff's Office called me on, I want to

4    say, two or three occasions.  There was two judges, Superior

5    Court judges, where they had an individual that comes into

6    the court and writes letters.  So you have to evaluate.

7           You know, they sent the letters over to kind of see

8    and look for my assistance to see if it matched or in any way

9    shape or form could be a valid threat as inappropriate

10   communications.

11          You have to remember a lot of -- a lot of these

12   communications or these threats, they may not be illegal,

13   they're not a crime.  So you have to make that assessment.

14   People can say all kinds of things and not be a crime.

15          So that's the difficulty -- difficult part about this

16   analyzing.  It requires some careful analysis and you want to

17   get probably more than one person to make sure that you do it

18   right.

19   Q.      On those cases were you making determinations as to

20   whether or not these persons that there was concern about

21   were making credible threats of violence?

22   A.      Yes.  I tried to apply -- Well, I did apply what was

23   in my training and offered my opinion.  And there was times

24   when I said I didn't think this was a good threat, you don't

25   have to worry about it.

94

1    Q.       You were asked some questions -- I can't remember

2    when it was, yesterday or the day before or last week --

3    about whether you had ever qualified as an expert in court.

4            Have you ever provided expert opinion in court?

5    A.       I've been asked by judges for my opinion.  I've been

6    asked by attorneys for my opinion.  And in court, yes, I

7    have.

8    Q.       All right.

9            And you referenced something about you were asked

10   about being qualified as an expert.

11           Did you understand at those times whether you were

12   qualified as an expert?

13   A.       I don't make that judgment.  I give the information

14   to the attorneys and to the judge and they decide.  I know in

15   the questions that were asked was if I ever went through

16   that.  I know there is that process where the judge goes

17   through that two or three prong process where he qualifies

18   you.  I have never been through that.

19   Q.       But as a trained law enforcement peace officer, had

20   you provided opinions -- your opinions in courts?

21   A.       Yes, sir.

22   Q.       Before the spring of 2005?

23   A.       Yes, sir.

24   Q.       Can you give examples, just generally, of what types

25   of matters you had given opinions on in that capacity?

95

1   A.      When I was a homicide detective, they would -- I

2   can't remember the dates because I just -- I haven't been in

3   a court testifying for quite some time.  They did ask my

4   opinion on a specific witness' credibility on a statement

5   that a witness would make.

6           They would ask -- There's been, when I was in patrol,

7   DUI, driving intoxicated, they'd ask me about that.

8           Been through some narcotics training where they ask

9   if I thought the individual was under the influence and what

10  were the characteristics based on the training that I was

11  provided.

12          Those are some of the situations where I provided

13  that.

14  Q.      Let's move now to the time period in or about April

15  7th.  And this was possibly, but it's at least a visit by

16  Mr. Toler to the District Attorney's Office.

17          Did you receive any information that day about the

18  circumstances surrounding Mr. Toler's visit to the District

19  Attorney's Office?

20  A.      Which day was that, sir?

21  Q.      April 7th.

22  A.      Yes.  I received information from I want to say --

23  April 7th -- from Brook.  And there's that one e-mail I got

24  from Marsha about Mr. Toler's behavior at that point.  And

25  Mr. Godwin.

96

1  Q.      In or about April 7th did you have any direct contact

2  with Investigator Godwin about assigning him the

3  investigation that Mr. Toler was asking about?  In other

4  words, the complaint of the threat by Mr. Oawster?

5  A.      I may have.  I don't recall.  I dealt through Brook

6  Byerley.  He's the supervisor that was -- He was actually the

7  only supervisor at that time.  I didn't have the two that I

8  have now.  So I dealt with Brook and instructed him.

9          And I may have seen Mr. Godwin in the hallway and

10  said, "What's going on with this, what are you doing with it,

11  and you need to follow up on it."

12  Q.      In connection with Investigator Godwin, when an

13  investigator in your office is assigned a particular

14  investigation, did you have any expectation that they would

15  be preparing periodic reports of that investigation?

16  A.      Yes, I did.

17  Q.      And in terms of Mr. Godwin, did you expect the same

18  from him?

19  A.      Yes, I did.

20  Q.      Did you ever have to perhaps remind Investigator

21  Godwin from time-to-time to be on top of his reports?

22  A.      Yes.

23  Q.      Did you ever believe that the reminders, if you will,

24  of Investigator Godwin being on top of his reports affected

25  his abilities as an investigator?

97

1   A.       Most definitely not.

2   Q.       How did you consider him as an investigator?

3   A.       Mr. Godwin is a very good and effective investigator.

4   I have reason to believe that he's done some other cases in

5   his career in Oakland -- when he was at Oakland PD that were

6   complicated and knew that he could do the job.

7   Q.       Now, in or about April 12th this ad was published in

8   the Daily Republic or one of the other papers.

9            Do you recall that time period?

10  A.       Yes.

11  Q.       And you indicated that you had made some contact with

12  District Attorney Paulson regarding that ad?

13  A.       Yes.

14  Q.       And would you describe the nature of that contact,

15  please?

16  A.       The contact, as I explained before I think, is that

17  my normal procedure is to go in and see Mr. Paulson after

18  I've gone to my office.

19           I go to my office and my two investigators kind of

20  brief me a little bit as to what's going on, is there

21  anything hot, what they call a crisis that needs to be fixed

22  that day.  And then they usually hear from another attorney

23  with regards to the ongoing court cases that are going on

24  or anything else.  If he's received some phone calls and he

25  needs me to do something, I'll just go by there and check.

98

1          I believe one of the supervisors may have mentioned

2     to me the article.  And I, in my going to Mr. Paulson's

3     office, as is my normal procedure is to knock on his door,

4     you know, "Hey, I'm here."  "What's going on?"  "You know

5     this is going on?"  "Did you see the article in the paper

6     about Toler?"

7          "Yeah."

8          That was it.  That's kind of it.  Then we moved on to

9     probably three or four more other things.

10    Q.     As of that point in time what was your understanding

11    of what was being done in relation to Mr. Toler's request of

12    the District Attorney's Office to look into the complaint

13    (sic.) that Mr. Oawster had made?

14         THE COURT:  If you know?

15         THE WITNESS:  I believed that Mr. Godwin had at some

16    point remedied that situation, had taken care of it.

17    BY MR. CASSIDY:

18    Q.     And what do you mean by that?

19    A.     He had followed-up, done his investigation, done some

20    interviews, completed his report, also had notified Mr. Toler

21    and told him.

22    Q.     I'm back in April though.  I'm before June.  So I'm

23    talking about the first advertisement at that point in time.

24         When you stepped in and mentioned it to District

25    Attorney Paulson, what was your understanding of the status,

99

1    if any, that you had regarding Mr. Toler's request that the

2    complaint -- or excuse me -- the threat by Mr. Oawster be

3    investigated?

4    A.      I just thought it was ongoing.  I didn't really know

5    a whole lot about it at that point.

6    Q.      After this time period, between April 12th and June

7    12th of 2005, did you receive any information regarding what

8    was taking place in relation to any investigation regarding

9    Mr. Toler's request that the District Attorney's Office

10   investigate the Oawster threat?

11   A.      Brook -- Brook Byerley and Mr. Godwin verbally would

12   come into my office.  I can't tell you exactly when, but they

13   would update and tell me what they were doing and fill me in

14   as to how the investigation was proceeding, what they were

15   doing.

16          And at the same time Mr. Godwin would tell me about

17   how Mr. Toler just hates me.  He would include that in.

18   Q.      Did you have any understanding as to why Mr. Toler

19   might be expressing some dislike or hate of you?

20   A.      Did I what now?

21   Q.      Did you have any understanding why Mr. Toler would

22   say he dislikes or hates you?

23   A.      No.  I could never to this day understand that.  I

24   met him once.  I don't know why he would do that.

25   Q.      Well, prior to that time that Investigator Godwin was

100

1    reporting that to you, had you ever met personally with

2    Mr. Toler?

3    A.      No.  I had a phone conversation that I remember.

4    Q.      And that was how far back?  How long before this

5    April, May, June period of 2005?

6    A.      I don't know how far, but it was before Mr. Toler

7    came in for the complaint regarding the threat -- the

8    Fairfield PD report taken and his complaint.

9            I don't know.  The only thing I can tell you is the

10   gist of the conversation had to do with issues of the

11   Sheriff, and I believe there was maybe one or two others.

12           One of them was Mr. Toler was concerned that the jail

13   staff may be allowing or calling one of the local bail bonds

14   and not calling the other ones.

15   Q.      Did you, based on your understanding of your

16   conversation with Mr. Toler on that occasion, did you say

17   anything to Mr. Toler that you believed might have caused him

18   to somehow dislike or hate you?

19   A.      I don't think so.  I think the conversation ended

20   fine.  He had some information he wanted to provide.  I

21   listened to him, and I told him that I would call and talk to

22   the Undersheriff, Tom, about it.

23           And I suggested to him that he needed really to

24   address the issue with the Sheriff's Office because they're

25   the ones that provide the training, the protocol, the

1    procedures.  They're the ones that have control of the staff

2    down there to do those kinds of things.  And that I would

3    call Tom and let him know Mr. Toler had voiced an interest.

4            As a matter of fact, I think he may have had some

5    evidence that might prove that somebody down there was doing

6    this.  And I said that you need to give that to Tom, that's

7    their jurisdiction, I can't do anything about that.

8    Q.      When you say "Tom," who are you referring to?

9    A.      I'm talking about Tom the Undersheriff.  Tom -- His

10   name escapes me now.  Ferrara.  Tom Ferrara.  I'm sorry.

11   Q.      Between this April 7th to 12th and June 12th, did you

12   receive any other information about the status of the

13   investigation into the Oawster threat?

14   A.      No.  They came in, and they -- they came in to let me

15   know what was going on with the case.  I remember Brook

16   sending me an e-mail.  And I asked him if the case had -- if

17   it was a filed case, I believe that was probably initially,

18   and if there was a Deputy DA assigned.

19           During their course of -- Mr. Godwin's course of

20   investigation I know at some point we did get the report.

21   They kept giving me these bits of information on-and-off that

22   somebody had reviewed it.

23           Mr. Godwin was going to actually do some more

24   follow-up on his own to do that, to see if we could, you

25   know, assist Mr. Toler in getting to the bottom of this

102

1    report.  Fairfield really didn't do a lot.

2    Q.      Prior to June 13th, when Mr. Toler came into the

3    office and had contact with you, did you have any

4    understanding as to where the investigation was at that

5    point?

6    A.      Well, I know that at some point they came in and told

7    me they were finished and concluded with that -- with the

8    investigation.

9    Q.      Was that prior to June 13th?

10   A.      Yes.

11   Q.      And did you receive any details of how it concluded

12   or what was going on?

13   A.      The only details that I got that I can recall was

14   that Mr. Godwin presented his information to the Deputy DA,

15   the Intake Deputy DA, and they had -- the Intake Deputy DA

16   decided not to file based on either lack of proof or lack of

17   elements and that he had notified Mr. Toler of it and told

18   him.  That was about it.

19          I know Mr. Godwin interviewed and made contact with

20   people in that -- regarding that report.

21   Q.      You mentioned and there was reference to an article

22   on June 12th that was in the Daily Republic.  And just what

23   was your understanding of the general nature of that article?

24   A.      That Mr. Toler had filed some small claims court

25   action or lawsuit against Mr. Paulson for gas money for going

103

1   to the office or something like that.

2   Q.      And had you made any comments to the reporter in

3   relation to that article?

4   A.      Yes.  I believe -- I recall while I was going back

5   and forth, maybe from the courts to the office, I ran into

6   the Daily Republic reporter, Jess Sullivan.  And he asked me

7   about it.  And I told him -- I gave him a statement.

8   Q.      Do you recall what that statement was generally?

9   A.      Generally, I said, I think, something about, Yes,

10  he's adamant -- Mr. Toler is adamant about seeing

11  Mr. Paulson.

12  Q.      At that point, when you gave that comment to

13  Mr. Sullivan, did you have any understanding as to the status

14  of the investigation?

15  A.      I can't recall.

16  Q.      Do you recall any information from the article as to

17  Mr. Toler's comments about the status of the investigation?

18  A.      I'd have to look at the article again, but I can't

19  recall.

20  Q.      Did you read the article when it came out?

21  A.      No.

22  Q.      Any particular reason why not?

23  A.      When it -- I don't read the paper.  I don't get the

24  paper.  I don't really read that many articles in the paper

25  with regards to that.

104

1          I get to work, I got some other things to do.  My

2    supervisors will bring those things to my attention and let

3    me know, especially if they're pertinent, like this

4    situation.  I recall they did bring it to my attention.

5          There are sometimes that they'll have articles in

6    there with regard to current court cases, maybe the current

7    law enforcement crime spree going on.  You know, if there was

8    a shooting in Fairfield or a shooting in Vallejo, those kinds

9    of things they'll bring to my attention.

10   Q.     After the article was brought to your attention, did

11   you do anything in response to the article?

12   A.     No, not particularly.  I mentioned it in my briefing.

13   As I said before, I did mention it to Mr. Paulson when I went

14   to normally see him.  "Did you see there was an article?"  He

15   says, "Yeah."

16   Q.     Was there any further discussion?

17   A.     No.  That was it.

18   Q.     What's the next thing that happens in relation to

19   anything involving Mr. Toler?

20   A.     You talking about the June 13th incident?

21   Q.     So let me stop you there.

22          June 13th, what's your first notice that Mr. Toler's

23   present in the District Attorney's Office?

24   A.     As best as I can remember, I was in the hallway and

25   someone said Mr. Toler's out in the lobby asking for you.

1           I looked around.  Everybody is busy.  I'm the only
2   one available so I say, Well, I'll go talk to him.
3   Q.      So what happens next?
4   A.      I go out the hallway that's been described previously
5   here on this thing.  I go out that one door that comes out of
6   that section of the building, and I opened the door.  As soon
7   as I opened the door, there is Mr. Toler standing there.
8   Q.      Let me stop you there for a moment.
9           MR. CASSIDY:  Madam Clerk, do you know where the
10  pointer is?
11          THE CLERK:  What is it?
12          (Clerk and Counsel confer.)
13  BY MR. CASSIDY:
14  Q.      Can you use that as you describe this.
15          All right.  So show us where it was that you, as you
16  just described, went out to meet Mr. Toler?
17  A.      This is the hallway that comes from our end of the
18  building.  As I mentioned earlier, investigations is way down
19  here some place.
20          I came out this hallway, opened the door, and Mr.  --
21  and I stood there and Mr. Toler was right there some place.
22  Q.      Did you remain in the doorway or did you step all the
23  way out into that area that you just showed --
24  A.      I stepped --
25  Q.      -- outside the door?

106

1    A.       I stepped all the way out.

2    Q.       Was the door closed that you exited from?

3    A.       Yes.  I can tell you why.

4    Q.       Why?

5    A.       This door, there's a recess in here.  When the door

6    opens, you have to step out because this is a conference room

7    so you come out this way.

8    Q.       All right.  What happens next?

9    A.       I see Mr. Toler there.  He's standing there with, I

10   believe, quite a number of documents, stuff holding on with

11   his left hand.

12           I say, "Hey, Tom.  How you doing?"  "Can I help you

13   with something?"

14           "Yeah."  "I want to see Mr. Paulson."

15           "All right."  "No problem."  "Okay."  "Great."

16   Q.       Let me stop you there.

17           I'm going to take this one step at a time.  I'm

18   sorry.  I don't want to belabor, but it's important.

19           What is Mr. Toler's response to you initially after

20   you say "Hello, Tom?"

21   A.       "I want to see Mr. Paulson."

22   Q.       What is your response to him?

23   A.       I said, "No problems."  "Great."  "Let me have a

24   phone number where I can reach you, and I'll go get that

25   done."

107

1   Q.      What happens next?

2   A.      As he's writing, he goes like this and takes out -- I

3   believe he tears out a piece of paper.  He's got his pen, and

4   he's writing -- writing.  I assume he's writing his phone

5   number.

6   Q.      Now, Mr. Toler has been at least in contact with the

7   District Attorney's Office a couple of prior times, he's been

8   in contact with Investigator Godwin so his number is

9   somewhere in the -- his telephone number is somewhere in the

10  District Attorney's Office.

11          Why do you ask him for his telephone?

12  A.      I would like to have that phone number in my hand

13  because I was going to go talk to Mr. Paulson right then

14  after talking to Mr. Toler.  And I didn't want to go looking

15  around for it.

16          I didn't want to find Godwin.  I didn't want to look

17  for a report or anything.  I wanted to be able, as soon as I

18  finished my conversation with Mr. Paulson, I can call

19  Mr. Toler.

20  Q.      What do you mean by that, when you say you're going

21  to go talk to Mr. Paulson immediately?

22          What was your intent at that moment that you asked

23  Mr. Paulson -- excuse me -- Mr. Toler for his telephone

24  number?

25  A.      I was going to go talk to Mr. Paulson and say that

1    Mr. Toler wants to meet with you.  We're going to have to

2    figure out a way to meet with him.

3    Q.    And did you ever get --

4    A.    I mean, it is Mr. Paulson's decision whether he does

5    or not, but I was going to make that attempt.  I was going to

6    attempt to do that.

7    Q.    What happens next?

8    A.    When he is doing that, when he's writing, I ask him:

9    So Tom, can you tell me what this is going to be about?

10   Q.    And why do you ask that?

11   A.    I ask that because that's what I normally do when I

12   talk to anyone that comes up and says that they want to see

13   Mr. Paulson.

14         I would like to know -- I like to run an effective

15   meeting and to make sure that when we have this meeting, it

16   is a constructive meeting so that the individual gets all

17   their answers.

18         If we do need other individuals, I need some other

19   paperwork or I need to research it, we will have all of that

20   ready available and get that -- make that thing happen, that

21   meeting happen so that we can answer and be responsive.

22         We might need another Deputy DA in there, you know,

23   if it had to be.

24   Q.    So what happens next?

25   A.    Mr. Toler stops writing, looks at me and is

109

1    continuing to look at me.

2    Q.      What do you mean by that?

3    A.      Well, he's staring at me.  He's staring at me like

4    he's -- I would assume he's attempting to think of what to

5    tell me in response to what I asked him.

6    Q.      And what happens next?

7    A.      He says, "You don't know what the fuck this is all

8    about?"  "Don't you read the fucking papers?"

9    Q.      What is your response to that?

10   A.      I said, "I don't know what you're talking about."

11           But at that time I did tell him, "You don't need to

12   use that language -- vulgar language."

13   Q.      At this point in time did you understand that Godwin

14   had completed his investigation and told Toler the DA's

15   Office was not going to file charges against Oawster?

16   A.      I seem to remember that was done and over with.  Yes,

17   sir.  That particular case had been dispositioned.

18   Q.      In response to your inquiry about -- to Mr. Toler

19   about, you know, what is this about, does he say anything

20   other than referencing this paper as he did as you just

21   described?

22   A.      No, he doesn't say anything else.

23   Q.      What happens next?

24   A.      Then he says -- Then he starts saying that he doesn't

25   know -- I'm trying to recall.  Something about Brook.  Every

110

1   time he comes up here that Brook pats him down.

2   Q.      What else does he say or what do you say?

3   A.      Okay.  That Brook pats him down like if I had -- he

4   pats me down like if I had an Uzi on me and maybe I should

5   have one the next time I come up.  Something like that.

6   Q.      So what's Mr. Toler's demeanor when he makes this

7   comment?

8   A.      He's obviously at that point, that I can see, he's

9   very upset.  He's very upset.  His demeanor from my initial

10  first contact when I saw him was fine.  I didn't note

11  anything at all.  He just seemed like he was there.  He was

12  there.  No problem.

13          But he (snaps fingers) just like that he switched

14  when I asked him that question.

15  Q.      Which question?

16  A.      What is this -- what is it about this meeting that

17  you want to have.  --

18  Q.      What happens next after he makes the comment about

19  the Uzi?

20  A.      I  again tell him, "You know, you don't have to make

21  threats."  "I can't understand why you're making threats."

22  Q.      What happens next?

23  A.      Then he continues to walk away from me towards the

24  elevators.  And he says -- I can't remember the words.  I

25  have read it over and over.

1        "Al --" I think he was at a loss for saying

2   something.  I believe he was so upset because he's, "Al, fuck

3   me" or "Blow me" or something he said.  "I think I'll just go

4   get another ad in the paper."

5        And I just said, "You know, Tom, you're going to have

6   to do what you have to do."  And he went down the elevator.

7   Q.      Now, at the point that Mr. Toler made this comment to

8   you, did you consider arresting him?

9   A.      No.

10  Q.      Why not?

11  A.      Well, for one, like I said, Mr. Toler's demeanor had

12  changed so drastically in such an immediate time that I knew

13  he was really mad.  He was hot.  You could see it in his

14  face, by the language he was speaking, in the tone that he

15  was speaking in.

16       I didn't feel the need to arrest him at that time.

17  And he was leaving so the immediate threat at that point was

18  gone.  I wasn't armed.  I made that decision, and that's what

19  happened.

20  Q.      What do you mean "not armed?"

21  A.      I wasn't carrying a weapon.

22  Q.      Do you wear any kind of police belt or anything with

23  an apparatus and all kinds of things?

24  A.      Normally I carry a badge and handcuffs and a gun.

25  Q.      At that point do you recall whether you had handcuffs

112

1   or not?

2   A.      No, I didn't.  I didn't have anything on.  It was my

3   badge.

4   Q.      What happens next?

5   A.      At that point I go talk to Mr. Paulson and report the

6   incident to him.  I write a narrative report immediately

7   thereafter.  I say in my report that this is what happened

8   and I offer quotations.

9          I cite the Penal Code Section that I believe that

10  Mr. Toler violated, threatening a public official, the

11  District Attorney's Office.  And I felt threatened and

12  referred it to the Sheriff's Office.

13  Q.      Why did you refer it to the Sheriff's Office?

14  A.      The Sheriff's Office has jurisdiction over all Solano

15  County buildings and property so I referred it to them for

16  further follow-up.

17         My intent was one of the other follow-up -- somebody

18  needs to contact -- Normal business would be somebody needs

19  to contact Mr. Toler and get a statement from him.

20  Q.      And what do you do -- Can you just generally describe

21  your discussion with Mr. Paulson?

22  A.      Well, my discussion with Mr. Paulson is to describe

23  to him the incident that just occurred.  And it was -- And I

24  felt at that time that given the two times, plus this time

25  Mr. Toler had been there, and the behavior and the conduct

113

1    and the language and the information I had received from all

2    these other people, the staff, that to me I needed to report

3    it.  There was a possibility that exists that Mr. Toler could

4    provide some violence to the office.  I had to make that

5    determination.

6    Q.      Did you conduct any additional investigation after

7    you provided the information to District Attorney Paulson?

8    A.      What we did is -- Mr. Byerley was involved in the

9    conversation, Mr. Paulson and myself, and I can't remember if

10   there was another investigator or not, but we decided to at

11   least look into it a little bit more.

12           So what we did is we received that -- somehow we

13   received that document from Marin where we knew he was in a

14   restraining order out of Marin County.  We knew that he had

15   accessibility to weapons so we --

16   Q.      Let me stop you there for a moment.

17           How do you make that determination?

18   A.      He's a bails bondsman, and he's a private

19   investigator and those people have weapons.  And he's prior

20   law enforcement.

21   Q.      So what else do you learn?

22   A.      Well, at that time we made the decision to contact

23   County Counsel.

24   Q.      So describe what you did in that regard?

25   A.      We contacted County Counsel and explained to them the

114

1    incident.  And we reported it.  And they made a decision

2    and -- we all made a decision that we should do a restraining

3    order.

4    Q.     Had you ever been involved in obtaining a workplace

5    restraining order prior to that time?

6    A.     No.

7    Q.     Had you ever prepared any types of declarations in

8    support of obtaining a workplace restraining order prior to

9    that time?

10   A.     No.

11   Q.     You mentioned that you prepared a report.  What did

12   you do?  Did you do anything with that report other than

13   provide it to the Sheriff's Department?

14   A.     Made it part of our records.  County Counsel had a

15   copy of it.

16   Q.     Did you write out the language in the declaration

17   that was prepared in support of the request for the temporary

18   restraining order?

19   A.     No.

20   Q.     And who prepared that?

21   A.     County counsel.

22   Q.     Generally, did you review that declaration to try to

23   be sure it was accurate?

24   A.     I did.  Yes, sir.

25   Q.     And you ultimately signed that declaration?

115

1    A.      Yes, sir, I did.

2    Q.      And as you reviewed it, did you believe it was as

3    accurate as possible at the time?

4    A.      Yes, sir.

5    Q.      In your discussions with County Counsel, did you

6    advise County Counsel about the other information that you

7    received, the restraining order or the weapons, those types

8    of things?

9    A.      We gave County Counsel all the information that we

10   had -- that we could give.

11   Q.      Did you check on the status of Investigator Godwin's

12   reports after this incident with Mr. Toler?

13   A.      Yes.  That was part of the process after this thing

14   is to -- after this incident in June 13th was to get

15   Mr. Godwin's reports as it related to this investigation he

16   conducted.

17   Q.      And did you or do you know if someone directed him to

18   do so?

19   A.      Brook Byerley did, yes.

20   Q.      All right.

21           You were asked about those series of reports that he

22   prepared?

23   A.      Correct.  Yes, sir.

24   Q.      Now, was there any discussion prior to the submission

25   of the request for the restraining order about the

116

1  restrictions that would be placed on Mr. Toler if the order

2  were granted?

3            THE COURT:  I'm sorry.  Was there any discussions

4  with whom.

5            MR. CASSIDY:  Thank you.

6  BY MR. CASSIDY:

7  Q.       Any discussions with Mr. Paulson, Mr. Byerley or

8  County Counsel about the restrictions that would be placed on

9  Mr. Toler if the temporary restraining order were issued?

10  A.       The discussions that I was privy to or what I said is

11  that we needed to keep Mr. Toler off the fourth floor.

12  Q.       What do you mean by "off the fourth floor?"

13  A.       Which is the District Attorney's Office on the fourth

14  floor of the Government Center.  In order to protect the

15  staff and the people there and anybody else, myself and

16  Mr. Byerley, he can't -- if you're going to issue a

17  restraining order, we need to keep him off the fourth floor.

18  Q.       At any time prior to submitting the request for the

19  retraining order, did you intend to interfere in any manner

20  with Mr. Toler's work as a bail bondsman?

21  A.       No.

22  Q.       Do you recall any discussions with Mr. Paulson,

23  Mr. Byerley or County Counsel about the distance that might

24  be placed on Mr. Toler from his going to the District

25  Attorney's Office?

117

1    A.      No.  County Counsel was preparing that.  They were

2    looking at the yardage.

3    Q.      At some point after the temporary restraining order

4    was issued, do you recall there being a reduction of the

5    yardage that was initially imposed on Mr. Toler in staying

6    away from the District Attorney's Office?

7    A.      I believe so.

8    Q.      And do you recall what the reduction was?

9    A.      No.  I believe it was from 500 to 100.  There was a

10   motion or Mr. Toler was asking County Counsel that he was

11   having problems trying to get into the SO, the Sheriff's

12   Office, going to the jail to conduct his business, and his

13   other business was down the street.

14          And I believe it was County Counsel, Wendy Getty, who

15   asked if we had any objection.  And we said No, we don't have

16   no objection to that, none.

17   Q.      At the point in time there was a reduction from 500

18   yards to 100 yards for Mr. Toler to stay away from the

19   District Attorney's Office, what was your intent at that time

20   in terms of the restriction you wanted on Mr. Toler?

21   A.      My intent was to keep him off the fourth floor and

22   not coming back to the lobby of the District Attorney's

23   Office.  That was my intent.

24          It is not my intent, because in the Government

25   Building there is Board of Supervisors in the same building,

118

1    so you've got to be able to go to the Board of Supervisors

2    meeting if you want.

3    Q.      Did you at some point have any discussions with

4    Mr. Paulson, Mr. Byerley or County Counsel Getty about making

5    the Government Center building available to Mr. Toler if he

6    made an appointment?

7    A.      Correct.  Yeah.  I believe so.  I remember that they

8    talked about -- County Counsel had more conversations and

9    more conversations either with Mr. Toler or Mr. Toler's

10   attorney that I -- I wasn't privy to.

11   Q.      Did you have any objection to allowing Mr. Toler to

12   come to the Government Center so long as he made an

13   appointment?

14   A.      No.

15   Q.      After the -- Or in or about the time the request for

16   the temporary restraining order is made, do you implement any

17   security measures with respect to yourself, Investigator

18   Byerley or District Attorney Paulson?

19   A.      Yes, we do.

20   Q.      Can you just generally describe those?

21   A.      Generally, we assigned intermittently some

22   investigators to Mr. Paulson to make sure we knew where he

23   was, if he came into the building, came into the parking lot.

24   We increased our awareness and our exposure in knowing where

25   Mr. Paulson was and having Mr. Paulson communicate with us

119

1   more on a daily basis for that reason, yes.

2   Q.      Was there any attempt to try to alert people about

3   Mr. Toler's description?

4   A.      Yes.  I believe staff had some photographs that were

5   printed and placed in the lobby area somewhere.  Inside the

6   District Attorney's Office when I say that, where the

7   reception area is.

8   Q.      So they're not posted outside on the fourth floor or

9   anywhere else in the budding?

10  A.      No.  No.

11  Q.      What's the purpose of why you would put those

12  photographs, for instance, in the reception area or

13  elsewhere?

14  A.      Because we didn't advertise it and we didn't do

15  anything.  So that people at the reception area who are there

16  constantly, if Mr. Toler walks in, they know what he looks

17  like.

18  Q.      Did you provide them any instruction about vacating

19  the area if they saw him, that type of thing?

20  A.      No.  We just tell them that if you see Mr. Toler in

21  here you need to immediately call us or call the Sheriff's

22  Department.

23  Q.      At the time that you applied for the -- at the time

24  you applied for the workplace temporary restraining order

25  against Mr. Toler on behalf of yourself, Investigator Byerley

120

1    and District Attorney Paulson, did you believe Mr. Toler

2    posed a credible --

3           THE COURT:  What threat -- What did you believe about

4    Mr. Toler as a possible threat?

5           MR. CASSIDY:  Fine.

6           THE COURT:  Do you understand the question?

7           THE WITNESS:  Yes, sir.  I believed there was a

8    viable threat.  I do.

9    BY MR. CASSIDY:

10   Q.     Why?

11   A.     Mr. Toler had been in our office on two occasions --

12   on two occasions.  And he was obviously upset and very

13   emotional.  On the second occasion he used some very vulgar

14   language.  He made some threats.

15          The information from staff was that they were afraid

16   of him.  They were -- they were really concerned about their

17   safety.

18          Mr. Godwin had investigated and made contact and had

19   communications with Mr. Toler and in those communications

20   with Mr. Toler he made some very, how would I say,

21   disparaging remarks about Brook and I.  He hated us to put it

22   lightly.

23          He had access to the weapons.  He was -- he has

24   access to all the public areas.  He's prior law enforcement

25   so he knows how to use weapons.  And he's -- and he -- and he

121

1   has resources that he can use to his ability to find out

2   where each and every one of us lived.

3        And he had a prior history of a workplace -- that was

4   a document that was identified to me as a workplace

5   protection in Marin County.

6        And for no apparent reason, on June 13th, when I

7   thought everything was okay, I was going to attempt to assist

8   Mr. Toler in getting this appointment, and when I asked him a

9   simple question he goes off on me and says maybe he should

10  bring an Uzi to the office.

11       That, to me, is enough for me to think that the

12  possibility exists that this individual could come in here

13  given those set of circumstances and the potential for

14  violence exists for the staff.

15       The Solano County Workplace Protection Policy doesn't

16  tell me that I either can or may.  It says I shall report to

17  my immediate supervisor the perceived real threat -- or real

18  threat to my immediate supervisor.  And that's what I did.

19       I believe and I still do believe that Mr. Toler at

20  that time was a threat.  And I don't know why.  That's -- I

21  don't know what it's about.

22  Q.    What role did Mr. Toler's comments about hating you

23  play in your decision-making process?

24  A.    I'm sorry.  Say that again?

25  Q.    Sorry.  I'm drying out.

1          What role did Mr. Toler's comments to Investigator

2    Godwin about hating you play in your decision-making process?

3    A.     Oh, they were considered, yes.

4    Q.     Why?

5    A.     Because of his hatred for me, his calling me names,

6    you know, useless or whatever.

7    Q.     What was the significance of that in terms of the --

8    A.     The significance is that I don't know why he would

9    have so -- so much hatred for me if I only met him once and I

10   had a decent conversation with him on the phone.  I don't get

11   it.

12   Q.     You mentioned that you considered threats that

13   Mr. Toler had made.  What threats were you referring to?

14   A.     The threats that he made during his -- that he would

15   take care of this.  If we didn't take care of this issue with

16   the Oawster filing for threatening his kids, then he was

17   going to handle it himself, that he would -- he would kill --

18   kill this person.

19          Those kinds of words, even though they are referenced

20   to this case he had, you have to consider those kinds of

21   things because of his emotion and for him to even say those

22   kinds of words.

23   Q.     So those have a significance beyond just his claiming

24   to say that just in the context of protecting his children?

25   A.     Yes.  It indicates to me the propensity for violence

123

1   is there.

2   Q.      In relation to your decision-making process to seek

3   the restraining order, did you intend to retaliate against

4   Mr. Toler in any respect for his criticism of the District

5   Attorney's Office, whether it be the advertisement he made or

6   the article that was later in the Daily Republic?

7   A.      No.

8   Q.      Did you ever sit and meet or discuss in some fashion,

9   communicate between yourself, District Attorney Paulson and

10  Investigator Byerley, and agree in some manner or conspire in

11  some manner that you're going to obtain this restraining

12  order to retaliate against Mr. Toler for his criticism of the

13  District Attorney's Office?

14  A.      No, sir.  That's not the purpose of this.

15  Q.      What was the purpose?

16  A.      To protect the staff, Mr. Paulson, myself and Brook.

17  And mostly the staff.  The public that's in the hallway that

18  comes into that lobby, it was to protect those people.

19          MR. CASSIDY:  Thank you.  That's all I have.

20          THE COURT:  Ladies and Gentlemen, we'll take our

21  afternoon recess.  Fifteen minutes.

22          Please, remember the admonition the Court has

23  heretofore given to you.

24          May I see counsel after the jury is gone.  I just

25  want to see you for a minute.

124

1          Off the record.

2          (Off the record at 02:35 PM.)

3          (On the record at 02:51 PM.)

4          THE CLERK:  Please, remain seated.

5          Court is now in session.

6          THE COURT:  Recross, Mr. Gonzalez?

7          MR. GONZALEZ:  Thank you, Your Honor.

8                RECROSS-EXAMINATION (ADVERSE WITNESS)

9    BY MR. GONZALEZ:

10   Q.      Mr. Garza, if I understand correctly your testimony

11   is that you had Mr. Godwin keeping you -- that you were being

12   kept on top of the reports, that you had him checking in with

13   you regularly; is that correct?

14   A.      Intermittently, yes, sir.  Him and Brook Byerley

15   would at least tell me what's going on with the case.  Yes,

16   sir.

17   Q.      And if I understand correctly, though, when I

18   examined you previously, you really couldn't explain why

19   Mr. Godwin wrote three reports after you filed your

20   declaration in support of the TRO as opposed to

21   contemporaneous with the investigation; is that correct?

22   A.      That's true.  Yes, sir.  That's true.

23   Q.      And, in fact, can you tell me on what date Mr. Godwin

24   met with Mr. Daugherty and decided that there would not be a

25   case prosecuted by the Solano County District Attorney's

125

1    Office related to the report that Tom Toler made to the

2    Fairfield Police about the threats to his children?

3    A.      No, sir.  I couldn't tell you the date.

4    Q.      You testified -- I mean -- Let me ask you this:  Does

5    that concern you that you can't indicate what dates

6    Mr. Godwin met with witnesses in a matter that he was

7    investigating?

8    A.      Does it concern me that I can't tell you now?

9    Q.      Yes.

10   A.      No.

11   Q.      Why not?

12           Why doesn't it concern you if I say to you when did

13   Mr. Godwin meet with John Colfer for instance?

14   A.      I don't know what you mean by "concern me" I guess.

15   Q.      Well, you're the Chief Investigator in the Solano

16   County District Attorney's Office.  Presumably you understand

17   these reports are being prepared in anticipation of

18   litigation and somebody is going to look at these and ask

19   questions about them, right?

20   A.      That wasn't the purpose of the reports.

21   Q.      Right.  But the purpose of the reports wasn't to just

22   kind of prepare them after you sought a TRO either, or is

23   that your testimony?

24           MR. CASSIDY:  Objection.  Vague and ambiguous.

25           THE COURT:  Sir?

126

1              Let me try and get to the heart of this.

2              You indicated earlier it would be appropriate for

3     Mr. Godwin to memorialize the dates that he met various

4     witnesses.  That was standard police procedure?

5              THE WITNESS:  Yes, sir.  It is more than appropriate.

6     Yes, sir.

7              THE COURT:  And these reports do not demonstrate

8     that.

9              THE WITNESS:  That's correct.  They don't, sir.

10             THE COURT:  Now, the question is therefore are you

11    concerned about the fact that they don't reflect what

12    standard police procedure would be?

13             THE WITNESS:  I'm concerned, yes, sir, to the extent

14    those reports are not written when they should have been

15    written.  Yes, sir.

16    BY MR. GONZALEZ:

17    Q.     Sir, you testified -- At the end of your testimony

18    Mr. Cassidy asked you what role did the fact that Mr. Toler

19    hated you and had communicated that to Mr. Godwin play in

20    your decision-making process as related to the TRO.  And you

21    said that this was something that went into your threats

22    assessment; is that correct?

23    A.     Yes, sir.

24    Q.     Now, didn't you tell me during the previous

25    examination, however, that after reviewing all of the memos

127

1   that Mr. Godwin prepared you could not find any reference to

2   the fact that Tom Toler hated you?

3   A.       That's true.

4   Q.       In other words, prior to you seeking the TRO, nobody

5   ever told you that Tom Toler hated you; is that true?

6   A.       No, that's not true.

7   Q.       I want you to think about this, Mr. Garza.  Your only

8   interaction with Tom Toler was on June -- was it June 13th or

9   June 14th -- June 13th; is that correct?

10  A.       Physically.  Yes, sir.  I mentioned a prior phone

11  conversation.

12  Q.       Regarding this case, June 13th?

13  A.       Yes, sir.

14  Q.       All right.

15          So I asked you previously:  Can you think of any

16  reason why Tom Toler would have had any animus towards you

17  prior to June 13th.  And you previously said you couldn't

18  think of any reason; is that right?

19  A.       I still can't think of it.  I was told what

20  Mr. Godwin told me, and I couldn't understand why.  I still

21  can't.  And even at the 13th -- after the 13th I don't know

22  why he hates me.

23  Q.       Right.  But I'm asking you, all of Mr. Godwin's

24  reports, after the one related to April 12th and April 7th,

25  are written after you sought the TRO; is that correct?

128

1   A.      Correct.

2   Q.      And so is it possible that Mr. Godwin told you about

3   Tom Toler's animus towards you after you sought the TRO, not

4   before it?

5   A.      No, sir.

6   Q.      Why don't you mention in the declaration that you

7   submitted in support of the TRO that Tom Toler is talking

8   about hating you for no reason?

9   A.      Mention it to who?  Oh, in the TRO?

10  Q.      Right.

11  A.      Oh, it's not in there.  No, sir.  I don't know.

12  Q.      But you just told counsel that this played an

13  important role in your threats assessment as you tried to

14  gauge where Tom Toler is in terms of a possible threat to the

15  office?

16  A.      Yes, sir.  I mentioned that to everyone, including

17  County Counsel, in the preparation of that.

18  Q.      So Wendy Getty prepares this declaration after

19  speaking to you presumably, right?

20  A.      Yes, sir.

21  Q.      After she leaves out important details that you

22  shared with her, did you tell her, "You left out some things

23  that I think should be inserted into this declaration before

24  I sign it?"

25  A.      I can't recall.  I may have.  When I'm talking to

129

1  attorneys I usually tell them things, and they just ignore

2  me.

3  Q.      Right.

4          THE COURT:  The question -- the question as you sit

5  here now is do you have an independent recollection of saying

6  to Miss Getty, I guess the name is, "Look, there's important

7  information you left out of the declaration."

8          Do you have an independent recollection of that?

9          THE WITNESS:  No, sir.  I don't.

10  BY MR. GONZALEZ:

11  Q.      And, in fact, you didn't -- Well, when you read the

12  declaration -- You read the declaration before you signed it,

13  right?

14  A.      Yes, sir, I did.

15  Q.      And so you saw mistakes in your declaration, but you

16  elected to sign it rather than tell her to correct the

17  declaration; is that correct?

18  A.      I can't recall if I did, if that conversation took

19  place.

20  Q.      So it is possible that you -- Let me ask you:  Do you

21  see, as you look at the declaration today, would you say that

22  it's a fair portrayal and assessment of the situation as it

23  relates between the District Attorney's Office and Tom Toler?

24  A.      Is it a fair assessment as it relates to the District

25  Attorney's Office and Mr. Toler?

130

1    Q.        You've interacted with him, you're submit a

2    declaration saying Tom Toler is a threat.  You told me

3    previously that you think it is important the declaration be

4    balanced and give a complete picture of what you're dealing

5    with, correct?

6    A.        Correct.  Yes, sir.

7    Q.        And as you sit here now, under oath, do you believe

8    that the declaration that you signed and that was submitted

9    with the TRO, do you think that was a fair and balanced

10   presentation of your relationship with Tom Toler?

11   A.        Yes.

12   Q.        You say that even though you don't tell the judge a

13   litany of things I've already gone through, that he doesn't

14   have a criminal record, he is a former peace officer, the

15   reason why he has come to the DA's office?

16   A.        Yes, sir.  I provided all the information to the

17   individual, the County Counsel, who was preparing this

18   document.

19            And I may have had discussions.  I can't recall the

20   discussions I had in all this information.  And yes, I did

21   sign it.  And I don't know if the attorney made the decision

22   of what things to put in and what to leave out.

23   Q.        Right.  But, sir, I'm asking you a different

24   question.

25            It sounds to me like you shared with this attorney

131

1    quite a bit of information that didn't get included in your

2    declaration; is that correct?

3    A.      All the information that I have been sharing with you

4    today was shared with the -- regarding this incident was

5    shared with County Counsel, yes, sir.

6    Q.      But also the information that I've questioned you

7    about that seems as if it should have been included if you

8    were giving a fair characterization of your interaction with

9    Tom Toler, those things you brought up to the County Counsel

10   because you thought a judge should know about them before

11   they made a decision assessing Mr. Toler's threat level?

12        MR. CASSIDY:  Objection.  Overbroad and misstates his

13   testimony.

14        THE COURT:  Overruled.  You may answer.

15        Is that right?

16        THE WITNESS:  Could you ask that one more time,

17   please.

18   BY MR. GONZALEZ:

19   Q.      I asked a few minutes ago about some of the facts

20   like that Tom Toler doesn't have a criminal record at that

21   time?

22   A.      Correct.  I remember that.  Yes, sir.

23   Q.      And Mr. Toler was a former peace officer with a good

24   reputation, that he had come to the District Attorney's

25   Office on a report of threats to his children, that he had

132

1    published an ad in the newspaper critical of the District

2    Attorney's Office, that that ad in the paper talked about the

3    Democratic process and how to create change in our society,

4    that he had talked about his good interactions with

5    Mr. Godwin in your office.

6              Are these things that you shared with Wendy Getty and

7    she simply didn't put them in the declaration?

8    A.        She knew about the ads, yes, sir.

9    Q.        Did she know about the litany of things I mentioned?

10             I mentioned about five things.  Did she know about

11   all of those things?

12   A.        I don't know if she knew about those things.

13   Q.        But you understand before you signed the declaration

14   in this matter that those factors were not in the declaration

15   you were signing, correct?

16   A.        Correct.

17   Q.        And so as you sit here today, would you concede that

18   the declaration you signed did not give a complete picture of

19   your office's interactions with Tom Toler as related to his

20   threat assessment level?

21   A.        Yes, sir.  I would agree with that.

22   Q.        Okay.  And that's because what factors were not

23   included in the declaration that should have been?

24   A.        I'd have to look at the application itself again to

25   see exactly what's been left off.

133

1    Q.      Sure.  Go ahead.

2    A.      Obviously, the things you talked about.

3    Q.      Okay.

4    A.      Okay.  The accessibility of weapons for Mr. Toler I

5    think, wasn't in the affidavit.  The fact that he hated --

6    he's made -- he hated me, he hated Brook, he hated

7    Mr. Paulson.

8           The fact -- I'm just going off memory here.  I

9    think -- I'm trying to remember because all of these are

10   things that I mentioned.  His accessibility to the office and

11   in the public area.

12   Q.      So Mr. Garza --

13          MR. CASSIDY:  Objection, Your Honor.  He's

14   interrupting the witness' answer.

15          THE WITNESS:  We mentioned -- she mentioned the Marin

16   workplace restraining order.  Some of the statements that

17   were made by Godwin where he said he would kill, I don't know

18   if that was in there because of the crime report.

19          I can't recall all of them, sir.  I'm trying to

20   remember.  Like I said, the ones you mentioned.

21   BY MR. GONZALEZ:

22   Q.      Mr. Garza, so in asking you whether or not the

23   declaration that you submitted was complete or not, you've

24   conceded that it was not complete.

25   A.      Didn't have --

134

1      MR. CASSIDY:  Objection.  Asked and answered.

2  BY MR. GONZALEZ:

3  Q.     So then I asked you --

4      THE COURT:  This is cross-examination.  You can

5  object it is cumulative.  It is clearly preliminary to other

6  questions.

7      You may put the question again, and we'll go through

8  it one more time even though I think at some point it is

9  cumulative, sir.

10     MR. GONZALEZ:  I understand, Your Honor.

11 BY MR. GONZALEZ:

12 Q.     Sir, Mr. Garza, I asked you, it appears you've

13 conceded that the declaration that you signed was not a fair

14 portrayal of your interaction -- your office's interaction

15 with Mr. Toler.

16     So then I followed up with a question about what were

17 some of the things that would have made it a more fair

18 portrayal.  And now you're adding some other factors that you

19 think would have helped the judge make that determination,

20 all of them negative to Mr. Toler; is that correct?

21 A.     Yes.  I included yours, sir.

22 Q.     Okay.  But you've included mine simply by saying

23 everything that you say plus these other things, right?

24     Let me ask you this:  Did you ever participate in

25 making a threats assessment on Richard Oawster during the

135

1    investigation of Mr. Toler's case?

2    A.      No, sir.

3    Q.      Why not?

4    A.      That was Mr. Godwin's responsibility in determining

5    if he had committed a crime.

6    Q.      Did anybody in the District Attorney's Office prepare

7    a threats assessment on Mr. Oawster?

8    A.      No, sir.

9    Q.      And so you could have gone down a list of things

10   about Richard Oawster that would indicate whether or not he

11   was likely to carry out the threats against Tom Toler's

12   children; isn't that right?

13   A.      That could be possible.  Yes, sir.

14   Q.      What are some of the things that you would put in

15   such a threat assessment if you were asked to do it?

16   A.      With regards to Mr. Oawster?

17   Q.      Yeah.

18   A.      Again, I would try and do a background history, see

19   if he's employed or not employed, if he's losing his job.

20   Those are critical issues.

21           Does he have weapons.  Does he have a history of

22   potential violence.  What is the relationship between, again,

23   like I said, the target and who the threat is being made to.

24   You know, why they're making the threat.  How long the threat

25   is.

136

1        Other considerations are again the -- those that I

2   talked about, does he have access to resources to follow this

3   person, to surveil these people.  Does he have -- has he made

4   some inappropriate communications with these individuals,

5   whether they be, you know, non-threatening or threatening,

6   some fixation he has on this person.

7        All of the same things that I utilized to assess --

8   to make the assessment with Mr. Toler.

9   Q.      So as you sit here now, is it your conclusion that

10  you would reach a conclusion that Mr. Oawster did, in fact,

11  propose a credible threat to Tom Toler and his children?

12  A.      I'm not sure.  I wouldn't be able to give you an

13  opinion on that because I'm not privy to all of those

14  details.  I didn't do an investigation so I couldn't tell

15  you.

16  Q.      But Mr. Garza, you're the Chief Investigator in the

17  office?

18  A.      Uh-huh.

19  Q.      You've got investigators working for you that have

20  worked up the case and are keeping you informed.

21       At some point isn't the ultimate question whether

22  Mr. Oawster presents a threat to Tom Toler and his children?

23       MR. CASSIDY:  Objection, Your Honor.  It is vague as

24  to what context.  A restraining order or --

25       THE COURT:  The objection is overruled.

137

```
1         He's asking whether that was an appropriate thing for
2    you to do, "yes" or "no?"
3         THE WITNESS:  No, it wasn't at that time.
4    BY MR. GONZALEZ:
5    Q.     At what time would it have been appropriate to assess
6    Mr. Oawster's threat level?
7    A.     I can't answer that.
8    Q.     Is it that you can't answer it because your office
9    didn't do it and you don't want to admit it should have been
10   done?
11        MR. CASSIDY:  Objection, Your Honor.
12   Argumentative.
13        MR. GONZALEZ:  It is cross-examination, Your Honor.
14        THE COURT:  No.  You can answer that question.
15        THE WITNESS:  No, we didn't do it, sir.  And the
16   criminal investigation that Mr. Godwin was conducting is kind
17   of what he's making, trying to do, is assess that threat for
18   the purposes of filing a criminal complaint.
19   BY MR. GONZALEZ:
20   Q.     But your office didn't make any formal threat
21   assessment, and you didn't participate in doing a threat
22   assessment of Mr. Oawster?
23   A.     No, sir, I didn't.
24   Q.     Now, if I understand correctly, you indicated that
25   you did not read the small claims article prior to your
```

138

1    interaction with Tom Toler on June 13th; is that correct?

2    A.      That's correct.

3    Q.      But you did mention it to Dave Paulson during your

4    meeting with him; is that correct?

5    A.      Yes, sir.

6    Q.      And you were aware that you had been quoted in the

7    article; is that correct?

8    A.      Yes, sir.

9    Q.      If you didn't read the article, how did you know you

10   were quoted in it?

11   A.      As I said, my investigators, Brook and Curtis, they

12   came in and they tell me about it.  They mentioned:  Hey,

13   there was an article in the paper and you were quoted about

14   Toler.

15   Q.      Who told you what the quote was?

16   A.      I can't recall that they told me what the quote was.

17   He said I was quoted.

18   Q.      But you've testified that you knew when Tom Toler

19   came into the office that you had already stated that

20   Mr. Toler was adamant to see the District Attorney, right?

21   A.      Correct.  I read it later.

22   Q.      So you do read articles sometimes?

23   A.      After -- after they brought it to my attention.  Yes,

24   sir, I do.

25   Q.      So had you read the article or hadn't you before Tom

139

1    Toler came into your office?

2    A.      No, sir.

3    Q.      And you hadn't read the article before you mentioned

4    it to Dave Paulson?

5    A.      Exactly.  Yes, sir.

6    Q.      Isn't the entire purpose of briefing Dave Paulson in

7    the morning to give him an update on information and things

8    that are happening?

9    A.      Yes, sir.

10   Q.      You wouldn't be able to do that with an article you

11   hadn't read, would you?

12   A.      No, sir.  I just didn't think that was important

13   enough.  I had probably some other more priority stuff that

14   was going on that was an immediate.

15          MR. GONZALEZ:  Your Honor, I would like to impeach

16   the witness with his deposition on page 27, lines 3 to 9.

17          THE COURT:  I've got it up here.

18          Thank you.

19          MR. CASSIDY:  I don't see how that is impeaching.

20          THE COURT:  You may proceed.

21          MR. GONZALEZ:  Mr. Garza, I'm going to read some

22   testimony from your deposition which takes place January

23   19th, 2006.

24          (READING):

25          QUESTION:  When Mr. Toler asked you, "Don't you read

140

1              the papers," your response was that you didn't know

2              what he was talking about?

3              ANSWER:  Correct.

4              QUESTION:  But you had read this paper, the Daily

5              Republic, and discussed with Mr. Paulson Mr. Toler's

6              publication?

7              ANSWER:  Correct.

8              (READING CONCLUDED.)

9    BY MR. GONZALEZ:

10   Q.     Mr. Garza, prior to June 13th, you were aware that

11   Mr. Toler had not only publish an advertisement at his own

12   expense, but was now being quoted in an article critical of

13   the District Attorney's Office, correct?

14   A.     Yes, sir.

15   Q.     Prior to June 13th had you ever made a recommendation

16   to Dave Paulson that he should sit down with Tom Toler and

17   speak to him?

18   A.     No, sir.

19   Q.     Did you ever tell Dave Paulson that your information

20   was that Tom Toler had a good reputation as a law enforcement

21   officer from your contacts?

22   A.     No, sir.

23   Q.     Had you participated in any way in trying to

24   de-escalate what appeared to be happening between your office

25   and Tom Toler?

1  A.      In assisting him in his complaint with regards to the

2  Fairfield PD report where the threats were made against his

3  children, that's -- that's what we were trying to do to help

4  him do that.

5  Q.      Mr. Garza, would you agree that if you are going to

6  question a suspect about a criminal act that they've engaged

7  in, that -- Well, let me ask it like this.  You were aware

8  that Mr. Godwin spoke with Mr. Oawster to try to confirm and

9  figure out whether or not he had, in fact, made a threat?

10  A.      Yes.  I believe I had that information.  That would

11  be part of the investigation.

12  Q.      All right.

13          And you heard Mr. Godwin testify about how he

14  conducted that interview with Mr. Oawster?

15  A.      Yes, sir.  I heard that.

16  Q.      And did you find that to your satisfaction as the

17  Chief Investigative Officer of the Solano County District

18  Attorney's Office?

19  A.      Yes, I believe it was an appropriate thing to do.

20  Q.      Now, if I recall what Mr. Godwin said is that first

21  off he asked Mr. Oawster whether or not he had called Tom

22  Toler and made a threat.  And Mr. Oawster denied having

23  called Tom Toler for any reason.

24          Is that correct?

25          MR. CASSIDY:  Objection.  Outside the scope.

142

1          THE COURT:  Beyond the scope of cross.

2          That appears to be the case, Mr. Gonzalez.

3          MR. GONZALEZ:  It goes to Godwin's reports.  He asked

4     him whether or not he thought Godwin was a good investigator.

5     It goes directly to that.  He said he's got a very good --

6          THE COURT:  You're right.  That did happen.

7          You may proceed.

8     BY MR. GONZALEZ:

9     Q.     So do you remember that Mr. Godwin told us that he

10    asked Mr. Oawster whether or not he had called Tom Toler and

11    made a threat, and Mr. Oawster responded that he hadn't

12    called Tom Toler for any reason.

13         Do you remember that?

14    A.     Yeah.  I think -- I don't know if the threat was made

15    to Tom Toler's kids or to Tom Toler.

16    Q.     The phone call was made to Tom Toler regarding

17    threatening his children.  That's the phone message that

18    Mr. Godwin had and could prove Mr. Oawster had called Tom

19    Toler.

20    A.     Okay.  I remember him testifying.

21    Q.     Here's the point.  Here's what I want to ask you.

22    A.     Uh-huh.

23    Q.     It seem like as soon as Mr. Godwin knew Mr. Oawster

24    was lying to him, he didn't ask him:  Look, I can prove

25    you're lying.  Why are you calling Tom Toler and threatening

143

1    his kids?

2            He didn't ask him that question.  But as soon as he

3    found out he was being lied to he told the guy:  Hey, buddy,

4    cut it out.  Don't make any more phone calls or I'll be back

5    here and arrest you or something to that effect.

6            Do you remember that?

7    A.      Yes, sir.

8    Q.      So is it the job of an investigator trying to figure

9    out, in fact, what act has been committed to end an

10   investigation by simply telling someone not to engage in the

11   conduct, or to find out the specific information that

12   actually took place?

13   A.      He should -- In order to make a complete report, he

14   should find out if, in fact, and get from Mr. Oawster if he

15   did make that phone call, yes.

16   Q.      But after Mr. Oawster says that he didn't make the

17   phone call, and you can prove that he did, are you satisfied

18   that the way to handle that interview is simply to say:  Cut

19   it out.  Don't do it again.  I'm leaving.  And if I have to

20   come back out here again, I'm going to do something about it?

21   A.      I'm not sure of the scenario or situation that

22   Mr. Godwin was in when he was conducting that interview so I

23   wouldn't be able to tell you whether it was appropriate or

24   inappropriate.

25   Q.      Was Mr. Paulson in the office on June 13th when Tom

144

1    Toler came into the office wanting to meet with him?

2    A.      I don't know.

3    Q.      You don't have a memory of that?

4    A.      No.

5    Q.      Was Tom Toler staring intently at you after you asked

6    him, "What do you want to meet Dave Paulson about?"

7    A.      I can only describe it as him staring at me.

8    Q.      When you say that he was staring at you, it sounded

9    very similar to the way Mr. Byerley had described Tom Toler

10   staring toward the reception area.

11           Do you remember that testimony?

12   A.      Yes, I remember that.  Yes, sir.

13   Q.      And you're conceding, aren't you, when Mr. Toler

14   said, "You don't know what this is about," "Don't you read

15   the papers," that you lied to him.  You had, in fact, looked

16   at the paper and knew you were quoted in it?

17   A.      I really didn't know what he was talking about, what

18   papers.  Because I know he had the two articles.  I had in my

19   mind that there were two articles, the advertisement and

20   there was this article.

21           And then I had it in my mind that I thought we had

22   taken care of or had assisted him and there was a disposition

23   on the one.  So really I didn't know what it was he wanted.

24   Q.      But Mr. Garza, you saw me.  I read the testimony from

25   your deposition that was closer in time to the events that

145

1      we're talking about.  And in that deposition you said -- you

2      answered "Correct" to a question that you had read the paper

3      and discussed it with Mr. Paulson.  You said "correct," that

4      you had read that article.

5             MR. CASSIDY:  Objection.  That misstates --

6             THE COURT:  That's what it says.  But if the

7      objection is that it assumes something not in evidence,

8      namely he did that before he talked to Mr. Toler, that's a

9      very good objection Mr. Cassidy and it is sustained.

10            MR. GONZALEZ:  Well, but the first question, Your

11      Honor, is:

12            (READING):

13            QUESTION:  When Mr. Toler asked you, "Don't you read

14            the papers," your response was that you didn't know

15            what he was talking about?

16            ANSWER:  Correct.

17            QUESTION:  But you had read the paper, the Daily

18            Republic, and discussed with Mr. Paulson

19            Mr. Toler's publication?

20            ANSWER:  Correct.

21            (READING CONCLUDED.)

22            THE COURT:  That's correct.  That doesn't say he did

23      it before he talked to Mr. Toler.

24            MR. GONZALEZ:  Sure it does.

25            THE COURT:  He may have done it afterwards.

146

1          MR. GONZALEZ:  No.

2          (READING):

3          When Mr. Toler asked you, "Don't you read the

4          paper --"

5          (READING CONCLUDED.)

6          THE COURT:  Thank you, sir.

7          You may get on with your next question.

8     BY MR. GONZALEZ:

9     Q.     Sir, at the time you claimed Mr. Toler made a threat,

10    you asked him to, in effect, clarify whether or not he was

11    making a threat; isn't that right?

12    A.     I documented my -- as much as possible my exact words

13    immediately afterwards.  And you're correct, it says "Are you

14    making a threat?"

15    Q.     And Mr. Toler told you he's going to go get another

16    ad out in the paper, right?

17    A.     Yeah, he did say that.

18    Q.     And you didn't say to him, "Tom, I think you're

19    making a credible threat of violence," you said, "You got to

20    go do what you got to do?"

21    A.     Correct.  Yes, sir.  That's what I said.

22    Q.     You didn't mean by that remark that he should go get

23    an Uzi and bring it back to the office, did you?

24    A.     Most definitely not.

25    Q.     You didn't think he was going to bring any kind of

147

1   weapon to your office, did you?

2   A.      I think the possibility existed.

3   Q.      But the possibility exists today that I would do such

4   a thing.  It is not a question of what the possibility is,

5   the question is whether or not you believed that this was a

6   credible likelihood?

7   A.      You don't have the history that he had, and you're

8   not telling me the word that really bothered me which was

9   Uzi.

10          THE COURT:  The question is anything in the world is

11  possible.  That's not the standard.

12          Now put your question.

13  BY MR. GONZALEZ:

14  Q.      All right.

15          Mr. Garza, concerning Mr. Oawster's threat

16  assessment, you're aware he was out of work on some kind of

17  disability?

18  A.      Yes.  I remember that.

19  Q.      Are you aware he was on medication?

20  A.      No, sir.

21  Q.      Are you aware that he was upset about losing his

22  kids?

23  A.      I believe somebody said -- Bill Godwin may have said

24  that to me.

25  Q.      Are you aware that he was a law enforcement official

148

1    of some kind with access to weapons?

2    A.       Yes, sir.  He was a correctional officer.

3    Q.       You were aware he had lied to a law enforcement

4    officer conducting an investigation in the case about whether

5    or not he had even called Tom Toler?

6    A.       That information was relayed, yes, sir.

7    Q.       Were you aware that there were confirmed CPS reports

8    and other reports in the Illinois jurisdiction?

9    A.       I'm not sure if I knew that.

10   Q.       That there had been restraining orders issued against

11   him that he was alleged to have violated?

12   A.       I may have been aware about that, yes, sir.

13   Q.       You indicated that the immediate threat that Tom

14   Toler posed was gone when he left your office; is that

15   correct?

16   A.       Yes, sir.

17   Q.       And so I thought your testimony was that the threat

18   that he posed was that he was going to come back to your

19   office and do something?

20   A.       Yes, sir.

21   Q.       So when he left, how could the immediate threat be

22   gone?

23   A.       He's not there.

24   Q.       Sir, Mr. Toler never entered your office with any

25   kind of weapon at his belt to your knowledge?

149

1   A.      To my knowledge.

2   Q.      Nobody ever reported anything to the contrary?

3   A.      I didn't hear anybody report.  No, sir.

4   Q.      Now, you have indicated that we all handled the

5   decision to seek the TRO; is that correct?

6           You said the County Counsel, yourself, Mr. Byerley,

7   Mr. Paulson, that you all discussed it and made that decision

8   together; is that right?

9   A.      Yes, sir.

10  Q.      And despite your experience dealing with threat

11  assessment, you had never sought a Workplace Violence TRO

12  before?

13  A.      That's correct, sir.

14  Q.      And it's your testimony that in the seeking of this

15  order you simply wanted Tom Toler to stay out of your office,

16  and so for that reason you really wanted him off the fourth

17  floor or was it the third floor?

18  A.      Fourth floor.

19  Q.      That's really what you wanted, right?

20  A.      Yes, sir.

21  Q.      So when somebody brought it to your attention that he

22  had been ordered to stay 500 yards away from your office and

23  they were talking about reducing it to 100 yards, did you

24  tell anyone that you thought that was too long of a distance?

25  A.      I may have said that we just don't need him to be on

150

1   the fourth floor.

2   Q.      Right.  So if somebody was seeking 100 yards, an

3   entire football field distance between you, Dave Paulson,

4   Brook Byerley, Dave Toler, that was just too much distance,

5   wasn't it?

6   A.      That would be the call of the County Counsel.  I

7   expressed my views on that.

8   Q.      Sir, you're aware though that the declaration that

9   you filed put into motion a set of circumstances that

10  included that Mr. Toler was ordered to do certain things?

11          You're aware of that?

12  A.      Yes, sir.

13  Q.      You're not trying to escape liability for that by

14  suggesting that it was really another lawyer that did every

15  thing, you had nothing to do with it?

16  A.      No, sir.

17  Q.      Mr. Garza, as I have asked you the questions related

18  to whether or not Mr. Toler expressed hate for you, the

19  natural question comes up as to whether or not he expressed

20  hate for you before or after June 13th.

21          Do you understand that?

22  A.      Yes, sir.

23  Q.      All right.

24          Do you have any memo prepared by anybody at the

25  District Attorney's Office that Mr. Toler said he hated you

151

1    or any animus towards you directed by Mr. Toler prior to you

2    seeking the TRO in this matter?

3    A.      No, sir.

4    Q.      Now, you testified as to some of your law enforcement

5    background with Mr. Cassidy.  You raised the fact that you

6    have POST training and graduated from the Police Academy; is

7    that correct?

8    A.      Yes, sir.

9    Q.      This is the same kind of training Mr. Toler had

10   received?

11   A.      Yes, sir.

12   Q.      And you're not suggesting, are you, that because

13   you're a police officer with POST training that that makes

14   you an expert in every field that you study -- in every field

15   that you study; is that correct?

16   A.      I'm sorry.  Say that again.

17   Q.      Well, think of it like this.  I went to law school.

18   I studied a bunch of different subjects.  In some cases I was

19   in a class all year long.  It would not make me an expert in

20   that field.

21           So I'm asking you, do you understand that although

22   you may have studied certain subjects at the police academy,

23   and even studied them for many hours, that you may not be an

24   expert in that field?

25   A.      Yes, sir.

1    Q.      In other words, you may have information, you may

2    have information that other people want, you may have

3    information they call upon for your advice, but it doesn't

4    make you an expert in the field.

5            Do you understand?

6    A.      Yes, sir.

7    Q.      You would agree with that, wouldn't you?

8    A.      I would agree.  Yes, sir.

9    Q.      So you have also conceded already that when you

10   signed that declaration, and you said that you had qualified

11   as an expert, you know, numerous times in Superior Court in

12   Solano County, that was not the truth; is that correct?

13   A.      What's in the declaration qualifying in the Superior

14   Court as an expert, that statement is not correct.

15   Q.      It's not just not correct, it is not true, is it?

16   A.      It is not true.

17   Q.      Okay.  Now, if I understand you correctly about the

18   expertise that you do have, the courses that you've taken in

19   trying to make threat assessments, you've indicated that

20   there is not some profile that can give you a degree of

21   certainty as it relates to somebody's threat assessment

22   level; is that correct?

23   A.      That's correct, sir.

24   Q.      That in effect it is a judgment call, putting

25   together a lot of factors in trying to decide what somebody's

153

1    threat assessment level is, correct?

2    A.       That's correct.

3    Q.       And there's certain indicators that would help you to

4    make that decision, right?

5    A.       Correct.  Yes, sir.

6    Q.       And that's precisely why you have to be accurate

7    about the information that you consider when you're trying to

8    decide whether or not somebody poses a threat; isn't that

9    right?

10   A.       That's correct.  Yes, sir.

11   Q.       Now, when you spoke to Mr. Paulson after your

12   conversation with Tom Toler to raise this issue about

13   Mr. Toler's comment that included an Uzi, did you tell

14   Mr. Paulson that you felt it was a judgment call as to

15   whether or not he was making a credible threat?

16   A.       No, I didn't.

17   Q.       Do you remember testifying, when I examined you

18   previously, that at the time that happened, in light of what

19   subsequently happened where you asked Tom whether or not he

20   was making a threat and he told you he was going off to get

21   another advertisement or put out another thing in the paper,

22   that it was a judgment call?

23   A.       Did you ask me that?

24   Q.       I'm asking you.  Do you remember you said it was a

25   judgment call as to whether or not this was a credible

154

1   threat?

2   A.      If that's what I testified, yes, it is a judgment

3   call.

4   Q.      So what would be the factors that would indicate it

5   was not a credible threat?

6   A.      Well, you could eliminate maybe the history.  I'm

7   trying to think you could eliminate that history that we had

8   with the office with Mr. Toler coming in.  You could

9   eliminate that, and it would not be a credible threat then I

10  would think.  It would be his being upset.

11  Q.      Let me stop you there then.

12          So even if the language is exactly what you've told

13  us, you're saying if you can get rid of the history it would

14  not be a credible threat?

15  A.      That would be a consideration.  Yes, sir.

16  Q.      And the history, as I understand it, is the first

17  interaction Mr. Toler had in the District Attorney's Office

18  with Mr. Byerley in March -- March 28th or 29th?

19  A.      Correct.

20  Q.      And then the subsequent visit to the DA's Office on

21  April 7th?

22  A.      Correct.

23  Q.      So those two incidents have been discussed here in

24  this trial, correct?

25  A.      Yes, sir.

155

1    Q.     And you've heard the testimony about the April 7th

2    matter, right?  That Mr. Toler came to the DA's office eleven

3    days after filing a report on threats to his children, right?

4    A.     Correct.  Yes, sir.

5    Q.     And nobody from your office had contacted him after

6    that meeting with Mr. Byerley to tell him -- to give him an

7    update on the status of his report, right?

8    A.     Correct.

9    Q.     So are you telling me that it's not reasonable for a

10   father to come to the District Attorney's Office and be upset

11   that action hasn't been taken to protect his children?

12   A.     I'm not sure what you're asking.  You asked me if I

13   eliminated some parts what would I take into consideration in

14   making my judgment in assessing my opinion that was a viable

15   threat.  I said it was that, the whole thing.

16          Now you're asking me a question whether I would --

17   you're asking me a question about that.  I don't get it.  I

18   don't understand.

19          THE COURT:  Don't try and guess his motivation.  The

20   question is is it -- is it your view that it was unreasonable

21   for Mr. Toler to be upset when he arrived eleven days later

22   to discover that, at least in his view, nothing had been

23   done?

24          THE WITNESS:  No, it is not unreasonable.

25   ///

156

BY MR. GONZALEZ:

Q.      And so concerning Mr. Toler's first visit to the DA's

Office, do you think it would be unusual for someone to say

that if necessary they'll defend themselves and their

children if it is necessary?

A.      No, it is not unusual.  It has probably been said in

that lobby before.

Q.      In fact, Mr. Godwin said it at his deposition, that

if somebody threatened his children, he would want them to, I

think he said, vacate the earth, right?

        Is that a "yes?"

A.      Yes, sir.

        MR. GONZALEZ:  Your Honor, I think I'm almost done

here.  I'll just check my notes.

        (Brief pause.)

BY MR. GONZALEZ:

Q.      Let me ask you this:  You saw when Detective DeWall

came into court.  He made reference to a report that had the

date that an interview took place, the time, the place and

the contents of that interview; is that correct?

A.      That was his testimony, yes, sir.  I didn't see the

report.

Q.      And in the memos that Mr. Godwin prepared, you'll

concede there is no such information as related to an

interview with Mr. Oawster or with John Colfer?

157

1    A.      Yes, sir.

2    Q.      Mr. Garza, when you had spoken to Tom Toler about --

3    previously sometime prior to 2005 related to the bail bonds

4    issue, do you remember what year that was?

5    A.      No, sir.  I can't remember the year it was.

6    Q.      And you referred him to someone.  I believe Tom

7    Ferrara at the Sheriff's Department?

8    A.      Correct.

9    Q.      Are you aware Mr. Ferrara became the Undersheriff in

10   2008?

11   A.      Could be.

12   Q.      All right.

13           Did you become aware sometime after speaking to you

14   that Mr. Toler had turned his information over to the State

15   Department of Insurance which conducted an investigation?

16   A.      I don't know if -- I wasn't aware of that, no.

17   Q.      You don't know one way or the other?

18   A.      No, sir.

19           MR. GONZALEZ:  All right.

20           Thank you, Your Honor.

21           MR. CASSIDY:  I'll try to make this brief, Your

22   Honor.

23                         REDIRECT EXAMINATION

24   BY MR. CASSIDY:

25   Q.      Investigator Garza, did you have any information in

158

1  or about June of 2005, prior to submitting the declaration in

2  support of obtaining the restraining order, with respect to

3  Mr. Toler's reputation in his prior law enforcement

4  experience?

5  A.      I believe I had an acquaintance that may have told me

6  that he was a prior law enforcement.

7  Q.      But in terms of his overall reputation in that

8  capacity, did you have any information on his background and

9  what he had done as a law enforcement officer, that type of

10  thing, or was it just he was an officer?

11  A.      Yeah.  Just that he was an officer and didn't mention

12  anything.

13  Q.      You were asked whether Mr. Oawster would have

14  provided a credible threat of violence.

15          Is that your understanding of what the DA's

16  investigation into Mr. Oawster's threats were supposed to

17  develop in relation to submitting it to the Charging District

18  Attorney?

19  A.      Yes.  The jurisdiction between Fairfield PD and

20  writing the report with regards to the threats, the crime

21  that is committed and what Mr. Godwin was doing, they're

22  supposed to establish a complete investigation and have the

23  elements of the crime so the charging deputy can make an

24  assessment and review the charge.

25  Q.      What's your understanding of what the charging deputy

159

1    is ultimately determining?

2    A.      Whether they're going to prosecute the case -- file

3    charges and prosecute the case.

4    Q.      What is the Charging District Attorney, when a case

5    is submitted to them following the investigation, what do

6    they determine?  What do they assess?

7    A.      Well, they're making sure the elements of the crime

8    are met.  They are making sure all the witnesses are

9    available.  They're making sure that all the statements are

10   taken, you know, and that they have enough evidence to prove

11   to a jury beyond a reasonable doubt this crime occurred and

12   this is the individual who committed that crime.

13   Q.      So it is not just that it is a credible threat of

14   violence, it has to be that the DA can prove it beyond a

15   reasonable doubt?

16   A.      Correct.  Yes, Your Honor.

17           THE COURT:  I didn't ask it.

18           THE WITNESS:  I'm sorry.

19           Just going back and fourth.

20   BY MR. CASSIDY:

21   Q.      In terms of the temporary restraining order that was

22   obtained, did you also intend it to provide that Mr. Toler

23   would stay away from you personally?

24   A.      Yes, sir.

25   Q.      All right.

160

1          And did you also intend that it would keep Mr. Toler

2     hopefully away from District Attorney Paulson and

3     Investigator Byerley personally?

4     A.     Yes, sir.

5     Q.     So in addition to the overall office, Mr. Toler was

6     not to have contact with you or the other two?

7     A.     Yes, sir.

8     Q.     You indicated that it was not unusual for someone to

9     be upset about when a report comes in or that perhaps there

10    had been a threat against their children.

11         Was there something different about how Mr. Toler was

12    upset based upon the information you had in relation to those

13    comments that he made and his interaction with the District

14    Attorney's Office?

15    A.     I don't understand.  Is there something different?

16         THE COURT:  You indicated -- I'm sorry.

17         Go ahead, Mr. Cassidy.

18    BY MR. CASSIDY:

19    Q.     You indicated it is not unusual for someone to come

20    in, perhaps be a little upset that there's a delay in

21    obtaining a report or that, you know, there might have been a

22    threat against a family member.

23         Was there something different about how Mr. Toler

24    handled himself from the typical type of person that's a

25    little upset about that?

161

1  A.      Well, normally when you explain to a person the

2  process, you know they will at least work with you.

3         Mr. Toler was, from my understanding, people were

4  telling me, he was very adamant that he was just going to

5  take care of this thing on his own.

6         And he mentions these words that he'll kill this

7  person if we don't do anything about it.  And that he just

8  wouldn't let people -- he would talk over people when they

9  were trying to help him out.

10 Q.      If Mr. Toler had never used the word "Uzi" in the

11 context as you've indicated he said it to you, would any of

12 this have ever occurred?

13 A.      No.

14 Q.      Has anyone else ever uttered words about bringing an

15 Uzi into the District Attorney's Office?

16 A.      No.  That's just a red flag.  If he hadn't used -- It

17 could have been any weapon, gun or whatever, that was a flag

18 to me that it's a threat.

19        MR. CASSIDY:  Thank you.  That's all I have.

20        FURTHER RECROSS-EXAMINATION (ADVERSE WITNESS)

21 BY MR. GONZALEZ:

22 Q.      Mr. Garza, the entire comment about an Uzi made in --

23 if your recollection of Mr. Toler's statement is to be

24 believed is nonsensical, isn't it?

25        MR. CASSIDY:  Objection, Your Honor.  It is

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

162

1    argumentative.

2         THE COURT:  Sustained.

3    BY MR. GONZALEZ:

4    Q.    Let me ask it to you like this:  You had no

5    information that Mr. Byerley had ever pat searched Tom Toler,

6    right?

7    A.    That's correct.

8    Q.    You wouldn't need a pat search to discover an Uzi; is

9    that correct?

10   A.    No.

11   Q.    What do you understand an Uzi to be?

12   A.    An Uzi is a semi-automatic -- fully-automatic --

13   well, fully-automatic weapon that's pretty compact.  About

14   that size.

15   Q.    So you are holding what would you say, 16 inches?

16   A.    Somewhere around there.  Yes, sir.

17   Q.    Distance?

18   A.    Excuse me.

19   Q.    Okay.  I'm just asking.

20         So if your recollection of what was said is accurate,

21   first off Mr. Toler made reference to something that nobody

22   believes has taken place, that he was ever pat searched

23   coming into your office, right?

24   A.    No, he was never pat searched.

25   Q.    Did he make a comment to you about meter maids?

163

1  A.     I can never recall him making that comment to me,

2  sir.

3  Q.     Right.

4         Would you agree that if he had said to you in a

5  disparaging way that the only difference between you and a

6  meter maid is if a meter maid took an Uzi into the

7  courthouse, they would be arrested, and if you did it, you

8  would probably be okay, would you agree that would not be a

9  threat?

10 A.     Depends where he said it and to whom he said it to.

11 Q.     If he said --

12 A.     What were the set of circumstances.

13        I documented that incident right afterwards, and I

14 dated it.  That's exactly what happened.

15 Q.     Right.

16 A.     I'm not lying when I wrote that report.

17 Q.     Mr. Garza, but you also signed a declaration at the

18 same time you memorialized that statement that had all kinds

19 of things that you have admitted were not true?

20        MR. CASSIDY:  Objection, Your Honor.  It is overbroad

21 and misstates --

22        THE COURT:  And argumentative.

23        Well, it is argumentative.  Make your point.

24        You'll tell the jury that I expect if we ever get to

25 that point, not that I expect to.

164

1          MR. GONZALEZ:  It is getting late.  Sustained.

2    Object.

3          All right.

4          MR. CASSIDY:  Nothing further, Your Honor.

5          THE COURT:  You may step down, sir.

6          (Whereupon, the testimony Al Garza was concluded.)

7                         ---o0o---

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                       REPORTER'S CERTIFICATE

2                              ---o0o---

3
     STATE OF CALIFORNIA   )
4    COUNTY OF SACRAMENTO  )

5


6
             I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8


9

10               IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California on this 5TH day of
11   OCTOBER, 2009.

12


13


14   /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
15           Official United States District Court Reporter

16

17

18

19

20

21

22

23

24

25
```