1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE EASTERN DISTRICT OF CALIFORNIA

3                        ---O0O---

4     BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6     JOEL THOMAS TOLER,

7          Plaintiff,

8     Vs.                              CASE NO. CIV. S-06-0735 LKK

9     DAVID PAULSON, COUNTY
      OF SOLANO, AL GARZA,
10    BROOK BYERLEY, and DOES
      1 THROUGH 10, inclusive,

11

12         Defendants.

13    _____/

14

15

16

17                      ---o0o---

18                 REPORTER'S TRANSCRIPT

19            EXCERPT FROM TRIAL PROCEEDINGS

20         TRIAL TESTIMONY OF BROOK ROBERT BYERLEY

21    THURSDAY, AUGUST 13TH, 2009 - FRIDAY, AUGUST 14TH, 2009

22                      ---o0o---

23

24

25    Reported by:              CATHERINE E.F. BODENE,
                                CSR. No. 6926

```
1                           APPEARANCES

2                             ---o0o---

3

4    For the Plaintiff:

5            GONZALEZ & LEIGH, LLP
             Two Shaw Alley, 3rd Floor
6            San Francisco, California  94105

7            BY:  MATT GONZALEZ, Attorney At Law
             BY:  MATT SPRINGMAN, Attorney At Law
8

9

10

11   For the Defendants:

12            PORTER SCOTT
              350 University Avenue, Suite 200
13            Sacramento, California  95825

14            BY:  TERENCE J. CASSIDY, Attorney At Law

15

16

17

18

19

20

21

22

23

24

25                            ---o0o---
```

```
 1                      EXAMINATION INDEX

 2                         ---o0o---

 3

 4    FOR THE PLAINTIFF:

 5       EXAMINATION:                              PAGE

 6

 7    BROOK ROBERT BYERLEY (ADVERSE WITNESS)

 8    (Thursday, August 13th, 2009)

 9       Cross-Examination by Mr. Gonzalez           1
         Direct Examination by Mr. Cassidy          32
10

11

12    (Friday, August 14th, 2009)

13       Continued Direct Examination by Mr. Cassidy  45
         Recross-Examination by Mr. Gonzalez         93
14       Redirect Examination by Mr. Cassidy        118
         Further Recross-Examination by Mr. Gonzalez 119
15       Further Redirect Examination by Mr. Cassidy 120
         Further Recross-Examination by Mr. Gonzalez 121
16

17

18

19

20

21                         ---o0o---

22

23

24

25
```

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1

```
 1                    SACRAMENTO, CALIFORNIA

 2          THURSDAY, AUGUST 13TH, 2009 - AFTERNOON SESSION

 3                          ---o0o---

 4          (Excerpt from trial proceedings.)

 5            MR. GONZALEZ:  I will call Mr. Brook Byerley to the

 6    stand.

 7                    BROOK ROBERT BYERLEY,

 8    was thereupon called as a witness herein by the Plaintiff,

 9    and having been sworn to tell the truth, the whole truth and

10    nothing but the truth, was thereupon examined and testified

11    as follows:

12            THE CLERK:  Please, take a seat.

13            State your name, spell your last name and speak

14    directly into the microphone.

15            THE WITNESS:  Brook Robert Byerley, B-y-e-r-l-e-y.

16            CROSS-EXAMINATION (ADVERSE WITNESS)

17    BY MR. GONZALEZ:

18    Q.      Good afternoon, Mr. Byerley.

19    A.      Good afternoon.

20    Q.      Can you tell the jury what you do for a living?

21    A.      I'm the Supervising Investigator for the Solano

22    County District Attorney's Office.

23    Q.      How long have you held that position?

24    A.      About 22 years.

25    Q.      I want to start out by asking you about the first
```

2

1   interaction you had with Mr. Toler in the District Attorney's

2   Office.

3           Do you recall that first meeting?

4   A.      Yes, sir, I do.

5   Q.      Was it the first time you had interacted with

6   Mr. Toler?

7   A.      Yes, it was.

8   Q.      And there has been -- I want to get this handled

9   right away.  There has been some talk about whether or not

10  you took notes during that meeting?

11  A.      Yes, sir.

12  Q.      Did you take notes?

13  A.      I have them right here.

14  Q.      Can I take a look at those?

15  A.      Absolutely.

16  Q.      I haven't seen them.

17          (Documents handed to counsel.)

18          MR. GONZALEZ:  Your Honor, this is the first time

19  we've seen this.  Is there a way to make a copy of it so

20  counsel can have that?

21          I don't know if he's ever seen it before.

22          MR. CASSIDY:  It was produced in discovery.  I'm

23  happy to take a copy of it.

24          MR. GONZALEZ:  That's fine.  If he has a copy, I'm

25  happy to continue.  It's just for his courtesy.

3

1             THE COURT:  Go ahead.

2    BY MR. GONZALEZ:

3    Q.      Why don't you tell the jury -- Mr. Byerley, why don't

4    you tell the jury what's on that sheet of paper?

5             MR. GONZALEZ:  I don't believe it is marked as an

6    exhibit, is it, Counsel?

7             MR. CASSIDY:  No.

8             MR. GONZALEZ:  Okay.

9             THE WITNESS:  What I have written at the top is:

10   Fairfield PD, Tom Toler.  Then I wrote -- it looks like the

11   beginning of an F, then 4202.  Then I've got 4202 Virginia

12   Pine Court, 1988 Molest Case, Lieutenant and the sign for

13   "at" 709 Jefferson, IA Marsha Zalenskey (phonetic) -

14   916-464-3772, yesterday, the sign for "at," 2:41, 3-27-05, a

15   square with a -- I'm sorry -- a square with an "X" in it,

16   05-4800 Strictland.  I think it is 1218.

17            I believe that's what it is.

18   BY MR. GONZALEZ:

19   Q.      So, Mr. Byerley, is that a document that you might

20   have prepared after calling the Fairfield police?

21   A.      No.

22   Q.      It has an address for Mr. Toler that is not an

23   accurate address for him.  Do you realize that?

24   A.      No, I don't.

25   Q.      And it doesn't have a date on it; is that correct?

4

1    A.      Correct.

2    Q.      And the lack of a date on this document is why you

3    have referred to March 28th or 29th as the first date you had

4    an interaction with Mr. Toler?

5    A.      That's correct.

6    Q.      Now, how did you first become aware Mr. Toler wanted

7    to speak with you?

8    A.      I was back by my cubicle.  Chief Garza, we were kind

9    of like passing by one another.  He asked me if I would go up

10   front and talk to somebody about a child abuse investigation.

11   Q.      And so you stepped out in the lobby, and you talked

12   to Mr. Tom Toler?

13   A.      Yes.

14   Q.      And when you first stepped out, you were under the

15   belief he might be a peace officer?

16   A.      Yes, sir.

17   Q.      But he identified himself how to you?

18   A.      At the time we first met, he was sitting down.  He

19   stood up, he shook my hand, and I believe he introduced

20   himself as a child abuse investigator.  And then I sat down.

21   Q.      Well --

22   A.      He used his name too.  Sorry.

23   Q.      In Defendant's Exhibit B, it's an item that you

24   prepared on April 12th speaking about the earlier incident,

25   you wrote that Toler told you -- I asked -- Excuse me.  Let

5

1   me start over.

2           (READING):

3           I asked Toler what law enforcement agency he worked

4           for.

5           (READING INTERRUPTED.)

6           And this is after some other things you have written.

7           (READING CONTINUED):

8           Toler appeared irritated and told me he was a private

9           investigator and also had a bail bonds business here

10          in Fairfield.  Toler also told me he was a former

11          peace officer, and I don't recall if he told me with

12          what agency.

13          (READING CONCLUDED.)

14  A.      I'm sorry, sir.  I understood your question was when

15  I first met him, how did he introduce himself or what was my

16  impression.

17          That was the first impression I had, was that -- him

18  introducing himself as -- I think he used the term "child

19  abuse investigator."

20          After we had a conversation, I asked him a question,

21  and then he clarified what he did.

22  Q.      And when he then -- The point is he identified

23  himself as a bail bondsman and an investigator with some

24  peace officer background?

25  A.      He did identify himself as a private investigator,

6

1   told me he had a bail bonds business in the area, and that he

2   was a former peace officer.

3   Q.      Did you see him with any materials?

4   A.      I think he had a notebook in his hand.  I believe it

5   was, like, a legal pad.

6   Q.      You don't have a clear memory of it?

7   A.      No, I don't.

8   Q.      Is it possible that he had a folder with him like the

9   one I have in front of me?

10  A.      What I recall seeing was yellow papers so that's why

11  I thought it was a legal pad folded over, like a note pad.

12  Q.      All right.

13          Now, was it obvious he had a lot of information he

14  wanted to impart to you?

15  A.      Yeah.  We started having a conversation, yes.

16  Q.      And at some point did you tell him that you really

17  couldn't do anything until you had the original police

18  report?

19  A.      I told him there was nothing -- that our office had

20  not received the report yet, so there was nothing I could do

21  to assist him right at that minute.

22  Q.      All right.

23          And did you -- At some point did you advise him of

24  the sorts of steps he could take to protect himself from

25  someone that was making a threat against him or his children?

7

1    A.      When we first started to talk, I asked him if he had

2    filed a police report.  That's when he told me he had

3    contacted the Fairfield Police Department.

4    Q.      Did you give him any advice on how to deal with the

5    threat if it had immediacy to it?

6    A.      I don't have a clear recollection of doing that, no.

7    Q.      At what point in the conversation did you believe

8    that he was making a threat against you or your office?

9    A.      When he first sat down and he started talking about

10   what his investigation had shown, and I was kind of confused

11   about what was going on, I asked him to -- because I was

12   still under the impression he was another law enforcement

13   officer, and I asked him something to the effect of "What

14   agency do you work for?"  Because he seems -- it was not the

15   way a normal peace officer would ask about a case that they

16   had submitted so I was slightly confused.

17          I asked him the question.  I distinctly remember he

18   tightened up his lips.  He grimaced.  That's when he told me

19   he was a private investigator and a bail bonds agent.

20          Sir, I don't remember your question.  I'm sorry.

21   Q.      Let me ask you this:  Any reason why you didn't take

22   him into an interview room rather than do it in the lobby of

23   the office?

24   A.      It's not unusual for me to talk to people right out

25   there in the lobby.

8

1  Q.      Isn't it true, though, before you even stepped out to

2  talk to him you already knew you didn't have a police report?

3  A.      I don't know if I knew it before going out there or

4  after we were talking I had to check to see if a report had

5  been submitted.

6          I don't know how -- I know I had the information we

7  had not received the report yet, but I don't know if it was

8  while talking with him I stepped back to see if we had it or

9  if I knew that prior -- prior to coming out.

10 Q.      My question earlier was when did you -- when did you

11 believe Mr. Toler made a threat against your office?

12         You talked about him grimacing.  That wasn't a

13 threat, was it?

14 A.      It was an unusual reaction.  He appeared to start

15 getting angry.

16         THE COURT:  Well, people get angry all the time.

17 That doesn't equal, or does it in your mind equal with a

18 threat?

19         THE WITNESS:  No, sir, it doesn't.

20 BY MR. GONZALEZ:

21 Q.      So at some point, I mean, did Tom Toler say, "Don't

22 make me protect my children"?

23 A.      Yes, he did.

24 Q.      And he said that after you told him that there was

25 nothing you could do until you got the police report?

9

1   A.      It was -- There was some other conversation where he

2   demanded special attention for his case.  He said that he

3   didn't want it to fall through the cracks.

4           And what I told him is that once we get the police

5   report, it will be reviewed by a Deputy District Attorney.

6   If there is sufficient evidence to charge the case, the case

7   will be charged.

8           He continued to --

9   Q.      At some point he said then, "Don't make me protect my

10  children," right?

11  A.      Yes, he did.

12  Q.      So it was after you told him you weren't going to

13  start working on it until you got the police report?

14  A.      Well, I think that would mischaracterize it just a

15  little bit, sir.

16          The other thing I would add is I told him I would

17  contact Fairfield Police Department and ask them to send me a

18  copy of the report, but that I didn't have it.

19          And that's when he started getting more agitated and

20  said, "Don't make me protect my kids."

21  Q.      All right.

22          Now, did you tell him that you would get back to him

23  as soon as you had that report?

24  A.      Yes.

25  Q.      And did you tell him you would -- Did you get back to

10

1   him, for instance, that day when you learned that the

2   Fairfield police hadn't sent the report to your office?

3   A.      No, I did not.

4   Q.      Why not?

5   A.      I was busy doing other duties.  I had told him that I

6   would get back with him when I had the report.

7   Q.      So now you believed "Don't make me protect my

8   children" is a threat?

9   A.      The way he said it, the way he was reacting, it

10  struck me -- He didn't just say it once.  He said it twice.

11  He said it as he started to walk away from our office.

12          It struck me as somebody that was -- that was -- my

13  immediate reaction was this guy is setting up a defense if

14  something happens.  I thought he was going to take the law

15  into his own hands.

16  Q.      Mr. Byerley, I want you to think about what you're

17  saying.

18  A.      Okay.

19  Q.      Somebody comes to you about a threat against their

20  children.  And he's in the lobby there trying to get help

21  from your office, right?

22          Yes?

23  A.      Yes.

24  Q.      And he's already gone to the Fairfield police before

25  that, right?

11

1  A.      Correct.

2  Q.      And you're reaching a conclusion that he wanted to

3  take the law into his own hands, and he was setting up a

4  defense?

5  A.      My immediate reaction was it was such an unusual

6  comment.  I have not had somebody tell me that in my law

7  enforcement experience.

8          I have worked child abuse cases.  I was a specialist

9  in child abuse cases.  I'm used to people getting upset and

10 protective of their kids.

11 Q.      Mr. Byerley, could the comment have been evidence

12 that this was a threat that Mr. Toler was taking very

13 seriously, and he was trying to convey to you, "Don't make me

14 protect my kids"?

15         Did you consider that it really might be that he's

16 there with a very serious matter?

17 A.      I would agree that he took the matter very serious.

18 Q.      At some point --

19         MR. GONZALEZ:  I'm looking at a deposition of your

20 testimony, March 2nd of 2006, page 57.

21         THE COURT:  Line, please?

22         MR. GONZALEZ:  Beginning at line 8.

23         THE COURT:  Through?

24         MR. GONZALEZ:  16.

25         (READING):

12

1          QUESTION:

2          THE COURT:  Hang on.  Give counsel an opportunity.

3              (Brief pause.)

4          MR. CASSIDY:  For what purpose?

5          MR. GONZALEZ:  I'm going to ask him questions based

6     on it.

7          THE COURT:  Well, ask him the question.  I mean, if

8     you're not using the deposition to impeach or refresh

9     recollection, it's not appropriate.

10         Ask him a question and see what his response is.

11         MR. GONZALEZ:  All right.

12    BY MR. GONZALEZ:

13    Q.    Mr. Byerley, did you ever hear Mr. Toler make any

14    remarks with respect to physically injuring somebody or

15    killing somebody?

16    A.    I never personally heard him say that, no.

17    Q.    All right.

18         At your deposition do you recall answering the same

19    question affirmatively?

20    A.    I would have to know what the question was before and

21    after.

22    Q.    All right.

23         Going to the transcript, the same section.

24         (READING):

25         QUESTION:  During any encounter that you had with

13

1          Mr. Toler, and this can go back from March 2005 to

2          April of 2005, did you ever hear Mr. Toler make any

3          remarks with respect to physically injuring somebody

4          or killing somebody?

5          ANSWER:  I would have to answer that yes.

6          QUESTION:  Okay.  What would that be?

7          ANSWER:  When he stated to me twice, "Don't make me

8          protect my kids."

9          (READING CONCLUDED.)

10   A.     Sir, the question that was asked to me was killing or

11   injuring somebody.  And I took when he said "Don't make me

12   protect my kids" as a threat that he could kill or injury

13   somebody.

14   Q.     But I asked you the same question here, Mr. Byerley,

15   and you answered it differently than you did under oath on a

16   previous occasion; is that correct?

17   A.     I'm -- I'm not sure.

18   Q.     All right.

19          And at that previous occasion, your deposition was

20   being taken because Mr. Toler was, in part, trying to defend

21   against this temporary restraining order?

22          You're aware of that?

23   A.     I know a deposition was taken, yes, but I'm not quite

24   sure of the purpose.  It was some type of lawsuit.

25   Q.     All right.

14

1          Now, would you concede today that there was an

2     equal -- there was an equally valid interpretation of the

3     remark "Don't ask me to protect my kids" after someone has

4     gone to the police, come to a District Attorney's Office and

5     been told that the DA's Office can't get working on something

6     until they have a report, is it fair that saying those things

7     might not be a threat to kill somebody, but might be exactly

8     what somebody is saying, "Help me.  Don't make me protect my

9     kids alone"?

10         Isn't that possible?

11    A.     Anything is in the realm of possibility.  But yes, it

12    is possible.

13    Q.     Do you think it is reasonable, sir?

14         Is that a reasonable interpretation?

15    A.     That would be -- that could be a reasonable

16    interpretation.

17    Q.     Now, at some point you were present when on April

18    7th -- Let me ask you a final question about March 27th.

19         Did Mr. Toler walk away from you in midsentence?

20    A.     No.  He walked away and -- He said, "Don't make me

21    protect my kids," and he walked away towards the elevator.  I

22    was still sitting there.

23    Q.     So when you wrote this encounter up, I read it

24    earlier while Mr. Paulson was on the stand, the portion of

25    the end of your meeting on March 28th or 29th, you said:

15

1        (READING):

2        I told Toler that I would call Fairfield Police

3        Department and make sure they forwarded a copy of the

4        report to me also.  Toler again stated, "Don't make

5        me defend my kids."  After Toler left the front

6        lobby, I came back to Chief Garza's office and spoke

7        to him.

8        (Reading concluded.)

9        So you're saying though he did not abruptly -- Well,

10   he made those statements, but my question to you is he did

11   not abruptly walk away from you while you were still talking

12   to him; is that true?

13   A.     The way I would categorize it was that he had said

14   what he wanted to say.  He was -- It appeared he was upset.

15   He got up, and then he walked away.

16   Q.     All right.

17        Am I to understand that you had enough information to

18   follow up on this police report?

19   A.     I had the police department's case number.  I had his

20   name.  I felt I had enough to follow up on.

21   Q.     Let me ask you about the April 7th interaction when

22   Mr. Toler came into the office.

23        If I understand correctly, you were informed that

24   Mr. Toler was in the office inquiring about his case; is that

25   correct?

16

1   A.      Yes.

2   Q.      And you looked around and discovered that the police

3   report had been faxed to your office that day?

4   A.      That would be incorrect, that order.

5   Q.      Okay.  So you already had the report, but hadn't had

6   a chance to read it?

7   A.      Correct.

8   Q.      So you informed Mr. Butler, I believe, or someone

9   else to go talk to Tom and let him know that the report had

10  arrived but nobody had read it yet; is that correct?

11  A.      That's not my memory.

12  Q.      All right.  What did you do?

13  A.      Okay.  That morning it was a fairly busy morning as

14  we have.  I know that in my in-basket there was a faxed copy

15  of the Fairfield Police Department report.

16          I was out doing other things.  I believe I had just

17  left a meeting and had started to walk up towards my cubical.

18  I heard Mr. Butler on the telephone say the name Tom Toler.

19          I basically said:  Oh, man, I just got that report

20  this morning.  I haven't even had a chance to read it.

21          Mr. Butler then volunteered to go up and talk to

22  Mr. Toler.  And I said that that's fine, tell him I'll give

23  him a call as soon as I can read the report.

24  Q.      All right.

25          Did it occur to you, Mr. Byerley, that this was --

17

1   this was over a week after you had interacted with him and

2   told him that you would follow up on your meeting; is that

3   correct?

4   A.      I had attempted to follow up on it by contacting

5   Fairfield.

6   Q.      I'm not asking you how you did that.  I'm saying that

7   you interacted with him.  Now you're hearing his name and you

8   realize, "Boy, it's been over a week and I haven't called

9   this guy to tell him what's going on."

10          Is that correct?

11  A.      Yes, that's correct.  May I explain my answer?

12  Q.      I'm not accusing you of not having done anything

13  between March 28th or 29th and April 7th.  I'm asking you

14  that on April 7th, when you heard the name Tom Toler, you

15  realized you had ignored communicating with him for over a

16  week; is that correct?

17  A.      I would say that's incorrect.

18  Q.      All right.

19          And you made a decision that you were not going to

20  personally go speak to him and tell him what was going on,

21  but you allowed someone who is not a lawyer or investigator

22  to go take care of that; is that correct?

23  A.      That would be correct.

24  Q.      And you had already had, let's say, a difficult

25  interaction with Mr. Toler on March 28th or 29th; is that

18

1    true?

2    A.      I don't know if I would call it a difficult

3    interaction.  We had an interaction on that date.

4    Q.      Right.  But you had an interaction with somebody that

5    already had grimaced and given you an impression that he was

6    unhappy with what you were saying, right?

7    A.      I don't know if he was unhappy with what I was

8    saying.  He reacted when I asked him what law enforcement

9    agency he worked for.  That's when he grimaced.  When I tried

10   to ask him how we could help him --

11   Q.      Mr. Byerley, did it occur to you on April 7th that

12   you should go speak to Mr. Toler or you were going to be

13   inviting a nonlawyer, noninvestigator to walk right into a

14   problem because they had no information to share with him

15   over a week after -- I mean actually over ten days after

16   threats had been made against his children?

17          MR. CASSIDY:  Objection.  Misstates his testimony.

18          THE COURT:  What's the misstatement?

19          MR. CASSIDY:  He sent Mr. Butler up there with a

20   message to convey to him.

21          THE COURT:  The objection is overruled.

22          I'm sorry.  Let me read you the question.

23          (Whereupon, the record was read back.)

24          THE COURT:  That's a terrible question, but do you

25   understand the question?

19

1           THE WITNESS:  Yes, sir, I do.

2           THE COURT:  You may answer it.

3           THE WITNESS:  Okay.  I didn't know I was sending

4    Mr. Butler up to a problem.  It was a very busy day.  I was

5    in the middle of another task.  Had we had an appointment

6    scheduled, I would have had time taken out of my schedule to

7    handle that.  But we did not have an appointment.  Mr. Toler

8    showed up.  I was trying to deal with the situation as

9    efficiently as I could at that time.

10   BY MR. GONZALEZ:

11   Q.    Mr. Byerley, I want to take what you just said and

12   put it in context because you never wrote up that initial

13   interaction with Mr. Toler until he published something in a

14   newspaper, then you wrote a memo talking about that original

15   incident; is that correct?

16   A.    That's correct.

17   Q.    And so when you wrote up that incident -- I'm

18   sorry -- your memo on April 12th, you characterized that

19   original meeting with Mr. Toler in a particular way.  Isn't

20   that true?  Based on your memory?

21   A.    I wrote what I recalled happened that day.

22   Q.    Right.

23         You've heard Mr. Toler testify to it and the way he

24   reacted.  He didn't say he grimaced at you and things like

25   that, right?

20

1    A.       I don't recall him saying he didn't grimace.

2    Q.       Right.

3             Is it possible -- Don't you think, sitting here now,

4    that if the way you're describing the March 28th or 29th

5    encounter is accurate, there's no way you would have sent

6    Warren Butler to go talk to Tom Toler when he was there

7    eleven days after the threats had been made to tell him that

8    no one has read your report yet?

9             MR. CASSIDY:  Objection, Your Honor.  Calls for

10   speculation.

11            THE COURT:  No.  He's asking him to think about now

12   whether that was an appropriate thing to do.

13            I'm not sure it is relevant, but anyhow, if you can

14   answer, go ahead.  If not, just say I don't know or whatever.

15            THE WITNESS:  Can I ask him to repeat the question?

16            THE COURT:  I don't blame you.

17            What was the question?

18   BY MR. GONZALEZ:

19   Q.       Mr. Byerley, you wrote about the March 28th and 29th

20   incident on memory April 12th after Tom Toler published an ad

21   in the newspaper, correct?

22   A.       That's correct, sir.

23   Q.       And you wrote that up from memory?

24   A.       Yes.

25   Q.       And you characterized that incident a particular way,

21

1  right?

2  To the best of your abilities you wrote it up the way

3  you remembered it, right?

4  A.     Correct.

5  Q.     Now, I'm asking you, though, don't you think that if

6  the way you wrote it up was accurate, that on April 7th, when

7  Tom Toler came into the office inquiring about his case, you

8  wouldn't have sent or allowed Warren Butler to go talk to him

9  in your place?

10  A.     No, that's incorrect.

11  Q.     Do you think it would be reasonable that somebody

12  would have gotten a follow-up call or some kind of message

13  from an Assistant District Attorney or investigator after

14  that initial meeting of March 28th or 29th?

15  Is it reasonable Mr. Toler should have heard from

16  somebody from your office to give him an update?

17  A.     In a perfect world, yes.

18  Q.     Not a perfect world, in the world that you live and

19  work in, in your office, would it be reasonable that somebody

20  could expect to be given that kind of treatment?

21  A.     Okay.  In the world I live in, if we don't have the

22  information, it's hard to respond to somebody or answer their

23  questions.

24  If the agency has not provided you with a copy of the

25  report, it is hard to talk to somebody and answer questions

22

1    for them or have an intelligent conversation back and forth.

2    Q.      Mr. Byerley, did it occur to you to tell Warren

3    Butler to tell Mr. Toler that I will be out to see him as

4    soon as I'm done reading this police report?

5    A.      No, it did not.

6    Q.      Is there any reason why you didn't tell him to do

7    that?

8    A.      Yes.

9    Q.      And why was that?

10   A.      I was in the middle of another task, and I was trying

11   to handle that task.  When I had walked over to my desk, I

12   continued to try to handle that task.

13   Q.      Mr. Byerley, after Tom Toler sat down with William

14   Godwin you, in fact, went back to your desk and read the

15   report, didn't you?

16   A.      Yes, I did.

17   Q.      And then you went and talked to John Daugherty and

18   said that you didn't think there was enough evidence to

19   proceed on it, correct?

20   A.      I'm sorry.  Could you ask your question again.

21   Q.      My question to you, sir, is there are a lot of tasks

22   going on in your office at any given time, correct?

23   A.      Correct.

24   Q.      You're a busy guy?  Everybody in your office is busy?

25   A.      Yes.

23

1    Q.      But you've got somebody that's following up on a

2    matter eleven days later.  You've got the report there.  And

3    I'm asking you why didn't you say:  Have Tom Toler wait and

4    let him know I'm going to see him as soon as I'm done reading

5    it.  I may have another task before I read it, but I am going

6    to read it and get back to him today.  He can sit there and

7    wait for me.

8    A.      I didn't think -- I didn't think of asking him to

9    wait there while I completed the task I had.  I'm not sure

10   how long that would have taken.  I don't even recall what it

11   was I was doing.  It seemed to have a higher priority at that

12   time.  To have him wait and then have time to read the

13   report, I just didn't think of it.

14   Q.      Did it occur to you he would be willing to wait?

15   That this was important enough to him that he would wait?

16   A.      It didn't even occur to me.

17   Q.      Now, at some point on April 12th you read an ad that

18   Mr. Toler took out in a local paper; is that correct?

19   A.      Yes.

20   Q.      And at some point after reading the ad, did somebody

21   direct you to write up your previous interactions with Tom

22   Toler?

23   A.      I don't know if I was directed or if it was my own

24   initiative that now I need to start documenting this, it's

25   not just a citizen coming in and asking about a case.

24

1    Q.      Did you ever talk to Mr. Paulson about perhaps he

2    should have a meeting with Tom Toler after you read that ad?

3    A.      Not that I recall, no.

4    Q.      Did you say that to Al Garza?

5            Did you say:  You know, Al, why don't we set up a

6    meeting, it's a concerned father, let's take care of him?

7    A.      No.

8    Q.      Did you personally talk to Mr. Paulson about the --

9    about Tom Toler?

10   A.      Yes, I did.

11   Q.      And did you talk to him about the interaction that

12   you had had with him in March?

13           MR. CASSIDY:  Objection.  Vague as to time.

14           THE COURT:  Yeah.  Well, I agree.  That's actually a

15   good vagueness argument.

16   BY MR. GONZALEZ:

17   Q.      All right.

18           Did you, after April 7th, speak to Mr. Paulson about

19   Tom Toler?

20   A.      Yes.  Much after April 7th.

21   Q.      All right.

22           And how many times did you speak to him?

23           THE COURT:  About this issue he means.

24           THE WITNESS:  I can recall -- I can recall about

25   three conversations that we had specifically about

25

1   Mr. Toler.

2   BY MR. GONZALEZ:

3   Q.      After April 7th?

4   A.      Yes.

5   Q.      So do you mean sometime after June you spoke to

6   Mr. Paulson three times?

7           You were asked a question at your deposition about

8   April 7th -- speaking to him about it after April 7th and you

9   said yes.

10          Do you remember that?

11  A.      Yes, I do.

12  Q.      How many times did you speak about Mr. Toler to Dave

13  Paulson?

14  A.      I can recall three times.

15  Q.      And what was the time range?  Between April 7th and

16  June 13th?

17  A.      It was about two weeks -- or two months later.  It

18  was after another incident had happened.

19  Q.      So you're saying when you gave an affirmative answer

20  about speaking to Dave Paulson after April 7th, you really

21  meant you spoke to Dave Paulson in June sometime?

22          MR. CASSIDY:  Objection.  Argumentative.

23          THE COURT:  No.  He's asking what he meant.  But I

24  don't know why you've reached that conclusion either.

25          Let me see whether I can -- I don't know that anybody

26

1  wants to get this right, but when was the first time that you

2  spoke to Mr. Paulson?

3          THE WITNESS:  About Mr. Toler?

4          THE COURT:  Yes, sir.

5          THE WITNESS:  Where we had an actual conversation

6  focusing on Tom Toler using his name and that would have been

7  after he came in and made a statement to Mr. Garza after he

8  had met with Mr. Garza.

9          I think I told Al Garza actually about the -- after

10 the advertisement came out that we had taken care of the

11 situation that was discussed in the advertisement.

12         THE COURT:  Well, I'm not -- that doesn't appear to

13 me to be responsive.  Perhaps I'm wrong.

14         You read the advertisement -- You had never talked to

15 Mr. Paulson about Mr. Toler before the advertisement came

16 out; is that right?

17         THE WITNESS:  That's correct.

18         THE COURT:  And you did talk to him after the

19 advertisement came out?

20         THE WITNESS:  There was -- I don't know if I -- I

21 don't know if I talked with Mr. Paulson about the name Tom

22 Toler.  I don't have a clear recollection like a sit-down

23 conversation with Mr. Paulson about Tom Toler until after

24 June.

25         THE COURT:  Okay.  So your testimony now is your best

27

1   recollection is you did not have a conversation with

2   Mr. Paulson about Mr. Toler until sometime in June?

3            THE WITNESS:  Not mentioning -- not mentioning him.

4   I don't have a clear recollection of it, sir.

5            THE COURT:  You may proceed.

6   BY MR. GONZALEZ:

7   Q.       Mr. Byerley, you were in court when Dave Paulson

8   testified in this trial?

9   A.       I was sitting right over there.

10  Q.       That's right.  So you're aware of his testimony?  You

11  were here for that?

12  A.       Yes, I was.

13  Q.       All right.

14           I want to try to explore this date.  And counsel, I'm

15  looking at his deposition, page 75 and 76.

16           THE COURT:  Give him the line numbers and give him a

17  chance to look at it.

18           MR. GONZALEZ:  Page 75, beginning line 17.

19           THE COURT:  To?

20           MR. GONZALEZ:  To page 76, line 22.

21           I'm going the read from it because it speaks about --

22           THE COURT:  Just a minute.

23           Right now there isn't an objection so you don't --

24           MR. CASSIDY:  For what purpose?

25           Is it to refresh his recollection about this

28

1    discussion of the conversations with Mr. Paulson?

2           THE COURT:  Do you believe it is impeaching, sir?

3           MR. GONZALEZ:  It starts with a question, "Can you

4    estimate how many times you talked to Mr. Paulson?"  There is

5    a date thrown in there, April 7th.

6           THE COURT:  Hang on a second.  Let me do this because

7    otherwise we'll be here all day.

8                (Brief pause.)

9           MR. GONZALEZ:  Your Honor, the offer of proof I would

10   make is page 76, he mentions memorializing.

11          THE COURT:  You may read it, sir.

12          MR. GONZALEZ:  Thank you.

13   BY MR. GONZALEZ:

14   Q.    Reading beginning on page 75, line 17.

15         (READING):

16         QUESTION:  Okay.  Can you estimate how many times you

17         talked to Mr. Paulson about Tom Toler following April

18         7th?

19         ANSWER:  Probably, oh, gosh, I can recall three --

20         three times we have discussed it.  But there's

21         probably more than that, but I -- I recall three

22         times.

23         QUESTION:  And during those conversations over three

24         times, were you sharing new information with him?

25         Like, for instance, were you getting more information

29

1          from other outside places that you were keeping him

2          updated on or what were the, in essence, the

3          substance of those conversations?

4          ANSWER:  I think it would be accurate to say it was

5          updating him on our assessment of the threat.

6          QUESTION:  Is it fair to say at this point now there

7          was actually a DA-generated investigation of

8          Mr. Toler?

9          ANSWER: Uh, yes.

10         QUESTION:  And that would be around the time that you

11         thought it prudent to start memorializing your

12         encounters?

13         ANSWER:  Yes.

14         QUESTION:  Were you aware that there was a newspaper

15         ad or something that Mr. Toler had placed in the

16         local paper about Mr. Paulson?

17         ANSWER:  Yes.

18         QUESTION:  Do you recall when that time period was?

19         ANSWER:  Oh, I -- No.  It -- I know it was after the

20         April 7th meeting, but I -- I don't recall the exact

21         date.

22         QUESTION:  But it was pretty close in time to when

23         this investigation of Mr. Toler was going on?

24         ANSWER:  Yes.

25         (READING CONCLUDED.)

1    BY MR. GONZALEZ:

2    Q.      Mr. Byerley, is it fair to say you had a conversation

3    with Mr. Paulson about Tom Toler about the time you started

4    memorializing Mr. Toler's behavior in your office?

5    A.      That would be accurate then.

6    Q.      And you indicated -- you indicated that that occurred

7    with the publication of an ad on April 12th by Mr. Toler in a

8    local paper, that you started writing up your previous

9    encounters with him; is that correct?

10   A.      Could you restate your question.  I'm sorry.

11   Q.      Yes.  I asked you whether or not you started talking

12   to Mr. Paulson about Tom Toler at the time you were

13   memorializing your interactions with Toler, and you said yes.

14           And I said you started memorializing those

15   conversations -- I'm sorry -- those interactions with Tom

16   Toler when that ad was published April 12th; isn't that

17   correct?

18   A.      I started memorializing what happened after the

19   advertisement came out.  That's correct.  I believe what I

20   said during the deposition was that I started having the

21   conversations with Mr. Paulson after the threat had come

22   out -- the threat with Mr. Garza.

23   Q.      Sir, we've already read from the transcript --

24           THE COURT:  Sir, don't argue.  The transcript says

25   what it says.  The jury heard it.  Let's go on.

31

1    BY MR. GONZALEZ:

2    Q.      Sir, on the April 7th meeting, when you read the

3    police report and you had a conversation with Mr. Daugherty

4    and after Tom Toler left after he spoke to William Godwin and

5    he left, you sent out an e-mail to other members of your

6    staff inquiring as to whether or not anybody had a file on

7    Richard Oawster that Mr. Toler had possibly left with your

8    office; is that correct?

9    A.      What my e-mail stated was if anybody -- if anybody

10   had received a, quote, "thick portfolio" from Mr. Toler

11   please contact me and let me know that you have it.

12   Q.      And did you ask Tom Toler to get you another copy of

13   that?

14   A.      No, I did not.

15   Q.      Did you ask Tom Toler to give you a copy of that

16   before you had the conversation with Mr. Daugherty wherein

17   you decided there wasn't sufficient evidence to proceed with

18   the case?

19   A.      I had no further conversations with Mr. Toler.

20   Q.      I want to ask you what kind of weapons do you wear,

21   if any, when you go to work?

22   A.      I carry a Glock.45 caliber pistol on my belt.  I

23   carry an expandable baton.  I carry pepper spray.  And then I

24   carry a secondary .45 caliber pistol, a backup gun on my

25   ankle.

32

1       MR. GONZALEZ:  I don't have anything further.

2       Thank you, Your Honor.

3       THE COURT:  Hang on a second, Mr. Cassidy.

4       (Court confers with court reporter.)

5       Go ahead.

6                   DIRECT EXAMINATION

7  BY MR. CASSIDY:

8  Q.      Investigator Byerley, will you please give us a brief

9  description of your educational background?

10 A.      I graduated the basic police academy.  I've been a

11 patrol officer.  I hold an advanced certificate from the

12 Police Officer Standards and Training.  I have two specialty

13 certificates from the Ron Presley Institute of Criminal

14 Investigation, one in homicide investigation, the second in

15 child abuse investigation.

16       I'm a FBI-certified rangemaster.  I was one of the

17 first 20 state-certified survival shooting instructors.  I'm

18 a forensic interviewer for children that have been abused.

19       I have had training in dignitary security.  Gosh, let

20 me think.  All sorts of advanced training classes; informant

21 development, environmental crimes.  There's a lot of

22 education.  A bachelor's degree also.

23 Q.      Thank you.

24       Prior to working at the Solano County District

25 Attorney's Office, where did you work?

33

1    A.       Suisun City Police Department.

2    Q.       For how long?

3    A.       About five years as a regular patrol officer.

4    Q.       What year did you join the Solano County District

5    Attorney's Office?

6    A.       I believe 1987.  It was about 22 years ago.  I'm

7    sorry.  I think it was '87.  It was 22 years ago.

8    Q.       What year did you become a supervising investigator?

9    A.       That was about six years ago.

10   Q.       What are your duties?

11           Just describe very briefly generally your duties and

12   responsibilities as a supervising investigator.

13   A.       As a supervising investigator I'm responsible for

14   making assignments for the other peace officers that work for

15   our office, the other DA investigators.  I'm responsible for

16   reviewing their reports.

17           I interact with attorneys to find out what support

18   they need in court.  I interact with all different law

19   enforcement agencies to assist them on investigations.

20           I go out and do public speaking engagements.  I'm

21   responsible for training for the department, both POST

22   training and county training.  I'm responsible for running

23   the fleet of vehicles that we have.

24           That's basically it.

25   Q.       Do you still investigate cases?

34

1    A.      Not so often.  On rare occasions.

2    Q.      And do you assist in supervising the investigators in

3    the department with respect to any investigations they're

4    going to conduct?

5    A.      Yes.

6    Q.      And just generally what is your role in that respect?

7    A.      I might give them advice or another avenue of

8    information that they can go to.  I might have to critique

9    the reports they have written.  Just stuff like that.

10   General day-to-day supervision.

11   Q.      Now, I'm going to draw your attention to the March

12   28th, 29th, contact with Mr. Toler.

13           At that time I think you described the interaction

14   with Mr. Toler.  You referenced when you read into the record

15   your notes and there was reference to yesterday at 2:41,

16   3-27-05.

17           Do you recall that?

18   A.      I'd have to look at my note.

19           (Witness reviews document.)

20           Yes.

21   Q.      Would that generally indicate to you that those notes

22   were taken the next day since you referenced yesterday?

23   A.      I believe so, but I didn't feel comfortable enough to

24   put it in the report that way.  I can't say positively.

25   Q.      So that's why you noted either the 28th or 29th?

35

1    A.      Correct.

2    Q.      Now, what did you advise Mr. Toler you were going to

3    do in response to his inquiry on either March 28th or March

4    29th?

5    A.      I told him I would get a copy of the Fairfield Police

6    Department report.

7    Q.      And you were asked some questions about his comment

8    about protecting his kids or don't make me protect my kids.

9            Did you find that to be an unusual comment?

10   A.      Extremely unusual.

11   Q.      Why was that?

12   A.      In the 22 years that I've been in the office, I've

13   never had somebody come up to the front counter -- and I have

14   dealt with angry citizens before -- and say something that

15   struck me as this guy's going to take the law into his own

16   hands.

17   Q.      After the meeting with Mr. Toler, you indicated you

18   went back into the investigators' area?

19   A.      That's correct.

20   Q.      And what did you do first?

21   A.      I spoke with my chief, Al Garza.

22   Q.      Why is that?

23   A.      I was under the impression when I went up there that

24   I was going to speak to a fellow police officer.  And finding

25   out he's not, that this guy got upset, and that he made the

36

1    comment "Don't make me protect my kids," so I was asking him

2    if he knew this guy.

3    Q.      So did you report that comment that Mr. Toler had

4    made to you about "Don't make me protect my kids" to Chief

5    Investigator Garza?

6    A.      Yes, I did.

7    Q.      Was there any discussion about the impact or what

8    that meant to you at that time?

9    A.      Other than me possibly making the comment that, you

10   know, it was -- he was emotional about it, no, there wasn't

11   really -- there might have been a short discussion, but not

12   that I recall.

13   Q.      All right.

14           Now, you indicated, I believe, that you then

15   reviewed -- Well, withdrawn.

16           What did you do next after the conversation with

17   Chief Investigator Garza?

18   A.      I then called John Dugan from the Fairfield Police

19   Department and told him about the contact I had with

20   Mr. Toler.

21   Q.      Describe what happened in that conversation?

22   A.      I asked him for a copy of the report.  And I just

23   told him -- basically it was kind of like, Hey, you guys need

24   a heads up.  When he left here he told me, "Don't make me

25   protect my kids," "Don't make me protect my kids."

37

1   Q.      Did you request a copy of the report?

2   A.      Yes, I did.

3   Q.      What did Sergeant Dugan tell you in relationship to

4   when to expect that report?

5   A.      I don't recall him saying when to expect it.  He just

6   basically promised to get me a copy of the report.

7   Q.      All right.

8           Now, did the sergeant advise you from the Fairfield

9   Police Department about the status of the investigation they

10  were conducting?

11  A.      I don't recall if he told me the report hadn't been

12  submitted yet, but --

13          THE COURT:  The question is not about the report.

14  The question is the status of their investigation as I

15  understand it.

16          Did you discuss that at all?

17          THE WITNESS:  No, sir, I didn't.

18  BY MR. CASSIDY:

19  Q.      Okay.  After you had this conversation with

20  Sergeant Dugan, you were expecting at some point to receive

21  the completed report from the Fairfield Police Department?

22  A.      Yes.

23  Q.      Did you have -- Prior to April 7th, 2005, did you

24  have any further contact with Sergeant Dugan?

25  A.      Sergeant Dugan?

38

1   Q.      Sorry.

2   A.      Yes, I did.

3   Q.      He's Irish.  I should get that.  With Sergeant Dugan.

4   What was the nature of that contact?

5   A.      After my initial contact with Mr. Toler and I had

6   called the Fairfield Police Department, the following week I

7   got a phone call from Sergeant Dugan.  He apologized to me

8   that the report was not finished, and he would still get it

9   to me when it was ready.

10  Q.      So at that point you were continuing to expect at

11  some point the completed report from the Fairfield Police

12  Department?

13  A.      That's correct.

14  Q.      Did he give you any information about the status of

15  that investigation?

16  A.      I believe by him apologizing and telling me the

17  report hadn't been completed, that would be the status, that

18  it is not a completed investigation.  That's what I took it

19  to mean.

20  Q.      Now, does anything else happen in relation to this

21  report that Mr. Toler made to the Fairfield Police Department

22  between that call -- that later call with Sergeant Dugan and

23  the time that Mr. Toler arrives at the District Attorney's

24  Office on the morning of April 7th?

25  A.      I'm sorry.  I don't understand.

39

1    Q.      Anything else happen in between that time period?

2    A.      No.  Well, other than regular work, no.

3    Q.      Okay.  When you arrived, how did you learn that the

4    police report was faxed to you?

5    A.      I have an in-basket that's like a hanging basket

6    outside my cubicle.  As I had come to work I glanced and saw

7    all the in stuff I had.  That was one of the items in there.

8    Q.      And it was after the conversation you had with --

9    Well, withdrawn.

10          What did you ask Investigator Godwin to -- Did you

11   ask Investigator Godwin to take any action on April 7th?

12   A.      Yes, I did.

13   Q.      What did you ask him to do?

14   A.      I asked him to come up to the front lobby with me

15   because there was a problem up there.

16   Q.      All right.

17          Would you describe what happened in that regard?

18   A.      Yes.  After Mr. Butler had volunteered to go up front

19   and talk to Mr. Toler I continued doing whatever it was I was

20   doing.

21          I then got a call from Mr. Butler on a Nextel, which

22   is like a two-way walkie-talkie.  He called me on that and

23   said that Mr. Toler wanted to schedule an appointment with

24   Dave Paulson.

25          I told Mr. Butler to put him in contact with Marsha

1   Johnson who schedules or assists in scheduling Mr. Paulson's

2   appointments.

3   Q.      What happened next?

4   A.      I continued whatever I was doing.  I next got a call

5   from Linda Jones telling me "You better get up here.  He's

6   yelling."

7   Q.      What happens after that?

8   A.      As I started to walk up to the front I saw Bill

9   Godwin, one of our other sworn peace officers, standing by

10  his cubicle.  I told him, Bill, come with me, there's a

11  problem up at the front counter.  And then I started to brief

12  him on the information I knew from about Mr. Toler.

13  Q.      And can you just briefly describe what it was you

14  told Investigator Godwin at that point?

15  A.      What I told him was that Mr. Toler had come into the

16  office because somebody had made a threat to his children.

17  The person that had made the threat to his children was a

18  lieutenant or captain that worked for the California

19  Department of Corrections.

20          I could not remember the guy's name at that time.  I

21  told Bill that Mr. Toler had already reported it to the

22  Internal Affairs Division of the Department of Corrections.

23  And I believe that's all the time we had as we're walking up

24  front.

25          I was also on my Nextel calling another investigator

41

1    and asking them to come to the lobby area.

2    Q.      Why is that?

3    A.      Because I had sent Warren Butler up there.  Warren

4    Butler was unable to -- Warren Butler did not call me on his

5    Nextel walkie-talkie asking me to come up to the lobby asking

6    me to speak to somebody.  I was getting a call from somebody

7    that I knew was behind some protective glass telling me that

8    I needed to get up there, he's yelling.

9    Q.      So what happened next?  What do you do next?

10   A.      As we got up to the lobby area, I'm still talking on

11   my Nextel walkie-talkie to Kurtis Cardwell.  As we started to

12   walk out the front door, Bill Godwin walked out in front of

13   me.  And as I walked out, I saw Mr. Toler standing near the

14   elevators -- near the north bank of elevators.  His back was

15   to us, and he appeared to be focused on the reception area.

16   He was staring into the reception area.

17   Q.      Could you see Warren Butler at that time?

18   A.      I really -- At that particular time, when I first

19   walked out, no, I don't recall seeing Mr. Butler.

20   Q.      All right.  What happened next?

21   A.      As we -- as we came out, Mr. Godwin walked kind of

22   like around and in front of Mr. Toler and asked him something

23   to the effect of "Is there a problem" or "Can I help you?"

24   It was very a short question that he asked.

25   Q.      And what happened next?

1  A.      Mr. Toler responded a very short response.  It was a

2  three or four response in an angry tone -- in an angry tone.

3  Q.      All right.  What happens after that?

4  A.      Mr. -- I'm sorry.  Investigator Godwin told him, "If

5  you'll --" I think he said, "If you'll calm down, I'll see if

6  I can help you."  Or something about calming down and I'll

7  see if I can help you.

8          I can't say those are his exact words.  I know he put

9  his hands up and was doing like, if you will, verbal judo.

10  It's a way of trying to defuse a situation, putting your

11  hands up, trying to get somebody to calm down.  It is a

12  common physical expression, calm down.

13  Q.      And you are putting your hands palms outstretched in

14  front of you at chest level or thereabouts?

15  A.      Yes.

16  Q.      And what was Mr. Toler response to Investigator

17  Godwin's approach?

18  A.      There was a slight pause.  My impression was that he

19  thought about it.  I saw his body physically kind of relax,

20  his shoulders dropped down, and then they shook hands.

21  Mr. Toler and Investigator Godwin shook hands.  Bill then

22  invited him into a conference room.

23          THE COURT:  This might be an appropriate time to

24  stop.

25          Ladies and Gentlemen, we'll take our afternoon

43

1    recess.  We'll reconvene tomorrow morning.  You know how I

2    told you yesterday I ask Ana.  She's not here.  There she is.

3    Tomorrow morning what time?

4           THE CLERK:  9:15.

5           THE COURT:  9:15.

6           Please, remember the admonition the Court has

7    heretofore given to you.

8           MR. GONZALEZ:  Before we leave, Your Honor --

9           THE COURT:  I was going to say we have a couple of

10   things to talk about.

11          Thank you, Ladies and Gentlemen.

12          (Jury exits at 04:14 PM.)

13          THE COURT:  Record will reflect we're in open court,

14   counsel are present, the jury is not.

15          Yes, Mr. Gonzalez.

16          MR. GONZALEZ:  Your Honor, we just wanted to give you

17   an idea of the order of witnesses.  We were going to take

18   Mr. Garza next, then if counsel could make Mr. Godwin

19   available.  And our offer to submit the declaration of Warren

20   Butler remains a good offer.

21          THE COURT:  I don't know anything about that.

22          MR. CASSIDY:  I'm going to review Mr. Butler's

23   testimony again and see whether that is sufficient.  He's

24   going to be a short witness though.

25          THE COURT:  But the question is I gather you want

44

1    Mr. Godwin tomorrow?

2            MR. GONZALEZ:  Yes.  It would be Mr. Garza.

3            THE COURT:  Garza first, then Mr. Godwin.

4            MR. CASSIDY:  Okay.  Mr. Godwin is in from Arizona,

5    but he needs to leave tomorrow.  So we want to be sure --

6            THE COURT:  Why don't you take Mr. Godwin first.

7            MR. GONZALEZ:  What time is his flight?

8            MR. CASSIDY:  I don't know.  I just don't know.

9            MR. GONZALEZ:  Your Honor, we'll take him first, but

10   we'd rather do it the other way.

11           THE COURT:  Find out when he is leaving.

12           MR. CASSIDY:  We could do the first half of

13   Mr. Garza, then finish -- It looks like we're going to get

14   into Tuesday.  Hate to say it, but --

15           MR. GONZALEZ:  All right.  That would be agreeable.

16           MR. CASSIDY:  I'm sure he doesn't have to leave until

17   the end of the day.

18           THE COURT:  All right.

19           Let's go off the record for a minute.

20           (Off the record at 04:16 PM.)

21                           ---o0o---

22

23

24

25

45

1                    SACRAMENTO, CALIFORNIA

2           FRIDAY, AUGUST 14TH, 2009 – MORNING SESSION

3                          ---o0o---

4           (Excerpt from trial proceedings.)

5           THE COURT:  Madam Clerk.

6           (Jury seated at 09:23 AM.)

7           THE COURT:  You are examining, sir?

8           MR. CASSIDY:  Correct.

9           THE COURT:  I see what I did.  You were examining.

10          MR. CASSIDY:  Thank you, Your Honor.

11          (Whereupon, Mr. Byerley resumes the witness stand.)

12                    CONTINUED DIRECT EXAMINATION

13   BY MR. CASSIDY:

14   Q.      Good morning, Investigator Byerley.

15   A.      Good morning.

16   Q.      I believe where we left off was at the point in time

17   where you were describing and had described the contact with

18   Mr. Toler at the elevator bank which is on the -- Where is

19   that located in the Government Center Building?

20   A.      It is basically like in the center.  That elevator

21   bank is in the center of our office.  It is not quite evenly

22   divided, but it is in the center of the office.

23   Q.      All right.

24           And so if one were to come out of the elevator

25   bank -- I suppose it depends on which side of the elevator

46

1    bank.  Could you describe what's on perhaps the north side

2    and south side, if that's possible?

3    A.      Absolutely.  It wouldn't matter which side of the

4    elevator you got off, they both face one another, but if you

5    turn to the west it is the reception area for the District

6    Attorney's Office.  If you turn to the east, it leads to a

7    hallway that's open to the public, a conference room, two

8    sets of bathrooms, and down to Veterans Services, which is

9    another office, and then the rest of our office which is

10   behind doors.

11   Q.      So if you get off -- and thank you, you said north,

12   south, east, west -- if you get off the elevator bank and go

13   directly east, there is a door that you face.  Is that the

14   door that leads to the area where the investigators' offices

15   are located?

16   A.      Yes.  It leads to the hallway that goes down to it.

17   Q.      And the investigator offices are on the sides and

18   further down that hallway?

19   A.      Yes, sir.

20   Q.      All right.

21           And if you go west, then you face the lobby area

22   which has a little couch and chair in it, for instance, and

23   the glass window, if you will, leading to the reception -- or

24   leading to the receptionist?

25   A.      The only thing I would change is that there is two

47

1   sets of seats that sit back to back and it is like lodge

2   seats.  It is similar to but not quite like what the jury is

3   sitting in.  Some of them are double.

4   Q.      Where we picked up -- I think where we left off

5   yesterday is that you indicated that Mr. Godwin --

6   Investigator Godwin had approached Mr. Toler as he was

7   starting to get on the elevator or at the elevator banks, and

8   he put his hands up and made a comment.

9           How close was Investigator Godwin to Mr. Toler at

10  that time?

11  A.      He would have been about a three-foot distance.

12  Q.      And where were you located at that time?

13  A.      I would have been about four to five feet away.

14  Q.      All right.

15          And what were you doing at that point in time?

16  A.      When we first walked out there, I was going out there

17  to take care of whatever the situation was.

18  Q.      But what were -- What did you do?

19          Just describe what you did?

20  A.      When Mr. Godwin first made contact with Mr. Toler and

21  they started talking, he asked Mr. Toler to calm down and he

22  would try and listen to him.

23          I started moving back.  I started to fade.  Well,

24  move towards the background.

25  Q.      Did you -- How close did you get to Mr. Toler?

48

1    A.      Gosh, at any time I don't think I was closer than

2    three feet.  I don't think I was closer than that.

3    Q.      Where were you?

4    A.      Let me correct that.  Three feet would actually be

5    closer.  It would probably be four feet and beyond.

6    Q.      Did you somehow attempt to surround Mr. Toler?

7    A.      No.

8    Q.      In fact, what did you do in relation to your

9    positioning?

10   A.      What I was trying to do was trying to deescalate the

11   situation.  So that's why I kind of -- after Bill made

12   contact, I was trying to move into the background.

13   Q.      Now, did you, as you were present in that elevator

14   area and Investigator Godwin was making and as you approached

15   to make contact with Mr. Toler, did you have any concerns for

16   your safety?

17   A.      Yes.

18   Q.      And would you describe that, please?

19   A.      Due to my prior contact with Mr. Toler where he

20   became angry and had walked off, I had just been advised he

21   was causing a disturbance in the front lobby, that he was

22   yelling at the staff up there, and then, you know, just from

23   almost 30 years in the business of law enforcement, when

24   you're dealing with people that are yelling and that or

25   angry, you can't tell where their actions are going to go so

49

1    I was concerned.

2    Q.      How would you characterize Mr. Toler's behavior that

3    you observed as you exited from the doorway from the hallway

4    leading from the investigator area?

5    A.      What my perception was was that he was still focused

6    on the reception area where this yelling had just taken

7    place.

8            His body seemed tense.  I would describe it as his

9    shoulders being back.  He was tense.  His face appeared red

10   to me, and he seemed to be focused on the reception area.

11   Q.      Did you have any impression in that time whether

12   Mr. Toler was acting aggressively?

13   A.      At that time he was -- just by his body language and

14   that he seemed -- he wasn't aggressively moving towards

15   somebody, but he seemed to be tense, he seemed to be angry.

16   That's probably the way I would describe it.

17   Q.      So at some point Investigator Godwin moves into a

18   conference room with Mr. Toler?

19   A.      That's correct.

20   Q.      Now, is the doorway to that conference room -- If

21   you're facing east where the doorway is to the hallway

22   leading to the investigators' offices, is that just to the

23   left of the doorway that leads into the hallway?

24   A.      If you came out of the hallway where our offices are

25   located, it would be to the right.  So it would actually be

50

1    on the north side of that door.  It will just be confusing if

2    I say left and right, so it would be the north of that

3    doorway.

4    Q.      Okay.  But it's almost immediately adjacent to that

5    doorway?

6    A.      Yes.

7    Q.      Okay.  Now, what did you do while Investigator Godwin

8    was meeting with Mr. Toler?

9    A.      I was still trying to deescalate the situation so I

10   walked back to that -- or back through that doorway that

11   leads to our offices, and then I came back around.

12          We've got some victim/witness rooms that have two-way

13   doors that go from an inside hallway out to the hallway.  I

14   buttonhooked around one of those and came back out into the

15   hallway.

16          Bill had left the door open to the conference room,

17   and I was listening to what was going on.

18   Q.      When you say the term "deescalate," I don't think I

19   asked you, but what do you mean by that?

20   A.      Well, it's been my experience, when you're dealing

21   with somebody that is upset, pumped up, you're trying to use

22   the least amount of people you can so you're not throwing

23   fuel onto that fire.

24          You're trying -- you're trying to deescalate it.

25   You're not trying to add fuel to it.

51

1    Q.      And I believe you indicated that there was another

2    investigator in the area, Cardwell?

3    A.      Kurtis Cardwell eventually arrived, yes.

4    Q.      What was his role in this series of events taking

5    place in or about the elevator bank and in the conference

6    room?

7    A.      He was also to provide cover for Investigator Godwin.

8    Once Kurtis got there, I left the area.  I went back towards

9    my cubical.

10   Q.      What do you mean by "cover?"

11   A.      If the situation escalated back up, if something else

12   happened, Kurtis was there to provide the safety of

13   Mr. Godwin and any other citizens or any other staff that

14   happened to be in the area.

15   Q.      Well, you were in that area outside the conference

16   room.  Did you ever step in or glance into the conference

17   room and ask Investigator Godwin whether everything was okay?

18   A.      I walked by the conference room, but I didn't step

19   inside or ask anybody anything.

20   Q.      Did you observe anyone else ask Investigator Godwin

21   if everything was okay?

22   A.      No.

23   Q.      Did you ever observe Investigator Cardwell ask

24   Investigator Godwin if everything was okay?

25   A.      I would have to say no.

52

1    Q.      At some point did Investigator Cardwell advise you he

2    had checked on Investigator Godwin?

3    A.      Yes.

4    Q.      What did he tell you?

5    A.      It was after several minutes.  He told me everything

6    was okay.  What I believe he said was Code Four, which is a

7    police code for no further assistance needed.

8    Q.      All right.

9            Now, at some point this meeting between Investigator

10   Godwin and Mr. Toler concluded?

11   A.      Yes.

12   Q.      And what happens next?

13   A.      Bill came back to my cubical.  He told me the

14   concerns that Mr. Toler had.  He told me that he had given

15   Mr. Toler his business card and told Mr. Toler he would look

16   into the matter further.  I told Bill that was okay, to go

17   ahead and do it.

18   Q.      At that point did you consider that you had

19   essentially assigned this investigation to

20   Investigator Godwin?

21   A.      Yes.

22   Q.      Do you recall any of the specifics that

23   Investigator Godwin told you about what Mr. Toler had

24   imparted to him?

25   A.      I just know it was basically what he had told me on

53

1    the first meeting, that his kids had been threatened, that it

2    was Mr. Oawster that had done it, that Oawster was a

3    lieutenant or captain at CDC and that he was going to check

4    into it further.

5    Q.      Was there -- In connection with the assignment of

6    this assignment to Investigator Godwin, was there any game

7    plan about how he would approach this investigation?

8    A.      I made no game plan with him.

9    Q.      Okay.  What did you do next?

10   A.      At that time I started reading the report that had

11   been prepared by Fairfield Police Department.

12   Q.      And continue.  What did you do next?

13   A.      After I had finished reading the report by Fairfield

14   Police Department, I walked down to John Daugherty, our

15   Charging Deputy District Attorney, and asked him if he would

16   review it and give his opinion.

17   Q.      In advance of asking Mr. Daugherty for his opinion,

18   did you give him your opinions or conclusions regarding

19   whether criminal charges -- whether there was sufficient

20   evidence for criminal charges to be filed against Mr. Oawster

21   in relation to the complaints made or submitted to the

22   Fairfield Police Department by Mr. Toler?

23   A.      No.

24   Q.      And did Mr. Daugherty -- Deputy District Attorney

25   Daugherty review the Fairfield police report?

54

1    A.      Yes.

2    Q.      And what did he tell you in response to that?

3    A.      He didn't feel there was sufficient evidence that had

4    been documented for us to charge criminally.

5    Q.      Was that the end of the matter?  Was that a closed

6    case as far as the DA's Office was concerned?

7    A.      No.

8    Q.      What happens next?

9    A.      Well, I had assigned Bill to see if he could work on

10   it to build the case up.

11          One of the things that had not happened was the

12   Fairfield Police Department never contacted Mr. Oawster to

13   get a statement from him.  They had made about a week's worth

14   of phone calls and never got a call back.  So all they did is

15   they closed the report and forwarded it -- or asked it be

16   forwarded to our office.

17   Q.      All right.

18          I'm going to ask you to take a look at Defendant's

19   Exhibit A?

20   A.      Okay.

21   Q.      All right.

22          During the course of reviewing the Fairfield police

23   report, did you receive any other information about possible

24   follow-up investigation?

25   A.      Yes.

55

1    Q.      And what was that?

2    A.      In the report that had been written by the Fairfield

3    Police Department, the Fairfield Officer Strictland wrote

4    that he went out and contacted Tom Toler on this complaint.

5            Tom Toler gave him a history about his child abuse

6    investigations with Mr. Oawster and what his case had proven.

7    And then he said that he had given the District Attorney's

8    Office a "thick portfolio" was the term he used of

9    Mr. Oawster's activity.

10           He then went and told Officer Strictland what had

11   happened to him with the phone call, how he received the

12   phone call.

13   Q.      In relation to the information you read in the

14   Fairfield Police Department report that Mr. Toler had given

15   the District Attorney's Office a portfolio regarding

16   information pertaining to Mr. Oawster, did you take any

17   action in response to that?

18   A.      Yes, I did.

19   Q.      What did you do?

20   A.      I sent out an office-wide e-mail asking people --

21   asking if anyone had received this thick portfolio of

22   information.

23   Q.      All right.

24           And is that -- In the bottom of Defendant's Exhibit

25   A, is that the e-mail that you circulated to the office

56

1   looking to see if this portfolio had, in fact, been delivered

2   by Mr. Toler?

3   A.      Yes, sir.

4   Q.      All right.

5           And did you ever receive a response from anyone

6   indicating that Mr. Toler had provided that portfolio to

7   them?

8   A.      No one responded to me that they had a portfolio.

9   Q.      Now, there was a response to the e-mail you received

10  from Chief Investigator Garza?

11  A.      Yes.

12  Q.      What was his inquiry?

13  A.      He asked if this case had -- was pending prosecution

14  and if we even had the case.

15  Q.      What did you understand him to mean by that?

16  A.      Well, he asked if the case had -- What I understood

17  him to mean was he was asking questions about what's going

18  on, why are you sending this out, do we have a case pending

19  on this, is there a deputy DA that's been assigned to this

20  case to work on this case.

21  Q.      By "case pending" did you mean a criminal

22  complaint has already -- did you understand him to mean a

23  criminal complaint had already been filed?

24  A.      Correct.

25  Q.      And did you respond to Chief Investigator Garza's

57

1    inquiry in that regard?

2    A.      Yes.

3    Q.      All right.

4            What did you advise him?

5    A.      I told him that there was no case pending, and then

6    reminded him that this was the guy that he asked me to go

7    talk to about two weeks ago that told me "Don't make me

8    protect my kids."

9    Q.      And that series -- that two additional e-mail series

10   is what's set forth in Defendant's Exhibit A?

11   A.      Okay.  There was one other thing that I had advised

12   Chief Garza and that was that Bill Godwin had told me Toler

13   had made a threat to him about Mr. Oawster.

14   Q.      So was that something that Investigator Godwin had

15   reported to you after he met with Mr. Toler?

16   A.      Yes.

17   Q.      And what was that additional information that

18   Mr. Toler had stated to Investigator Godwin during the course

19   of that conference that Investigator Godwin reported to you?

20   A.      Bill told me that Mr. Toler said he would kill the

21   guy if he hurt his kids.

22   Q.      And did you report that information to anybody?

23   A.      When I -- Yes.  When I talked with the Fairfield

24   Police Department, I told them -- I take that back.  No.

25   Q.      Did you report it to Chief Investigator Garza?

58

1    A.      Yes, I did.

2    Q.      And that was also contained in this e-mail response

3    that you referred to earlier?  That's one of the three

4    e-mails in Defendant's Exhibit A?

5    A.      Yes, sir.

6    Q.      Now, on -- I'm going to draw your attention now to --

7    Withdrawn.

8            Between April 7th and April 12th, the time that the

9    ad was placed in the paper by Mr. Toler, did you have any

10   discussions with Investigator Godwin about the progress of

11   the investigation?

12   A.      I don't recall.

13           I take that back.  Yes, I do recall.

14           What Bill had told me was that he had made a

15   telephone call to the Internal Affairs investigator at the

16   California Department of Corrections to try and get in

17   contact with him.  But other than that, I don't recall

18   anything.

19   Q.      There was reference to Investigator Godwin being a

20   prison liaison investigator.  What is that position?

21   A.      Basically, what it is in Solano County we have two

22   prisons located in our county.  We have agreed to place two

23   investigators to work directly with the prison so when

24   there's crimes that occur at the prison or with prison staff

25   we have one of our investigators that can be a liaison

59

1    between questions their department might have or

2    investigative assistance or reports going back and forth in

3    our office and the attorneys that are assigned to work prison

4    cases.

5    Q.      What was your understanding in relation to this call

6    that Investigator Godwin was going to make to the Department

7    of Corrections?  What was the relationship to Oawster?

8    A.      Well, because Mr. Oawster was, as I recall, a

9    lieutenant or captain that worked for the Department of

10   Corrections, Mr. Toler told us that he had already reported

11   this to one of the Internal Affairs investigators at the

12   prison.  We're just starting to confirm this information that

13   they were aware of this and that this contact had taken

14   place.

15   Q.      And so that was just kind of the beginning, if you

16   will, of Investigator Godwin's investigation and follow-up

17   into the information Mr. Toler provided?

18   A.      Yes.

19   Q.      Now, I'm going to draw your attention to April 12th,

20   and that was the day that the ad was published by Mr. Toler

21   in one of the papers or more locally regarding his contacts

22   with the District Attorney's Office.

23           Did you review that ad in or about April 12th?

24   A.      Yes.

25   Q.      And did you -- In reviewing that ad, what were your

60

1    impressions?

2    A.      Well, it caused me some concern because of the

3    language that was used and how the incident was portrayed.

4    Q.      Specifically, you understood that there was some

5    description about his meeting -- Mr. Toler's meeting with

6    representatives of the District Attorney's Office up to that

7    time?

8    A.      Yes.

9    Q.      And were those representations that Mr. Toler made in

10   this ad accurate?

11   A.      They were not accurate.

12   Q.      Did that somehow cause you to get mad or upset with

13   him?

14   A.      No.

15   Q.      Was there anything else about that ad that caused you

16   any concern?

17   A.      Yes.  It was the implied threat again.

18   Q.      And what was the nature of the information in the ad

19   that reflected the implied threat you referred to?

20   A.      Mr. Toler in the ad stated that he had made it quite

21   clear to the District Attorney staff that he would take care

22   of this problem.  That if the District Attorney's Office

23   didn't act on it, he would take care of it.

24           He also said that he shouldn't -- he shouldn't have

25   to take this into his own hands, kind of words to that

61

1    effect.

2    Q.      All right.

3            And why did that cause you concern?

4    A.      Well, there were two things that caused me concern on

5    it.  One of them was that he said that four District Attorney

6    Investigators had come out and contacted him.  That was

7    absolutely not accurate.  So I had some concerns if his

8    perception -- How can I put this?

9            I had concerns whether he was accurately seeing what

10   other people would see, that he had been surrounded by four

11   investigators.

12           And then the restating of this threat, that he would

13   take the law into his own hands -- that he made it clear to

14   our staff he would take the law into his own hands if we

15   wouldn't act.

16   Q.      You referenced in this ad that one of the comments

17   that Mr. Toler referenced was that on the visit he made on

18   April 7th that he was surrounded by four investigators.

19           Was that accurate?

20   A.      I don't know if he used the word "surrounded," but

21   what he basically said was he made it clear to the supervisor

22   that was behind the glass that he would take care of this

23   matter if the DA's Office wouldn't.  And suddenly -- I think

24   it said, "Suddenly there were four investigators there around

25   him."  But I don't recall the term "surrounded."  Might have.

62

1    Q.      At the point in time when you were at the elevator

2    bank, and you came out to find out what was going on and

3    Investigator Godwin contacted Mr. Toler, did you try to

4    effect something that would surround Mr. Toler?

5    A.      No.

6    Q.      After your review of this ad, did you make any

7    determinations of how to further proceed in relation to the

8    investigation that you had assigned to Investigator Godwin?

9    A.      No.

10   Q.      Did this play any -- The fact the ad came out, have

11   the information that you just described that caused you

12   concern, play any role in requesting that written reports be

13   prepared in this matter?

14   A.      Yes.

15   Q.      And why is that?

16   A.      Because in meetings that took place between

17   Mr. Godwin and Mr. Toler, and in meetings that took place

18   after that, Mr. Toler was giving Bill information that I

19   thought needed to be documented.

20   Q.      Okay.  I'm going to draw your attention to

21   Defendant's Exhibit B?

22           THE COURT:  I'm sorry.  Don?

23           MR. CASSIDY:  B as in boy.  Sorry.

24           THE COURT:  Thank you.

25   ///

63

1   BY MR. CASSIDY:

2   Q.      If you would, briefly take a look at that.  I think

3   you're familiar with it?

4   A.      Yes.

5   Q.      And what is that?

6   A.      This is the report that I generated.

7   Q.      And are you referencing the report you generated in

8   or about April 12th after having read this ad?

9   A.      Yes.

10  Q.      All right.  And your reason was?

11          THE COURT:  No, sir.  This is critical stuff.  You

12  can't lead on this.

13          MR. CASSIDY:  I was going to say "was what".  I

14  wasn't going to go there.

15          THE COURT:  All right.  I'm sorry.

16  BY MR. CASSIDY:

17  Q.      Let me do it the other way.

18          What was your reason for preparing this report?

19  A.      Because of Mr. Toler's actions when he first came

20  into the office and had met with me and making the statement

21  "Don't make me protect my kids," that had caused me concern

22  enough that I contacted Fairfield and told them.

23          Then the incident that happened with -- where he came

24  into the office and was yelling, had scared the staff, that

25  Bill Godwin asked him to calm down, and then Bill at the end

64

1   of that meeting, I thought things had gone along well, I

2   thought they had parted -- I'm pretty sure Bill said they had

3   parted as friends, I thought we were taking care of his

4   concerns, the advertisement came out and it's like, you know,

5   we need to start documenting what we're doing, what we have

6   done and how -- what steps we've taken to try to help him and

7   what he's done while he's been in the office.

8   Q.      I'm going to draw your attention -- Do you have the

9   plaintiff's exhibit binder there?

10  A.      Yes, sir.

11  Q.      Before you go there, one last question.

12  A.      It's the defendant's binder.

13  Q.      One last question on Exhibit B, as in boy, that we

14  were looking at.

15          Does that report accurately reflect the events as you

16  recall them fresh in your mind as of April 12th, 2005,

17  regarding the contacts you had with Mr. Toler?

18  A.      Yes.

19  Q.      Now, I'm going to --

20          MR. CASSIDY:  May I approach, Your Honor?

21          (Counsel locates exhibit for witness.)

22  BY MR. CASSIDY:

23  Q.      Would you please refer to Plaintiff's Exhibit 6.

24  A.      Okay.

25  Q.      All right.

65

1          And generally would you describe what that is,

2     please?

3     A.     It's the same report that we've just looked at.  It

4     was the report written by me.

5     Q.     This is the copy the plaintiff's gave me of these

6     exhibits.  Let's see if I can --

7          THE COURT:  If you have a copy of the Court's

8     exhibits, that will be accurate.

9          MR. CASSIDY:  I'll move on.  I'll do it the easy way.

10    BY MR. CASSIDY:

11    Q.     In or about April 12th, did you direct Investigator

12    Godwin to prepare a report regarding the status of the matter

13    that he had been involved in with Mr. Toler?

14    A.     Yes.

15    Q.     And did he prepare a report that day?

16    A.     I don't know if he prepared it that day, but I'm

17    pretty sure he did.  I think the one exhibit you are talking

18    about is labeled 7 in here.

19          Is that the report by Bill Godwin?

20    Q.     Maybe it is out of order.

21          MR. GONZALEZ:  Counsel, you identified Plaintiff's 6.

22    It is Plaintiff's 7.

23          MR. CASSIDY:  Thank you.  I was looking at the

24    exhibit list.  Thank you.

25          MR. GONZALEZ:  We accept your apology.

66

1    BY MR. CASSIDY:

2    Q.      Okay.  Back to it.

3            Plaintiff's Exhibit 7, is that the report that you

4    directed that Investigator Godwin prepare in connection with

5    his contacts with Mr. Toler as of that time?

6    A.      Yes.

7    Q.      Now, I want to clarify, if possible, one of the areas

8    of inquiry you were asked yesterday.

9            At any time between the time Mr. Toler was at the

10   District Attorney's Office on April 7th and you saw him in or

11   about this elevator bank and meeting with Investigator

12   Godwin, and June 13th, at the time that Mr. Toler makes the

13   threat in the presence of Chief Investigator Garza, did you

14   have -- do you recall having any conversations or speaking

15   with District Attorney Paulson about Mr. Toler?

16   A.      I don't recall any -- or I don't recall.

17   Q.      As Investigator Godwin proceeds with his

18   investigation, do you receive any information from him

19   regarding the progress of that investigation?

20   A.      Yes.

21   Q.      And generally, how would that occur?

22   A.      As our paths would cross Bill would fill me in on

23   what he had done so far, what steps he had taken so far.

24   Q.      All right.

25           And do you have any clear recollection of the

67

1    progress of those events or do you just generally recall the

2    bits of information he provided you?

3    A.      Just the various bits.

4    Q.      And can you tell us, please, what it was – and maybe

5    work through a little bit at a time – what information

6    Investigator Godwin imparted to you about the progress of his

7    investigation on behalf of Mr. Toler regarding the report he

8    made to the Fairfield Police Department and the further

9    investigation conducted by your office?

10   A.      As far as that part of it went, the investigation he

11   was doing, Bill told me that he had made several telephone

12   calls to the Internal Affairs Division of the California

13   Department of Corrections.

14          I believe he told me he had finally gotten in touch

15   with the Internal Affairs investigator and they did, in fact,

16   have an investigation going.

17          Bill told me that he was going to take one of our

18   other investigators down to Galt, California, where

19   Mr. Oawster lived and contact Mr. Oawster.

20          Bill told me that Mr. Toler had provided him with a

21   copy of a phone bill that he was going to use when he went

22   down and confronted Mr. Oawster about this telephone call

23   that Oawster made to Mr. Toler.

24          Bill told me that they did go down.  And I think they

25   had to go on more than one occasion.  I'm pretty sure they

68

1   had to go on more than one occasion.

2        Anyway, they did go down there.  He did contact

3   Mr. Oawster.  Mr. Oawster denied making the phone call.  Bill

4   confronted him with the phone bill.  Told him that, you know,

5   they know at least a phone call was -- a phone call had been

6   made and that Oawster should stay away from Mr. Toler and

7   stay away from his children.  Okay.

8   Q.     In relation to Investigator Godwin's contact with the

9   Department of Corrections, do you recall any specific

10   information that he imparted to you that he had learned?

11   A.     I'm pretty sure what he told me was that Oawster was

12   off on some kind of disability.  But I -- I was more

13   concerned that -- I won't say I was concerned.

14        My focus was on that it had been reported to the

15   Internal Affairs Division, that they know there was some kind

16   of child abuse investigation that had gone on or ask if they

17   knew there was.  And Bill said that was being looked into.

18   Q.     Have you related to us all of the information

19   Investigator Godwin advised you or reported back to you in

20   the progress of the investigation regarding his contact with

21   Mr. Oawster?

22   A.     All I can recall.

23   Q.     And you indicated that Investigator Godwin advised

24   you that Mr. Toler had provided him with a phone bill.

25        What was your understanding of the nature of that

69

1  phone bill as imparted to you by Investigator Godwin?

2  A.     I don't know if -- I know it was a phone record of

3  some type.  I don't know if it was a phone bill or what.

4         It was my impression that Toler had somehow gotten

5  Oawster's phone bill, and they were going to confront Oawster

6  with his own phone bill.

7  Q.     Did that have any significance to you at the time you

8  learned that information?

9  A.     Yes.

10  Q.     And what is that?

11  A.     Well, it would be -- I don't even know how you would

12  go about accomplishing that unless you were a police officer,

13  and then a search warrant to get a copy of somebody's phone

14  records.  I don't know how he accomplished that.

15         It also -- it added to the information that I was

16  starting to gather that this is somebody that is very skilled

17  in obtaining information on other people.

18  Q.     Did Investigator Godwin provide you with any

19  information about what Mr. Toler was telling him about you

20  and Chief Investigator Garza?

21  A.     Yes.

22  Q.     And what did he tell you in that regard that

23  Mr. Toler had advised Investigator Godwin?

24  A.     After, I believe, it was the first meeting, which

25  would have been in April, Bill told me -- he came back and he

70

1   kind of chuckled and said, "Toler, does not like you."

2        There were -- Every time Bill would go out and meet

3   with Mr. Toler, Bill would come back with more information

4   about how Toler felt towards myself and Chief Garza.

5   Q.     All right.

6        What did Investigator Godwin tell you that Mr. Toler

7   had told him about you and Chief Investigator Garza?

8   A.     What I can recall is he specifically said that I was

9   an ass-kissing moron, that I couldn't -- something like I was

10  worthless as an investigator and should be a Good Humor ice

11  cream salesman.

12       Gosh.  I know there was derogatory comments about

13  Chief Investigator Garza, about his investigative abilities

14  or something like that.  It was not flattering stuff.

15  Q.     As far as you were concerned, in the context of the

16  communications and contacts you had had with Mr. Toler, did

17  that seem to be -- what was your impression of his responses

18  toward you?

19  A.     Well, I treat everybody respectfully.  It was

20  somewhat surprising that we were trying to help him on this

21  case, and he still was angry, was getting angry, focusing his

22  anger on both Chief Garza and myself.

23       I had only talked to him one time so it was

24  surprising that he was -- he had this much venom against

25  me.

71

1    Q.      Did Investigator Godwin ever tell you that Mr. Toler

2    had said that he hated you?

3    A.      I don't recall those -- I don't recall.

4    Q.      During the course of the investigation and in the

5    progress of the investigation conducted by Investigator

6    Godwin, did he report any information to you -- and I'm

7    talking about before.  I want to put a timeline on this.  Is

8    the information you've already related information that

9    Investigator Godwin reported to you prior to June 13, 2005?

10   A.      Yes.

11   Q.      And in that same time period, during the progress of

12   Investigator Godwin's investigation, did he provide you with

13   any information about contacts he had with the Napa Police

14   Department?

15   A.      Yes.

16   Q.      What was the nature of the information that he

17   reported to you in that regard?

18   A.      Bill told me he had learned that a son or a stepson

19   from Mr. Toler had also reported that Mr. Oawster had made a

20   threat to him in Napa, California.

21          Bill went over and got a copy of the Napa Police

22   Department investigation.  Found out that a Napa police

23   officer had taken a report.  They investigated it.  They sent

24   it to the Napa County District Attorney's Office.

25          The Napa County District Attorney's Office said there

72

1   was not sufficient evidence there to charge the case, and

2   they closed it.

3        Bill then contacted the -- this is where I'm

4   confused -- it is either the son or stepson of Mr. Toler.

5   And I believe his name is John Confer, but I might have the

6   name wrong, but stated that Mr. Toler put pressure on him to

7   file this police report.

8   Q.     During the course of the progress of the

9   investigation being conducted by Investigator Godwin into

10  this report Mr. Toler made to the Fairfield Police

11  Department, did Investigator Godwin tell you anything about

12  comments Mr. Toler had made about District Attorney Paulson?

13  A.     I don't recall.

14         I take that back.  I'm sorry.  Could you repeat your

15  question?

16  Q.     Sure.  Did Investigator Godwin tell you Mr. Toler had

17  made any comments about District Attorney Paulson during the

18  course of his communications with Mr. Toler?

19  A.     Yes, he did.

20  Q.     What was that?

21  A.     Mr. Toler had expressed wanting to come down and meet

22  with Dave Paulson.

23  Q.     And did you provide any response back through

24  Investigator Godwin?

25  A.     I believe what Bill -- I'm not sure what Bill told

73

1   him to do.  I didn't tell him anything to do.

2   Q.      Did Investigator Godwin provide you with any other

3   information in that regard?

4   A.      I think -- No.  I don't recall.

5   Q.      At some point during the progress of the

6   investigation did Investigator Godwin report to you about

7   presenting the information he had received to Deputy District

8   Attorney -- or to Charging Attorney John Daugherty?

9   A.      Yes, he did.

10  Q.      What did he tell you in that regard?

11  A.      What he had done was he had taken the Fairfield

12  Police Department report back to Mr. Daugherty, had discussed

13  what his investigation had revealed, that Oawster denied --

14  first denied making a phone call, but then denied making a

15  threat.

16          And Daugherty reviewed it and said there is still not

17  enough here that we can charge criminally, we can't win a

18  conviction on it.

19  Q.      And did you have any understanding whether that

20  information would be imparted to Mr. Toler?

21  A.      Yes.

22  Q.      And what was that?

23  A.      Bill told me he did tell Mr. Toler that the case had

24  been reviewed and that it is one that couldn't be charged.

25          Mr. Toler told him he understood and thanked him for

74

1    his help.

2    Q.      In the context of the time frame, do you recall did

3    that occur prior to June 13th, 2005?

4    A.      Yes.

5    Q.      I'm going to draw your attention now to June 13th,

6    2005.  At some point did you become aware that Chief

7    Investigator Garza had had contact with Mr. Toler?

8    A.      Yes.

9    Q.      When was that?

10   A.      I had been -- I was in a meeting with some people.  I

11   don't know who it was.  We had the conference room door open.

12   Chief Garza started to walk past me.  He told me Tom Toler is

13   in the front lobby.

14           I asked him:  Do you want me to go up and speak to

15   him?  He said:  No.  No.  He's being calm.  I'll go up and

16   talk to him.

17           Chief Garza left.  He was up there for a while.  He

18   then came back and said:  Tom Toler made a threat.

19   Q.      What happens next?

20   A.      I was kind of surprised.  Asked him basically what he

21   had said, and he gave me a brief synopsis of what the

22   conversation was.

23   Q.      And what did Chief Investigator Garza tell you at

24   that point?

25   A.      What Al had done -- I'm sorry -- Chief Garza had done

75

1    was gone out and asked him what he could do to help him.

2    Mr. Toler had told him that he wanted to make an appointment

3    to see Dave Paulson.

4         Mr. Garza said:  Okay.  Give me a phone number --

5    write down your name and give me a phone number so we can

6    give you a call back.

7         Tom Toler started to write it down.  Chief Garza

8    asked him:  Can I tell the District Attorney what this is

9    regarding?

10        Tom Toler wadded up the piece of paper and told him:

11   You just don't get it.  And then he said words to the effect

12   of every time I come in here you send Brook Byerley up here.

13   He pats me down like I'm carrying an Uzi, which maybe I

14   should do.

15        Mr. Garza then said:  Why are you making a threat?

16   I'm trying to get an appointment with you.  There was some

17   other profanities used too.  I'm sorry.  I don't recall the

18   exact profanities.

19        Chief Garza asked him why he was using the

20   profanities, said that I'm trying to set up this appointment

21   between you and Garza (sic).

22        I do recall that Mr. Toler told him that he could

23   blow him and maybe I'll take out another ad in the paper.

24   And I believe what Mr. Garza told me his response was you can

25   do what you think is right.  And Mr. Toler walked off.

76

1  Q.      What happens next?

2  A.      Well, with the information that Bill would trickle in

3  and other information that we had obtained about Mr. Toler's

4  actions, and now him making a comment about bringing an Uzi

5  into the office, I was very concerned.

6  Q.      What did you do in relation to that?

7  A.      We went down and talked with Mr. -- First I told

8  Chief -- I didn't tell him because Chief Garza told me.

9          We had a brief discussion about this, that we needed

10  to bring Dave into the loop -- Mr. Paulson.  I believe we

11  walked down to Mr. Paulson's office and told him this has

12  really escalated.

13  Q.      All right.

14          And so the three of you met with District Attorney

15  Paulson a relatively short time after Chief Investigator

16  Garza told you about the threat?

17  A.      The three of us met, yes.

18  Q.      Could you describe what it was that you advised

19  District Attorney Paulson in this meeting that you had?

20  A.      I told him the concerns that I had with Tom Toler,

21  the information that I had or knew about that I considered

22  when I was telling him this is getting more serious, this

23  could be a real threat, this needs to be looked into.

24  Q.      Now, did you impart to him the information that

25  Investigator Godwin had told you about during the course of

77

1    his investigation?

2    A.      Yes.

3    Q.      And so rather than repeat that did you cover those

4    items that you've related here today that Investigator Godwin

5    told you about his investigation?

6    A.      Well, there was more items also that I haven't told

7    you about.  I'm sorry.

8    Q.      So would it be fair to say you did tell District

9    Attorney Paulson about the items that Investigator Godwin had

10   told you about during the progress of the investigation?

11   A.      Yes.

12   Q.      Then there was some additional items that you

13   discussed with District Attorney Paulson?

14   A.      Yes.

15   Q.      Okay.  And would you please describe the additional

16   information that you provided to District Attorney Paulson in

17   this meeting after Chief Investigator Garza has heard the

18   threat from Mr. Toler?

19   A.      What I told Mr. Paulson is that Bill Godwin had

20   reported to us that in his meetings with Mr. Toler, Mr. Toler

21   had told him that part of the restraining order that had been

22   filed against Mr. Oawster he was supposed to surrender all

23   his firearms.

24          Mr. Oawster had not surrendered his firearms, and

25   that Mr. Toler went out to his property, climbed inside a

78

1    barn and found where these guns were hidden inside the barn.

2            Mr. Godwin had told us that he had done surveillance

3    on Mr. Oawster and in one of these surveillances he had

4    followed Mr. Oawster up to the Sacramento Airport, had

5    followed him all the way up to some part of the airport where

6    he was able to see him physically board a plane.

7            He told -- Mr. Toler had told Bill Godwin that he was

8    accompanying Miss Oawster to court in Sacramento for family

9    law hearings and that the judge had barred him from a -- had

10   barred Mr. Toler from attending these family law hearings.

11           I thought it was some kind of disturbance and he had

12   been barred from attending any court hearings in Sacramento.

13           MR. GONZALEZ:  I'm sorry, Your Honor.  I'm going to

14   object.  Just so the record is clear, this is what Toler

15   allegedly said to Godwin or is Godwin saying he learned this

16   from some other source?

17           THE COURT:  I'm sorry, sir.  I don't know what -- Are

18   you asking me to ask Mr. Cassidy to clarify the source of

19   this information?

20           MR. GONZALEZ:  I would make a foundational objection,

21   but I think the witness isn't being clear as to that one,

22   where it is coming from.

23           THE COURT:  All right.

24           MR. GONZALEZ:  If he says it is coming from Toler,

25   fine.

1          MR. CASSIDY:  He said Investigator Godwin told him he

2     learned this information from Mr. Toler.

3     BY MR. CASSIDY:

4     Q.      Is that correct?

5     A.      Bill had told us this is where he got the information

6     from.

7     Q.      From Mr. Toler?

8     A.      Yeah.

9     Q.      All right.  What else?

10    A.      Mr. Toler had told Bill Godwin that his relationship

11    with Mrs. Oawster had become personal.  And I -- I think

12    that's all I can recall at this time.

13    Q.      And was there some -- At some point did you -- What

14    was District Attorney Paulson's response?

15    A.      We made a phone call to County Counsel.

16    Q.      At some point -- Well, what happens next?

17    A.      We told Mr. Paulson that it appeared that Tom Toler

18    was focusing on his -- he was focusing on Al Garza and

19    myself, but also on the office.

20          He was -- had come into the office and scared the

21    office staff so we advised him of that, that he had made

22    these implied threats and would take the law into his own

23    hands, was focusing on that.

24    Q.      At this point in time that you're relating this

25    information to District Attorney Paulson, were you concerned

80

1   for your safety?

2   A.      Yes.

3   Q.      And did you have concerns for anyone else's safety?

4   A.      Yes.

5   Q.      Who?

6   A.      The entire staff.  Mr. Toler had come up and yelled

7   and scared the staff that worked in the front reception area.

8           I was concerned that he was focusing on the office of

9   the District Attorney and that he had expressed a total

10  dislike is, I think, the way Bill told me of both Al Garza

11  and myself.

12  Q.      What happens next in the context of this meeting?

13  A.      What we had originally tried -- While this

14  conversation is going on we had talked about, you know, what

15  we could do to protect the office.

16  Q.      So just generally, instead of the specifics of actual

17  security, generally what's discussed?

18  A.      One of the things that was discussed with County

19  Counsel was getting a restraining order barring Mr. Toler

20  from coming up onto the fourth floor to the District

21  Attorney's Office.

22  Q.      Did you discuss any security measures that you would

23  adopt even before a restraining order may be sought?

24  A.      Well, there were steps we wanted Mr. Paulson to take.

25  There were steps that as a peace officer I was going to start

81

1    taking myself also.  But it was stuff we were telling

2    Mr. Paulson he needs to start thinking about and doing.

3    Q.      And that was for his safety?

4    A.      Correct.

5    Q.      At some point did you determine to conduct some

6    additional investigation regarding Mr. Toler?

7    A.      Yes.

8    Q.      And when was that?

9    A.      It would have been June 13th, after that threat had

10   come out.

11   Q.      Okay.  So it was during the context of this meeting

12   or shortly after the meeting?

13   A.      There was still more stuff we needed to do so it

14   would have been after the meeting.

15   Q.      And what was -- can you describe the nature, please,

16   of the additional investigation that was conducted in

17   relation to Mr. Toler?

18   A.      During the whole process I know -- I know we had

19   learned of an additional police report that had come from the

20   Fairfield Police Department concerning Mr. Toler.

21           In that case -- And I believe it had been submitted

22   to our office a couple of months prior and had been referred

23   to another agency.

24           Fairfield Police Department had been contacted by an

25   attorney in Sacramento who was making a complaint of identity

82

1   theft, and Mr. Toler and an unknown female were the people

2   that she felt were responsible.

3   Q.      Was there any other additional information you

4   received through the course of additional investigation after

5   you met with Mr. Paulson and Chief Investigator Garza?

6   A.      Yes.

7   Q.      And what additional information did you obtain?

8   A.      At some point we had run to see if he has access to

9   guns or guns registered to him, and we obtained a list of

10  firearms that had been registered to him.

11  Q.      And what was the significance of the fact that you

12  ran and discovered that he was registered with firearms?

13  A.      It shows he has the tools to carry out a threat.

14  Q.      Any additional information you obtained during the

15  course of this additional investigation?

16  A.      Well, I became aware of stuff, but I didn't

17  personally do it.

18  Q.      All right.

19          So were those items that you actually had conducted

20  yourself that you just identified?

21  A.      The gun registration being done, I don't know if I

22  did it or somebody else did it.  I know it had been done.

23          The Fairfield police report, I don't recall if I had

24  done it or if somebody else did it.  It was brought to my

25  attention, "Here, we have this old report that had been

83

1   referred to another District Attorney's Office."

2   Q.      What additional information -- Well, at some point a

3   decision was made to obtain a temporary restraining order?

4   A.      Yes.

5   Q.      And you understood that your name would be included

6   as one of the persons on whose behalf that order would be

7   sought?

8   A.      Correct.

9   Q.      And the -- Was there any -- Let me ask it this way.

10  I withdraw.

11          Was there any additional information, other than what

12  you've already stated, that went into your decision-making

13  process as to whether you believed the restraining order

14  would be appropriate?

15  A.      Yes.

16  Q.      And what was that?

17  A.      I knew from my personal contact with Mr. Toler, he

18  told me he was a former peace officer.  I knew that he had a

19  private investigative agency.  I knew he was a bounty hunter.

20  I knew he had come into the office and scared our staff.

21          I knew that a restraining order had been taken out in

22  another county against him.  I knew he had guns registered to

23  him.  I knew that another -- well, an attorney had filed a

24  report on Mr. Toler getting phone records by assuming her

25  character.

84

1   Q.      Okay.  Did all of the information that you received

2   through Investigator Godwin during the progress of his

3   investigation, as well as the additional investigation that

4   your office conducted in relation to Mr. Toler after the

5   threat was made by Mr. Toler, as well as the threat that

6   Mr. Toler made to Mr. Garza, play a role in your

7   decision-making process to obtain the TRO?

8   A.      Yes.

9   Q.      Based on all of that information, did you believe

10  that --

11          THE COURT:  Sir, you are leading about matters that

12  are the very issues in issue.

13          MR. CASSIDY:  I was going to ask a question to ask

14  him if he believed there was a credible threat of --

15          THE COURT:  Go ahead.  If you want to ask it that

16  way, it is limited enough.  It is still leading.

17          Go ahead.  You may ask.

18  BY MR. CASSIDY:

19  Q.      Did you believe that Mr. Toler posed a credible

20  threat of violence towards you?

21  A.      Yes.

22  Q.      I think we covered that, but what was that based on?

23  A.      Based on the fact that he was a former police

24  officer --

25          THE COURT:  You're not going to go through it all.

85

1    All the stuff you just described?

2            THE WITNESS:  Yes, sir.

3            MR. CASSIDY:  Fair enough.  I didn't want to lead.

4    BY MR. CASSIDY:

5    Q.      In connection with the decision-making process to

6    obtain the temporary restraining order, did you request that

7    that restraining order be obtained in any manner to retaliate

8    against Mr. Toler for his having placed the ad in the paper

9    about the District Attorney's Office?

10   A.      No.

11   Q.      At any time did you and Chief Investigator Garza and

12   District Attorney Paulson conspire or come to some kind of

13   agreement that you wanted to act out against Mr. Toler and

14   obtain this restraining order to retaliate against him for

15   having taken that ad out?

16   A.      Absolutely not.

17           MR. CASSIDY:  That's all I have.  Thank you.

18           THE COURT:  Why don't we take our morning recess,

19   then you can start Mr. Gonzalez.

20           MR. GONZALEZ:  Okay.

21           THE COURT:  Fifteen minutes, Ladies and Gentlemen.

22           Please, remember the admonition the Court has

23   heretofore given to you.

24           (Off the record at 10:22 AM.)

25           (On the record at 10:41 AM.)

86

1          THE CLERK:  Please, remain seated.

2          Court is now in session.

3          THE COURT:  Record will reflect we're in open court,

4     counsel are present, the jury is not.

5          Yes, sir.

6          MR. GONZALEZ:  Your Honor, during the examination of

7     Mr. Byerley counsel elicited evidence about an identity theft

8     complaint against Mr. Toler.  This was not referenced in any

9     memo, in any document, in anything related to a reason for

10    the TRO.

11         We made a previous motion in limine that any bad acts

12    that they intended to offer that they would do so.  Of

13    course, you asked what are they.  We said that we don't know.

14    He said he would make an offer of proof beforehand.  He

15    didn't.

16         THE COURT:  That's true.

17         I had forgotten that, but I know what you are talking

18    about now.

19         MR. CASSIDY:  There was a reference in Mr. Byerley's

20    deposition to other illegal activity apparently that was

21    pending at the time it was considered by the District

22    Attorney's Office in relation to obtaining the TRO.  And it

23    is the same -- All it shows --

24         THE COURT:  I don't care what you think it shows.

25    The issue is something else, Mr. Cassidy.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

87

1          You know, you're an experienced lawyer in this court,

2    you have been here before.  You know that kind of stuff

3    doesn't go.  You had an obligation to make the offer of

4    proof.  Now what do we do?

5          MR. GONZALEZ:  I would like to correct it like this,

6    Your Honor, I would like to ask Mr. Byerley when we get to

7    that portion, I would like to -- just to give -- well, just

8    ask him:  Did you learn that that was an unfounded complaint

9    against Mr. Toler?

10         Yes.

11         Did you consider it?

12         THE COURT:  I don't know whether he would say yes or

13   not.

14         MR. GONZALEZ:  If not, I can tell you what it is

15   about.  The defendant uses an online service to get

16   somebody's records, then they made a claim that hey, he used

17   a stolen identity.  It is a total bogus thing.

18         THE COURT:  Whether it is total bogus or not, it is

19   in.

20         Mr. Byerley, apparently, sir, you don't know

21   whether -- you have no reason to believe it is false or do

22   you or bogus, whatever?

23         THE WITNESS:  Sir, it was referred to the Sacramento

24   County District Attorney's Office.  We never even reviewed

25   it.

88

1          MR. GONZALEZ:  But, Your Honor, there is no document

2     that they relied on in the TRO.

3          THE COURT:  Please, be quiet.

4          I expect it from a lot of other attorneys.  I don't

5     expect it from you, Mr. Cassidy.

6          MR. CASSIDY:  It was nothing other than

7     inadvertence.

8          THE COURT:  I accept that.  I believe it.  I believe

9     it.  All right.

10          MR. CASSIDY:  May I add one thing?

11          THE COURT:  No.  Please, no.

12          (Brief pause.)

13          All right.  Yes, sir.

14          MR. CASSIDY:  The one issue that came up was that

15     Mr. Toler had provided a copy of Mr. Oawster's home phone

16     record to Investigator Godwin, and the only impact of this

17     other information on the DA's Office was he could obtain

18     records they couldn't otherwise obtain.  That's all it was

19     meant.

20          THE COURT:  It had a much -- it had a bigger effect

21     on me, much less the jury.

22          I understand your problem.  I'm trying to think of

23     what to do.  Just hang on a second, Mr. Gonzalez.

24          I'm certainly not going to mistry the case.  We're

25     going to get this case over with, but that's how serious it

89

1    is.  That occurred to me, Mr. Cassidy.

2         MR. GONZALEZ:  Your Honor, may I say something?

3         THE COURT:  Yeah.

4         MR. GONZALEZ:  When you asked me earlier about a

5    remedy, I didn't say let's mistry the case.  I said given

6    what has happened, you have to let me try to cure it.  And

7    the way to let me cure it is to make the witness say it is an

8    unfounded allegation.

9         THE COURT:  But if he doesn't know that to be the

10   case, he's not going to say that.  I won't require him to say

11   something he doesn't personally know.

12        MR. GONZALEZ:  Let's enter into a stipulation that

13   corrects it somehow.

14        MR. CASSIDY:  I have no objection to Mr. Toler coming

15   in and saying that I get these through an online service and

16   here's what I do and it was unfounded.

17        THE COURT:  No.  No.

18        Sir, Mr. Gonzalez, would you be satisfied if the

19   Court strikes the testimony and tells the jury that they may

20   not consider it, that there are reasons which we don't have

21   to go into which would suggest that the accusation was

22   unfounded.

23        MR. GONZALEZ:  Well, it leaves in the minds of the

24   jury that he was using that and thinking about it when he

25   sought the TRO.

1          THE COURT:  Well, that's the truth.  I mean, I don't

2     know whether it is the truth or not.  I wasn't there.

3     Mr. Byerley says that's the truth.

4          MR. GONZALEZ:  But, Your Honor, the matter was never

5     prosecuted.

6          THE COURT:  I didn't say that.

7          MR. GONZALEZ:  It is unfounded.

8          THE COURT:  Please, you're not listening.

9          MR. GONZALEZ:  I am listening.

10          Your Honor, I think it is a very serious thing that

11     goes to Mr. Toler's character, truth and voracity, that he

12     stole an identity.

13          THE COURT:  I just finished saying that I think it is

14     very serious, serious enough for me to think about a

15     mistrial.

16               (Brief pause.)

17          Which I'm not going to do.  I'm not going to do that.

18     Although, I tell you, it's in nobody's interest retrying this

19     case.  It is so expensive.

20          MR. GONZALEZ:  Your Honor, if the Court were to

21     instruct the jury in the manner that you suggested, then

22     allow Mr. Toler right now to just say this is --

23          THE COURT:  I won't allow it right now, but he can

24     come back on redirect and explain to the jury.

25          MR. GONZALEZ:  But my problem then is Your Honor is

1  going to be curing the situation now, but leaving it in the

2  minds that he engaged in this identity theft.

3       THE COURT:  No.  You can put Mr. Toler on to explain

4  how he got it and where he got it from.  I'm going to tell

5  the jury I'm striking it because -- Well, I can't actually

6  strike it if he says -- Oh, I see what I'm going to say.

7       I need a piece of paper, Madam Clerk.  Just give

8  me -- You know what, I've got them in here.

9       Yeah.  I do.

10       Go tell the jury it is going to take a couple of

11  minutes.  We've got a problem.

12            (Brief pause.)

13       MR. GONZALEZ:  Your Honor, Mr. Cassidy proposed some

14  language as a stipulation that I found very agreeable.

15       THE COURT:  What's that, sir?

16       MR. CASSIDY:  Just that we would stipulate that in

17  relation to that matter Mr. Toler did not engage in illegal

18  activity, was not prosecuted, it was later determined to be

19  unfounded because he sought the records through an online

20  service.

21       It is short and simple.

22       THE COURT:  Very good.  Very good.

23       MR. CASSIDY:  I apologize to the Court.

24       THE COURT:  Mr. Cassidy, I've been going on and on

25  and on to make the biggest -- That's a perfect solution.

92

1              Thank you, sir.

2              Madam Clerk, bring the jury in.

3              MR. CASSIDY:  Will you recite it?

4              THE COURT:  Yes, I'll do it or you guys can.

5              MR. CASSIDY:  Just he did not engage in illegal

6       activity.  There was no prosecution.

7              THE COURT:  You say it, you stipulate to it, I'll

8       tell them what a stipulation means.

9              MR. CASSIDY:  That's fine.

10             THE COURT:  Bring the jury in.

11             Gentlemen, the jury is asking for an estimate about

12      when this case will be to them.

13             Tuesday sound right or Wednesday?

14             MR. CASSIDY:  I would say Wednesday.

15             THE COURT:  Wednesday.  Okay.

16             (Jury seated at 10:54 AM.)

17             THE COURT:  Mr. Cassidy, it is my understanding that

18      you have reached a stipulation.

19             Will you set it forth to the jury.

20             MR. CASSIDY:  Yes, Your Honor.

21             During the course of the testimony of Investigator

22      Byerley he referenced a matter involving a Sacramento

23      attorney involving an alleged illegal theft identity.

24             The parties stipulate that Mr. Toler did not engage

25      in any illegal activity.  There was no prosecution ultimately

93

1   in that matter.  It was deemed unfounded.  And he obtained

2   that record through an online Internet service.

3          THE COURT:  So stipulate?

4          MR. GONZALEZ:  That's the stipulation.

5          THE COURT:  Ladies and Gentlemen, I think I told you

6   before, but if I haven't a stipulation is an agreement

7   between the parties that something is true.

8          When the parties agree that something is true, you

9   should accept it as true.

10          You may proceed, Mr. Cassidy.

11          MR. CASSIDY:  I completed, Your Honor.

12          THE COURT:  I beg your pardon.

13          Mr. Gonzalez.

14          MR. GONZALEZ:  Thank you.

15              RECROSS-EXAMINATION (ADVERSE WITNESS)

16   BY MR. GONZALEZ:

17   Q.     Mr. Byerley, I want to go to the matter on April 7th.

18          If I understand correctly -- Well, actually, do you

19   have a marker?

20          Can you draw a quick diagram of the -- As I

21   understand the office -- the DA's Office, the elevators,

22   there is kind of an L-turn where the windows are -- reception

23   windows?

24   A.     I can probably draw it easier.

25   Q.     It is not to scale, but it will help the jury

94

1    understand the floor layout.

2    A.      (Witness draws diagram.)

3    Q.      All right.

4            THE COURT:  Hang on a second.

5            Madam Clerk, will you mark that as defendant's next

6    in order for identification.  Whether you want to put it in

7    or not is up to you.

8            MR. GONZALEZ:  Plaintiff's.

9            THE COURT:  I'm sorry.  What did I say?

10           MR. GONZALEZ:  Defendant's.

11           THE COURT:  I beg your pardon.  Plaintiff's.

12           THE CLERK:  That will be number 26.

13           THE COURT:  Thank you, ma'am.

14   BY MR. GONZALEZ:

15   Q.      Maybe just, Mr. Byerley, point out what you've drawn

16   for the jury?

17   A.      Okay.  This would be a brief sketch of our reception

18   area.  I've drawn two boxes over here -- or actually four

19   boxes with X's in it.  Those would represent the elevators

20   that come up to our office area.

21           Once you come up to the office area, you walk into

22   the actual reception area.  This is the ten chairs I was

23   talking about out in our reception area.

24           There's two doors that lead inside the office I'm

25   going to draw real quick here.  There's two desks that sit

95

1  side by side.  That's where our receptionists sit.

2       Over here on the east side of the building -- and

3  I'll draw an E for east and a W for west, north and south --

4  on the east side of the building this is the conference room

5  I was talking about.  It's got a door that leads into it.

6       There's a hallway that I've got right here.  And I'll

7  label that "Hall."  That goes down towards our offices.  And

8  then there's three separate victim/witness rooms.  And I'll

9  just write "VW" on it.  These have got doors that go --

10  Q.     I'm sorry.

11  A.     Two of them have got doors that go both into the

12  hallway and out into our office proper.

13  Q.     Mr. Byerley, what I'm interested in is asking you

14  about -- you gave testimony yesterday and you gave it today

15  related to Mr. Toler when he -- when you first saw him on

16  this occasion he was at the elevators.  And I believe you

17  said he was staring intently at the reception area, he was

18  focused on the reception area.

19       Do you remember that testimony?

20  A.     Yes, sir, I do.

21  Q.     So I want to understand where was he and what he was

22  doing because this is important.

23  A.     Okay.  To draw this a little more accurately there is

24  a little lip that comes out here, and there's a security

25  camera right here.

96

1          When we came out the doorway, my recollection is

2     Mr. Toler was standing in this area.  And I'm drawing an

3     arrow which way he was facing.

4     Q.     All right.  But you said that he was staring intently

5     at the reception area?

6     A.     Yes, sir.

7     Q.     And so he's looking at the people presumably that

8     he's just had an interaction with?

9     A.     I could say he was staring into the reception area.

10    When I came out his back was to me.  His head was facing

11    looking, it appeared to me, into the reception area.

12    Q.     Okay.  And you can have a seat now.

13          This is obviously not a diagram to scale; is that

14    correct?

15    A.     No, sir.

16    Q.     And who else -- When you first stepped out, was

17    Mr. Toler already at the elevator?

18    A.     When I stepped out he was.

19    Q.     And when Mr. Godwin and you were in the area of the

20    elevator, who else was in that area?

21    A.     When I first walked out there I saw Mr. Godwin and

22    Mr. Toler, and that's who I was focused on at that immediate

23    time, the very first contact we made.

24    Q.     Was there another investigator named Cardwell?

25    A.     No.

97

1    Q.      Was Warren Butler there?

2    A.      Warren Butler?  After the situation stabilized, saw

3    there was no immediate threat, then I noticed Mr. Butler.

4    Q.      All right.  So there were three folks there.  Did

5    anybody walk through while Mr. Godwin was talking to

6    Mr. Toler?

7    A.      Yes.

8    Q.      And who was that?

9    A.      That would have been Steve.  I can't remember Steve's

10   last name.  He's one of our clerical people.

11   Q.      Now, do you remember in your -- First of all let me

12   ask you, have you seen the videotape?

13           You mentioned there is a security camera.  Have you

14   seen the video of this -- of what transpired on that date?

15   A.      Yes.

16   Q.      Did you see it in the last day?

17   A.      Yes.

18   Q.      And would you concede that there's nothing on that

19   videotape that suggests Mr. Toler is staring intently at the

20   reception area?

21   A.      I -- My impression, when I walked out, that's what he

22   was focused on.

23           THE COURT:  The question is what was on the tape.

24   BY MR. GONZALEZ:

25   Q.      I asked you if you saw the tape in the last day and

98

1    whether or not you stand by that testimony because you gave

2    it yesterday and today?

3    A.      What -- what appears to happen is when Mr. Godwin

4    comes out and steps in front of him, that he's looking at

5    Bill.  He focuses on Bill that is standing in between the

6    reception area and --

7    Q.      Mr. Godwin, would you agree with me --

8            THE COURT:  No.  He's not Mr. Godwin.

9            MR. GONZALEZ:  I'm sorry.

10   BY MR. GONZALEZ:

11   Q.      Mr. Byerley, would you agree with me that when you

12   represent to the jury under oath that Mr. Toler stood there

13   staring intently at the reception area, that you're conveying

14   a basis to have a continuing concern about his potential for

15   violence?

16           MR. CASSIDY:  Objection.  It is argumentative.

17           THE COURT:  No.  Is that what you understand your

18   testimony is suggesting?

19           THE WITNESS:  No.

20           THE COURT:  Okay.

21           MR. GONZALEZ:  We've got -- We're going to play the

22   video.  I'm sorry, Your Honor.

23           We're going to play the video.  It is in evidence as

24   Plaintiff's 25.

25           THE COURT:  Thank you, sir.

99

1          MR. GONZALEZ:  I'm going to move it to the portion

2    that deals with this interaction.  I'll play it.  It's very

3    short, less than probably 20 seconds.  I'll rewind it and

4    play it a second time so everyone can see it.

5          It's going to show from the screen from the bottom

6    Mr. Toler apparently wearing a white shirt, and it is going

7    to show Mr. Godwin initially walking from the top of the

8    screen down.

9          It's about 20 seconds from now.

10          (Exhibit published.)

11          MR. GONZALEZ:  We can turn that off.

12    BY MR. GONZALEZ:

13    Q.     Mr. Byerley, Mr. Tom Toler was never on April 7th

14    standing at the elevators staring intently at the reception

15    area; is that true?

16    A.     Yes.

17    Q.     And you've testified under oath twice, both yesterday

18    and today, that the opposite was, in fact, the truth; isn't

19    that right?

20    A.     I testified that was my perception when I walked out.

21    Q.     Mr. Byerley, you would not have come to court --

22    Strike that.

23          You understand, for instance, when you gave testimony

24    today about the ad in the paper April 12th, you told your

25    counsel it caused you concern how the incident was being

1    portrayed in the ad Mr. Toler took out.

2          Do you remember that testimony today?

3    A.     Yes.

4    Q.     And you talked about how his representation was

5    unfair because he was never surrounded by four people, true?

6          I mean you said that today?

7    A.     I don't think I used the word "surrounded."  There

8    was some question about surrounded.

9    Q.     The point I'm trying to make was you felt his

10   representation of matters as he published them April 12th

11   were not accurate, and yet you testified yourself that

12   Mr. Toler was engaging in behavior that would give people

13   reason to be concerned about his motives or intention, even

14   though you had seen his video within the last day and there

15   is nothing on it to suggest he behaved in the way that you

16   have said he behaved?

17         MR. CASSIDY:  Objection, Your Honor.  Overbroad and

18   compound.

19         THE COURT:  It is not clear to me how he could have

20   asked that question any differently.

21         It starts off with "The point I'm trying to make."

22   It doesn't matter what point you're trying to make.  I

23   suppose to that extent the question is bad.

24         You may try it again, sir.  Let's see whether we

25   can -- The jury has seen the tape.  The jury has heard the

1    testimony.  Everything else is argument.

2           MR. GONZALEZ:  I'm moving onto a different subject.

3           THE COURT:  I'm sorry, sir?

4           MR. GONZALEZ:  I'm going to move on to something

5    else.

6           THE COURT:  Good.

7    BY MR. GONZALEZ:

8    Q.    Mr. Byerley, in the memo you prepared, I'm going to

9    read something that you state.  You said -- This is the April

10   12th memo that's been referred to.

11          MR. CASSIDY:  Exhibit number, please?

12          MR. GONZALEZ:  Yes.  Plaintiff's B.

13          MR. CASSIDY:  Thank you.

14   BY MR. GONZALEZ:

15   Q.    (READING):

16          Bill Godwin invited Toler into the large conference

17          room east of the elevators.  By this time Kurtis

18          Cardwell also had walked into the area but never said

19          anything to Toler.  Bill Godwin and Toler went into

20          the conference where Bill Godwin spoke to him.

21          (READING CONCLUDED.)

22          Is that correct?

23   A.    I'm sorry, sir.  What -- I know you're on page 2.

24   I'm not sure which paragraph.

25   Q.    All right.  I'm trying to understand what

102

1    Investigator Cardwell's relationship was to this memo.

2         In other words, you prepared a memo -- Let me say it

3    like this.  You appear to take offense to the way Mr. Toler

4    portrayed what took place when he took out the ad April 12th,

5    correct, what had transpired on April 7th?

6    A.    I wouldn't use the word "offense."

7    Q.    Okay.  But you found it inaccurately portrayed what

8    had actually happened?

9    A.    Yes.

10   Q.    You just saw the interaction that Mr. Toler had with

11   Mr. Godwin the first time they met.  Did you see that?

12   A.    Yes.

13   Q.    And Mr. Godwin is talking to Mr. Toler, and, in fact,

14   is turned in a way where his firearm, which is on his waist,

15   is faced towards Tom Toler; isn't that right?

16   A.    When he first -- Once again, my recollection, when he

17   first approaches him, no, he takes a semi-bladed stance.  And

18   in trying to de-escalate the situation he might have turned

19   more face-to-face.

20   Q.    Right.  But listen to the question I'm asking.

21   A.    Sorry.

22   Q.    You can face someone straight on, you can be giving

23   them your left, be giving them your right.  Mr. Godwin is

24   giving him his right when he first starts talking, which is

25   the side his weapon is on.  He's facing Mr. Toler that way.

103

1          Is that correct?

2     A.    I -- I'm not positive if that's the way he's facing.

3     Q.    Let me say to you this:  You're training and

4     experience would be you would not stand talking to somebody

5     that you're fearful of or you think is violent or may carry

6     out some threat, you wouldn't face them that way as you are

7     talking to them, would you?

8     A.    I wouldn't.

9     Q.    Right.

10          And then while they're talking, Mr. Godwin closes the

11    gap and actually steps forward to Tom as they're talking and

12    starting to dialogue; is that correct?

13    A.    Yes.  When Mr. Godwin is trying to deescalate the

14    situation, yes.

15    Q.    All right.

16          Then you see Tom Toler reach his hand out, and they

17    shake hands, correct?

18    A.    Correct.

19    Q.    Did you see that Mr. Toler appeared to have a folder

20    with him when we saw the video of the April 7th visit?

21    A.    He's carrying some kind of paperwork in his hands.

22    Q.    All right.

23          I appreciate that you have indicated that the

24    Fairfield report stated that Mr. Toler had apparently already

25    given the District Attorney's Office this folder.

104

1          You heard Mr. Toler testify under oath that no, what

2     he said was he was prepared to do that, that he was willing

3     to give that.

4          But you've testified today that your office didn't

5     have it, and you sent out an e-mail because you saw what was

6     written in that report inquiring if anybody had the report,

7     right?

8     A.     That was a complex question, sir.  I'm sorry.  There

9     was several parts to that.

10    Q.     Let me ask you this.

11         You sent out an e-mail because you saw a reference to

12    the Oawster information that Tom had in the Fairfield report,

13    right?

14    A.     Correct.

15    Q.     So you wanted to make sure that nobody in your office

16    might have this because it was referenced as having been

17    given to the District Attorney, right?

18    A.     Correct.

19    Q.     And I asked you yesterday whether or not it ever

20    occurred to you to call Tom up to see if he could provide you

21    with a copy or if he still had it, and you said you didn't do

22    that, right?

23    A.     Correct.

24    Q.     Did you ask Mr. Godwin whether or not he had access

25    to this file at any time?

105

1    A.       No, sir, I didn't.

2    Q.       Why didn't you do that if you were looking for it?

3    A.       Because I had handed the assignment off to

4    Mr. Godwin.  Mr. Godwin was going to be doing it.  He's an

5    experienced investigator.

6    Q.       Right.

7    A.       I didn't think of it.

8    Q.       You're not suggesting in your testimony, are you,

9    that Tom Toler's investigation of Mr. Oawster, that the

10   information he had related to that is something he did not

11   want to give to the District Attorney's Office?

12   A.       I never said that.

13   Q.       No.  I'm saying now you're not suggesting that by

14   anything you've stated in your testimony, are you?

15   A.       I have no factual basis to say that.

16   Q.       We talked yesterday about the alleged threat, about

17   saying not only "Don't make me protect my children," but also

18   "If this guy hurts my children or physically hurts my

19   children, that I'll kill him."

20           I want to ask you about that because you presented

21   that as a very serious threat.  You took that as a serious

22   threat, correct?

23   A.       I took it as a threat.

24   Q.       If one of your own employees, one of your own

25   investigators would say the same thing, would you consider

106

1   that a threat and inappropriate?

2   A.      It depends on the surrounding circumstances.

3   Q.      Don't you think just about any parent would say that

4   if somebody injured their kid, molested their kid, stomped

5   their kid like they may have done to, you know, an animal,

6   that saying that you want to kill that person, that you would

7   kill that person, that's not a surprise, is it?

8           MR. CASSIDY:  Objection, Your Honor.  Argumentative.

9   Calls for speculation.  Compound.  Assumes facts not in

10  evidence.

11          THE COURT:  Mostly the question is bad.  For me to

12  sort it out is too much.

13          But the question is would you regard it as a serious

14  threat if someone were to respond that if someone was to hurt

15  his children that he might want to kill them or he would kill

16  them?

17          You can answer that question.

18          THE WITNESS:  I would take it as a threat.

19  BY MR. GONZALEZ:

20  Q.      So if a parent said that if somebody hurts my

21  children, I'm going to kill that person, in the context of

22  Tom Toler, which you know that person has a history of

23  violence towards others, towards animals, molestation against

24  a child, you would still say that's a threat?

25  A.      Yes.

107

1   Q.      And so you must have decided to fill out some kind of

2   police report to have Mr. Toler arrested and prosecuted for

3   making that threat?

4   A.      No, sir.  I didn't.

5   Q.      All right.

6           And so if Mr. Oawster made such a threat -- in fact a

7   more direct threat that has been related during these

8   proceedings that, Okay, now it is your turn, you've taken

9   away my kids, now I'm going to take away your kids, that

10  bitch and bastard son of yours are dead, you know, have fun

11  working on your motor home, that's a very serious threat,

12  isn't it?

13  A.      Yes, sir.

14  Q.      And you took it seriously, didn't you?

15  A.      Yes, we did.

16  Q.      So seriously that when you learned that he lied about

17  even ever calling Tom Toler, you decided to go out and arrest

18  him because you had enough evidence to show that he was being

19  untruthful?

20          MR. CASSIDY:  Objection, Your Honor.  Argumentative.

21  Assumes facts not in evidence.

22          THE COURT:  Overruled.  You may answer the question.

23          THE WITNESS:  We did not go out and arrest

24  Mr. Oawster, no.

25  BY MR. GONZALEZ:

108

1    Q.      In fact, you spent most of your time generating

2    reports after the article that came out April 12th making

3    sure everybody was documenting Tom Toler's visits to the

4    District Attorney's Office because you thought that, you

5    know, you wanted to make sure there was a record of what was

6    going on?

7    A.      You're talking about me doing that?

8    Q.      Yes.

9    A.      That was the only involvement I had was to provide

10   information about Mr. Toler's actions when he had come into

11   the office and scared the staff and the continuing problems.

12   Q.      Sir, you said he scared the staff repeatedly.  And

13   the testimony, as I understand it in this trial, is that

14   Mr. Toler got loud on one occasion, that was the April 7th

15   occasion where your staff stated anything about being -- that

16   he was loud.

17           Is that correct?

18           MR. CASSIDY:  Objection.  Misstates his testimony.

19           THE COURT:  His testimony as of this moment.  That's

20   what the testimony -- I mean, that's a reasonable statement.

21           Sir, put your question again.

22           MR. GONZALEZ:  Yes.

23   BY MR. GONZALEZ:

24   Q.      Up to this point you've been saying that your staff

25   was scared, and you're basing that on the April 7th incident;

109

1    is that correct?

2    A.      That's correct.

3    Q.      Do you have anything that indicates a member of your

4    staff talked to you about wanting a TRO or was scared of Tom

5    Toler?

6    A.      Yes.

7            Okay.  I couldn't answer that "yes" or "no" without

8    an explanation.

9    Q.      Let me ask it to you like this --

10   A.      Okay.

11   Q.      Mr. Toler -- you're presenting a picture of Tom Toler

12   that justifies why you needed to go get this temporary

13   restraining order against him, correct?

14   A.      Correct.

15   Q.      And you understand that when you actually went and

16   got the order, the people that were directly protected happen

17   to be you, Mr. Garza and Mr. Paulson.

18           You understand that?

19   A.      We're the people named on the restraining order, yes.

20   Q.      Now, did you hear Linda Jones' testimony that even

21   when Mr. Toler yelled in his interaction with Marsha Johnson

22   that she had simply gone back to her work, she had stuff to

23   do.

24           Do you remember that?

25   A.      Yes, I do.

110

1   Q.      You've conceded, I believe, that between the time

2   that you first interacted with Mr. Toler on March 28th or

3   29th, it sounds like you believe it may be the Monday the

4   28th, and when he came to the office eleven days later or

5   twelve days later, whatever that would be, that nobody to

6   your knowledge in your office had communicated with him

7   following up on that first conversation you had?

8   A.      That's correct.

9   Q.      So if you were doing work on his behalf, making

10  inquiries to the Fairfield police, doing that sort of thing,

11  Mr. Toler had absolutely no way of knowing that; is that

12  true?

13  A.      That would be true.

14  Q.      So when he came into your office, would you concede

15  that somebody maybe would be a little bit upset to have made

16  a serious allegation of threats against somebody else and not

17  know what's going on for over ten days?  That wouldn't be

18  surprising to you that somebody is upset?

19  A.      To the extent to his reaction I'd have to say yes, it

20  was surprising.

21  Q.      Sir, you didn't see his reaction on April 7th, did

22  you?

23  A.      Okay.  From what I was told it was his reaction.

24  Q.      Answer the question.  You didn't see his reaction on

25  April 7th, did you?

111

1    A.      I saw the aftermath of his reaction.

2    Q.      Right.  And the aftermath --

3            THE COURT:  Sir, that was not an answer to the

4    question.

5            Put your question one more time.

6    BY MR. GONZALEZ:

7    Q.      You didn't see Tom Toler's reaction in the reception

8    area on April 7th, did you?

9    A.      No, I didn't.

10   Q.      In fact, what you did see you've mischaracterized

11   under oath, that he stood staring intently at the reception

12   area; is that correct?

13   A.      No.  I wouldn't say I mischaracterized it.

14   Q.      Sir, is there a reason why you are so intent on

15   conveying to this jury that you had a justifiable fear of

16   Mr. Toler given what we've seen on this video?

17           You've seen the video in the last day?  You saw it

18   twice?

19           THE COURT:  All right.  The objection is --

20           MR. CASSIDY:  The objection is argumentative.

21           THE COURT:  Sustained.

22   BY MR. GONZALEZ:

23   Q.      Mr. Godwin -- Mr. Byerley -- I keep saying Godwin

24   because so much of the testimony was about what Mr. Godwin

25   told you.

1          But Mr. Byerley, you made reference to this phone

2     bill that was -- that Mr. Godwin obtained from Mr. Toler.

3     And it seems like you were, in fact, more interested in the

4     question of whether or not any laws had been violated as

5     related to the obtaining of this phone bill than if you

6     should arrest Mr. Oawster for lying to a peace officer?

7          COURT:  Objection it's argumentative?

8          MR. CASSIDY:  Objection, argumentative.

9          THE COURT:  Sustained.

10    BY MR. GONZALEZ:

11    Q.     Did you ever ask Mr. Godwin to show you the document

12    that Tom Toler provided him related to this phone call that

13    Mr. Oawster made?

14    A.     No, sir, I didn't.

15    Q.     So if I were to tell you that it was obtained from an

16    online company in Florida that generated the document, you

17    would have no reason to disbelieve that, do you?

18    A.     I have no reason to disbelieve it.

19    Q.     Right.  But you have come to court and suggested that

20    Tom Toler may have violated the law; isn't that right?

21    A.     What I was told, sir, was that the phone bill had

22    come from Mr. Oawster's phone.  I don't know.  For me as a

23    peace officer to get that I'd have to write a search warrant.

24    I don't know of another way to do that.  I don't know of

25    another mechanism to do that.

113

1    Q.      Well, there is a San Marcos Company in Florida.  Find

2    them online.  They apparently can generate this document.

3            Let me ask you, do you believe Tom Toler was

4    surrounded by anybody on April 7th at the elevators?

5            Do you think that's a fair or unfair assessment?

6    A.      I think it's an unfair assessment.

7    Q.      If somebody gave false information to a peace

8    officer, is that a crime?  If they gave an untruthful

9    statement to a peace officer?

10   A.      No.

11   Q.      It is not a crime?

12   A.      No.

13   Q.      If they're investigating a case and they lie to the

14   police officer?

15   A.      No.  It happens all the time.

16   Q.      Right.  But it is not something that could be

17   prosecuted under 148 of the Penal Code Section?

18   A.      Boy, 148 is resisting, obstructing or delaying a

19   peace officer in the discharge of his duties.  I don't know

20   of a single -- I personally don't know of a single case of

21   that ever having been charged for somebody lying to them.  It

22   happens all the time.  People lie all the time.

23   Q.      I'm fully aware Mr. Godwin that people lie --

24   A.      Mr. Byerley.

25   Q.      Mr. Byerley.  Excuse me.

114

1          I'm asking you whether or not you can prosecute

2     someone when in the course of the investigation they outright

3     lie to you?

4          You have the evidence, and they lie to you, you're

5     saying no, it is not a crime, it happens all the time?

6          That's your answer?

7     A.    Well, first off I don't make charging decisions about

8     prosecutions.  But I know we get reports all the time where

9     people lie, and we don't prosecute them for lying.

10    Q.    You don't make charging decisions about prosecutions,

11    but you have very liberally given us your opinion about the

12    need to get a restraining order against Mr. Toler?

13          THE COURT:  Sir, why are you arguing with him.

14          MR. GONZALEZ:  Your Honor, you really want an answer

15    to that?

16          THE COURT:  Yeah.  I really want an answer as to why

17    you are not behaving appropriately.

18          Now, you may proceed.

19          MR. GONZALEZ:  All right.

20    BY MR. GONZALEZ:

21    Q.    Mr. Byerley, your testimony is and you just said 148

22    covers obstructing an officer in his duties; is that correct?

23    A.    Correct.

24    Q.    And giving false information and not being truthful

25    can be an obstruction; is that correct?

1    A.      In the broadest sense of the word, yes, it could be.

2    Q.      So if I -- Well, sir, I've been in the courts for a

3    decade -- two decades.  I've seen many cases prosecuted where

4    somebody lied to a peace officer.  You're telling me you have

5    never seen one?

6            MR. CASSIDY:  Objection.  Irrelevant.  Assumes facts

7    not in evidence.

8            THE COURT:  I thoroughly agree that Mr. Gonzalez's

9    statement about his own experience is beside the point.

10           You may ask a question.

11   BY MR. GONZALEZ:

12   Q.      Sir, would it be fair to say that you related what

13   Mr. Godwin told you about his interaction with Mr. Oawster?

14           He goes to Mr. Oawster.  He says:  Look, did you make

15   this phone call to Tom Toler?  Oawster denies it.

16           Is that correct?

17   A.      Correct.

18   Q.      Then if I understand your testimony, Mr. Godwin says:

19   Look, we know you made the call.  Here's the proof.  Cut it

20   out.  Don't have any more contact with him.

21           Is that what he does?

22   A.      Well, I would -- I don't know if he did this, but I

23   know he presented -- My understanding is, from what Bill

24   said, was he presented him with the phone bill, said we know

25   you made the phone call, quit calling Mr. Toler and leave his

116

1  kids alone.  Words to that effect.

2  Q.      Did he point his finger the way you did?

3  A.      Sir, I don't think he did.  That's my --

4  Q.      My point is this, Mr. Byerley.  Wouldn't you agree

5  with me that Mr. Godwin appeared to have additional evidence

6  that would support, when you're trying to weigh the

7  credibility of two people, that one has told you that a

8  threat was made and offered you the only proof available to

9  him that a phone call got made, and the other lied about

10  making the call.  That Mr. Godwin has that information now.

11          Is that true?

12  A.      Yes.

13  Q.      In fact, when you went to Mr. Daugherty to say,

14  "Well, the report, we don't really have anything to go on it,

15  we're not going to file it," you didn't know at that time

16  that Mr. Oawster had lied about even making a call, did you?

17  A.      I did not go to Mr. Daugherty in that way.  I asked

18  Mr. Daugherty to review the report.  I didn't tell him we

19  don't have enough to go on.  I asked Mr. Daugherty to review

20  the report and give me his opinion.

21  Q.      Sir, does Mr. Toler have the right to insult you?

22  A.      Yes.

23  Q.      He can call you names all he wants, can't he?

24  A.      Sure.

25  Q.      He's not violating any law when he does that?

117

1   A.      Probably not.

2   Q.      How would you feel about somebody that

3   mischaracterized interactions with you?

4           Would that be something that would get you angry?

5   A.      I wouldn't say angry.

6   Q.      What if they did it under oath; would that make you

7   more angry?

8   A.      I didn't say it would make me angry.

9   Q.      So Mr. Garza related what had happened on the

10  occasion on June 13th with him.  And he said that Tom at one

11  point said, "You don't get it."  When he started saying,

12  "What do you want to meet the District Attorney about" and

13  Tom said, "You don't get it."

14  A.      I'm sorry.

15  Q.      Mr. Garza told you that, right?

16  A.      Words to that effect.

17  Q.      And Mr. Garza told you he had denied seeing an

18  article that was written by a journalist in the paper that

19  day, that Mr. Garza was even quoted in, but he denied he had

20  seen it to Tom Toler.  Did he tell you that?

21  A.      No.  He didn't tell me that.

22  Q.      Did you become aware of that at some subsequent time?

23  A.      No.

24          MR. GONZALEZ:  All right.

25          Nothing further.  Thank you, Your Honor.

1            MR. CASSIDY:  Couple of quick follow-ups.

2                    REDIRECT EXAMINATION

3    BY MR. CASSIDY:

4    Q.      You were asked questions about this source of phone

5    records.  In the ordinary course of a police officer's

6    abilities to obtain records, could police officers, based on

7    your experience and knowledge, go and obtain somebody's

8    private phone records off some Internet service like this

9    San Marcos that was referred to?

10   A.      My personal experience in trying to use Internet

11   search records for phone -- or for phone records, this is

12   nonsubscription services, I don't know about subscription

13   services, I don't have that, but it might give you -- you

14   punch in a phone number, it might give you the person's

15   address, or you punch in an address, it might give you a

16   phone number.

17           I've personally never seen a phone search engine on

18   the computer where you can punch in a phone number and it

19   shows you a phone bill of when people are making phone calls.

20   I don't know of one.

21   Q.      All right.

22           But ordinarily peace officers are entitled to access

23   what is called public records?

24   A.      Correct.

25   Q.      And if they're going to go beyond what's in the

1   public record and seek somebody's personal and private

2   information, is something more required of a peace officer?

3   A.      Yes.

4   Q.      What is that?

5   A.      We'd have to do it with a search warrant.  We'd have

6   to have an order from a judge.

7   Q.      In relation to the consideration of obtaining the

8   TRO, why did this fact that Mr. Toler had presented the

9   private phone record of Mr. Oawster to Investigator Godwin,

10  why was that important to you?

11  A.      It showed me that he had an ability that went above

12  ours without a search warrant to get personal information on

13  somebody, what times they were making phone calls, who they

14  were calling.

15          MR. CASSIDY:  That's all I have.

16          Thanks.

17          FURTHER RECROSS-EXAMINATION (ADVERSE WITNESS)

18  BY MR. GONZALEZ:

19  Q.      Mr. Byerley, you don't -- you don't know whether or

20  not you can hire San Marcos and Associates in Florida to

21  obtain the phone records, do you?

22  A.      No, I don't.

23  Q.      So nobody said to you that they obtained phone

24  records by typing something on the Internet.  It's that

25  they're available via the Internet for hire.

120

1          You have no reason to believe that can't be done.

2    And that there are a number of services that do that?

3    A.      I have no experience with it.

4    Q.      Okay.  You also raised in the context of this this

5    idea that somebody engaging in surveillance, that they're

6    sort of obtaining information and what that says about them.

7          If somebody wanted to know what somebody else was

8    doing, isn't one of the things that an investigator does is

9    they follow somebody around to have an idea of what their

10   patterns are?

11   A.      That would be one way to do it, yes.

12   Q.      So if Mr. Toler wanted to know is Mr. Oawster hanging

13   out in my neighborhood or is he hanging out somewhere he

14   shouldn't, I'm going to every now and then follow him or send

15   someone to follow him just to know if he's doing that, would

16   that be odd?

17   A.      No.  No.

18   Q.      It wouldn't be odd?

19          But you've --

20          MR. GONZALEZ:  That's fine.  Thank you.

21                    FURTHER REDIRECT EXAMINATION

22   BY MR. CASSIDY:

23   Q.      Was that type of activity, the kind of activity that

24   Mr. Toler can engage in and go out and surveil people and

25   watch them where they are and do it surreptitiously

1    considered by you in relation to the obtaining of the TRO?

2    A.      Yes.

3    Q.      And did it cause you -- is that one of the reasons it

4    caused you concern for your safety?

5    A.      Yes, sir.

6    Q.      Why is that?

7    A.      Because once again it shows that he is paid to do

8    surveillance, he knows how to go out and establish people's

9    patterns, which way they drive to work, what their habits

10   are, where they park their cars, when they might be alone,

11   when they might be in an isolated area.  That's why it caused

12   me concern.

13           MR. CASSIDY:  Thank you.  That's all I have.

14           FURTHER RECROSS-EXAMINATION (ADVERSE WITNESS)

15   BY MR. GONZALEZ:

16   Q.      Mr. Byerley, you never submitted a declaration in

17   support of the TRO, did you?

18           MR. CASSIDY:  Objection.  Outside the scope of the

19   cross -- the direct.

20           THE COURT:  Actually, it is connected with what you

21   just asked.

22           You may answer that question, sir.

23           THE WITNESS:  No, sir, I didn't.

24   BY MR. GONZALEZ:

25   Q.      So when counsel today has been asking you to

122

1    enumerate the reasons why you wanted the TRO, that was never

2    submitted to a court in a declaration by you?

3            Did you ever see the application for the TRO?

4    A.      I don't recall.

5            MR. GONZALEZ:  Okay.

6            MR. CASSIDY:  No further questions.

7            THE COURT:  You may step down, sir.

8            THE WITNESS:  Thank you.

9            (Whereupon, the trial testimony of Mr. Byerley was

10            concluded.)

11                            ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        REPORTER'S CERTIFICATE

2                             ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5


6            I certify that the foregoing is a correct transcript

7    from the record of proceedings in the above-entitled matter.

8

9

10               IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California on this 19TH day of
11   OCTOBER, 2009.

12

13

14   /S/_Catherine E.F. Bodene_____
             CATHERINE E.F. BODENE, CSR NO. 6926
15           Official United States District Court Reporter

16

17

18

19

20

21

22

23

24

25