1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---O0o---

4    BEFORE THE HONORABLE LAWRENCE K. KARLTON, SENIOR JUDGE

5

6    JOEL THOMAS TOLER,

7          Plaintiff,

8    Vs.                          CASE NO. CIV. S-06-0735 LKK

9    DAVID PAULSON, COUNTY
     OF SOLANO, AL GARZA,
10   BROOK BYERLEY, and DOES
     1 THROUGH 10, inclusive,

11

12         Defendants.

13   _____/

14

15

16

17                      ---o0o---

18              REPORTER'S TRANSCRIPT

19         EXCERPT FROM TRIAL PROCEEDINGS

20         TESTIMONY OF JOEL THOMAS TOLER

21         WEDNESDAY, AUGUST 12TH, 2009

22                      ---o0o---

23

24

25   Reported by:              CATHERINE E.F. BODENE,
                               CSR. No. 6926

```
 1                        APPEARANCES

 2                          ---o0o---

 3

 4    For the Plaintiff:

 5            GONZALEZ & LEIGH, LLP
              Two Shaw Alley, 3rd Floor
 6            San Francisco, California  94105

 7            BY:  MATT GONZALEZ, Attorney At Law
              BY:  MATT SPRINGMAN, Attorney At Law
 8

 9

10

11    For the Defendants:

12             PORTER SCOTT
               350 University Avenue, Suite 200
13             Sacramento, California  95825

14             BY:  TERENCE J. CASSIDY, Attorney At Law

15

16

17

18

19

20

21

22                          ---o0o---

23

24

25
```

EXAMINATION INDEX

---o0o---

FOR THE PLAINTIFF:

EXAMINATION:                                    PAGE

JOEL THOMAS TOLER

Direct Examination by Mr. Gonzalez          1
Cross-Examination by Mr. Cassidy           83

---o0o---

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1

```
 1                    SACRAMENTO, CALIFORNIA

 2             TUESDAY, AUGUST 12TH, 2009 - 9:15 A.M.

 3                        ---o0o---

 4        (Excerpt from trial proceedings.)

 5        THE COURT:  We will now proceed to testimony.

 6        Call your first witness, sir.

 7        MR. GONZALEZ:  Thank you, Your Honor.

 8        We're going to call Tom Toler to the stand.

 9        THE COURT:  Come around and be sworn, sir.

10        THE CLERK:  Please, raise your right hand.

11                    JOEL THOMAS TOLER,

12   was thereupon called as a witness herein by the Plaintiff,

13   and having been sworn to tell the truth, the whole truth and

14   nothing but the truth, was thereupon examined and testified

15   as follows:

16        THE COURT:  Speak directly into microphone, sir,

17   otherwise you won't be heard.

18        THE CLERK:  Please, say and spell your first and last

19   name for the record.

20        THE WITNESS:  Joel Toler, J-O-E-L, T-O-L-E-R.

21                    DIRECT EXAMINATION

22   BY MR. GONZALEZ:

23   Q.    Mr. Toler, Tom, let me -- let's start out with some

24   of your background.

25        You heard me make remarks in opening statement.
```

2

 1    First of all, let's confirm some things.

 2            What professional occupation did you begin at the age

 3    of 18?

 4    A.      Contractor.  Heavy-equipment contractor, anything to

 5    do with dirt, we moved it.

 6    Q.      And what city were you working out of?

 7    A.      Pinole and Hercules.

 8    Q.      Do I understand correctly you started this business

 9    yourself at the age of 18?

10    A.      I actually started at 17.  I acquired a license at

11    18.

12    Q.      What kind of license was that?

13    A.      State contractor's license.

14    Q.      And how did that business go for you?

15    A.      The license is 31 years old here just last month, and

16    it was a good business.  It had ups and downs reflective of

17    the economy.

18    Q.      Now, at some point you heard my recitation of some of

19    your law enforcement background.

20            How did you first get interested in getting law

21    enforcement training?

22    A.      I think when I was about ten years old, we were

23    driving down the street, and I had a fit for my dad to stop.

24    Somebody was getting mugged or beat up, and I think that was

25    my first inkling.

3

1          Around about 20, 21-years-old, I decided to put

2     myself through the police academy and see what kind of an

3     interest I had and learn more about it.

4     Q.     So I'm not sure I understood that.  You say you saw

5     something as a young man that particularly got your interest

6     to go into the profession?

7     A.     I did.

8     Q.     And in 19 -- was it 1980 or some other time that you

9     went to the police academy?

10    A.     1980.

11    Q.     And where was the academy?

12    A.     In Pittsburg, California.

13    Q.     That's in Contra Costa County?

14    A.     It is.

15    Q.     And what kind of things did you study at the academy?

16    A.     Well, it was called the basic police academy.  It was

17    accredited by a commission of the State of California called

18    POST.

19    Q.     I'm sorry.  Called?

20    A.     Called POST, Peace Officer Standards and Training.

21    They set the standard as to what was trained and how you were

22    to be taught that training.

23    Q.     This is the same training that you heard Mr. Cassidy

24    say in opening that Mr. Garza has?

25    A.     Absolutely.

4

1    Q.      And how many hours does it take to go through a

2    police academy?

3    A.      At that time it was approximately 800 hours.

4    Q.      And after graduating from the academy, did you have

5    occasion to work for a law enforcement agency?

6    A.      I did.  I applied with a few different departments.

7    Vacaville police offered me a job.  That's the town I lived

8    in, and it was a short commute.

9    Q.      And you worked for them in 1981?

10   A.      I did.

11   Q.      Now, you heard me in opening statement say that you

12   logged in 2000 hours that year.  That's a lot of hours.

13   A.      Yes.

14   Q.      And you received -- that's where you received your

15   POST certificate?

16   A.      Yes.

17   Q.      And the POST certificate is, if I understand

18   correctly, one year of training on top of the police academy

19   work you had done for completing your first year?

20   A.      Once you graduate the academy and you're hired, after

21   you've implemented that training, you've been evaluated by a

22   field training officer for about 12 weeks, and then you

23   worked the street -- or worked with the police department for

24   approximately a year full-time, then you're normally granted

25   the POST certificate.

5

1        So it is your credentials to be able to work as a

2   peace officer in any setting in the State of California.

3   Q.      So when you -- when we say you worked 2000 hours in

4   1981 as a reserve officer, what does that mean?

5        Does that mean you're -- how does that differ from

6   the work that a police officer does?

7   A.      There is no difference except that I wasn't getting

8   paid.

9   Q.      And when you say that there is no difference, you

10  mean when you are on duty you're patrolling like a police

11  officer would?

12  A.      When you're on duty as a reserve police officer or a

13  police officer, you're operating under the authority of 832

14  of the Penal Code which gives the authority that a peace

15  officer has.  It also gives them some immunities if they make

16  a minor mistake.

17       The difference is once I got off -- when I clocked

18  out and I went home, I no longer had the authority that a

19  police officer would have.

20       But when I clocked in, we had equal authority, if you

21  want to use that word.

22  Q.      Now, you heard me say 2000 hours in 1982, over 2000

23  hours in 1983, 1100 hours in 1984 all for the Vacaville

24  police?

25  A.      That sounds correct, yes.

6

1    Q.      So what kind of work were you doing?

2            You were patrolling the streets alone or with

3    somebody else?

4    A.      For the first several months I was assigned, I

5    believe, three different training officers.  I completed a

6    12-week field training program which was also scrutinized,

7    approved, reviewed by the POST Commission.

8            The different training officers would instruct me,

9    coach me, offer me constructive criticism, write up the

10   reports of each day's events.  And there was always a

11   positive section and a negative section where they offered

12   constructive criticism.

13   Q.      Now, at some point during your work with the

14   Vacaville police, did they encourage you to become a

15   full-time officer?

16   A.      They did.  I got -- I came in from work --

17           MR. CASSIDY:  Objection, Your Honor.  Hearsay.

18           THE COURT:  Overruled.  You may proceed.

19           THE WITNESS:  I came in from work one day, and there

20   was a message on my recorder from Chief Gary Tatum from the

21   Vacaville Police Department.  And he called, and he says that

22   I need you to call me right away.

23           And I was just in a bit of a panic, thinking I did

24   something wrong.  I called.  Captain Bill McCore took my

25   call.  He says that I need you to get down here right now.

7

1          So I proceeded to his office, and he offered me a

2     job.

3     BY MR. GONZALEZ:

4     Q.     Now, did you relate to them that you were concerned

5     that your private contracting business might interfere with

6     your -- if you were to commit yourself to full-time police

7     work?

8     A.     I did.

9     Q.     And did they impress upon you a desire to have you

10    work full-time nonetheless?

11          THE COURT:  Now we are getting into --

12          MR. GONZALEZ:  I'll change the question.

13    BY MR. GONZALEZ:

14    Q.     Did you become a full-time police officer in

15    Vacaville?

16    A.     Yes.

17    Q.     And that was in what year?

18    A.     1982.

19    Q.     And how long were you a police officer with Vacaville

20    police?

21    A.     Several months.

22    Q.     And at the end of those several months, did you ask

23    to revert back to being a reserve officer?

24    A.     I asked for a meeting with my training officer, then

25    I requested a meeting to the sergeant, to the captain, to the

8

1    chief, respecting the chain of command.

2    Q.      What was the problem that you had with being a

3    full-time officer?

4    A.      I did slide repairs, which is a very touchy

5    operation.  There was a slide repair in Hercules, California,

6    that just kept springing a leak.  And I had already told

7    Chief Tatum two times that I thought we had it -- that was

8    the last contractual obligation I had, and I thought I had it

9    fixed.

10          He says -- He gave me two or three different times

11   where I had a week off to make sure that job was wrapped up.

12   They were really working with me.  They knew how much I

13   enjoyed the work.  But at the end of the day the slide became

14   a problem for another year, and I felt it better to offer my

15   resignation as a full-time police officer.

16   Q.      You continued working, though, for the next couple of

17   years as a reserve officer?

18   A.      Yes.

19   Q.      And then did you subsequently do reserve officer work

20   for Winters -- the Winters police?

21   A.      I did.  Yes.

22   Q.      And was that -- What were those years?

23   A.      I believe I was hired there in June of 1986.

24   Q.      And you worked 1987 and 1988 for them?

25   A.      Yes.

9

1   Q.      And I don't know if I mentioned this in opening, how

2   many hours, roughly, were you putting in for the Winters

3   Police?

4   A.      Not as much as Vacaville.  It was a smaller town.

5   But I believe upwards of a 1000 hours a year.

6   Q.      And you subsequently worked as a reserve officer in

7   Martinez?

8   A.      Yes.  In approximately late '88 or '89 I found that

9   my drill sergeant in the police academy had become chief at

10  Martinez police and I went to work for him.

11  Q.      And did you receive field training in Martinez?

12  A.      I did.  Approximately 12-week field training, again

13  assigned to two or three different field training officers,

14  which I was evaluated and critiqued daily.

15  Q.      Was there some kind of secondary police academy

16  training that you received?

17  A.      I believe in 1989 I was required to go to a

18  requalification academy here in Sacramento County.  And it

19  was -- POST has continuing education I guess you would call

20  it.

21  Q.      And in 1990, in addition to the Martinez police

22  reserve work you were doing, did you also have occasion to

23  work for the Oakland police services?

24  A.      Yes.

25  Q.      How long did you work for them?

10

1   A.      Not long.  Not long at all.  Months.

2   Q.      And is that because of the deployment I mentioned in

3   opening statement, the Gulf War deployment?

4   A.      In part, yes.

5   Q.      Okay.  Can you tell me about this helicopter

6   operation that you had that you loaned out to law enforcement

7   as well?

8          MR. CASSIDY:  Objection, Your Honor.  Relevancy.

9          THE COURT:  Overruled.

10         THE WITNESS:  Well, in 1986 I got a bug to see if I

11   could fly a helicopter, and I got my license.  And like other

12   things in my life, I couldn't keep it simple.  I decided to

13   make a business out of it.

14         I bought two or three helicopters, and we figured out

15   we would do crop dusting, advertisements, flight instruction.

16         I still had quite a passion for law enforcement, and

17   I had developed many contacts over the years with chiefs and

18   sergeants of different departments within the police

19   departments, and I offered them the use of my helicopters.

20         So when they would have a drug raid, we would

21   schedule.  I actually had a truck where I could bring the

22   helicopter to the City of Vallejo, park it in a field.

23         We're in radio contact.  In the helicopter I have one

24   of their officers with me, and now they're getting ready to

25   initiate a warrant.  And we get airborne so we could be an

11

1    eye from the sky for them.

2    BY MR. GONZALEZ:

3    Q.      I'm sorry, Tom --

4    A.      The police officer would be with me and communicate

5    down to the ground.

6    Q.      I don't want to spend a lot of time on this, but

7    which agencies took advantage of this service?

8            You heard me mention them in opening statement.  Is

9    that accurate?

10   A.      Yes.

11   Q.      Why don't you state them now.

12   A.      Vallejo.  Fairfield.  Pinole.  Richmond.  Contra

13   Costa County Sheriff.  SOLNET, which was a combined drug task

14   force of all the police departments in Solano County, the

15   Solano County Sheriff's, Department of Corrections, whenever

16   there was an escape, the sheriff's rescue posse, when there

17   was a search and rescue going on.

18   Q.      All right.  Can you tell me about your military

19   training?

20   A.      I entered the military in approximately 1987.  I

21   completed boot camp, airborne school.  Went to the special

22   forces course.  I had several different MOS's.  I was

23   assigned to the 12 special forces at Hamilton Field in

24   Novato.

25           My training had to do with demolitions, explosives,

12

1   implementing and defusing.  My cross-training was as a medic.

2   Every special forces member, it was mandated that they had to

3   cross-train.

4   Q.      Before I forget to ask you, on that helicopter

5   service did you ever charge any of those law enforcement

6   agencies for using that equipment?

7   A.      No.

8   Q.      As related to the military -- first as related to

9   your work as a peace officer, reserve officer, anybody ever

10  make a complaint against you?

11  A.      Never.

12  Q.      And you arrested individuals for a variety of

13  offenses?

14  A.      We're talking about a citizen's complaint?

15  Q.      Yeah.

16  A.      Never.

17  Q.      And you investigated and arrested people for a

18  variety of different offenses?

19  A.      I had to put my hands on people, and they weren't

20  happy, yes.

21  Q.      And this included things from domestic violence to

22  robbery to sexual assault?

23  A.      Yes.

24  Q.      DUI cases, petty theft cases?

25  A.      Yes.

13

1    Q.      Okay.  In the military did you ever have a negative

2    write-up of any kind?

3    A.      Never.

4    Q.      At some point did you -- you started a bail bonds

5    business; is that correct?

6    A.      That's correct.

7    Q.      And what year did you do that?

8    A.      2003.

9    Q.      You also were doing investigative work of some kind?

10   A.      I was a licensed private investigator, and I took

11   cases specifically relating to child abuse or domestic

12   violence where child abuse was alleged.

13   Q.      You heard Mr. Cassidy in opening mention a

14   restraining order that was against -- that was in Marin

15   County against you.  I want to ask you about that right now

16   before I forget.

17           You've seen Mr. Garza's declaration he submitted to

18   the court?

19   A.      I have.

20   Q.      He doesn't explain any facts related to that

21   restraining order in Marin County.  I want to ask you:  Do

22   you know when that TRO was first issued against you?

23   A.      When it issued was in approximately 2002.

24   Q.      All right.  When were you served with it?

25   A.      I believe it was late 2004.

14

1  Q.      So close to two years -- nearly two years?

2  A.      Yes.

3  Q.      And did that relate to a matter that you had

4  investigated as a private investigator?

5  A.      Yes.

6  Q.      And could you tell the jury what kind of -- was a

7  fraud scheme of some kind?

8  A.      It was a company called ETR, it was a foreign

9  exchange currency.  They sold software for $29.95 and tried

10  to convince you you could make a million dollars on weekends

11  trading.  They collected over 20 million dollars from

12  investors, and it turned out to be more of a Ponzi scheme.

13          So I had met with several investors.  We were able to

14  obtain bank records and wire transfers.  No trading ever took

15  place.

16          And with that information I gathered from connecting

17  the dots, if you will, we went to a Napa County Superior

18  Court judge, were able to get a temporary restraining order

19  to freeze this gentleman's account.

20          We were successful for about a week freezing

21  everything.  And during that time period, he alleged that the

22  only way I could have gotten that information was to enter

23  his office.  And for that reason he applied for a restraining

24  order.

25  Q.      Just so I understand, Mr. Toler, Tom, your

15

1    investigation was over on the case, and unbeknownst to you

2    there were mutual stay-away-orders agreed to in court?

3          MR. CASSIDY:  Objection.  Leading, Your Honor.

4          THE COURT:  That objection is well-taken,

5    Mr. Gonzalez.

6          MR. GONZALEZ:  Yeah.  I'm sorry.

7    BY MR. GONZALEZ:

8    Q.    Mr. Toler, why don't you explain the nature of this

9    order that got issued that you didn't know about for nearly

10   two years?

11   A.    I had an attorney.  The only attorney I ever had at

12   the time just reviewed contracts for me and business law and

13   whatnot.

14         When we got this restraining order, the notification

15   of it, he went to court for me.  He called me one day at work

16   and he said:  Do you have any reason to be around Glenn

17   Cybulski?  I said:  No.

18         He said:  Do you have any heartburn with an order

19   being issued that each of you stay away from each other?  I

20   said:  That's fine.  My investigation is over.

21         That was the only conversation I had with the

22   attorney.

23   Q.    Let me ask you another question.  Did you learn when

24   you were served with the order that it was of a more formal

25   nature than what you had believed from that conversation with

16

1   your attorney?

2   A.      Yes.

3   Q.      All right.

4           Just so we're clear, because Mr. Cassidy brought it

5   up in opening, this was not a stay away order where you were

6   accused of making threats in a domestic violence case or

7   something like that?

8   A.      No.  Not at all.  Actually, he had listed his wife

9   and kids.  And they had actually come forward a year later in

10  a deposition on an unrelated matter --

11          MR. CASSIDY:  Objection, Your Honor.  Hearsay.

12  BY MR. GONZALEZ:

13  Q.      Well, I don't want to spend a lot of time on this.

14  It came up so I want to address it.  Just so we're clear, and

15  I think a "yes" or "no" answer would suffice, this order did

16  not allege that you had threatened somebody, did it?

17  A.      No.

18  Q.      All right.

19          Have you ever had a restraining order against you for

20  yelling at somebody's office or something like that?

21  A.      Just the District Attorney of Solano County.

22  Q.      There was -- Let's move on.

23          Let's get to how you started in this matter with

24  Bobbi King, the facts that bring us here today.

25          What caused you to see her in, I believe it was,

17

1   2000.

2          Well, you tell me.

3   A.     2004.  She had -- I had known her ten years prior as

4   a German shepherd dog breeder and trainer.  I had lost my dog

5   and --

6   Q.     How many years earlier did you know her?

7   A.     Ten.

8   Q.     And so you had -- did you buy a dog from her?

9   A.     I did.

10  Q.     More than one?

11  A.     I bought two dogs from her over a ten-year period.

12  Q.     You were going back to look and purchase?

13  A.     I hadn't seen her for eight or ten years.

14  Q.     And just so we're clear, at this point you had never

15  had any personal relationship with her?

16  A.     No.

17  Q.     She had never worked for you or anything like that?

18  A.     No.

19  Q.     All right.

20         So what happened when you went to go see her about

21  the dogs?

22  A.     I came into their rural, farm-like setting, met with

23  her.  She showed me the dog, and I'm kind of seeing if we're

24  going to get along.

25         I put a dog on a leash, wanted to work him a little

18

1    bit, see if he was going to smile for me.  That was my next

2    contact with her.

3    Q.      And did you see a gentleman named Richard Oawster

4    there?

5    A.      I did.

6    Q.      Tell me what that interaction was like?

7    A.      Well, he didn't come over and introduce himself.  I

8    recognized him from many years earlier when he was there.

9            And I observed him wearing a sidearm and walking

10   around with a glass bottle of beer, which I didn't really

11   think too much about.

12           He come walking over as I was working the dog.  He

13   says:  Here, let me see if I can work him for you.  He took

14   the leash, and the dog wouldn't respond quick enough to a

15   command, and he doubled up his fist and hit the dog in the

16   nose, like you might a man if you were mad at him.

17   Q.      And what was going on?

18           Was there anything going on between Miss King and

19   Mr. Oawster in their relation?

20   A.      Well, when I told her that I would like to take the

21   dog home and maybe give him a try for a couple of weeks, see

22   if we were going to work out -- I hadn't seen her for many

23   years.  She gave me a great dog before, Patton.  He just was

24   a real protection guy.  I gave her a hug, and I whispered in

25   her ear:  Is everything okay?

19

1    Q.      Why did you say that?

2    A.      Well, it was clear that Mr. Oawster had been drinking

3    and their body language to each other.  And he was just

4    glaring at her for the 30 minutes or so that I was there.

5    And she wouldn't even look up at him.

6    Q.      Did you have occasion -- did she, in fact, contact

7    you to want to talk to you about what was going on?

8    A.      She did.  When she told me that -- you know, just

9    said that no, things aren't, just a whisper.  And I called

10   her later that night, and asked if she was okay.

11           She gave me, you know, the nickel tour of the

12   situation.  I said:  Well, I'm going to be in the area

13   tomorrow.  She met me somewhere in Sacramento with her mother

14   and just gave me a story that was a handful.

15   Q.      Let me ask you this:  Was Miss King and Mr. Oawster

16   going through a divorce?

17   A.      Yes.

18   Q.      And did you -- how did you help her or encourage

19   Miss King with the information she was telling you about him?

20   A.      I met with her with another female, is the only way I

21   would ever meet with any female I was working with as a

22   client.  So her mother was with her.  And so I started to

23   offer suggestions about having her own money, her own

24   transportation, battered women's groups.  And, you know,

25   having a girlfriend with her, not being alone.  Some of the

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

20

1    tips that I might have instructed.  I used to do a lot of

2    lectures at schools for stranger awareness.

3           She had already done all of that.  She was a member

4    of an organization called WEAVE, Women Escaping A Violent

5    Situation.  She had told me a story of putting clothes -- a

6    set of clothes in a field behind their ranch in case her and

7    her kids had to escape.

8           She advised me of a tracking device found on her

9    truck.  She advised me of a $600,000 insurance policy that --

10   her life insurance policy that her husband took out on her

11   three weeks after he filed for divorce.

12          And --

13   Q.     Let me get this clear.  He filed for divorce against

14   her?

15   A.     She filed for divorce against him.

16   Q.     You just said it the other way around.  Was that a

17   mistake?

18   A.     That was a mistake.

19   Q.     So three weeks after she filed for divorce, she

20   learns he's taken out this policy.

21          Tell me what the formal arrangement was.  Did she

22   start to pay you to provide services?

23   A.     What my agreement with her was -- with her mother was

24   is that her mother was -- she was 80-something years old.

25   She had driven down from LA.  And the lady could barely walk.

21

1   She was there to protect her little girl.  She -- she asked

2   me to -- to help her just in general terms.

3        I agreed initially to look into the matter because in

4   the area of domestic violence, it can be a retaliation on one

5   another as quick as it could be one or the other's in

6   danger.

7   Q.    Let me ask you this.  You heard Mr. Cassidy's opening

8   remarks.  Do you have any information that Mr. Oawster had a

9   TRO against Miss King?

10  A.    No, not at all.

11  Q.    And did Miss King have a TRO against Mr. Oawster?

12  A.    It started off as an emergency protective order when

13  he was caught jumping over her fence and trying to enter her

14  home.

15  Q.    Just --

16  A.    It was one of her dogs actually that saved the day.

17  Q.    All right.

18        But let me ask you this.  You heard the remarks made.

19  I just want to clarify.  You have been working on this case.

20  You don't have any information that Mr. Oawster has a

21  restraining order against Miss King?

22  A.    That's never happened.  The attorney is wrong.

23  Q.    To your knowledge.  Okay.

24        Let me ask you this then:  Why did you start to

25  investigate Mr. Oawster's background?

22

1   A.      Well, before I accepted any case --

2   Q.      Let me say -- I mean, you heard the way it was

3   characterized was this was just a messy divorce?

4           MR. CASSIDY:  Objection, Your Honor.  Argumentative

5   in the form.

6           THE WITNESS:  Before --

7           THE COURT:  Hang on.  I'm trying to figure out what

8   was said and whether it was.

9           No.  You may answer, sir.

10          THE WITNESS:  Before I accept any case, I always did

11  a background on both the client and the subject of the

12  investigation.

13          I took a case once where a mother was alleging the

14  baby was being poisoned by the father.

15          MR. CASSIDY:  Objection, Your Honor.  Irrelevant.

16          THE WITNESS:  It was true, but the mother was

17  doing --

18          THE COURT:  Sir, when one of the parties objects, you

19  have to stop so I can rule.

20          THE WITNESS:  Yes, sir.

21          THE COURT:  I think that this is an explanation of

22  why he behaved in the way that he behaved.  For that purpose

23  only you may proceed, and the jury may give it such weight as

24  it believes it might deserve.

25          You may proceed, sir.

23

1          The question was:  Why was it that you investigated

2    Mr. Oawster?

3          THE WITNESS:  As a precursor to determining if I was

4    going to get deeper -- or get more involved into possibly

5    taking this case on as a full-time mission.

6    BY MR. GONZALEZ:

7    Q.     And when you say that -- I mean, let me ask you this

8    directly:  Was he engaging in any behaviors that concerned

9    you?

10   A.     Yes.

11   Q.     What were the behaviors that you saw that led to

12   further investigation?

13   A.     Well, I have never seen a man punch a dog on a leash

14   like that.  But his behavior on his wife that day led me to

15   -- I mean, I searched public records.  I found that just in

16   the month of March of '84, a couple of months before I was

17   there, there was a founded complaint by CPS where he had --

18   the complaint said he was -- it was founded that he was -- he

19   had physically and emotionally abused his two boys.

20          He was ordered to counseling.  He refused to go.  The

21   CPS investigator came to the residence to question him about

22   this, and he literally chased her out of the gate.  She

23   called the sheriff and was escorted back in.

24   Q.     Did you ultimately have occasion to speak to former

25   wives of Mr. Oawster?

24

1    A.      Yes.  Three of them.

2    Q.      And what did -- did they relate behaviors that he had

3    engaged in?

4    A.      I was able to find the first wife he was married to.

5    She was 17 years old back in 1980-something.  And it ended up

6    being three different women who had never met one another

7    with stories that were strikingly similar with regards to

8    threats and retaliation.

9    Q.      And did you have occasion to speak with Mr. Oawster's

10   biological daughter?

11   A.      I did.

12   Q.      And what did she relate to you?

13           Where did that meeting take place and what did she

14   relate?

15   A.      Stephanie Oawster.  Stephanie Oawster.  I had a phone

16   conversation with her first.  I advised her who I was, what I

17   was trying to do.

18           She told me -- she told me a story that was just a

19   nightmare about that she had been molested when she was six.

20   She was able to share paperwork with me where it was -- she

21   had been inspected by a hospital, a doctor.  They had

22   confirmed she had been sexually molested.

23   Q.      Where is she living right now, Tom?

24   A.      She lives in Illinois.

25   Q.      Did you also speak to her aunt who raised her?

25

1    A.      Mary Weaver.  Yes.

2    Q.      And where does she reside?

3    A.      Also in Illinois.

4    Q.      You heard a reference earlier that I want to ask you

5    about that at some point Mr. Oawster phoned your son John

6    Confer.  Apparently this was in Napa?

7    A.      He was in Napa at the time he received the call.

8    Q.      You heard that was characterized as you pressured

9    John to make a report about it.

10          Can you relate to the jury what John told you

11   happened and what you told him to do as a result of it?

12          MR. CASSIDY:  Objection, Your Honor.  Hearsay and

13   compound.

14          THE COURT:  The objection is overruled, but do take

15   it one at a time.

16          What did he tell you?

17          This is coming in not for the purpose of the truth of

18   the matter, but that it happened and explains what Mr. Toler

19   did in response.

20          Everybody understand what I'm saying?

21          All right.  You may proceed, sir.

22          THE WITNESS:  John called me at about 6:30 on a

23   Monday morning and told me that the boys' dad had just called

24   him.  He knew the boys.  He just referred to them as the

25   "boys," and Jay and David Oawster.

26

1   BY MR. GONZALEZ:

2   Q.      Let me stop there because I should lay a little bit

3   of a background here.

4           Your kids started hanging out with Miss King and

5   Mr. Oawster's children?

6   A.      Yes.

7   Q.      And in effect, while you were providing services in

8   this case, your families at times spent time together?

9   A.      I could not spend 24 hours a day in Galt, California,

10  supervising Miss Oawster.  There were days that I brought her

11  to Solano County.  I housed her in a hotel near my residence.

12  And then I offered her and her two boys the rooms in my home,

13  which we had plenty of room.  We ended up bringing them home

14  for the weekends.

15  Q.      And let me ask you this:  At some point did it appear

16  to you in the investigation that you did in this matter that

17  Mr. Oawster had broken into her residence when she wasn't

18  there?

19  A.      WEAVE advocate that was assigned to Bobby Oawster

20  witnessed -- stated that she witnessed Mr. Oawster hopping

21  over the six-foot wood fence, coming into the backyard,

22  searching through two different vehicles, trying to get into

23  my motor home.

24          When I stayed in Galt, I didn't stay in her home.  I

25  stayed in the back lot in my motor home with an intercom so I

27

1   could make sure I knew what was going on in the house.

2   Q.      All right.  But let me try and direct you just so we

3   can move through this area.

4           Was there some occasion where the home was flooded in

5   some fashion?

6   A.      It was my home.

7   Q.      Your home was flooded?

8   A.      One weekend when I had brought the family home, we --

9   I had -- I was gone working doing something and had come

10  back, and there was a couple of inches of water in the

11  downstairs of my house.  And I thought there was a busted

12  pipe or something.

13          So everybody came out.  It was a new house.  And they

14  determined that it had nothing to do with any of the

15  mechanics of the house.  But also there was -- one of Bobbi's

16  dogs just had a litter of puppies.  Turns out the entire

17  litter of the puppies were killed at the same time the water

18  was in the house.  And that we believe that --

19  Q.      Let me ask you this:  Did you ever learn anything

20  from Mr. Oawster's previous wives about a similar situation?

21  A.      Yes.

22  Q.      What did you learn?

23          MR. CASSIDY:  Objection, Your Honor.  Irrelevant.

24          THE COURT:  The problem is, sir, all of it bears upon

25  his attitude and concerns when he reported the matter to the

28

1    sheriff's office and district attorney.

2            Once again, Ladies and Gentlemen, it's not clear -- I

3    mean, what he learned is what people told him, and it is

4    hearsay.  But it also -- it all bears upon his state of mind

5    when he reported the matter that you have heard about to the

6    police and to the district attorney's office.  For that

7    reason and for that purpose only it may be received.

8            What was it that you were told by previous wives?

9            THE WITNESS:  Barbara Biggs, who lives in Washington

10   State, is where I located her, she had changed her name from

11   Page to Biggs, she stated in an effort to hide from

12   Mr. Oawster.

13           She shared with me that she came home, that Oawster

14   was mad at her for something, and that he had busted off the

15   faucets in the home.  And she had called someone to shut off

16   the water, but he had already -- she felt that he was the one

17   that poured some bags of concrete in and around the water

18   meter main, like in the front yard.  So they weren't able to

19   turn off the water readily.  They had to shut down the entire

20   street main.

21   BY MR. GONZALEZ:

22   Q.    Let me go back to what I started to ask you about,

23   the phone call that your son received from Richard Oawster.

24           Was it normal for Richard Oawster to be calling your

25   son?

29

1    A.      No.

2    Q.      He called your son, and you believed he said what to

3    your son?

4    A.      John told me that he asked to talk to his boys.  John

5    told me that he told the guy that your kids aren't here.

6    Q.      Which was true?

7    A.      Which was true.

8    Q.      And?

9    A.      And then Oawster -- John told me Oawster said:  You

10   better put my kids -- my boys on the phone or you're gonna

11   regret it.

12   Q.      Something to that effect?

13   A.      Something to that effect.

14   Q.      And so you told -- you immediately told your son to

15   do what?

16   A.      I told him to call the police.

17   Q.      Did he want to?

18   A.      No.

19   Q.      How old was he?

20   A.      He doesn't want to do his home work either.

21   Q.      How old was he at the time?

22   A.      Fourteen or 15.

23   Q.      All right.

24           You heard how it was characterized earlier.  Do you

25   feel you pressured your son to make a report?

30

1    A.       I demanded that he make a report.

2    Q.       Okay.  Now, you were not surprised at all -- Let me

3    ask you:  Were you surprised that that matter was not

4    prosecuted?

5    A.       No.

6    Q.       And that's because of the entire --

7             THE COURT:  Why is that, sir?

8             MR. GONZALEZ:  Thank you.

9             THE COURT:  Pretty soon, Mr. Gonzalez, even if

10   Mr. Cassidy is nice enough not to object, the Court will.

11            Why is that, sir?

12            THE WITNESS:  I had had -- I had had some experiences

13   in law enforcement.  I had experience evaluating the gap

14   between the police department and district attorney's Office.

15   BY MR. GONZALEZ:

16   Q.       Mr. Toler, let me try to focus you on this because I

17   want to move to other areas.

18            I'm asking you, you've related what your son said to

19   you which was something about that he would regret something,

20   right?

21   A.       Yes.

22   Q.       You insisted that he make a report, right?

23   A.       Yes.

24   Q.       But you'll concede, won't you, that wasn't -- that

25   that threat might be something you want to tell the police

31

1    but you weren't surprised they didn't prosecute?

2    A.      That's correct.

3    Q.      I want to ask you about something else.  There was a

4    suggestion made that you had told William Godwin that you had

5    apparently gone on to Mr. Oawster's property illegally and

6    searched the property.

7            Did you do such a thing?

8            MR. CASSIDY:  Objection, Your Honor.  Misstates it.

9    It is argumentative.

10   BY MR. GONZALEZ:

11   Q.      I'm asking you:  Did you ever have occasion to tell

12   Mr. Godwin that you had, in effect, trespassed on

13   Mr. Oawster's property?

14   A.      No.

15   Q.      What did you say to Mr. Godwin as related to learning

16   something about what was, in fact, on Mr. Oawster's property?

17   A.      I advised Mr. Godwin that I had seen weapons -- what

18   I believed to be weapons on the property of Mr. Oawster

19   located in a barn detached from his house in a rural setting

20   surrounded by cow pastures.

21   Q.      Let me stop you there.

22           How did you reach that conclusion?

23   A.      Well, I had been conducting surveillance and watching

24   him move.  I knew he had several weapons.  I knew a

25   restraining order had been issued.  I knew the night before

32

1    he was supposed to turn in the weapons for the restraining

2    order.

3            He alleged that I went over and stole the entire safe

4    with it loaded with weapons and that's why he didn't turn

5    them in.

6    Q.      Let me ask you this:  You say you saw something on

7    his property.  How can you see something on his property

8    without going on his property?

9    A.      I have equipment and technology that allows me to

10   look out.  Sometimes it's as simple as binoculars.  Sometimes

11   it's long-range photographic lenses, I have thermal imaging

12   devices.  We used a little bit of everything to determine in

13   this case what we thought we had.

14   Q.      Now, when you made those observations that you

15   related to Mr. Godwin, were you, in fact, in an area that you

16   had permission to be on?

17   A.      Yes.

18   Q.      How did you obtain permission?

19   A.      I was on a freeway frontage road for one angle, which

20   I -- it was just a private -- or public parking area, I

21   guess.  It wasn't private property.

22           And next door to Mr. Oawster lived a gentleman that

23   ran his cows in this pasture.  I asked him if I could hop

24   over his fence.

25           We were talking through the fence.  I asked him if I

33

1    could come over to get one side of a view on this shack, this

2    barn, to see what I could see.

3            He told me:  I don't want to get mixed up in his

4    divorce, but if I see you on my property, I'm not going to

5    call the police on you.  He says:  But just let me go back

6    home first.  He walked back over.

7            THE COURT:  This is an appropriate place to take our

8    luncheon recess.

9            Ladies and Gentlemen, we'll reconvene at 1:30.

10   Please, remember the admonition the Court has heretofore

11   given to you.

12           (Off the record at 11:52 a.m.)

13           (On the record at 1:29 p.m.)

14           THE CLERK:  Please, remain seated.

15           Court is now in session.

16           THE COURT:  Mr. Gonzalez.

17           MR. GONZALEZ:  Thank you, Your Honor.

18           Your Honor, I'm going to make reference to

19   Plaintiff's Exhibit 8 that was admitted into evidence.

20           We informed counsel this morning that the second page

21   of that exhibit, which is also Defendant's F, was mixed up so

22   now we've corrected it.  I don't think that copy has been

23   corrected yet, but I just wanted to let you know.

24           THE COURT:  You want to give him a corrected copy?

25           (Brief pause.)

34

1    BY MR. GONZALEZ:

2    Q.     Mr. Toler, I want to move to the phone call from

3    Mr. Oawster, the threat that's been referred to.  I want you

4    to tell us what the circumstances were receiving the call

5    from him.

6          When did that take place?

7    A.     When the call was made to myself?

8    Q.     Yes.

9    A.     On March 27th, right around two o'clock in the

10    afternoon, a little bit after, I received a call from a voice

11    I recognized as B. Richard Oawster.

12    Q.     What did he say to you?

13    A.     He said that my trick with DOJ did not work.  You've

14    taken my kids, now it is my turn.  Your son and daughter -- I

15    believe he said:  Your son and daughter are dead.  He made

16    references -- belligerent references about my son and

17    daughter.

18    Q.     Under oath you previously stated that he referred to

19    them as "bitch and bastard son."

20          Is that correct?

21    A.     Yes.

22    Q.     Did he give you -- did you have any reason to believe

23    that he might even be eaves dropping on you?

24    A.     Well, to tell you the truth, I thought he was there

25    within eyesight of my property as he made reference to me

1    working on my motor home.  He said:  Enjoy working on your

2    motor home.  And that's what I was doing on a Sunday

3    afternoon.  So, yes, I immediately called the police.

4    Q.    All right.  And you spoke to the Fairfield police?

5    A.    I did.

6    Q.    And did they take a report?

7    A.    They did.

8    Q.    And how long did they sit down and talk with you?

9    A.    Well, they were there for probably 20 minutes, 30

10   minutes maybe.

11   Q.    All right.

12         Did you have your materials related to Richard

13   Oawster and the investigation you had done with you?

14   A.    I did.

15   Q.    And what did you say to the police about that

16   material?

17   A.    Well, I advised the Fairfield police officer that --

18   who I was, what my involvement was with Richard Oawster, and

19   that I had several folders filled with my investigation

20   material.

21         And as I had made habit for over two years by then, I

22   made a daily report, made sure I logged any contact or any

23   new information that came in.  I brought that out to look

24   through it and add to what had just occurred, and I shared

25   with the police officer that I was going to be making that

1    available to the district attorney once the report had been

2    turned over.

3    Q.      Okay.  And do you remember what day of the week March

4    27th was?

5    A.      Sunday.

6    Q.      And did you have occasion to interact with -- first

7    of all, let me ask you:  Did you believe this was a credible

8    threat?

9    A.      Absolutely.

10   Q.      Why?

11   A.      Well, I had spent almost -- I had spent over almost a

12   year -- right around a year investigating this man.  I had

13   met people that claimed they were victims of his behavior.

14           I had seen parts of police reports that supported

15   what they had to say.  I had read through depositions

16   relating to child custody, to family court hearings.  I had

17   been given letters that matched his handwriting given to me

18   by prior female relations showing where he had threatened and

19   was belligerent to them.

20           The man was a credible threat.

21   Q.      Let me ask you this before I forget.  It is something

22   I should have raised earlier I think.

23           During the period of time that you dealt with the

24   family court proceedings dealing with Miss King and

25   Mr. Oawster, were you ever thrown out of a court proceeding?

37

1   A.      No.

2   Q.      Have you ever been thrown out of a court proceeding

3   in your lifetime?

4   A.      Never.

5   Q.      All right.

6           Was anybody associated with those court proceedings

7   ever thrown out of a courtroom?

8   A.      During a family trial hearing, where Richard Oawster

9   had lost his composure, a family court judge in Sacramento

10  County instructed Mr. Oawster to go outside and calm down.

11          He was gone for approximately an hour.  The judge

12  admonished -- told the attorney of his to get a grip on him,

13  and they came back in an hour or so later and continued the

14  hearing of that day.

15  Q.      All right.

16          Did you have occasion to go to the district

17  attorney's office to follow up on this complaint you had made

18  with the Fairfield police?

19  A.      I did.

20  Q.      And did you have occasion to speak -- Who was the

21  first of the defendants that you spoke with?

22  A.      Mr. Byerley.

23  Q.      All right.

24          He's the gentleman seated at the end of the defense

25  table?

38

1   A.      The far left, yes.

2   Q.      All right.

3           I want to ask you what transpired there.  Do you

4   remember what day it was?

5           Sunday, March 27th, was when you got the threat.

6   A.      The next day or two or three.  I'm not sure how many,

7   but I went to the Fairfield Police Department to inquire on

8   the status of the report because I knew it was going to leave

9   them and go to the district attorney at some point.

10          I was advised the day that I went there that the

11  report had been forwarded to the district attorney.  So I

12  knew my inquiry needed to be with them to try to get some

13  indication as to whether or not they thought I had given them

14  enough to file charges.  And I was armed with folders of

15  background information on Richard Oawster ready to share it

16  with the investigator.

17  Q.      Let me -- I want to get one fact clear because I made

18  reference to the exhibit in front of you, Plaintiff's 8.  At

19  some point did you show Inspector Godwin proof that

20  Mr. Oawster had called you?

21  A.      Yes.

22  Q.      And what was that proof?

23  A.      It was a copy of a phone record of that day.

24  Q.      And did Investigator Godwin indicate to you whether

25  or not Mr. Oawster admitted to having called you?

39

1    A.      He told me he denied it.

2    Q.      And, in fact, in Plaintiff's 8 in front of you, which

3    are some of his notes in memorandum, he indicates that

4    Oawster denied even making a phone call to you; is that

5    correct?

6    A.      That's correct.

7    Q.      And let me just ask you this:  As someone that's

8    worked as a reserve police officer, given that history, is

9    giving false information to somebody doing an investigation,

10   is that in and of itself an offense?

11         MR. CASSIDY:  Objection, Your Honor.  Calls for

12   opinion testimony.  It's improper, lack of foundation and

13   speculation.  And he hasn't been designated as percipient

14   witness.

15         THE COURT:  I know you won't believe me, sir, but I

16   haven't understand a word you said after "objection."  But I

17   think what you're objecting to is it calls for him to express

18   a legal conclusion.

19         Is that right?

20         MR. CASSIDY:  Yes, Your Honor.

21         THE COURT:  That appears to be justified, sir.  I'm

22   the person who instructs the jury as to the law.

23         MR. GONZALEZ:  Your Honor, I'll ask Investigator

24   Godwin when he takes the stand what significance that had.

25         THE COURT:  All right.

40

1  BY MR. GONZALEZ:

2  Q.      All right.

3         So let's -- I'm sorry to jump forward, but, okay, so

4  tell me how it was that you spoke to Mr. Byerley?

5         You go to the district attorney's office What

6  transpired?

7  A.      I had never been there before, first of all.  I came

8  off on their floor, went up to the receptionist window and

9  asked to speak to someone concerning a police report that I

10  had filed with the Fairfield police that may I speak to an

11  investigator about it.

12  Q.      And what did the -- was there somebody behind the

13  window that spoke to you?

14  A.      Yes.

15  Q.      Can you describe the window, what that looks like?

16  A.      It's several feet long, wide, more than ten feet, I

17  would say.  Very thick plexiglas with a gap, then another

18  layer behind it that you kind of talk through.

19         I believe there was some type of apparatus or hole to

20  be able to pass papers back and forth.

21  Q.      And when the -- did the receptionist say anything to

22  you about your inquiry?

23  A.      No.  She appeared to call somebody for me.

24  Q.      And did Mr. Byerley come out to talk to you?

25  A.      He did.

41

1    Q.      And how long did that take for him to come out and

2    speak to you?

3    A.      I'm not sure.  It wasn't long to the point that I

4    would notice I was waiting for a long time.

5    Q.      All right.

6            And had you told the receptionist the purpose of your

7    visit?

8    A.      To make an inquiry about a police report, yes.

9    Q.      So when Mr. Byerley came out, how did that transpire?

10   What did he say to you, if anything?

11   A.      Well, he walked out.  I was already sitting down.  I

12   stood up, shook his hand, introduced myself.  I started

13   sharing that I had information concerning a police report

14   that I wanted to share, and that the police report -- the

15   nature of the police report was threats against my children.

16           And I was going on about what all I had, and he kind

17   of stopped me and said:  You know, I don't even know what you

18   are talking about.  I don't have any police report with your

19   name on it.

20           And I said:  Well, the situation is I've had a

21   gentleman that has threatened the lives of my kids that I

22   believe is credible.  And I believe it's -- you're going to

23   agree with me if you look through this.  This is not somebody

24   who's lost their temper one day.  This is somebody with a

25   history of it.

42

1          I was trying to describe this, and he said:  What do

2     you expect me to do?  I don't have a police report.

3     Q.     Let me stop you there.

4          So this is possibly two, three days after the initial

5     report -- sometime after the initial report of threats,

6     right?

7     A.     Yes.

8     Q.     And did you have material related to Mr. Oawster with

9     you?

10    A.     I did.

11    Q.     And so did you refer to it while you were speaking to

12    Mr. Byerley?

13    A.     I was sitting down.  It was on my lap, and I was

14    looking up at him as I was turning pages and giving him some

15    sound bites of what I had.

16    Q.     And he said something like:  What do you want me to

17    do about it?  Or what did he say?

18    A.     His words were:  What do you expect me to do?  I

19    don't have a police report.  His body language and tone --

20         MR. CASSIDY:  Objection.  Beyond the scope of the

21    question.

22         THE WITNESS:  He was extremely non-concerned.

23         THE COURT:  There is an objection, sir.  That

24    objection is sustained, but you may ask the question he wants

25    to talk about.

43

1          MR. GONZALEZ:  All right.

2          THE COURT:  Describe his body tone -- his body

3     language and tone as you perceived it, sir.

4          THE WITNESS:  Uncaring.

5     BY MR. GONZALEZ:

6     Q.     Why do you say that?

7     A.     The man wouldn't even sit down with me.  I'm there

8     concerned about my children after investigating a man -- and

9     I'm trained to make this determination -- that I feel is

10    dangerous.

11         He's threatened my kids.  He called me at home.  He

12    already called one of my other kids.  And this guy, who is

13    sworn to uphold the law, is giving me the outer-space look.

14    Q.     Let me ask you this.  We heard reference to this

15    earlier.  Did you see Investigator Byerley taking down notes

16    when he talked to you?

17    A.     No.

18    Q.     Did he ever ask you for the materials in the file

19    that you had to photocopy?

20    A.     Those were copies I was prepared to leave with him,

21    but no.

22    Q.     And how did the meeting end between the two of you?

23    A.     With him saying, you know, "What do you expect me to

24    do" and "I'll see what I can find out."  And I left, and he

25    left.

44

1   Q.      Did you threaten to kill anybody while you had this

2   interaction with Mr. Byerley?

3   A.      No.

4   Q.      Did you say anything about "protecting your

5   children"?

6   A.      No.

7   Q.      Did you say you were going the take the law into your

8   own hands?

9   A.      No.

10  Q.      Did he offer any support for what security measures

11  you might take to increase the safety of your home or

12  children?

13  A.      He didn't offer me directions back to the parking

14  lot.

15  Q.      Excuse me?

16  A.      No, he did not.

17  Q.      Did you have occasion to return to the district

18  attorney's office to see if they had received this report?

19  A.      I did.

20  Q.      And how many times would you say that you went back

21  to that office before April 7th, April 7th being, I believe,

22  when you had the interaction with Mr. Godwin?

23  A.      I would say that was either the fourth or fifth time.

24  Q.      And when you went back on those occasions, did you

25  ever have occasion to speak to an investigator in the DA's

45

1    office?

2    A.       No.

3    Q.       Were you handled primarily by whoever was behind the

4    glass at the reception table?

5    A.       Yes.

6    Q.       On April 7th, how many days had it been since the

7    report of threats had been made?

8    A.       Eleven -- ten or eleven.

9    Q.       And do you recall what time of day you walked into

10   the office?

11           If you don't, that's okay.

12   A.       I recall it as being in the afternoon.

13   Q.       Uh-huh.  You made a number of visits to the office?

14           MR. CASSIDY:  Objection, Your Honor.  It is

15   leading.

16           THE COURT:  Please.  You may proceed.

17   BY MR. GONZALEZ:

18   Q.       All right.

19           Let me ask it like this:  On April 7th, when you went

20   up to the window, did -- who did you speak to?

21   A.       The young lady that was at the reception window.  I

22   think it was -- looking back it was a young lady by the name

23   of Linda Johnson.

24   Q.       And did you have --

25   A.       Linda Jones.

46

1   Q.      Did you have -- you had seen her there before?

2   A.      Yes.

3   Q.      And did she go to try to get somebody else to talk to

4   you?

5   A.      Well, I had asked her to leave a message.  I was

6   there to see DA again, of course.  And I was asking -- I was

7   in the midst of "Well, can I leave another message," and she

8   reminded me that, well, she's already left a message for me,

9   that request a day or two earlier.  So I asked to speak to

10  her supervisor.

11  Q.      And did a gentleman come out to speak to you?

12  A.      Not yet I don't believe.

13  Q.      All right.  Who do you remember coming out to speak

14  to you next?

15  A.      I recall whoever the lady was -- the very nice lady

16  at the reception window, I believe the next lady was also

17  some type of a supervisor above her, and I said:  Well, I

18  want to talk to your supervisor then.

19  Q.      All right.

20  A.      Then Marsha Johnson was my contact there.

21  Q.      All right.

22          Now, what was your demeanor at this time?

23          Was it the same it had been in the earlier visits?

24  A.      I went to bed eleven different nights concerned about

25  my kids.  I got up during the night checking noises, being

47

1   concerned about them going to school.  And as politically

2   correct as it is not, I was pissed off.  Those are my kids.

3   Those are my kids.

4   Q.     So ten, eleven days after making a report, repeated

5   visits to the DA, on this occasion you've heard the

6   characterization that you were yelling.

7          Did you get loud in this interaction?

8   A.     Without a doubt my passion was enough to increase my

9   voice.  And if you want to characterize that as "yelling" for

10  my kids, by God, I did it.

11  Q.     And did -- was a deputy district attorney speaking to

12  you?

13  A.     Not at that time.  I was speaking between the

14  bullet-proof glass to Marsha Johnson trying to plead with

15  her, then challenge her, then -- to get me -- if she couldn't

16  give me a date and time that I could meet with the elected

17  district attorney, who has no trouble soliciting my vote,

18  then give me a time that I can make the inquiry to get the

19  date that I can come and meet with the elected district

20  attorney.

21  Q.     Let me ask you this:  So you spoke, if I understand

22  correctly, to the receptionist.  You believe you spoke to one

23  or two other people and then to Miss Johnson -- Marsha

24  Johnson?

25  A.     Yes.  I believe she was the third person I talked to.

48

1    Q.        Okay.  But even as you were -- even though you had

2    gotten loud, they had not sent an investigator or a district

3    attorney to speak to you?

4    A.        Not yet.

5    Q.        Okay.  At some point did your -- at some point did

6    you give up on this meeting with -- I mean, did you leave the

7    office at some point?

8    A.        Well, I gave up with trying to convince Miss Johnson

9    to give me some type of time frame as to when I could get an

10   appointment.

11   Q.        And were you making pronouncements that you were

12   going to take the law into your own hands?

13   A.        I stated that I've been up here a number of times,

14   I've tried to explain to you my concern.  I made a specific

15   point of saying that I'm not up here complaining that someone

16   has stolen my lawn mower, my children have been threatened.

17           You're dragging your feet, you're not giving me an

18   appointment, and I probably said something -- I believe I

19   said something to the effect that if that man comes near my

20   kids -- if he comes and tries to harm my kids, I'll deal with

21   him myself.

22           If you'd like to interpret that as if he was going to

23   try to kill my kids, without a doubt I would have killed him.

24   Those are my children.

25   Q.        Let me ask you this, Tom:  In terms of the level of

49

1    volume that you got, you had not yelled at any earlier time

2    on a visit to the DA's Office?

3         THE COURT:  That is not established.  You might ask

4    that question.

5    BY MR. GONZALEZ:

6    Q.    Did you ever yell earlier?

7    A.    No.

8    Q.    And afterwards, did you ever stand there in the

9    reception area and yell through the glass to anybody?

10   A.    No.

11   Q.    All right.

12         What happened when you left the office?  Did anything

13   happen when you left?

14   A.    Well, when I was done with my interaction with

15   Miss Johnson, I had pretty much just turned around, I saw two

16   -- two males to my backside.  I believe one was Warren

17   Butler, one was Mr. Byerley.

18         I had walked right toward the elevator.  I pushed the

19   button on the elevator.  I'm waiting for the elevator doors

20   to open, and to my left the door opened, similar to this door

21   right here.  It opened outward, and a gentleman that I now

22   know as William Godwin, he just looks at me, he kind of holds

23   his hands up, he says:  Will you talk to me, sir?  I said:

24   Sure.

25   Q.    Then what happened?  Did you talk?

50

1    A.      We walked into a kind of private conference room.  He

2    says:  What's up?  And I --

3    Q.      Let me stop you there for a minute.

4            Tom, it's been labeled as Plaintiff's Exhibit 25,

5    it's videotape.  It's already been admitted into evidence.

6            My characterization of it is not evidence.  It will

7    speak for itself, but it's a videotape of you going to the

8    elevator to leave.

9            Have you had occasion to see that before the trial?

10   A.      No.

11   Q.      All right.  Well, it is in evidence.  We'll play that

12   later.

13           Had anybody told you that on that day, April 7th,

14   that the report had finally arrived and they were now going

15   to give it attention?

16   A.      No.

17   Q.      Did anybody say to you:  Mr. Toler, the report just

18   came in today.  Can you sit tight so we can read it and get

19   more information from you?

20   A.      No.

21   Q.      When you spoke to Marsha Johnson, did she tell you

22   that the report had arrived?

23   A.      No.

24   Q.      Did Mr. Godwin tell you the report had arrived?

25   A.      No.

51

1    Q.      All right.

2            And how would you describe your interaction with

3    Mr. Godwin?

4    A.      I think we had two fathers having a conversation

5    about some kids.  He was older than me and had some words of

6    wisdom to say.

7            I think he made an effort to make an inquiry.

8    Whether it was to calm me down or to understand that I

9    deserved some attention, I don't know.

10           But he made it clear that this wasn't his job, he was

11   a prison liaison.  He made it clear he didn't know if they

12   would even let him work the case.  But he says:  If you'll

13   give me some information, I'll see what I can do.

14   Q.      How long would you say your meeting with Mr. Godwin

15   was before you left?

16   A.      Twenty or 30 minutes.

17   Q.      Okay.  Did you have occasion to publish an ad in a

18   newspaper related to this incident in the DA's Office?

19   A.      I did.

20   Q.      Do you recall when that was?

21   A.      April the 12th.

22   Q.      Tell me where you published the ad?

23   A.      Every newspaper in the county would take my money.

24   Q.      And do you recall the names of these newspapers?

25   A.      The Vacaville Reporter.  The Daily Republic.  I

52

1    believe the Tailwind, some type of military publication that

2    went along with the paper in Vallejo.  The Herald or

3    something like that.

4    Q.      Did they publish these only a single time or were

5    there repeated publications?

6    A.      Vacaville published it twice for me.  The Daily

7    Republic refused to publish it a second time.

8    Q.      What was the purpose of publishing this ad -- a

9    full-page ad?

10           Was it a full-page ad?

11   A.      It was.

12   Q.      All right.  What was the purpose of publishing it?

13   A.      I had a story to tell.  I mean, you know, I'm someone

14   that can defend my children.  I'm just blown away.  What if

15   that had been my daughter up there trying to make a report

16   that someone was threatening her children?  She doesn't have

17   my ability and my training.

18           They asked for that responsibility to play this role

19   in protecting us so we're not competing with the cave men.  I

20   used the system, in the order it was designed to be used, and

21   they didn't just ignore it, they were insulting in ignoring

22   it.

23           It wasn't we don't have time or we don't know about

24   it, it's we're not going to make time, we're not even going

25   to have a conversation about it.  I wanted the public to

53

1  know.

2  Q.      Mr. Toler, how much did you spend on those

3  advertisements?

4  A.      My daughter's first year of tuition for college.  I

5  believe it was a little over 50,000.  Something between 50

6  and 60,000 dollars for all the ads.

7  Q.      All right.  Did you have occasion to also write a

8  letter to the district attorney?

9  A.      I did.

10  Q.      And do you recall when that was mailed or how it was

11  delivered?

12  A.      It was at the same time.  During my conversation with

13  Mr. Godwin, I was being disgruntled about not getting a

14  return call.  He said:  Why don't you try writing a letter.

15        So I kind of wrote one in the local newspapers, then

16  I wrote one and sent it the same time I ordered the newspaper

17  ad.

18  Q.      What kind of security measures -- In light of the

19  fact that there wasn't a law enforcement response, that you

20  were aware of, what kind of security measures did you take

21  with your children, if any?

22  A.      I had an alarm system put in the house.  And I took

23  an extra step of building what I refer to as a safe room.

24  The upstairs portion of the house, the master bedroom, there

25  was a huge closet.  And through there was a door going into

54

1    the attic.

2          So I secured that, put some supplies in there, a cell

3    phone and a direct line to the alarm company.  And I

4    instructed my children that if there was ever anything

5    that -- if anyone was banging on the door or somebody broke

6    in, this was a safe spot, run up there, there was water and

7    communications, and to lock yourself in that location.

8          I gave my kids a ride to school and picked them up.

9    I wouldn't -- there was times before I would let them ride

10   back and forth with a friend.  Then I stopped that.  I

11   contacted the two schools to make sure that nobody tried to

12   get them out of school.

13         One thing I missed is when I sent my boy to summer

14   camp, Richard Oawster showed up at the summer camp.  And

15   there my boy is, on the phone, John, saying:  Dad, he's

16   standing right next to me, what do I do?  He's up in Davis at

17   a computer camp.

18   Q.    When did that take place, the incident you're just

19   referring to, if you recall?

20   A.    I believe the summer of 2006 --

21   Q.    So at the time --

22   A.    Summer of 2005.

23   Q.    I failed to ask you this.  When your meeting with

24   William Godwin ended, did he give you a sense of whether or

25   not he was going to be working your case immediately, or did

55

1   he -- did he give you any kind of time frame?

2   A.      He advised me that he was the prison liaison, that he

3   don't know if they would let him work the case, that he

4   wouldn't be able to get to it until he finished -- he had to

5   travel somewhere down south to meet with some witnesses or

6   something.

7           He had some other time off.  There was several weeks

8   that went by from that day until he ultimately made contact

9   with Mr. Oawster.

10          THE COURT:  No.  The question was different, sir.

11          Did he tell you a time frame that he would be working

12   the case at the time you had the conversation?

13          THE WITNESS:  Well, that answer is simple.  I should

14   have been listening.  I'm sorry.  No, he didn't.

15   BY MR. GONZALEZ:

16   Q.      Did he tell you he was working on another case right

17   now?

18   A.      Yes.

19   Q.      Did he tell you that he was also taking some kind of

20   time off for vacation?

21   A.      Well, he told me he was otherwise disposed.  Whether

22   it was vacation or a project for his work, I don't know.

23   Q.      Did you have occasion to -- I want to ask you about

24   your interaction with Mr. Garza.

25          Do you recall what date that was?

56

1    A.        I believe June 13th.

2    Q.        And had you had occasion, prior to your interaction

3    with Mr. Garza, in filing a small claims matter?

4    A.        I did.

5    Q.        What did that entail?

6    A.        Well, after I wrote the letter in the paper, and I

7    still have absolutely nothing being done with my concern with

8    my kids, I decided to go over and fill out an application for

9    a small claims lawsuit and charged the DA with violating

10   his -- breaching his verbal contract he made with me as a

11   voter, and I think 20 or 30 dollars for gas or expenses that

12   I felt I was out from running back and forth to his office

13   trying to get a meeting with him.

14   Q.        Just to -- What was the purpose of filing that claim?

15   A.        To draw attention to it.  I mean, you know, I was

16   getting ready to wave a flag.

17   Q.        Let me ask you this:  At some later date, did you --

18   did you appear at the small claims action?

19   A.        No.

20   Q.        Okay.  And why not?

21   A.        The county counsel --

22   Q.        Let me just caution you not to relate information

23   that some opposing lawyer or anything like that said.

24   A.        I was asked to dispose of the case.

25   Q.        Your attorney gave you advice that it was better just

57

1   not to do it?

2   A.      My attorney asked me if I would dispose of the case.

3   Q.      Was there a story written in a newspaper about the

4   small claims action?

5   A.      Yes.

6   Q.      And do you know when that story came out?

7   A.      The same day I went and knocked on the DA's door

8   again.

9   Q.      All right.

10          Do you remember whether or not Al Garza was quoted in

11   that story?

12   A.      Yes, he was.

13   Q.      And do you remember anything he said or was quoted or

14   attributed to him?

15          MR. CASSIDY:  Objection.  Hearsay.  That's not an

16   exhibit in evidence.

17          THE COURT:  Mr. Gonzalez, it appears to be hearsay,

18   unless it had something to do with something that Mr. Toler

19   did.

20          MR. GONZALEZ:  Well, Your Honor, I think we've both

21   characterized the fact that Mr. Toler believes Mr. Garza is

22   lying to him in that interaction.  And part of that is

23   because he read words attributed to Mr. Garza in that story.

24   So it is not being offered for the truth --

25          THE COURT:  But to explain his frame of mind.

58

1          With that caution, Ladies and Gentlemen, you may

2     answer, Mr. Toler.

3     BY MR. GONZALEZ:

4     Q.     Mr. Toler, let me ask it differently so I think it

5     works better.

6          When you went -- when you first encountered

7     Mr. Garza -- Let's do it differently.

8          Was someone named Al Garza quoted in the story about

9     the small claims action?

10    A.     Yes.

11    Q.     And did you recall what was attributed to him?

12    A.     Well, it was a news piece.  And the part -- the quote

13    that I recall was that he says, "Toler was adamant about

14    meeting the boss."

15    Q.     All right.

16         So when you went into the DA's Office on June 13th,

17    tell me how the interaction unfolded?

18         Did you go up to the window?

19    A.     I went up to the window again.  I had seen the paper

20    just an hour earlier.  I was in the courthouse across the

21    street.  I'm in there quite a bit, four or five times a week.

22    I saw the paper, and I go:  Wow, this may be an opportunity.

23         So I went back over to the DA's Office, went to

24    reception, met one of their staff members there, a

25    receptionist, and asked to make an appointment with the

59

1    district attorney again.

2    Q.      Let meet ask you this:  Were the folks that worked

3    behind the counter at the DA's Office, did they appear to be

4    scared of you when you would walk into the office?

5    A.      No.

6    Q.      When you had the interaction with Marsha Johnson, on

7    that earlier occasion, on April 7th, and you got loud, did

8    the other people behind the glass, did they stand up and back

9    away from you?

10   A.      No.

11   Q.      Was there any activity like that going on?

12   A.      No.

13   Q.      All right.

14           So does Mr. Garza come out to speak to you on June

15   13th, the day that the story about the small claims action

16   came out?

17   A.      Kind of.

18   Q.      What do you mean?

19   A.      Well, he opened the door, stood in the doorway and

20   had a conversation with me.

21   Q.      All right.

22   A.      He didn't come out to visit.  He opened the door,

23   hollered across the hall and says:  What do you need?

24           I walked from the reception counter over to the door

25   he opened, and I says:  I want to see the DA.

60

1          I says:  You know, I'm not going away.  I want to see
2     the DA.  He's the elected DA.  I've got a right to see the
3     DA.
4          He said --
5     Q.     Let me stop you there for a moment, Mr. Toler.
6          Did he say anything to you about whether or not he
7     had seen the story that came out that day?
8     A.     As I was asking him, insisting of him to let me see
9     the DA, he says:  What do you want to see him for?
10         And I said:  Didn't you read the paper?
11         And I probably -- I probably said it in a snide --
12    with a snide tone with some type of a belligerent remark with
13    it.
14    Q.     Let me ask you this:  Did you feel he knew exactly
15    why you were there?  Did you feel that he knew?
16         MR. CASSIDY:  Objection.  Calls for speculation.
17         THE COURT:  Asking for state of mind.  The objection
18    is overruled.
19         You may answer.
20         THE WITNESS:  I feel that Al Garza is completely
21    useless.  He endangered --
22         THE COURT:  Move to strike that as nonresponsive?
23         Mr. Cassidy, you want to leave it?
24         Good.  Let's go.
25    BY MR. GONZALEZ:

61

1   Q.      Mr. Toler, why did you think he was useless?

2   A.      He's there to -- he's there as a cog in the wheel

3   that offers us public safety.  He -- the police department

4   passes the ball to the DA.

5           Without the DA, the police department is completely

6   useless or ineffective once they hand the paperwork over.  If

7   the DA doesn't move forward with it, nothing happens.

8   Q.      Mr. Toler, I want to know, you had never had an

9   interaction with him before?

10  A.      Never.

11  Q.      So you start talking to him.  Did you get a sense

12  that he knew why you were there?

13          MR. CASSIDY:  Objection.  Calls for speculation.

14          THE COURT:  Overruled.

15          THE WITNESS:  He --

16  BY MR. GONZALEZ:

17  Q.      "Yes" or "no"?

18  A.      It's been in the paper.  I'm in the hallway.  They're

19  hanging my picture around the hallway.  Of course he knew why

20  I was there.

21  Q.      Right.

22          What I want to ask you is the fact that he was acting

23  as if he don't know why you were there, one of the reasons

24  you don't have respect for him?

25  A.      He lied right to me before I could even get, you

62

1   know, "Hi, my name is Tom Toler" out.

2   Q.      And lied in what sense?

3   A.      He stated that he didn't know why I was there.

4   Q.      All right.

5           Did he make any reference to whether or not he had

6   seen the article?

7           Well, you asked him.

8   A.      I asked him.  I don't recall if he said -- Actually,

9   he said "No."

10  Q.      I want you to stop and think about this for a minute.

11          Do you remember how he said that?

12  A.      No.

13  Q.      All right.

14  A.      It was clear to me that he --

15          MR. CASSIDY:  Objection, Your Honor.  There is no

16  question pending.

17          THE WITNESS:  His quote was there.  I already knew he

18  had seen it.  He was part of it.

19  BY MR. GONZALEZ:

20  Q.      We got that.  I was asking a different question.

21          Did you make a comment to him that had the word "Uzi"

22  in it?

23  A.      Apparently.

24  Q.      I'm asking you, as you sit here now, do you remember

25  the comment that you made?

63

1   A.      Yes.

2   Q.      All right.  What did you say to him?

3   A.      I want to make sure I get this right.

4           I likened him to that of a meter maid.  I advised

5   Mr. Garza that he was as useless as a meter maid.  And that

6   the only difference between him and a meter maid was that if

7   a meter maid brought an Uzi into the building or the

8   courthouse, they would go to jail and he probably would not.

9   Q.      And so why did you make this remark?

10  A.      I've had it with them.

11  Q.      Was it meant to be a disparaging remark?

12  A.      Absolutely.  He might as well be conspiring with this

13  child molester to put my kids in harm.

14  Q.      Were you ever pat searched going into the DA's

15  reception area?

16  A.      No.

17  Q.      There's been -- You heard something counsel said in

18  opening.  Did you ever tell Mr. Godwin that you had

19  tape-recorded a conversation in the DA's Office?

20  A.      I believe, during a message I left him on the phone,

21  the day that I read about -- or the day that I was advised

22  about a restraining order had been signed, I had left him a

23  message.  And in that message I believe I told him that I had

24  tape-recorded my interaction with Al Garza.

25  Q.      And why did you think that that might have happened?

64

1          Did you go in there purposely trying to tape record a

2     conversation?

3     A.        No.

4     Q.        And so why did you think you might have a tape

5     recording of that conversation?

6     A.        Well, the reason I was at the courthouse that day was

7     to look for a fugitive.  And many times when -- well, all the

8     time, if I think I'm going to make an arrest or interview

9     somebody concerning trying to find a fugitive, I always tape

10    it because of the allegations that may come back.  I don't

11    want to have any misunderstanding.

12          That day I had a piece of equipment on me, a small

13    digital recorder, that once I got to the courthouse, just

14    casually looking for this gentleman, the recorder was

15    running.  Because I didn't know where or if we were going to

16    end up in a chase.  It is strange.  They will run, but then

17    show up for court sometimes.

18          I thought that piece of equipment was still on or

19    still had room in it to capture that conversation.

20    Q.        But let me ask you this:  How did you learn that a

21    restraining order based on this Uzi comment had transpired?

22    A.        My attorney at the time called me to tell me that

23    they had issued a restraining order.

24    Q.        And he told you it was based on Mr. Garza's

25    allegation that you had threatened to bring a weapon to the

65

1    DA's Office?

2    A.      Yes.

3    Q.      And did you -- so you had occasion -- did you call

4    Mr. Godwin after learning that?

5    A.      Right after.

6    Q.      And you -- What did you say to him?

7    A.      What's going on?  You know, him and I were just

8    talking.  He's leading me to believe that he's trying to, you

9    know, help me help my children without getting in the middle

10   of it.

11          I had spoken with him days earlier, and at least we

12   had a respectful relationship with one another.  And now all

13   of a sudden --

14   Q.      Let me ask you this:  Did you tell Mr. Godwin that

15   this statement that was being attributed to you in this TRO

16   was being mischaracterized?

17   A.      I probably told him it was more like a bunch of BS

18   and just a bunch of lies.

19   Q.      Mr. Toler, can you look at Defense Exhibit G?

20   A.      G?

21   Q.      G.  Do you see that?

22          It's in the white binder.

23          I want you to take a look at that.  That's a memo

24   that Mr. Godwin wrote up at some time.

25          Do you see that?

66

1    A.      Yes.

2    Q.      Does that refresh your memory as to what you said or

3    what you may have said to Mr. Godwin as it related to the

4    statement that was being attributed to you?

5    A.      Yes.

6    Q.      Let me ask you:  Did you, in that phone call to

7    Mr. Godwin, once you learned that a TRO had been issued based

8    on this statement, what did you say to him about the

9    statement?

10   A.      I told him I didn't believe -- I told him I couldn't

11   believe that he turned those words around and tried to make

12   it into some type of a threat.

13   Q.      Who did you mean by "he"?

14   A.      Al Garza.

15   Q.      All right.

16           And did you also say to Mr. Godwin that you thought

17   that you might have a tape recording of this -- of what

18   transpired between you and Mr. Garza?

19   A.      Yes.

20   Q.      Did you at some later time check to see if, in fact,

21   you had such a recording?

22   A.      Yes.

23   Q.      What did you find out?

24   A.      Well, I found out the digital recorder -- essentially

25   the tape had run out before I got upstairs.

67

1    Q.      All right.

2            Mr. Toler, did you have occasion to interact with

3    Dave Paulson in a public parking garage?

4    A.      Yes.

5    Q.      Do you remember what day that was?

6    A.      No.

7    Q.      And counsel can correct me if I'm wrong, for the

8    record the evidence appears to be that took place September

9    22nd, 2005.

10           Does that appear to be correct to you?

11   A.      That sounds correct.

12   Q.      And can you tell me how this interaction transpired?

13   What were you doing in the public garage?

14   A.      Being a member of the public, I was parking there so

15   I could go to court.  I had a scheduled court commitment that

16   morning concerning a bail matter.

17           I parked in the lower level -- street-level of the

18   parking garage -- the public parking garage.  And I had an

19   aide with me to carry my material because I had a recent knee

20   surgery.

21           I left my truck and walked through the public

22   corridor, through the public garage, and ended up crossing

23   paths with what turned out to be the elected DA, David

24   Paulson.

25   Q.      Let me ask you this:  Did you call out his name to

68

1    speak to him?

2    A.      No.

3    Q.      How was it that he or you approached one another?

4    A.      I had left my vehicle before my assistant because I

5    was moving slower.  I got up along a row of cars.  I think

6    where the handicap parking was at.  I learned up against one

7    of the cars and was kind of looking back to see where she was

8    at and waiting.  It was -- my -- my knee was pretty sore.

9    Q.      Tom, let me stop you.  You're referring to this

10   assistant.  You had a couple of people working for you at the

11   time.  Was this Bobbi King?

12   A.      Yes.

13   Q.      She had started doing some work with you?

14   A.      She was doing filing and process serving.

15   Q.      Tell me what that entailed?

16   A.      Serving documents to defendants and lawsuits mainly

17   to do with collection or subpoenas, and then filing a proof

18   of service with those with the court clerk.

19   Q.      All right.  So you -- where are you when

20   Mr. Paulson -- Who speaks first?

21   A.      Between myself and David Paulson?

22   Q.      Yes.

23   A.      He did.

24   Q.      What did he say to you?

25   A.      "Can I help you."

69

1    Q.      Okay.  Now, before he said, "Can I help you," had you
2    heard anybody call his name out?
3    A.      You know, we were 30 feet or so from the entrance.
4    People are -- a lot of people that are going to court,
5    walking, the cars coming in and out, the road traffic just
6    30, 40 feet away, and the chatter from the people, so I can't
7    say for -- with any certainty I heard that.
8    Q.      When Mr. Paulson walked up to you and said, "Can I
9    help you," were you surprised by this?
10   A.      Yeah.
11   Q.      What did you say to him?
12   A.      I stopped and caught my breath for a minute.  And I
13   looked side-to-side.  And he had a happy smile on his face, a
14   coat thrown over his shoulder, and he comes walking up and
15   says, "Can I help you?"
16           And he had his hand out, and I had my hand ready to
17   extend, and I said, "I don't think we've had the pleasure of
18   meeting yet.  My name is Tom Toler."
19   Q.      How did he respond to hearing your name or seeing you
20   up close?
21   A.      Like I had said "boo."
22   Q.      So what did he do?
23   A.      Retreated.
24   Q.      Does that mean he turned around and walked away?
25   A.      Yeah.  Yes.  He turned and ran away.

70

1    Q.      All right.

2            Now, did you proceed to conduct your business in the

3    courthouse?

4    A.      I called my attorney, Matt Bishop, and I said -- from

5    right there in that spot -- and I says:  Here's what just

6    happened.

7    Q.      Did you have occasion to go into the building?

8    A.      I went on over to the courthouse.  I'm upstairs in

9    the criminal building.  I see William Godwin running through

10   the courthouse.  And I hollered out his name, "Bill."

11           He looks.  He kind of darted over my way.  What?

12   What.

13           I said:  Are you looking for me?

14           He says:  No.  Why?

15           I said:  Well, I think I just met your boss, and I'm

16   a little nervous about that.  He said:  Well, I heard

17   something about that, but don't worry about it.

18           I said:  Well, I thought you were running to look for

19   me.  He says:  No, I'm running because I'm late for court.

20   Q.      The TRO that was issued prohibited you from being how

21   close from the district attorney's office?

22   A.      Initially, it was 400 yards further than the last TRO

23   order that was issued to a rapist.

24   Q.      That's not what I asked you.

25           MR. CASSIDY:  Move to strike, Your Honor.

71

1          THE WITNESS:  I'm sorry.

2          THE COURT:  Motion to strike is granted.  Jury is

3     directed to disregard.

4          Put your question again, Mr. Gonzalez.

5     BY MR. GONZALEZ:

6     Q.    Mr. Toler, I know you have strong feelings about it,

7     but what I'm asking you is what was the distance that you

8     were ordered to stay away from the district attorney's

9     office?

10    A.    Five hundred yards.

11    Q.    Okay.  And where was your bail bonds office located?

12    A.    About 350 yards.

13    Q.    From?

14    A.    From the -- The order was to stay 500 yards from what

15    is referred to as the "government center" where the elected

16    district attorney is housed in this brand-new beautiful

17    building.

18    Q.    Does the order specify it is 675 Texas Street?

19    A.    It just says -- You know, I don't know.

20    Q.    What's the address of the Government Center?

21          Don't take my word for it.

22    A.    I don't know.  Across the street is 600.

23          Actually, I think the Government Center faces Texas

24    Street.

25    Q.    Hold on.  Hold on.  I'm looking at my notes here.

72

1          THE COURT:  Is the restraining order in evidence?

2          MR. GONZALEZ:  Yes, Your Honor.

3          THE COURT:  What are we doing?

4          MR. GONZALEZ:  Right.  I'm going to refer to the

5     evidence and then ask the question.

6          THE COURT:  Okay.

7     BY MR. GONZALEZ:

8     Q.     Mr. Toler, the temporary restraining order that was

9     filed June 15th, 2005, indicates that you were to stay away

10    500 yards from the DA's Office noted as 675 Texas Street?

11    A.     Okay.

12    Q.     And your place of business was on Jefferson Street?

13    A.     Yes.

14           And 790 Jefferson ring a bell?

15    A.     Yes.

16    Q.     Are you testifying that the distance between your

17    place of business and the district attorney's office was

18    closer than 500 yards?

19    A.     Yes.

20    Q.     And did the issuance of this TRO adversely affect

21    your business?

22           I'm not asking you for dollar amounts.  I'm asking

23    you how.

24    A.     It shut my business down in Solano County.  It

25    completely kept me from going to the jail, which I had to

73

1    deliver bonds and meet clients and clients' families.

2              It kept me from going to my office where we conducted

3    business in the first place.

4    Q.      Let me ask you this:  There was something -- was

5    there an issue that had come up related to the property you

6    were leasing, something to do with your landlord, or was that

7    a later time?

8    A.      Well, I was in an office space that was slated to be

9    remodeled in the next six to eight months.  And after this

10   nonsense with the restraining order came out, the landlord

11   came over one day just to let me know that they were going to

12   go ahead and do the remodel and demolition earlier.

13             I reminded them of a commitment I had from them

14   earlier that I would be able to occupy a space across the

15   street.  And he advised me that that space was not going to

16   be available, and that I was going to need to probably look

17   for some new place to land.

18             So we moved out, and the office sat there for, I

19   think, almost a year before they finally started the remodel.

20   Q.      Mr. Toler, before I forget to ask you this, were you

21   arrested or did you have to surrender on the allegation that

22   you had violated the temporary restraining order from the

23   incident you had in the garage?

24   A.      I was.

25   Q.      Which one of those?  Did you surrender yourself?

74

| | | |
|---|---|---|
| 1 | A. | Well, yes. |
| 2 | Q. | All right.  And did you bail out of custody? |
| 3 | A. | I did. |
| 4 | Q. | And did you bail yourself out or did you -- |
| 5 | A. | I used another bail agent. |
| 6 | Q. | One of your competitors, I take it? |
| 7 | A. | I did. |
| 8 | Q. | They got a kick out of that I bet? |
| 9 | A. | It was quite a laugh. |
| 10 | Q. | How long would you say that you were in custody? |
| 11 | A. | A few hours. |
| 12 | Q. | And did the landlord allow you to re-occupy the |

13  space?

14  A.      No.

15  Q.      Did you look for other -- Well, was your reputation

16  as a bail agent in Solano County affected by the TRO in your

17  opinion?

18          MR. CASSIDY:  Objection.  Calls for speculation.

19  Lacks foundation.

20          THE COURT:  He may testify as to what he understood

21  the effect was.

22  BY MR. GONZALEZ:

23  Q.      Did you notice anything different --

24  A.      I did.

25  Q.      -- now that you had this TRO in place?

75

1          What did you see?

2    A.      Well, the Solano County jail staff, they are

3    extremely professional and polite.  But there was several

4    times that I came to "post a bond," as we call it, deliver a

5    bond to the jail and do the paperwork, and they would not

6    initially take my bond because they thought I was illegally

7    there or violating the restraining order after it was

8    modified.

9          I had customers that I had already bailed out that

10   saw the article in the paper.  Some of them that were kind of

11   paying on credit terms didn't feel like they should have to

12   pay.

13         Some of them called me and asked me if I was going

14   out of business.  They were concerned about their bail

15   status, things of that nature.

16   Q.      To defend against this TRO matter, did you have to

17   hire any attorneys?

18   A.      Boy, I did.

19   Q.      And without giving me dollar amounts, can you tell me

20   who the different lawyers were and in what capacity they were

21   employed?

22   A.      Chuck Gravett was the first attorney that responded

23   to the TRO.  His partner, Elizabeth Freighter took it from

24   there and facilitated some depositions.

25         At their recommendation, I took Matt Bishop on

76

1   because they felt like he would be more qualified to deal

2   with this.

3          Then John Downing was brought on to help with the

4   depositions because every time a new name was introduced, we

5   wanted to get their story for the record.

6          Then Dennis Honeychurch was retained.  And Dan Russo

7   was retained to consult with an attorney that I hired out of

8   San Francisco, Douglas Rappaport.

9   Q.     Did Mr. Rappaport handle the criminal matter?

10  A.     He did.

11  Q.     Did any other attorneys work on the criminal matter?

12  A.     Your firm worked with him on the criminal matter.

13  Q.     All right.  How long did that trial take place?

14  A.     You mean the actual trial itself?

15  Q.     Yes.

16  A.     It was five days.

17  Q.     Do you have any idea what kind of hours any of these

18  lawyers worked on your behalf?

19         MR. CASSIDY:  Objection, Your Honor.  Lacks

20  foundation.  Calls for speculation.

21         THE COURT:  Appears to be a good objection, sir.

22         MR. GONZALEZ:  I think to the extent that he's

23  certainly aware, he can indicate if he knows.

24         THE COURT:  I don't know how he would -- Well, you

25  know how long they were in court.  Do you have any idea how

77

1   long they were working when they weren't in court?

2   BY MR. GONZALEZ:

3   Q.      Let me ask you this:  Did you attend many of the

4   depositions, Mr. Toler?

5   A.      All of them.

6   Q.      And how many depositions do you recall there being?

7   A.      I believe seven or eight.

8   Q.      Uh-huh.  And were there -- are you aware whether or

9   not there were motions filed on your behalf in these various

10  proceedings?

11  A.      According to all the statements and billings that

12  came to my office, yes.

13          MR. GONZALEZ:  Okay.  Let me see if I have anything

14  else, Your Honor.

15              (Brief pause.)

16          Your Honor, I don't have anything else.

17          I would make -- That's fine.  I don't need anything

18  else.

19          Thank you.

20          THE COURT:  Why don't we take our break.  It is a

21  little earlier, but rather than interrupt you.

22          Please, remember the admonition the Court has

23  heretofore given to you.

24          Make it 20.  I want to talk to the lawyers about

25  something first.

78

1          (Jury exits at 02:35 p.m.)

2          THE COURT:  You may step down, sir.

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Record will reflect we're in open court,

5     counsel are present, the jury is not.

6          Fellows, I suspect that I don't know what I'm doing,

7     and that's -- it's okay if somebody says that to me.  Thirty

8     years ago, when I was a state judge -- 32 years ago, when I

9     was a state judge, my recollection is that a temporary

10    restraining order could not last more than ten days.

11         Is that wrong?

12         I mean apparently this went on forever.

13         MR. CASSIDY:  What happened, Your Honor, is that

14    there was -- it was scheduled for initial hearing.  That got

15    continued.  So what happened ultimately was continuance after

16    continuance.

17         THE COURT:  The parties stipulated to a continuance

18    of the temporary restraining order.

19         MR. CASSIDY:  And to continue the TRO remains in

20    effect.

21         THE COURT:  Okay.  Odd, but okay.

22         MR. CASSIDY:  There is another matter, Your Honor, if

23    I may?

24         THE COURT:   Yes.

25         MR. CASSIDY:  We discussed in relation to the motions

79

1    in limine yesterday the issue of the search warrant resulting

2    in the firearms that were found in November of 2005.

3         THE COURT:  You did.

4         MR. CASSIDY:  That issue -- and I indicated to the

5    Court I would make an offer of proof on why that is relevant.

6    That issue actually became part of the criminal prosecution

7    to which plaintiff refers, which was a violation of the

8    restraining order.

9         To the extent the door is now open, there were five

10   counts, I will represent to the court.  One was the parking

11   lot incident, and the other four are the additional firearms

12   that had not been turned over and were the result of the

13   search warrant.

14        MR. GONZALEZ:  Your Honor, you indicated that we

15   could make reference to the fact that he was charged with

16   violating the order.  He was acquitted of any charges.

17        We didn't go into any of these matters, which counsel

18   indicated he had wanted to, and you said you were not going

19   to let him go into these.

20        THE COURT:  But I said he could make an offer of

21   proof and if it was relevant, I would reconsider.

22        Here's the problem, gentlemen.  All right.  Obviously

23   it has -- it actually has more relevance from the plaintiff's

24   point of view than defendants', but that is neither here nor

25   there.  Maybe not.

80

1          I'm going to find that whatever relevance it might

2     have, and it is not clear to me it has any -- What probative

3     value does it have?

4          MR. CASSIDY:  I need to add a couple of facts.

5          In mid-July a report is generated by the Woodland

6     Police Department in which Mr. Toler is observed with a

7     firearm exposed on his side belt.

8          That report becomes part -- after the September 22nd

9     incident, the detective from the Solano County Sheriff's

10    Department, DeWall, who we've identified as a witness to

11    testify at trial, did the research and looked up what the

12    terms of the TRO were and what the weapons were that were

13    secured.

14         In making that search, he it came up with this

15    Woodland Police Department report.  And because the officer

16    had specifically said that Mr. Toler was carrying a sidearm

17    that appeared to be an automatic weapon, the detective then

18    prepared and executed a search warrant on Mr. Toler's

19    property.

20         The search warrant returned four weapons, which were,

21    according to the detective's investigation, directly in

22    violation of the restraining order.

23         The complaint in People versus Toler, which had

24    originally included the violation of the restraining order

25    for the contact in the parking lot with Mr. Paulson, was

81

1   amended to include four additional counts which resulted in a

2   prosecution involving the matter in the parking lot, as well

3   as unlawful possession of those weapons.

4          The plaintiff has now claimed that the consequential

5   damages of this parking lot incident and the prosecution are

6   part of his damages.

7          We would show that he was in violation of the

8   restraining order for other reasons.  He hadn't turned in the

9   weapons.

10         THE COURT:  Apparently you weren't able to prove at

11  the trial that he was in violation of the restraining order.

12  Hang on, Mr. Cassidy.

13         And the question is are you now barred.  And the

14  answer is no because there was a different person involved in

15  -- I mean, the government -- sorry -- the County was -- well,

16  no.  That is wrong, isn't it?

17         MR. CASSIDY:  The Attorney General's Office.

18         MR. GONZALEZ:  Let me add some facts, Your Honor.

19         The Woodland incident that counsel's referring to,

20  that officer was deposed.  He acknowledged it wasn't a gun,

21  this was a Taser that Mr. Toler had.  And that he had some

22  kind of paint ball gun.  So this offer of proof is not

23  legitimate.

24         THE COURT:  But if the report says it was a gun, even

25  if it was wrong, it says what it says.  If it gave rise -- I

82

1   mean -- Oh, yes.  We're going to be so far afield.

2          Here's what's going to happen, Mr. Cassidy.  We are

3   going to be down a long road.  You're going to put people on

4   about this gun.  Then he's going to have to call the officer

5   to say that it wasn't a gun.

6          The whole thing -- I mean, it's profoundly irrelevant

7   to the central issues of this case.  Court is going to

8   find --

9          MR. CASSIDY:  We're only going to call one witness,

10  Your Honor.

11         MR. GONZALEZ:  We want to rebut it.

12         THE COURT:  No kidding.

13         Stop gentlemen.

14         Mr. Gonzalez, the Court is of the view that all of

15  this is next to irrelevant, and it take us -- causes major

16  deviation from the real issues in this case.

17         However, it is not unfair for Mr. Cassidy to say:

18  Look, you're claiming that part of the damages was the cost

19  of the defense, and the charge was things -- But all of

20  those -- all of those -- that's the answer.

21         All of those other asserted charges are also the

22  result of the TRO, and the argument is that the TRO was based

23  on false information.

24         The Court is satisfied and finds that whatever

25  probative value exists is far outweighed by the prejudicial

83

1    nature and the fact it is going to take us several witnesses

2    to resolve the issue.  Accordingly, the Court will not permit

3    further evidence concerning that matter.

4            Stand in recess.

5            (Off the record at 2:44 p.m.)

6            (On the record at 3:01 p.m.)

7            THE CLERK:  Please, be seated.

8            Court is now in session.

9            THE COURT:  Mr. Cassidy.

10           MR. CASSIDY:  Thank you, Your Honor.

11                        CROSS-EXAMINATION

12   BY MR. CASSIDY:

13   Q.      Good afternoon, Mr. Toler.

14   A.      Good afternoon.

15   Q.      I was just trying to square away, as I understand it,

16   you have no biological children, correct?

17   A.      That's correct.

18   Q.      Okay.  And Melissa was introduced, and there was also

19   mention of John, who were the children residing with you in

20   Fairfield at the time of this March 27th call, correct?

21   A.      Yes.

22   Q.      And likewise, those are not your adopted children

23   either, are they?

24   A.      No.

25   Q.      They're not, correct?

84

1   A.      They're not legally adopted, no.

2   Q.      That's not to say that you don't call them your kids,

3   right?

4   A.      They are my kids.

5   Q.      Okay.

6           But just legally they are not truly either a

7   biological child or an adopted child?

8   A.      That's correct.

9   Q.      What were the names of Bobbi -- I'm going to try to

10  keep this straight, but just for the record, so we're clear,

11  when we say "Bobbi King" or "Bobbi Oawster," it is the same

12  person, correct?

13  A.      Yes.

14  Q.      Now, there was another person named, and I think the

15  name was John Confer.

16          Do you recall that mentioned?

17  A.      Melissa's brother.

18  Q.      So that's Melissa's brother?

19  A.      Yes.

20  Q.      When you say "stepson," that's a term of kind of how

21  you treat him as a stepson as opposed to him being either

22  through marriage or a biological son, correct?

23  A.      I found them in a homeless center, yes.

24  Q.      Okay.  So when you were in the military, as I

25  understand it actually you had done some training in Special

85

1    Forces?

2    A.      Yes.

3    Q.      Now, during the course of your training in the

4    military, did they train you in the use of automatic weapons?

5    A.      Yes.

6    Q.      And can you describe generally what the nature of

7    those automatic weapons were?

8    A.      So many of the military weapons have an automatic

9    feature on them, they were a weapon that once the trigger

10   mechanism was depressed, it continued to fire until it was

11   released.

12   Q.      Okay.  So that could be from a handgun, literally, to

13   a more -- even a machine gun-type weapon, correct?

14   A.      Probably not a handgun.

15   Q.      Okay.  But the other category would apply in that

16   training?

17   A.      Yes.

18   Q.      In Special Forces are you trained in enemy weapons?

19   A.      With regards to what type of a weapon that might be

20   encountered on a specific mission, yes.

21   Q.      Did you ever receive any training in the operation or

22   use of an Uzi while you were in Special Forces?

23   A.      No.

24   Q.      Did you ever receive that at any time?

25   A.      No.

86

1    Q.      Okay.  But as of June of 2005, you knew what an Uzi

2    was, correct?

3    A.      I know the name of an Uzi.  An Uzi is not even a

4    weapon that would be issued to an American soldier.

5    Q.      Correct.  It would be a foreign weapon, correct?

6    A.      Yes.

7    Q.      And it's a foreign automatic weapon akin to a machine

8    gun, correct?

9    A.      Yes.

10   Q.      Now, the -- in your time with the -- working as a

11   reserve with law enforcement agencies, you described you went

12   through the basic POST training, correct?

13   A.      Yes.

14   Q.      Then the field training, correct?

15   A.      Yes.

16   Q.      And one of the things that you are taught as part of

17   your law enforcement training and background, in order to

18   qualify as a peace officer to be out on patrol, for instance,

19   is the use of firearms, correct?

20   A.      Yes.

21   Q.      And that would include automatic weapons as well,

22   correct?

23   A.      No.  There's no training I recall of any automatic

24   weapons with the police department unless you were assigned

25   one if you were a member of the SWAT team.

87

1   Q.      Okay.  So maybe I misspoke because I guess what I was

2   thinking about was these handguns now that are

3   semi-automatic.  You were trained in those, correct?

4   A.      Yes.

5   Q.      Okay.  And you're not only trained in the

6   classroom --

7   A.      Let me correct myself.

8           During all my time as a police officer I carried what

9   was referred to as a "revolver."  The police departments

10  didn't start carrying automatic weapons until after my day.

11  Q.      So at the time that you were taught, you were just

12  taught on the basic single fire handgun, I take it, in the

13  classroom, correct?

14  A.      Yes.

15  Q.      And then what they call out-on-the-range?  You go out

16  and qualify to be sure that you can properly operate that

17  handgun and have a certain proficiency out in the field,

18  correct?

19  A.      Yes.

20  Q.      And now as a private investigator -- Well, at some

21  point, though, you did become familiar with semi-automatic

22  handguns, correct?

23  A.      Yes.

24  Q.      And was this at any time prior to your becoming a

25  private investigator?

88

1    A.      Yes.

2    Q.      Okay.  And so were guns a hobby of yours?

3    A.      No.

4    Q.      Okay.  Had you just gone out to ranges and fired

5    semi-automatic handguns?

6    A.      No.

7    Q.      But at some point you did learn how to use them?

8    A.      Yes.  Yes.

9    Q.      Now, as a private investigator -- You were a licensed

10   private investigator, correct?

11   A.      Still am.

12   Q.      And I think you indicated that you would look into

13   child abuse and domestic violence matters in particular?

14   A.      Yes.

15   Q.      And generally describe what your activities would be

16   during the course of an investigation in a domestic-related

17   matter, please?

18   A.      Observation, surveillance, obtaining statements,

19   referring my clients to third-party professionals to mediate

20   or testify or bring forth evidence.

21   Q.      If you get involved in a domestic matter that may,

22   unfortunately, involve some potential for domestic violence,

23   you also assist in conducting the investigation in that

24   regard, correct?

25   A.      Well, I could.  I'm not restricted in that way, so

89

1    yes.

2    Q.      But it is one of the things you do?

3            You may gather some evidence to assist the party you

4    represent and perhaps submit some evidence to the court in

5    support of the claim that the other side has possibly or

6    potentially engaged in some violent act toward them?

7    A.      My policy is normally all the evidence is turned over

8    to an attorney that retains that as part of their work

9    product.

10   Q.      And then -- and you know from time to time some of

11   the evidence you gather is actually used in support of a

12   person that is on your side that you are representing in

13   doing the investigation for -- to obtain a temporary

14   restraining order, correct?

15   A.      Yes.  It can be.  If it's that type of information.

16   Q.      Just depends on the circumstances?

17   A.      Yes.

18   Q.      But it has in the past, correct?

19   A.      It has in the past worked for and against the people

20   that have hired me.

21   Q.      Now, the -- And you have been involved in matters

22   where the people that are involved in these domestic

23   disputes, one or the other has obtained a restraining order

24   against the other, right?

25   A.      Yes.

90

1   Q.      Okay.  And being involved in those, is one of the

2   things that you would investigate, if you were looking into a

3   domestic matter where there is a potential threat of violence

4   against your client, you would want to determine whether or

5   not the other side, in other words the person from whom your

6   side is seeking dissolution of marriage, whether that person

7   has any firearms, correct?

8   A.      Well, I mean as a practice, whether I'm working for

9   somebody or investigating someone, the first thing that we

10  want -- that I want to know is if they have access or any

11  type of history with weapons.  So that's on my mind

12  irregardless.

13  Q.      So you would agree, regardless of the status, you

14  want to know whether the person that you might be

15  investigating has any access to firearms, correct?

16  A.      Yes.

17  Q.      Now, you're familiar with the fact that when a

18  temporary restraining order is issued in a domestic relations

19  matter, oftentimes, if the party against whom the order is

20  sought is known to have firearms, there is a provision in

21  that restraining order that requires they turn in any

22  firearms they have if the order is granted, correct?

23  A.      If the elements in the order show that there is

24  violent behavior, and that that violent behavior has shown to

25  be exhibited, physically, then that -- that line that you're

91

1    referring to in the TRO is the judge has the discretion to

2    request the firearms be turned in to the police department or

3    a licensed gun dealer or sold.

4    Q.      Thank you.

5            Now, in the matter involving the Oawsters, were there

6    two orders that were entered with respect to restraining the

7    person of Mr. Oawster against Mrs. Oawster?

8    A.      Well, paper was flying, but to my knowledge, in July

9    of '04, an emergency protective order was issued which was

10   the first step.

11           The police officer got on the phone with the judge

12   and articulated her observations, and right on the spot they

13   can do that.

14           Then a few days later there was a hearing set so both

15   parties have an opportunity to come in and speak their piece.

16   At that point a temporary restraining order was granted in

17   the Oawster case.

18   Q.      Okay.

19   A.      And then after that, more hearings were held,

20   depositions were taken, and a permanent -- or more permanent,

21   a three-year restraining order was issued.  But I believe

22   they all reflected the same case number.

23   Q.      Okay.  Thank you.

24           Now, in the first protective order, I think you

25   called it, that was issued without Mr. Oawster being able to

92

1    respond, correct?

2    A.     I guess.

3    Q.     That's your recollection of how it went down?

4    A.     My recollection is that an advocate from this

5    organization WEAVE made some observations, shared those

6    observations with the Galt Police Department, who then took

7    whatever course of action they took, which resulted in the

8    issuance of a Protective Order.

9    Q.     And then later there was a hearing and the temporary

10   restraining order was issued by the court, correct?

11   A.     Yes.

12   Q.     And you actually served Mr. Oawster with that

13   temporary restraining order, correct?

14   A.     Because the police department refused to, yes.

15   Q.     Okay.  Now, the restraining order in the Oawster case

16   that we just referred to, that directed that Mr. Oawster was

17   to turn in any firearms that he had in his possession,

18   correct?

19   A.     I don't know.

20   Q.     Well, if I recall correctly, on your direct

21   examination you had used some equipment to look into the barn

22   to see that Mr. Oawster still had some firearms in the barn.

23   And you knew that was inappropriate because it would have

24   been in violation of the restraining order that told him to

25   turn those in, correct?

93

1    A.      There is no doubt that one of those orders required

2    him to turn in his firearms certainly.

3    Q.      All right.  You just don't remember which one?

4    A.      I don't know if it was at the emergency protective

5    order or the temporary restraining order or the permanent

6    restraining order.

7    Q.      Fair enough.

8            And so when was this that you went out and crossed

9    over into the field and the other neighbor's property and

10   surveilled Mr. Oawster's property?

11   A.      I kept Mr. Oawster under surveillance from mid-June

12   of 2004 through at least the end of the year of 2004 at one

13   point so...  But specifically when did I go out, is that what

14   you're asking, and peeked into the barn?

15   Q.      Uh-huh.

16   A.      Well, it was sometime after he filed a report

17   alleging that all the weapons that he was supposed to turn in

18   were taken in a burglary the night before he was supposed to

19   turn them in.  Then I showed an interest in looking for the

20   weapons.

21           And it was also just a couple of days after the

22   Sacramento County Sheriff contacted me, an Officer Rainwater,

23   who advised me that Oawster had also reported a "service

24   weapon," as he referred to it, that was issued to him by the

25   Department of Corrections was taken.  And that he was

94

1    concerned that Mr. Oawster had filed that report, and that it

2    might be used in connection with harming Mrs. Oawster.

3          So all of my information that was coming in

4    day-by-day with our observation was turned over to a

5    commander at the Sacramento County Sheriff's Department

6    located in -- I believe it was Walnut Grove that was the

7    commander for that area.

8    Q.    And did they take any action on that, as far as you

9    know?

10   A.    Well, you know, I turned over a declaration from a

11   real estate agent who went in to talk to him and observed a

12   gun.

13         I showed them --

14   Q.    I'm just asking whether they took any action.

15         As far as you know, did the sheriff's department take

16   any action?

17   A.    I'm not sure.  At some point the Department of

18   Justice rolled out there and asked him to voluntarily

19   surrender weapons.  I don't know if that was because of my

20   efforts or if it was the sheriff's department that

21   facilitated that.

22   Q.    Fair enough.

23         As a private investigator you are permitted to carry

24   an exposed firearm, correct?

25   A.    No.

95

1   Q.      As part of your responsibilities as a private

2   investigator you may obtain -- request and obtain a permit to

3   wear an exposed weapon, correct?

4   A.      Well, outside of the private investigator license you

5   can request an exposed weapon permit through the Department

6   of Consumer Affairs or the Bureau of Security and

7   Investigation Services now.  That will allow you to carry an

8   exposed weapon.  Those are mainly designed for uniformed

9   guards standing a post somewhere.

10  Q.      And at what point did you apply for that permit?

11  A.      Sometime in 2003.

12  Q.      Okay.  And that was, in effect, in or about June and

13  July of 2005, correct?

14  A.      Yes.

15  Q.      Okay.  Just to be sure here, I'm going to ask you to

16  please refer to Defendant's Exhibit N.

17          THE COURT:  Nancy?

18          MR. CASSIDY:  Yes.

19  BY MR. CASSIDY:

20  Q.      I ask you to go to page 8 to start on that exhibit,

21  please.

22  A.      Yes.

23  Q.      Okay.  And that's a copy of the temporary restraining

24  order, if you will, that was entered over in Marin County

25  that was referred to during your direct testimony, correct?

96

1   A.      Yes.

2   Q.      Okay.  And the individual -- This was actually a Work

3   Place Violence Petition type of restraining order correct?

4   A.      Well --

5           THE COURT:  If you know, sir.

6           THE WITNESS:  I don't know.

7   BY MR. CASSIDY:

8   Q.      Okay.  The heading on the document says, "Order After

9   Hearing On Petition Of Employer For Injunction Prohibiting

10  Violence Or Threats Of Violence Against Employee."

11          That's what you understood was being issued in this

12  document, correct?

13  A.      Well, understand I had never seen this document until

14  two years after it was issued.

15  Q.      But you did see it?

16  A.      Yes.

17  Q.      This is what you were served with?

18  A.      Yes.

19  Q.      Okay.  And let's have you go to page 9.

20          At page 9 you're specifically directed to stay away

21  from, if you will, this Glenn Cybulski, correct?

22  A.      Yes.

23  Q.      And you're not only -- In subpart 7 of that, you're

24  not only told to stay away from his workplace, you're also

25  told to stay away from his home, correct?

97

1    A.      Yes.

2    Q.      And in addition you're told to stay away from his

3    family, correct?

4            His children are specifically listed in here,

5    correct?

6    A.      Yes.

7    Q.      Thank you.

8            Now, as I understand it --

9            MR. GONZALEZ:  I'm sorry, Your Honor.  I'm going to

10   object to, I think, the last statement.  There are no

11   children listed.  It's a box that's checked, I believe,

12   relating to, but I think there was a vagueness in the way he

13   asked that.

14           THE COURT:  Mr. Cassidy, do you agree that no

15   children were listed.  I don't know.

16           MR. CASSIDY:  The children are listed in an addendum.

17   I assume Mr. Toler understood they were included as part of

18   the restraining order.

19           That was my question.  I think he answered

20   affirmatively.

21           THE COURT:  You may proceed.

22           MR. CASSIDY:  Thank you.

23   ///

24   ///

25   ///

98

1    BY MR. CASSIDY:

2    Q.      Now, I think you said you were primarily doing

3    investigation with and on behalf of your client Bobbi King

4    Oawster in 2004, kind of that fall, and through the end of

5    2004, correct?

6    A.      Yes.

7    Q.      All right.

8            And then was it at that point that you gradually kind

9    of moved the motor home over to her property, or was that a

10   little bit later?

11   A.      I never moved my motor home that I used for when I'm

12   out of town to her property.  I did -- I did park it on the

13   street next to her property, advised the police department

14   when and what I was doing.  And I wanted to be visible as a

15   deterrent for any potential contact by Mr. Oawster.

16           And when I would leave, I would park the motor home

17   in the backyard so it is unoccupied and parked there while I

18   was not on her assignment.

19   Q.      Okay.  Now, between 2005 and 2007, you did have a

20   personal relationship with Bobbi King Oawster, correct?

21   A.      I think you probably should define "personal."

22   Q.      Well, you certainly spent a lot of time with her,

23   correct?

24   A.      Yes.

25   Q.      Okay.  And you --

99

1   A.      Well, no.  She spent a lot of time on my property.

2   And for 25 years I've offered my home as a safe house to

3   victims over -- for short periods of time.

4   Q.      One moment, Your Honor.

5           (Brief pause.)

6           Well, during this period of 2005 to 2007, you were

7   essentially doing things as a couple, correct?

8           You were taking the kids out and about, you went to

9   Disneyland several times, movies, that type of thing,

10  correct?

11  A.      As a couple, no.  But when I took my family to

12  Disneyland, I did escort or give rides to Bobbi Oawster and

13  her two boys to their grandmother's house who lived in

14  Buena Park and left them there for the days we were at

15  Disneyland.  And there was an occasion that I did take her

16  two boys in to Disneyland with my kids.

17  Q.      Okay.  So in addition to your professional role as a

18  private investigator assisting in her domestic relations

19  matter, you also developed a personal relationship, meaning

20  you took them on vacations, you spent time with them, not

21  just the security portion of your private investigation,

22  correct?

23  A.      Yes.

24  Q.      Now, you indicated that on March 27, 2005, this was

25  Sunday afternoon, that was the date -- the afternoon that

100

1    Mr. Oawster called you on your cell phone, correct?

2    A.      Yes.

3    Q.      And on that date he made the threat that you referred

4    to about your two children that were -- that live with you

5    essentially and call your kids, Melissa and -- I'm sorry.  It

6    was?

7    A.      John.

8    Q.      John.  Okay.  That's when he made that threat,

9    correct?

10   A.      Yes.

11   Q.      All right.

12           Now, at any time -- You talked about you got kind of

13   a safe room you built in the house, that sort of thing.

14           At any time, after you received that call, did you

15   ever yourself, or cause to be filed on your behalf, a

16   restraining order prohibiting Mr. Oawster from any contact

17   with you?

18   A.      In Sacramento County we -- we made that effort and

19   named me on as a protected party and it was denied.

20   Q.      That was before March 27th, 2005, correct?

21   A.      Probably.

22   Q.      And it is correct that you never sought a restraining

23   order against Mr. Oawster as a result of the threat he made

24   to you on the telephone on March 27th, 2005, correct?

25   A.      I only sought the advice and opinion of the public

101

1   safety officers that I talked to.

2   Q.      Just answer my question, Mr. Toler.

3           THE COURT:  He just did.  He said that I only sought

4   the advice of the public safety officers.  That means he

5   didn't seek anything else.

6           MR. CASSIDY:  I will so stipulate that, but I'm not

7   sure he said it affirmatively in response to my question.

8   BY MR. CASSIDY:

9   Q.      That afternoon you called and spoke initially with

10  the Fairfield Police Department to report that incident,

11  correct?

12  A.      Yes.

13  Q.      And an officer actually responded to your residence

14  to take a report, correct?

15  A.      Yes.

16  Q.      And that officer was Officer Strictland?

17          Correct?

18  A.      Okay.

19  Q.      You don't have any recollection of who it was?

20  A.      No.

21  Q.      Now, the -- and you provided your account of what you

22  recall Mr. Oawster saying to you on that telephone call that

23  he made within an hour or two previously, correct?

24  A.      Yes.

25  Q.      All right.

102

1            Now, at some point you told Officer Strictland that

2    you had provided the Solano County District Attorney's office

3    with a thick portfolio regarding Mr. Oawster's history,

4    correct?

5    A.      No.

6    Q.      You did not?

7    A.      No.

8    Q.      Where did you leave it off with Officer Strictland?

9    What did Officer Strictland tell you was going to happen

10   next?

11   A.      That he was going to investigate the allegation and

12   that it would be forwarded to the district attorney's office.

13   Q.      In fact, you insisted that it be forwarded to the

14   district attorney's office, correct?

15   A.      Yes.

16   Q.      Okay.  And the investigation, you understood, based

17   on your conversation with the officer, would involve them

18   trying to contact Mr. Oawster, correct?

19   A.      Yes.

20   Q.      Okay.  Now, did they give you any time frame as to

21   when to expect that investigation would be complete?

22   A.      No.

23   Q.      Okay.  You then, several days later, either the

24   Monday following, the Tuesday following, maybe the Wednesday,

25   you went to the Solano County District Attorney's office to

1    find out about the status of the report, correct?

2    A.      I did after I went to the Fairfield Police Department

3    to ask if the report had been forwarded.

4    Q.      Did you actually talk with the officer that had taken

5    the report?

6    A.      No.

7    Q.      Okay.  So someone else told you that they thought the

8    report had been sent over to the DA, correct?

9    A.      Yes.

10   Q.      And you never actually spoke with the officer that

11   took the report, correct, after that Sunday afternoon,

12   correct?

13   A.      I don't believe so.

14   Q.      Now, when you went to the district attorney's office,

15   the first person you spoke with was Special Investigator --

16   Supervising Investigator Brook Byerley, correct?

17   A.      I didn't know his title, but his name was definitely

18   Brook Byerley.

19           MR. GONZALEZ:  I'm sorry, Your Honor.  I object.  I

20   think he means the first person other than the reception

21   people obviously.

22           THE COURT:  Well, nobody said anything about it.  I

23   don't know whether he spoke to a receptionist or not.

24           Did you speak to the receptionist before you spoke to

25   Mr. Byerley?

104

1                    THE WITNESS:  Yes, Your Honor.

2                    THE COURT:  All right.

3       BY MR. CASSIDY:

4       Q.     Now, you advised Investigator Byerley there was

5       supposed to be a report at the DA's office from the Fairfield

6       Police Department, correct?

7       A.     I didn't advise him of anything.  I had come in to

8       start a conversation with him on a report that was either

9       there or somewhere within the trail that might -- I'm not

10      sure of the chain of command of the paperwork.  So I thought

11      somebody in his office might have it.

12                    He came out the door to speak to me at random.  I

13      didn't specifically ask for him.

14      Q.     At that time Brook Byerley told you the district

15      attorney's office had not received the Fairfield Police

16      Department report, correct?

17      A.     He told me he didn't know what I was talking about,

18      so I guess that was his...

19      Q.     At some point he told you that the district

20      attorney's office did not have the report, correct?

21      A.     Why do you say that?

22      Q.     I'm asking you.

23                    THE COURT:  He's asking questions.  You don't get to

24      sir.

25                    THE WITNESS:  Yes, sir.

CATHERINE E.F. BODENE, OFFICIAL COURT REPORTER, USDC
(916) 446-6360

1          THE COURT:  The question is:  Did he tell you, as

2    best you can recall, that the district attorney's office did

3    not have the report yet?

4          THE WITNESS:  No.

5    BY MR. CASSIDY:

6    Q.     And after you told him what you were interested in,

7    Investigator Byerley did not take your name, correct?

8    A.     That's correct.

9    Q.     And he did not take your phone number, correct?

10   A.     Well, I'm not saying he didn't remember it, but I did

11   not see him write anything down.

12   Q.     But he --

13   A.     I certainly told him my name.

14   Q.     Did you tell him your phone number?

15   A.     I don't recall.

16   Q.     But he was disinterested in whatever you had to say,

17   right?

18   A.     That was my inclination.

19   Q.     So Investigator Byerley did not take down any

20   information, for instance, the report number, did he?

21   A.     Well, I wouldn't have had the report number.

22   Q.     So you weren't able to tell him -- were you able to

23   tell him what officer took the report, or did he just not

24   care about that?

25   A.     I don't recall if we talked about the officer's name

106

1   or if I would have had that.

2   Q.      Okay.  And you left it off with your understanding

3   was Brook Byerley was not going to do anything about what you

4   told him, correct?

5   A.      He seemed very disinterested.

6   Q.      I mean, you left with the impression that Brook

7   Byerley wasn't going to do a thing, and if you were going to

8   get anywhere, you were going to have to come back and talk to

9   the district attorney, correct?

10  A.      I didn't feel that he was -- had any sense of

11  urgency.  So he may have done something at the pace he would

12  have maybe acted on a stolen bicycle, but I didn't see him

13  show any concern or offer any advice or any solutions or

14  safety information concerning the threats to my kids.

15  Q.      Now, you then -- by the way, after you left there,

16  did you contact the Vacaville -- or the Fairfield Police

17  Department again to find out what the status of the report

18  was?

19  A.      I went right back over there.

20  Q.      What did they tell you?

21  A.      They said:  We'll look into it.

22  Q.      Okay.  Now, the next time, other than you said you

23  stopped by when you would be across the street at the

24  courthouse, the next time you had any contact with any

25  persons other than the receptionist was when you stopped in

107

1    on April 7th, correct?

2    A.      I couldn't get beyond the receptionist.  They had

3    quite a barricade there.

4    Q.      And the receptionist -- When you came in those other

5    times, did the receptionist tell you that the district

6    attorney's office had not yet received the report?

7    A.      That never was -- My interaction with the

8    receptionist was to either leave a message for the district

9    attorney or inquire as to whether or not the district

10   attorney had received the numerous messages I had already

11   left.

12   Q.      Okay.  So fair to say then, when you went in on those

13   other occasions, before this April 7th event, you never

14   walked up to the receptionist and said:  Gee, you know, I

15   talked with Investigator Brook Byerley.  Can I see him again

16   and talk to him about what the status is of my prior

17   conversation?

18           Correct?

19   A.      I did not ask to see Mr. Byerley again.

20   Q.      Thank you.

21           Now, by the way, you said, when you were talking with

22   Mr. Byerley in that first week, that week of March 28th, you

23   indicated that you had that portfolio of materials with you,

24   correct?

25   A.      Could you ask that again, please.

108

1    Q.      When you spoke with Mr. -- Supervisor -- withdrawn.

2            When you spoke with Investigator Byerley in that

3    first couple of days of the week of March 28th, you said you

4    had this two-inch portfolio of material with you regarding

5    Mr. Oawster?

6    A.      Yes.

7    Q.      And did you offer to provide a complete copy of that

8    to Investigator Byerley?

9    A.      I offered to go over it with him right there in the

10   lobby and maybe have a conversation.

11   Q.      And he advised you that he first needed to see the

12   police report, correct?

13   A.      He stated:  What do you expect me to do without a

14   police report.

15   Q.      Now, the next time that you appeared at the district

16   attorney's office other than to reception, was when you

17   arrived on April 7th, correct?

18   A.      Other than the receptionist, yes, sir.

19   Q.      All right.  And you -- your first conversation with

20   anybody was with Linda Jones, correct?

21   A.      Yes.

22   Q.      All right.

23           And at that time, when you spoke with Linda Jones,

24   you did not tell Linda Jones that you had been there

25   previously and spoken with Investigator Byerley, correct?

109

1    A.      I was there on the same -- with the same intent in my

2    mind, which was to request an appointment or a phone call

3    from the elected district attorney.  I wasn't there to speak

4    to Mr. Byerley.

5    Q.      You didn't -- In all the times you went to the

6    district attorney's office, fair to say, Mr. Toler, you

7    didn't want to deal with anybody else other than the elected

8    district attorney Mr. Paulson, correct?

9    A.      I think after they -- they displayed their behavior

10   to me, it was -- it would have probably taken the district

11   attorney to share with me what his policy and philosophy was

12   about the well-being of children.

13   Q.      Just so I'm clear, it had nothing to do with your

14   conduct, it was always the conduct of everybody at the

15   district attorney's office, correct?

16   A.      You know, the receptionist was always extremely kind.

17   Q.      Okay.  So after you speak with Miss Jones, you either

18   speak with Mr. Butler or Miss Johnson.  Which is it?

19   A.      Miss Johnson.

20   Q.      Okay.  And so she came to speak with you before

21   Mr. Butler, correct?

22   A.      She stepped within eight or ten feet of the plexiglas

23   divider, and we attempted to communicate a little bit.

24   Q.      Okay.  And you understood, when you spoke with

25   Miss Johnson, that in her position she was the one that

110

1    coordinated meetings with Mr. Paulson, correct?

2    A.      I asked her if she was the person that could make or

3    tell me a time that she could make a meeting with

4    Mr. Paulson, and she refused to either make that time and

5    date available or give me a time and date when I could come

6    back or be called as to what date would be available.

7    Q.      What Miss Johnson said to you, Mr. Toler, was that

8    Mr. Paulson keeps his own calendar, but if you give me your

9    name and number, I'll try to set the appointment for you,

10   correct?

11   A.      How would you know that?

12           THE COURT:  Don't argue with him, sir.

13           THE WITNESS:  I'm sorry.

14           THE COURT:  The question is:  Did she say that?

15           THE WITNESS:  No, sir, she did not.

16   BY MR. CASSIDY:

17   Q.      Okay.  Now, as I understand it, during your

18   discussion, if you will, with Miss Johnson, you've described

19   it as you were pissed off, correct?

20   A.      Yes.

21   Q.      All right.

22           And whether it be a loud voice or yelling, it was

23   either or.  You were in a heated moment.  You were talking

24   loudly or yelling at Miss Johnson, correct?

25   A.      I was increasingly concerned with the well-being of

111

1    my children.

2    Q.      Did I hear a "yes" in there?

3    A.      Yes, sir.

4    Q.      Okay.  So the next person in order that gets called

5    out to try to talk to you is Mr. Butler -- Warren Butler?

6    A.      You know, if I had a conversation with Mr. Butler, I

7    don't remember it.

8            After my conversation, if you would like to call it

9    that, with Miss Johnson, I traveled from where I was standing

10   talking to her to the elevator and had pushed the button when

11   I remember having my next conversation with a kind gentleman

12   by the name of William Godwin.

13   Q.      So it is fair to say, Mr. Toler, that you were so

14   worked up in that lobby area of the district attorney's

15   office that if you spoke with someone other than Linda Jones

16   and Marsha Johnson, you have no recollection of it, correct?

17   A.      If I go to talk to my boy's math teacher, I'm not

18   concerned with talking to their English teacher.  Okay.

19   Q.      Is the answer "yes," sir?

20           THE COURT:  No.  You put the question in an

21   argumentative form.  He replied in an argumentative form.

22           If you want to ask a question, perhaps you can get an

23   answer.

24           Do you have any recollection of talking -- you

25   already indicated you have no recollection of talking to

112

1    Mr. Butler, correct?

2              THE WITNESS:  That's correct, Your Honor.

3              THE COURT:  If you want to make an argument, you can

4    do it at the end of the case, sir.

5              MR. CASSIDY:  Thank you, Your Honor.

6    BY MR. CASSIDY:

7    Q.       Now, when Mr. Godwin stepped out and approached you

8    at the elevator area, did he ask you to calm down?

9    A.       No.

10   Q.       He just said to you:  Will you talk to me, sir?

11   A.       Yes, he did.

12   Q.       That was that, you just went in to the conference

13   room and started your discussion, correct?

14   A.       Yes.

15   Q.       Okay.  And Investigator Godwin then spent at least 20

16   minutes, if not a half-an-hour, reviewing this entire matter

17   involving Mr. Oawster's threat with you, correct?

18   A.       That's fair.  Probably so, yes.

19   Q.       When you left it off with Investigator Godwin -- By

20   the way, when you were in the conference room, did any of the

21   other investigators or anyone else kind of check in, see if

22   everything was okay?

23   A.       I believe there was one of the investigators.  I

24   believe it was Brook Byerley that passed through and says:

25   Is everything going to be okay?

113

1   Q.      All right.  And I take it Investigator Godwin said

2   that it is fine?

3   A.      Yes.

4   Q.      Okay.  So you then explained to Mr. Godwin what's

5   going on.  By the way -- withdrawn.

6           At the some point in this discussion you've learned

7   that the district attorney's office only received the report

8   from the Fairfield Police Department that morning, correct?

9   A.      No.

10  Q.      Never learned that?

11  A.      No.

12  Q.      Okay.  So after you left -- at the time you left the

13  district attorney's office on April 7th, 2005, you were not

14  aware that they had received -- the district attorney's

15  office had received the report from the Fairfield Police

16  Department that morning?

17  A.      That's correct.  I was not aware of that.

18  Q.      Now, when you left it off with Mr. Godwin, it was --

19  he was telling you that he was not sure he could look into

20  it, but you had the impression it was going to be several

21  weeks at least before he could do anything, correct?

22  A.      I had the impression that I was at least dealing with

23  a public safety officer that had courtesy, that showed some

24  concern, and that had a conversation with me, and that most

25  likely he would be able to go back in that tunnel of offices

114

1    and knock on the person's door that could best help my

2    children.  That's what I believed.

3    Q.      Okay.  But as I understood the timing -- your

4    expectation as to the timing, when he could do it, was there

5    would be several weeks' delay in his taking any action,

6    assuming he could take action investigating your matter?

7    A.      There was no promise of what he -- he made no

8    commitments other than stating generally he would see what he

9    could do.

10   Q.      Now, by the way -- Excuse me one moment here.

11           When you met with Investigator Byerley in these first

12   few days in the week of March 28th, did you at any time state

13   to him:  Don't make me defend my kids?

14   A.      At one date I made that statement.

15   Q.      Did you -- Do you recall, did you make that to

16   Investigator Byerley?

17   A.      I remember making that statement to -- while I was

18   speaking to Marsha Clark or Marsha Johnson.

19   Q.      And so you have no recollection of making that

20   comment to Investigator Byerley, correct?

21   A.      No.

22   Q.      So the answer is "yes, you have no recollection"?

23   A.      Okay.  Yes.

24   Q.      I can't have a double negative.  Sorry.

25           Now, when you met with Investigator Godwin in the

115

1    conference room, did you make any comment to him to the

2    effect that if Oawster takes any action against your kids,

3    that you would kill him?

4    A.      I certainly would have said something like that.

5    This is back a little while so I would -- I think in -- I

6    think probably, yeah, yes.

7    Q.      Now, before Investigator Godwin had intervened, if

8    you will, at the elevator, and asked to speak with you, you

9    were really mad at the district attorney, correct?

10   A.      Well, I was certainly mad at the office he

11   represented and at the way he handled his office, but I don't

12   know the man personally to be mad about him as a person.

13   Q.      But you were upset with the way you had been treated

14   in not being able to meet with him, correct?

15   A.      I was upset they would not, as a public safety

16   office, step in and help me help them protect my children.

17   Q.      Because as far as you were concerned, up to the point

18   you were there on April 7th, they had done nothing, correct?

19   A.      How many days would you like me to wait?

20           THE COURT:  No, sir.

21           THE WITNESS:  I'm sorry.

22           THE COURT:  Up until then, as far as you knew, they

23   had done nothing; is that right?

24           THE WITNESS:  That's correct.

25   ///

116

1    BY MR. CASSIDY:

2    Q.      Now, after you meet with Investigator Godwin in the

3    conference room, you met with him at least three -- on at

4    least three other occasions prior to June 12th or 13th,

5    correct?

6    A.      I'll take your word for the date, but we met two or

7    three times.

8    Q.      And just to identify the locations, you met with

9    Investigator Godwin in a parking lot on one occasion,

10   correct?

11   A.      Yes.

12   Q.      And you met him at least two other times at a

13   Starbucks coffee shop?

14   A.      Yes.

15   Q.      Sat outside and talked with him, correct?

16   A.      Yes.

17   Q.      Now, on those occasions Investigator Godwin would

18   fill you in as to what the status was of his looking into the

19   complaint you had made that Oawster had threatened your

20   children, correct?

21   A.      No.

22   Q.      Never advised you of the status of any investigation

23   on his part, correct?

24   A.      I didn't say "never."

25   Q.      I am just asking about those three meetings.

117

1    A.      Would you like to take them one at a time?

2    Q.      I will.

3    A.      Okay.

4    Q.      All right.

5            So your first meeting is in the parking lot in

6    Vacaville, correct?

7    A.      Okay.

8    Q.      Well --

9    A.      I don't remember which was first or second.  I have

10   no reason to challenge it.  I believe I met with him probably

11   three times.

12   Q.      All right.  And --

13           THE COURT:  Sir, at any time -- I think we can

14   shortcut this.

15           At any time did Mr. Godwin advise you about his

16   progress in investigating the case?

17           THE WITNESS:  Yes.  Yes, Your Honor.

18           THE COURT:  See how easy that is.

19   BY MR. CASSIDY:

20   Q.      Did you learn that Investigator Godwin had gone and

21   investigated the report that had been made by John Confer

22   regarding the threat Mr. Oawster had made to him?

23   A.      Yes.

24   Q.      Did you learn in any of those meetings that

25   Mr. Godwin -- Investigator Godwin had gone and meet with

118

1      Mr. Oawster?

2      A.      No.

3      Q.      Did you learn from Investigator Godwin in any of

4      those meetings that he had made calls to CDC to look into the

5      status of Mr. Oawster's employment?

6      A.      No.

7      Q.      Did you learn from Investigator Godwin that after

8      looking into some of the information you had provided him,

9      and the investigation that he had conducted, that he had met

10     with a deputy district attorney, a charging attorney is what

11     they're called, and had reviewed all of his investigation,

12     the Fairfield Police Department report, and there had been a

13     determination made that the Solano County District Attorney's

14     office was not going to file charges against Mr. Oawster?

15             MR. GONZALEZ:  I'm sorry, Your Honor.  I'm going to

16     object.  Is he also qualifying this question with "at any of

17     those meetings."

18             MR. CASSIDY:  Yes.

19             THE COURT:  Yes.  That's the problem.  The witness

20     says, in all candor, I don't recall which meetings these

21     conversations took place.  Therefore, it is perfectly

22     legitimate to say:  At any of these meetings did Mr. Godwin

23     tell you the charging DA decided not to proceed with the

24     case?

25             THE WITNESS:  Not at the meetings, no.  The three

1  meetings you referred to, the two in the parking lot, the one

2  at Starbucks, I was never advised that the charging district

3  attorney had refused to take any action in protecting my

4  children.

5  BY MR. CASSIDY:

6  Q.      Did Investigator Godwin ever provide you that

7  information?

8  A.      I recall during a phone call with him, after he met

9  with Mr. Oawster, he advised me that they were not going to

10 do anything, in those words.

11 Q.      Did you ask him if he had reviewed it with a charging

12 deputy district attorney?

13 A.      Well, no.

14 Q.      Did he tell you he had reviewed it with the charging

15 DA?

16 A.      He said:  "They" were not going to do anything with

17 the case.

18 Q.      In any of the meetings you had away from the district

19 attorney's office with Investigator Godwin, did he ever

20 explain to you that the reason he wanted to meet with you

21 away from the district attorney's office is that you had

22 scared the receptionist and the staff in the district

23 attorney's office?

24 A.      No.

25        I should probably mention that information he had

120

1  requested of me, the proof of the phone call made from

2  Mr. Oawster, I delivered it to the district attorney's office

3  to him.

4  Q.    So you dropped off that copy, and that was a copy of

5  your cell phone record or Mr. Oawster's?

6  A.    Mr. Oawster called from his house line, and it was

7  evidence that he made that call on that date and time from

8  the line in his home to the line in my home.

9       THE COURT:  The question was:  Was the piece of paper

10 your phone record or Mr. Oawster's phone record, if you

11 remember?

12      THE WITNESS:  It was Mr. Oawster's phone record.

13 BY MR. CASSIDY:

14 Q.    So you were able to obtain his home phone record in

15 some manner?

16 A.    Yes.

17 Q.    Now, I'm going to refer you to exhibit -- let's go

18 to, if you would please, refer to Exhibit 5.

19      THE COURT:  I think we're starting a new topic

20 entirely, are we?

21      MR. CASSIDY:  A little bit.

22      THE COURT:  Ladies and Gentlemen, I think that's

23 enough for today.

24      We'll see you tomorrow morning at -- I always turn to

25 Ana and she tells me, but Ana is not here.  9:15.

121

1          Please, remember the admonition the Court has

2     heretofore given to you.

3          Stand in recess.

4          (Off the record at 4:01 p.m.)

5                         --o0o---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
     STATE OF CALIFORNIA  )
4    COUNTY OF SACRAMENTO )

5


6           I certify that the foregoing is a correct transcript
7
     from the record of proceedings in the above-entitled matter.
8


9

10                 IN WITNESS WHEREOF, I subscribe this
     certificate at Sacramento, California on this 19th day of
11   MARCH, 2010.

12


13

14   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
15        Official United States District Court Reporter

16

17

18

19

20

21

22

23

24

25